## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALAN MATTHEW SPADONE
425 Autumn Parc Court
Fenton, MO 63026

                 Plaintiff,

v.

JOHN M. McHUGH
Secretary of the Army
101 Army Pentagon
Washington, DC 20310

                 Defendant.

Case No. _____

### COMPLAINT FOR INJUNCTIVE RELIEF

      This action seeks review of a decision by Defendant to disenroll Plaintiff from the United

States Military Academy ("West Point" or "the Academy") and ordering Plaintiff to serve for

two years as an enlisted soldier in the United States Army. This action further seeks an order

from this Court requiring Defendant to afford Plaintiff the opportunity to re-enroll and complete

his education at West Point. In the alternative, this action seeks an order from this Court

prohibiting Defendant from ordering Plaintiff to active duty as an enlisted soldier.

### PARTIES

      1. Plaintiff, Alan Matthew Spadone ("Cadet Spadone"), is a United States citizen who

resides at the address stated in the caption. Until he was suspended in December 12, 2010, Cadet

Spadone was enrolled in full-time study at West Point as a member of the United States Corps of

Cadets ("USCC").

2. Defendant, the Honorable John McHugh, is the Secretary of the Army. He is the civilian head of the Department of the Army, an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 10 U.S.C. § 4334. See also, Dunmar v. Ailes, 348 F.2d 51, 53 (D.C. Cir. 1965) (noting that the D.C. Circuit has recognized "that the District Court may review actions by military authorities which violate their own established regulations.").

4. Venue lies in this Court pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1402(a)(2).

5. By filing this complaint with this Court, Cadet Spadone expressly waives any right or entitlement to recover monetary damages greater than $10,000 in this action.

## STATUTE OF LIMITATIONS AND
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. On August 26, 2011, Cadet Spadone was notified that Defendant, acting through the Assistant Secretary of the Army for Manpower and Reserve Affairs, had ordered that Cadet Spadone be disenrolled from West Point and had ordered Cadet Spadone to serve for two years as an enlisted soldier in the United States Army.

7. Pursuant to 28 U.S.C. § 2401(a), this type of claim must be filed within six years after such claim first accrues.

8. Cadet Spadone's claim first accrued on August 26, 2011.

9. Cadet Spadone need not exhaust all administrative remedies before bringing this action. As this Court has noted, "[T]he U.S. Supreme Court has held that exhaustion of

administrative remedies is not required prior to seeking judicial review under the [Administrative

Procedures Act], when neither the relevant statute nor agency rules specifically mandate

exhaustion as a prerequisite to judicial review." Wilhelm v. Caldera, 90 F. Supp. 2d 3, 7 (D.D.C.

2000) (citations omitted) aff'd, 6 F. App'x. 3 (D.C. Cir. 2001).

10. Neither the relevant statute (10 U.S.C. §§ 4331 through 4361) nor agency rules

(Army Regulation 210-26, Chapter 6) specifically mandate exhaustion of administrative

remedies as a prerequisite to judicial review.

## FACTS

### a. Cadet Spadone's Enrollment at West Point and Efforts to Participate in Study Abroad Program

11. West Point is a public institution, supported by taxpayer funds appropriated from the

United States Congress.

12. The students at West Point are members of the United States Army with the rank of

"Cadet." Collectively, the student body of West Point is the "United States Corps of Cadets"

["USCC"].

13. Cadet Spadone enrolled at West Point on July 2, 2007, thereby joining the United

States Corps of Cadets.

14. Prior to enrollment at West Point, Cadet Spadone was a civilian without any military

obligation.

15. For academic years 2007-2008, 2008-2009, and 2009-2010, Cadet Spadone was

awarded the Superintendent's Award for Achievement. This honor is given to cadets whose

performance places them in the top 10% of their class, as determined by cumulative average of

grades for academic, physical and military ability.

16. In February 2009, during his second year at West Point, Cadet Spadone was given

permission by Academy faculty member Brent Matthews to apply for a study abroad program through Pembroke College at the University of Cambridge (the "Study Abroad Program" or the "Program"). Mr. Matthews additionally wrote a letter of recommendation advocating Cadet Spadone's acceptance into the Study Abroad Program.

17. On July 1, 2009, Cadet Spadone was notified that he was one of ten (10) students worldwide accepted into the Study Abroad Program.

18. Although the University of Cambridge accepted Cadet Spadone into the Study Abroad Program, Cadet Spadone still required final authorization from West Point to enroll in the Program.

19. On July 1, 2009, Cadet Spadone notified Academy faculty of his acceptance in the Study Abroad Program and requested final approval for his participation in the Program.

20. Various professors and department chairs signed their support for Cadet Spadone's enrollment in the Study Abroad Program, and Cadet Spadone was allowed to rearrange his course schedule in anticipation of participation in the Program. However, final authority for Program approval was vested in West Point's Dean of the Academic Board (the "Dean").

21. Cadet Spadone had decided that, if West Point denied his enrollment in the Study Abroad Program, he would resign from West Point before the commencement of his third year in order to participate in the Program.

22. Cadets who enter the USMA directly from a civilian status have no active duty service obligation and will be discharged, with their military service obligation waived, if they resign or are separated from West Point prior to the commencement of their third year.

23. By contrast, cadets incur a military service obligation and/or obligation to repay the cost of their education if they resign or are separated from West Point subsequent to the

4

commencement of their third year.

24. The military service obligation incurred by cadets after they commence their third year of study includes two (2) additional years of study at West Point, five (5) years of active duty service as an officer in the United States Army, and three (3) years of service in the United States Army Reserves. As such, the military service obligation incurred after a cadet begins his/her third year of study at West Point represents the following ten (10) years of a cadet's life.

25. From April through August of 2009, during the spring of his second year and summer leading up to his third year, Cadet Spadone took extraordinary measures to seek a final determination from West Point's Dean on approval of the Study Abroad Program. Cadet Spadone called West Point frequently during the summer of 2009, and personally visited West Point during his two-week vacation period in an effort to learn whether the Dean would approve of Cadet Spadone's enrollment in the Program.

26. At the commencement of Cadet Spadone's third year at West Point (and thus the initiation of Cadet Spadone's military service obligation), notwithstanding Cadet Spadone's efforts, the Dean still had not provided Cadet Spadone with a final determination on whether the Study Abroad Program would be approved. Relying on West Point's actions in support and anticipation of the Program, Cadet Spadone began classes for his third academic year.

27. On September 2, 2009, less than three weeks after commencement of Cadet Spadone's third year at West Point and the initiation of his military service obligation, the Dean informed Cadet Spadone that the Dean would deny Cadet Spadone's application to the Study Abroad Program.

28. The Dean thus took 64 days to render a relatively simple decision, which, if rendered three weeks earlier, would have allowed Cadet Spadone to resign from West Point without

5

incurring a military service obligation and would have allowed Cadet Spadone to further consider whether a military career was the best choice for him.

29. At the September 2nd meeting, the Dean also informed Cadet Spadone that the Dean might reconsider his denial if outside funds for the Program were available.

30. During the subsequent four weeks, Cadet Spadone successfully raised $25,000 from private donors – enough to fund his participation in the Study Abroad Program.

31. On or about October 1, 2009, the Dean was notified that Cadet Spadone had raised sufficient funds to pay for his participation in the Study Abroad Program.

32. On or about October 2, 2009, the Dean's office notified Cadet Spadone via electronic mail that the Study Abroad Program did not correspond to West Point's more general semester abroad program, and thus that the Dean would again deny Cadet Spadone's Program application despite the availability of private funds to pay for Cadet Spadone's participation in the Program.

### b. **Honor Code Violation**

33. Cadet Spadone was accused of submitting academic assignments that were not his own work on or about October 27, 2009 and November 19, 2009.

34. Cadets at West Point are required to adhere to an internal policy known as the "Cadet Honor Code", which states, "A cadet will not lie, cheat, steal, or tolerate those who do."

35. The Cadet Honor Code is administered by the Honor Committee, a cadet-led organization that is part of the United States Corps of Cadets.

36. When a member of West Point's academic faculty becomes aware of a possible Honor Code violation, the faculty member is required to conduct an "approach for clarification."

37. Cadet Spadone was approached for clarification regarding the alleged Honor Code violations on or about November 23, 2009.

38. As part of the investigation into his alleged Honor Code Violation, Cadet Spadone was interviewed by Academy faculty members Major Anthony George, Dr. Terri Sabatos, and Cadet Adam J. Bishop with respect to his suspected Honor Code violation.

39. Cadet Spadone was not informed of his right to remain silent until after the interviews with superior officers and Academy faculty.

40. Cadet Spadone reasonably believed that he was required to answer questions posed in furtherance of the Honor Code investigation by a superior officer, faculty member, and member of the Honor Committee.

41. The Honor Committee was informed of the alleged Honor Code violation on or about November 30, 2009.

42. On March 8, 2010, pursuant to its internal policies, the Honor Committee conducted an Honor Investigative Hearing (the "HIH") into Cadet Spadone's conduct.

43. Cadet Spadone understood that cadets who admitted to allegations of Honor Code violations were awarded more lenient punishment than cadets who contested such allegations. As a result, Cadet Spadone admitted at the March 8th hearing to submission of assignments that were not his own work.

44. The HIH found that Cadet Spadone had violated the Honor Code by cheating.

45. West Point's Superintendent must confirm HIH findings and assign punishment for Honor Code violations. He is provided a recommendation for his decision by the Commandant of Cadets.

46. On April 19, 2010, Cadet Spadone was questioned about his purported violation by a panel composed of the Commandant of Cadets, USCC Command Sergeant Major, five (5) cadets who were members of the Cadet Honor Committee, and Cadet Spadone's Tactical Officer.

47. After approximately ninety (90) minutes of questioning by the panel, the Commandant of Cadets indicated that Cadet Spadone had not properly shown contrition and/or accepted responsibility for the alleged Honor Code violations. Cadet Spadone thus was forced to stand with his body rigid in a military posture and read aloud the "Cadet's Prayer." The Prayer states in part, "O God, our Father, Thou Searcher of human hearts, help us to draw near to Thee in sincerity and truth. May our religion be filled with gladness and may our worship of Thee be natural...Help us to maintain the honor of the Corps untarnished and unsullied and to show forth in our lives the ideals of West Point in doing our duty to Thee and to our Country."[1]

48. The Commandant of Cadets made clear that the requirement for Cadet Spadone to read the prayer aloud was an order from a superior officer to a subordinate, and that failure to read the prayer aloud and consider its meaning as it applied to Cadet Spadone's case would result in a less favorable outcome of the panel inquiry. The Commandant of Cadets's order further indicated West Point's position that Cadet Spadone was required for religious reasons to admit to his purported dishonesty.

49. On May 3, 2010, acting on the recommendation of the Commandant of Cadets, West Point's Superintendent approved the findings of the HIH.

50. Approximately 162 days passed from the date Cadet Spadone was approached for clarification until the date West Point Superintendent approved the findings of the HIH.

51. In conjunction with the Superintendent's findings of an honor code violation, the Superintendent determined that Cadet Spadone's graduation should be delayed one year, until May 2012. The Superintendent further determined that Cadet Spadone should be placed in a "suspended separation status" until his graduation.

52. The suspension of Cadet Spadone's separation from West Point was conditioned

---

[1] Cadet's Prayer, listed at http://www.usma.edu/chaplain/cadetprayer.htm.

upon, *inter alia*, Cadet Spadone's future exemplary conduct and his compliance with the
requirements of West Point's Honor Mentorship Program (the "HMP").

53. Cadet Spadone further was suspended from academic duty and thus was not allowed
to participate in the normal summer programs offered to West Point cadets. In addition, Cadet
Spadone was required to wear a brass insignia on his daily class uniform publicizing his dishonor
to fellow cadets and Academy faculty.

54. As a result of his experience with the purported honor code violation, Cadet Spadone
began to struggle with symptoms of depression and occasionally entertained suicidal ideations.
Cadet Spadone had never previously experienced any signs of depression or considered thoughts
of suicide.

### c. Cadet Spadone's Compliance with the Honor Mentorship Program and Disenrollment from West Point

55. Upon returning from summer break in August 2010, Cadet Spadone confided in a
fellow cadet that Cadet Spadone had entertained suicidal ideations. As a result, and with Cadet
Spadone's consent, Cadet Spadone spent the first two weeks of the 2010-2011 academic year in
a medical facility undergoing psychological evaluation.

56. Prior to beginning classes for the 2010 academic year, Cadet Spadone met with his
Tactical Officer, Major Michael Denehy, to discuss whether his resignation from West Point at
that time would result in a military service obligation. Cadet Spadone also met with West
Point's Chief of Legal Assistance, Michael Barrett, to discuss the same issue. Both faculty
members indicated that Cadet Spadone had already incurred his military service obligation and
thus that resignation at that time would result in a requirement that Cadet Spadone serve as an
enlisted soldier in the United States Army.

57. On or about September 2, 2010, upon returning to West Point from his psychological

evaluation, Cadet Spadone began his participation in the HMP. Cadet Spadone's participation was initiated by a verbal briefing from a fellow cadet outlining the rules and procedures of the HMP.

58. Cadet Spadone complied with HMP requirements by choosing an HMP mentor, engaging in active counseling with his HMP mentor, beginning to draft a Character Self-Assessment and Planning Calendar, and continuing to wear a brass insignia on his uniform publicizing his dishonor to Academy classmates and faculty.

59. The HMP also required that cadets in the program produce written journal entries at least twice a week for the duration of the HMP.

60. If a cadet fell behind in his journal entries, the HMP allowed that cadet to submit three entries per week to make up for the journal entry shortfall.

61. The HMP provides only broad guidelines with respect to requirements for the content of journal entries, stating in relevant part:

> The mentored cadet should write down brief descriptions of events that stimulated or challenged the sense of morality. The mentored cadet should record what confronted him/her, what action(s) taken, and what the cadet was thinking at the time. The issues do not need to be tremendously significant. A small argument with a roommate can provide many opportunities for reflection upon one's values and leadership dimensions. As time progresses, the mentored cadet should record efforts to alter his/her behavior to break bad habits. This will serve to heighten awareness during normal experiences and increase the likelihood that the cadet will try to modify behavior in the future. The goal is to REFLECT upon events that involve the mentored cadet's moral bearings. This should not just be a description of the mentored cadet's daily events.[2]

62. On or about October 20, 2010, after seven weeks in the HMP, Cadet Spadone had

---

[2] USCC PAM 15-1at paragraph 605(c)(3).

submitted nine journal entries.

63. In his first journal entry, Cadet Spadone indicated that he would "talk about what happened leading up to the honor violation and then discuss what happened after the honor violation."[3]

64. The remainder of Cadet Spadone's journal entries dealt with his experiences chronologically from lessons he learned in high school through until his most recent experience undergoing psychological evaluation.

65. In an internal memorandum dated October 22, 2010, Major Jason Daughtry, Special Assistant to the Commandant for Honor Matters, recommended that the suspension of Cadet Spadone's separation be vacated because Cadet Spadone had "neglected to submit any journals that meet the intent of reflection outlined in HMP", and therefore had violated the terms of the HMP.[4]

66. The October 22nd memorandum also stated that Cadet Spadone had not "began [sic] work on any other HMP requirement. Furthermore, [Cadet Spadone's] mentor, Lieutenant Colonel John Billie, believes that he has unresolved issues that will prevent him from being able to participate in the program. Additionally, [Cadet Spadone's tactical officer] reported that he was cleared by a professional at mental health, who stated that [Cadet Spadone] cannot contribute [sic] his actions to any mental condition."[5]

67. In a developmental counseling form, issued to Cadet Spadone on October 26, 2010, Cadet Spadone's Tactical Officer Major Michael Denehy informed Cadet Spadone, "Both your honor mentor and myself [sic] believe that your participation in the program is a failing effort due to your inability to move beyond issues from your past as well as your refusal to live up to

---

[3] Plaintiff's Honor Mentorship Journal, submitted to USMA.
[4] Major Jason N. Daughtry, Memorandum to Plaintiff's Tactical Officer, dated October 22, 2010.
[5] *Id.*

the expectations of you as a member of the program...I am recommending to your chain of command that you be separated from the United States Military Academy on grounds of failure to successfully complete your HMP – a violation of the terms of your suspended separation."[6]

68. Prior to the issuance of the October 26th counseling form, Cadet Spadone was not advised that his journal entries failed to meet the "intent" of the HMP.

69. Prior to the issuance of the October 26th counseling form, Cadet Spadone was not advised that Cadet Spadone had in any way demonstrated an "inability to move beyond issues from his past."

70. Prior to the issuance of the October 26 counseling form, Cadet Spadone was not advised that he would be denied the opportunity (afforded by the HMP regulations) to submit three journal entries per week in order to make up for weeks in which Cadet Spadone fell behind in his required journal entry submissions.

71. On November 30, 2010, the Superintendent issued a memorandum claiming that Cadet Spadone "failed to submit any journal entries that meet the intent of refection as outlined in [the HMP]" and that Cadet Spadone's mentor "believes that [Cadet Spadone] has unresolved issues that will prevent him from successful completion of the HMP."[7]

72. In his November 30th memorandum, the Superintendent noted his determination that Cadet Spadone had violated the terms of Cadet Spadone's suspended separation and requested that Defendant disenroll Cadet Spadone from West Point, transfer Cadet Spadone to the United States Army Reserve for two years, and order Cadet Spadone to active duty for two years as an enlisted soldier in the United States Army.

73. The role, responsibilities, salary, and subsequent military and/or civilian career

[6] Major Michael Denehy, Developmental Counseling Form, dated October 26, 2010.
[7] Lietenant General David Huntoon, Memorandum for Headquarters, Department of the Army, G-1, dated November 30, 2010.

opportunities of an enlisted soldier in the United States Army differ drastically from those of an officer in the United States Army.

74. On December 12, 2010, one day prior to the start of final examinations for Academy classes, Cadet Spadone was notified of the Superintendent's decision.

75. Pursuant to the Superintendent's decision, Cadet Spadone was suspended from West Point and placed on an authorized leave of absence without pay and allowances pending the final decision on his case by Defendant at Headquarters, Department of the Army.

76. Cadet Spadone was not provided an opportunity to present a defense or in any way respond to the allegations that he had failed to successfully complete the HMP. Cadet Spadone was not provided with a hearing, or with any way to present witnesses or evidence on his own behalf.

77. Before leaving West Point, Cadet Spadone was required to sign a form agreeing that he would not pursue educational or employment opportunities that could interfere with a potential enlistment in the United States Army.

78. Before leaving West Point, Cadet Spadone sent an email to fellow cadets and faculty members in which he wrote, "I will be the first to tell you that the journals were provocative, and my tone was angry...It is only with the passage of time that true feelings become evident."[8]

79. On January 6, 2011, after completing the administrative check-out process, Cadet Spadone left West Point and moved back to his parents' home to await a final decision on his case by the Department of the Army.

80. On March 24, 2011, West Point forwarded Cadet Spadone's separation package to Headquarters, Department of the Army for Defendant's decision.

81. Approximately 150 days passed from the date Cadet Spadone was notified of his

---

[8] Email sent from Plaintiff to Academy cadets and faculty, dated January 5, 2011.

13

alleged HMP failure until the date West Point forwarded his paperwork to Headquarters, Department of the Army for Defendant's decision.

82. On August 26, 2011, Cadet Spadone was informed that Defendant, acting through the Assistant Secretary of the Army (Manpower and Reserve Affairs), had signed orders officially disenrolling Cadet Spadone from West Point and ordering Cadet Spadone to serve for two (2) years on active duty as an enlisted soldier.

83. From the date he received notice of the Superintendent's decision on December 12, 2010, until Cadet Spadone received notice of Defendant's final decision on August 26, 2011, a period of 258 days, Cadet Spadone received no official correspondence, information, updates, or guidance from either West Point or from the Secretary of the Army.

84. Throughout these 258 days, Cadet Spadone and Cadet Spadone's counsel repeatedly attempted to glean from West Point and from Defendant updates or an anticipated timetable for a resolution to Cadet Spadone's case. On the occasions when Cadet Spadone or Cadet Spadone's counsel was able to communicate directly with a representative of West Point or Defendant, those representatives were unable or unwilling to provide a date for an expected resolution to Cadet Spadone's case.

85. A total of 305 days passed from the time Cadet Spadone was notified of his purported HMP failure on October 26, 2010, until he was given notice of final disposition of his case on August 26, 2011.

86. Pursuant to Defendant's orders, Cadet Spadone is required to report for enlisted soldier basic training on October 10, 2011.

## STATUTORY AND REGULATORY FRAMEWORK

87. 10 U.S.C. § 4334 (a) provides, "The supervision and charge of West Point is in the

14

Department of the Army, under officers of the Army detailed to that duty by the Secretary of the Army."

88. Under the Administrative Procedures Act (APA), a court may hold unlawful and set aside Department of the Army action if the court determines such action to be arbitrary, capricious, an abuse of discretion, in bad faith, unsupported by substantial evidence, or contrary to law, regulation, or published procedure. 5 U.S.C. § 706(2)(A).

89. Chapter 6 of Army Regulation 210-26, promulgated by order of the Secretary of the Army, governs grounds for the separation of cadets from West Point.

90. Sections 6-16 and 6-17 of Army Regulation 210-26 provide specific guidance with respect to Honor Code violations. Section 6-16(a) directs West Point's Superintendent to establish and maintain a system to administer the Honor Code.

91. Section 7-3 of Army Regulation 210-26 sets forth the respective duties and responsibilities of the Superintendent and the Department of the Army with respect to the separation of cadets from West Point.

92. Army Regulation 612-205 provides guidance for the disposition of Academy cadets who resign or are separated from West Point, based on the number of years spent at West Point. Table 3 indicates that cadets will be discharged without a military service obligation if they resign or are separated before the start of their third year, but will incur a military service obligation if they resign or are separated after the start of their third year.

93. West Point's internal procedures with respect to administration of the Honor Code are summarized in the United States Corps of Cadets' Pamphlet 15-1. Chapter 3 of Pamphlet 15-1 sets forth procedures for honor code investigations. Chapter 6 of Pamphlet 15-1 outlines requirements of the Honor Mentorship Program.

94. Appendix 2-1-1 is a form designed to provide notice to cadets of their rights, including the right to remain silent pursuant to Academy regulations and Article 31 of the Uniform Code of Military Justice.

95. USCC PAM 15-1, para. 204, states the Army's internal procedure that "standard processing time for honor cases, under normal circumstances, is 40 days from inception through a finalized decision by the Superintendent."

96. In a letter from the Secretary of the Army to the U.S. Military Academy Superintendent, dated 9 Feb. 1979, the Secretary wrote:

Excessive delays...cannot be tolerated. They are not fair to accused cadets, to their fellow cadets, to West Point, or to the Army. Therefore I am adopting the following policy. Except under the most unusual circumstances, I will not approve separation, or any other sanction requiring my action, in a cadet honor proceeding which has not been completed at the Military Academy and received at Headquarters, Department of the Army, *within 60 days* of the date on which a specific report of any included honor violation was made to the accused cadet's Company Honor Representative. Defense requested delays may be excluded.[9]

## LEGAL CLAIMS

### Count 1

**The Defendant's action was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise contrary to law, thus violating the Administrative Procedures Act.**

---

[9] Major John H. Beasley, The USMA Honor System-A Due Process Hybrid, 118 Mil. L. Rev. 187, 212-213 (1987) (quoting Letter from Secretary of the Army Clifford L. Alexander to U.S. Military Academy Superintendent LTG Andrew J. Goodpaster (9 Feb. 1979) [*emphasis added*]).

97. Cadet Spadone repeats the allegations as previously set forth herein.

98. In reviewing the disenrollment from the Naval Academy and discharge from Naval service of a midshipman, this Court has held that it maintained the authority under the APA to make an "assessment of whether the Secretary of the Navy's decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [citation omitted].'" Stainback v. Sec'y of Navy, 520 F. Supp. 2d 181, 185 (D.D.C. 2007).

99. Cadet Spadone complied with HMP requirements by choosing an HMP mentor, engaging in active counseling with his HMP mentor, beginning to draft a Character Self-Assessment and Planning Calendar, and wearing a brass insignia on his uniform publicizing his dishonor to Academy classmates and faculty.

100. The HMP regulations provide no ascertainable standard to determine whether a cadet's journal entries "violated the intent" of the regulations, nor did Academy staff notify Cadet Spadone that he was in violation of such undefined intent prior to the beginning of separation proceedings against him.

101. The HMP regulations provide no ascertainable standard to determine whether a cadet demonstrates "unresolved issues" that prevent the cadet from successfully completing the HMP, nor did Academy staff notify Cadet Spadone that had demonstrated such undefined issues prior to separation proceedings against him.

102. Academy staff failed to provide Cadet Spadone with the rights and protections afforded in the HMP, including the opportunity to submit three journal entries per week in order to make up for weeks in which participants failed to meet their submission requirements.

103. Based on the broad direction of the HMP instructions, the specific provision allowing cadets to submit up to three entries to make up for weeks in which cadets fall behind in

their required journal entries, and the lack of personal instruction to the contrary, Cadet Spadone did not fail to meet his obligations under the HMP.

104. Academy staff thus applied a standard adjudicating Cadet Spadone's case under which cadets in the HMP may be separated from West Point for any reason, or for no reason. More accurately, Academy staff failed to apply any standard at all in adjudicating Cadet Spadone's case.

105. In deciding to disenroll Cadet Spadone from West Point and ordering him to enlisted active duty service pursuant to West Point's adjudication of Cadet Spadone's case, Defendant acted without applying any ascertainable standard.

106. As such, Defendant's decision was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and otherwise contrary to law, thus violating the APA.

## Count 2

**Defendant's action violated Cadet Spadone's constitutional right to due process by not providing Cadet Spadone the opportunity to have a hearing and the opportunity to present his defense.**

107. Cadet Spadone repeats the allegations as previously set forth herein.

108. This court has held, with respect to a midshipman being separated from the United States Naval Academy, "Due process dictates that prior to being *involuntarily* dismissed from the Academy, a midshipman 'must have a hearing, be apprised of the specific charges against him, and be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence [citations omitted].'" Lebrun v. England, 212 F. Supp. 2d 5, 16 (D.D.C. 2002).

109. After being notified that he was deemed to have failed the HMP for "violating the

intent" of the program, for demonstrating unspecified "unresolved issues", and for failing to

submit a sufficient number of journal entries, Cadet Spadone was never given a hearing or any

other opportunity to present a defense to the charges of failing the HMP. Cadet Spadone thus

could not put forth witnesses or evidence in his own defense before Defendant disenrolled him

and ordered him to active duty as an enlisted soldier.

110. In deciding to disenroll Cadet Spadone from West Point and ordering him to enlisted

active duty service pursuant to West Point's adjudication of Cadet Spadone's case, Defendant

failed to provide Cadet Spadone with sufficient due process in the form of a hearing and a

chance to present evidence and witnesses in his defense.

### Count 3

**Defendant's action violated Cadet Spadone's constitutional right to due process of law and violated the Administrative Procedures Act by not following West Point's own internal procedures with respect to the amount of time taken to adjudicate Cadet Spadone's initial honor code violation.**

111. Cadet Spadone repeats the allegations as previously set forth herein.

112. Procedural due process applies to military in general, and to West Point in

particular. See, e.g., Andrews v. Knowlton, 509 F.2d 898, 903 (2d Cir. 1975). ("...the service

academies are subject to the Fifth Amendment and...cadets and midshipmen must be accorded

due process before separation.")

113. Due process requires at least that West Point follow its own internal regulations.

See, e.g., Friedberg v. Resor, 453 F.2d 935, 938 (2d Cir. 1971). ("When regulations prescribe

specific steps to be taken to insure due process they must be substantially observed.")

114. In reviewing an agency action under the APA, this Court has determined that

19

"agencies must follow their own regulations." Stainback v. Mabus, 671 F. Supp. 2d 126, 138 (D.D.C. 2009) [citations omitted].

115. Similarly, other courts applying the APA have "insisted that where the agencies have laid down their own procedures and regulations, those procedures and regulations must be followed even where discretionary decisions are involved." Lightsey v. King, 567 F. Supp. 645, 649 (E.D.N.Y. 1983).

116. West Point has implemented an internal policy of completing cadet honor proceedings within 40 days of when they are reported.

117. During the adjudication of Cadet Spadone's initial honor code violation, approximately 162 days passed from the time Cadet Spadone was approached for clarification until the Superintendent's approval of the Honor Investigative Hearing and resulting punishment.

118. West Point took over 40 days to process Cadet Spadone's case, in violation of its own internal regulations. By failing to follow its own internal policies when adjudicating Cadet Spadone's honor code case, West Point, represented by Defendant, violated Cadet Spadone's right to due process and the Administrative Procedures Act.

### Count 4

**Defendant's action violated Cadet Spadone's constitutional right to due process of law and violated the Administrative Procedures Act by not following the Army's own internal procedures with respect to the amount of time taken to disenroll Cadet Spadone from West Point.**

119. Cadet Spadone repeats the allegations as previously set forth herein.

120. Cadet Spadone repeats the references to legal authority as previously set forth herein affording students at military academy due process rights prior to separation and requiring

agencies to follow their own regulations

121. The Army has implemented an internal policy requiring West Point to complete cadet honor proceedings within 40 days of when they are reported.

122. West Point's internal regulations place an even more stringent deadline for processing cadets disenrolled after participating in the HMP: "Failure to successfully complete the Honor Mentorship Program results in the Superintendent vacating the suspension and separating the cadet *immediately*." USCC PAM 15-1, Para. 603(a) [*emphasis added*].

123. Approximately 150 days passed from October 26, 2010, when Cadet Spadone was notified of his alleged HMP failure, until March 24, 2011, when West Point forwarded Cadet Spadone's paperwork to Headquarters, Department of the Army for Defendant's decision.

124. An additional 156 days passed from March 24, 2011, when the Department of the Army received Cadet Spadone's separation paperwork, until August 26, 2011, when Cadet Spadone was notified of Defendant's final decision on Cadet Spadone's case.

125. From the time he left West Point on January 6, 2011, until the present time, Cadet Spadone has been legally prohibited from enrolling in a different college or accepting employment opportunities that would interfere with a potential Army enlistment.

126. By failing to follow its own internal policies when adjudicating Cadet Spadone's honor code case, West Point, represented by Defendant, and Defendant directly, violated Cadet Spadone's right to due process and the Administrative Procedures Act.

127. By delaying a final decision on his case for approximately 305 days while limiting Cadet Spadone's employment and educational opportunities, Defendant violated Cadet Spadone's right to due process.

### Count 5

**Defendant's action violated Cadet Spadone's constitutional right to due process of law and violated the Administrative Procedures Act by not following the Army's own internal procedures with respect to advice provided to Cadet Spadone about his military service obligation.**

128. Cadet Spadone repeats the allegations as previously set forth herein.

129. After the first honor code violation, West Point Superintendent delayed Cadet Spadone's graduation for one year, until May 2012. As such, Cadet Spadone's third year should have been deemed to start in August 2010.

130. Army regulations dictate that a cadet be discharged without any military service obligation if that cadet resigns or is separated before starting his/her third year at West Point.

131. Notwithstanding the above-referenced internal regulation, Cadet Spadone was advised by two members of West Point staff that he had already incurred a military service obligation prior to the start of the school year in August 2010. As such, Cadet Spadone was incorrectly advised that his resignation prior to the start of classes in August 2010 would result in a military service obligation.

132. Cadet Spadone relied on the instruction of Academy advisors, based on their positions of authority and, ostensibly, of knowledge and a thorough understanding of Army regulations with respect to Cadet Spadone's military service obligation.

133. With accurate guidance regarding the Army's internal regulations, Cadet Spadone likely would have resigned from West Point prior to the start of the 2010-2011 academic year, thus avoiding any military service obligation.

134. By failing to follow its own internal policies with respect to Cadet Spadone's military service obligation and by instructing Cadet Spadone in contradiction to those internal

22

policies, West Point, represented by Defendant, violated Cadet Spadone's right to due process and the Administrative Procedures Act.

## Count 6

**Defendant's action violated Cadet Spadone's constitutional right to due process of law and violated the Administrative Procedures Act by not following the Army's own internal procedures with respect to providing Cadet Spadone notice of his right to remain silent prior to questioning him in connection with his alleged Honor Code violation.**

135. Plaintiff repeats the allegations as previously set forth herein.

136. Academy regulations dictate that a cadet be notified of her right to remain silent without any adverse conclusions drawn against her prior to questioning in in furtherance of an Honor Code investigation.

137. Cadet Spadone was not advised of his right to remain silent and reasonably believed that he was required to answer questions from a superior officer, faculty member, and Honor Committee member in furtherance of an Honor Code investigation.

138. By failing to follow its own internal policies with respect to providing Cadet Spadone notice of his right to remain silent prior to questioning him in connection with his alleged Honor Code violation, West Point, represented by Defendant, violated Cadet Spadone's right to due process and the Administrative Procedures Act.

## Count 7

**Defendant's action in forcing Plaintiff to read the Cadet's Prayer while questioning Plaintiff about an alleged breach of West Point's Honor Code violated the Establishment Clause of the Constitution.**

139. Plaintiff repeats the allegations as previously set forth herein.

23

140. As a taxpayer-funded institution, West Point and/or West Point Commandant are state actors, and thus are subject to the prohibitions and limitations of the First Amendment's Establishment Clause.

141. Even if West Point and/or Commandant of Cadets are not deemed to be state actors generally, West Point and/or the Commandant should be considered state actor(s) for purposes of this Claim because their actions while questioning Cadet Spadone regarding an alleged violation of an Academy regulation created "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S. Ct. 449, 453, 42 L. Ed. 2d 477 (1974).

142. The Fourth Circuit has summarized the Supreme Court's jurisprudence Establishment Clause jurisprudence thus:

> The test most often employed is that enunciated by the Court in *Lemon.* 403 U.S. at 612-13, 91 S.Ct. 2105. A second test, known as the "endorsement test," was first articulated by Justice O'Connor in her concurrence in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), and later adopted by a majority of the Court in *County of Allegheny,* 492 U.S. at 592-94, 109 S.Ct. 3086. Under the endorsement test, the government may not engage in a practice that suggests to the reasonable, informed observer that it is endorsing religion. *Lynch,* 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring). Finally, in *Lee,* the Court formulated its "coercion test," under which "government may not coerce anyone to support or participate in religion or its exercise." 505 U.S. at 587, 112 S.Ct. 2649. Mellen v. Bunting, 327 F.3d 355, 370 (4th Cir. 2003)... While the *Lemon* test dominates Establishment Clause jurisprudence, coercion has

emerged as a prevailing consideration in the school prayer context.

Mellen v. Bunting, 327 F.3d 355, 370 (4th Cir. 2003).

143. By requiring Cadet Spadone to read aloud a prayer during the course of a panel questioning regarding his alleged Honor Code violation, West Point and/or Commandant of Cadets required that Cadet Spadone choose between engaging in religious activity or risking an even stiffer punishment for his purported Honor Code violation – to include separation from West Point and service as an enlisted soldier.

144. Under the coercion test, West Point and/or the Commandant of Cadets violated the Establishment Clause by coercing Cadet Spadone to support and/or participate in religion or its exercise.

### Count 8

**Cadet Spadone reasonably inferred a promise from West Point's actions, on which he relied to his detriment and to the unjust enrichment of Defendant.**

145. Plaintiff repeats the allegations as previously set forth herein.

146. "The District of Columbia recognizes unjust enrichment as a species of quasi contract that imposes, 'in the absence of an actual contract,' 'a duty ... upon one party to requite another in order to avoid the former's unjust enrichment…" Vila v. Inter-Am. Inv., Corp., 570 F.3d 274, 279-80 (D.C. Cir. 2009).

147. Cadet Spadone reasonably inferred from West Point's actions a promise that he would be allowed to participate in the Study Abroad Program. Specifically, West Point provided faculty approval, faculty recommendations, and allowed Cadet Spadone to arrange his academic

schedule to fit the Study Abroad Program.

148. Cadet Spadone reasonably relied on West Point's promise when deciding to remain enrolled at West Point for his third year, thus incurring a military service obligation. But for West Point's actions indicating that he would be accepted to the Study Abroad Program, Cadet Spadone would have resigned from West Point in order to avoid incurring the military service obligation.

149. Defendant stands to be unjustly enriched by forcing Cadet Spadone to serve as an enlisted soldier against his wishes.

## PRAYER FOR RELIEF

150. WHEREFORE, having no adequate remedy at law, Cadet Spadone respectfully requests that the Court grant the following relief:

(a)     An order issued post-haste temporarily setting aside Defendant's order that Cadet Spadone begin basic training as an enlisted soldier in the United States Army on or before October 10, 2011, such order to remain in effect until this Court renders a final ruling in this matter;

(b)     An order setting aside Cadet Spadone's disenrollment from West Point and requiring Defendant to reinstate Cadet Spadone to full academic status at West Point, with all academic privileges restored, and requiring Defendant to remove from Cadet Spadone's record any reference to the allegations of failure to successfully complete the Honor Mentorship Program and any reference to the Superintendent's recommended disenrollment;

(c)     Or, failing the grant of relief detailed in (a) and (b) above, in the alternative, an order requiring Defendant to discharge Cadet Spadone from West Point without requiring a period of enlisted military service;

(d)     Award Cadet Spadone monetary damages for back pay no greater than $10,000;

(e)     Award Cadet Spadone attorneys' fees and costs expended in pursuit of this claim,

pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(f)     Grant any other relief that the Court deems just and proper.

Respectfully Submitted,

*7ऽ丁 lll*

Joseph E. Fluet, III (USDC Bar No. 480527)
Fluet Huber + Hoang PLLC
4000 Genesee Place
Suite 205
Lake Ridge, VA 22192
Tel (703) 590-1234
Fax (703) 590-0366

*Please Serve:*
Hon. Ronald C. Machen, Jr., United States Attorney for the District of Columbia (attn.: Civil
    Process Clerk)
Hon. Eric H. Holder, Jr., Attorney General of the United States
Hon. John M. McHugh, Secretary of the Army