

# United States of America



## DEPARTMENT OF THE ARMY

| Washington, DC | November 18, 2011 |
|---|---|
| PLACE | DATE |

I HEREBY CERTIFY that the attached constitute true and accurate copies of files pertaining to Alan Matthew Spadone, a member of the United States Army and former Cadet at the United States Military Academy. Copies of Military Academic Records and other Investigative Records are located at the U.S. Military Academy, West Point, NY 10996. Copies of the Official Military Personnel File (OMPF) are maintained by the U.S. Army Human Resources Command, Fort Knox, Kentucky. The original personnel records and copies of other records are in the official temporary custody of the Military Personnel Litigation Branch, Litigation Division, Office of The Judge Advocate General of the Army.

*Susan B. Sutherland*

SUSAN B. SUTHERLAND
Lieutenant Colonel, U.S. Army
Chief, Military Personnel Litigation Branch

VOLUME II of II

I HEREBY CERTIFY that the Lieutenant Colonel Susan B. Sutherland, who signed the foregoing certificate, is the Chief, Military Personnel Litigation Branch, Litigation Division, Office of the Judge Advocate General of the Army, and that full faith and credit should be given to her certification.

IN TESTIMONY WHEREOF I, Joyce E. Morrow

The Administrative Assistant to the Secretary of the Army, have hereunto caused the seal of the Department of the Army to be affixed this _18th_ day of _November_, _2011_

By _____

*Administrative Assistant.*

**VANESSA A. BERRY**

**Colonel, U.S. Army**

**Chief, Litigation Division**

DA FORM ... FEB ... 8     EDITION OF 1 MAR 66 IS OBSOLETE     APD PE v1.10

# ADMINISTRATIVE RECORD
## Alan Matthew Spadone v. Secretary of the Army
### Volume II

| | | |
|---|---|---|
| Tab 23 | Summarized Record of Honor Investigative Hearing Proceedings, dated 5 and 8 March 2010 | 000049-000397 |
| Tab 24 | Board Exhibits ( 1 through 12 ) | 000398-000445 |
| A. | Sworn Statement of Cadet Alan Spadone, dated 8 January 2010 | 000399-000400 |
| B. | Sworn Statement of Cadet Alan Spadone, dated 12 January 2010 | 000401-000402 |
| C. | Sworn Statement of Dr. Terri Sabatos, dated 14 December 2009 | 000403-000405 |
| D. | Sworn Statement of Major Anthony George, dated 12 February 2010 | 000406-000407 |
| E. | EN302 "The Construction of an Image" paper by Cadet Spadone, Dated 19 November 2009 | 000408-000415 |
| F. | Handwritten notes, undated | 000416-000425 |
| G. | Excerpts from *Hirohito, the Emperor and the Man* | 000426-000430 |
| H. | Excerpts from *The History of Japanese Photography* | 000431-000437 |
| I. | EN302 Advanced Composition Course Syllabus Fall 2009 | 000438-000444 |
| J. | EN302 Advanced Composition Essay #4 Assignment Sheet | 000445 |
| Tab 25 | Respondent Exhibits | 000446-000448 |
| A. | USCC Pam 15-1, Para 106, dated 11 November 09 | 000447 |
| B. | Character Statement of Ms. Laura Vetter, dated 1 March 10 | 000448 |
| Tab 26 | Board Member Input and Recommendations | 000449-000503 |
| Tab 27 | Appellate Exhibits | 000504-000569 |
| A. | Allegations (Cheating & Lying) | 000505 |
| B. | Appointment of the IT & CUI Notification, dated 11 November 2009 and 7 January 2009 | 000506-000509 |
| C. | Rights Warning/Waiver Certificates of Cadet Spadone, dated 18 November 2009, 18 November 2009, 8 January 2010 and 12 January 2010 | 000510-000517 |
| D. | Reports of the IT Inquiries, dated 18 November 2009 and 12 January 2010 | 000518-000521 |
| E. | RHR Recommendations, dated 19 November 2009 and 18 January 2010 | 000522-000527 |
| F. | VCI Recommendations, dated 30 November 2009 and 2 February 2010 | 000528-000529 |
| G. | PRHP Reports and Decision Worksheets, dated 30 November 2009 and 10 February 2010 | 000530-000534 |
| H. | SJA Pre-Referral Advice, dated 16 February 2010 | 000535 |
| I. | CMDT Referral of Allegation and HIH, dated 16 February 2010 | 000536-000537 |
| J. | Notification of Referral to HIH, dated 17 February 2010 | 000538-000541 |
| K. | Elements of Cheating, USCC Pam 632-1, dated 1 February 2007 | 000542 |

| | | |
|---|---|---|
| L. | Elements of Cheating, USCC Pam 15-1, dated 11 November 2009 | 000543 |
| M. | Elements of Lying, USCC Pam 15-1, dated 11 November 2009 | 000544 |
| N. | Memorandum from COL Kerin to LTC Wilson, dated 6 November 2009 | 000545 |
| O. | Memorandum for Record by Dr. Sabatos, dated 6 November 2009 | 000546-00547 |
| P. | Memorandum from COL Kerin to Department of English Honor Liaison, dated 9 November 2009 | 000548 |
| Q. | Memorandum from LTC Wilson to COL Kerin, dated 9 November 2009 | 000549 |
| R. | Memorandum for Record by Dr. Sabatos, dated 7 December 2009 | 000550-000551 |
| S. | E-mail from Dr. Sabatos, dated 7 December 2009 | 000552 |
| T. | Memorandum from COL Kerin to LTC Reich, dated 9 December 2009 | 000553 |
| U. | Memorandum from LTC Reich to COL Kerin, dated 11 December 2009 | 000554 |
| V. | Memorandum from COL Kerin to the Department of English Honor Liaison, dated 11 December 2009 | 000555 |
| W. | Motion to Reduce Charges & Plea Agreement, dated 22 February 2010 | 000556 |
| X. | Commandant Action, dated 23 February 2010 | 000557 |
| Y. | Motion to Delay Hearing, dated 24 February 2010 | 000558 |
| Z. | Commandant Action, dated 25 February 2010 | 000559 |
| AA. | Motion to exclude objectionable evidence, dated 3 March 2010 | 000560-000562 |
| BB. | Privacy Act Statement, dated 5 March 2010 | 000563 |
| CC. | Appointment Memo, dated 2 March 2010 | 000564-000565 |
| DD. | IR Statement, dated 8 March 2010 | 000566-000567 |
| EE. | Findings Worksheet, dated S March 2010 | 000568-000569 |
| Tab 28 | Related Exhibits | 000570-000614 |
| A. | Sworn Statement of Cadet Alan Spadone, dated I8 November 2009 | 000571-000572 |
| B. | Sworn Statement of Cadet Alan Spadone, dated I8 November 2009 | 000573-000574 |
| C. | Sworn Statement of Dr. Terri Sabatos, dated 16 November 2009 | 000575-000577 |
| D. | Sworn Statement of Dr. Terri Sabatos, dated 16 November 2009 | 000578-000579 |
| E. | Sworn Statement of Cadet Adam Bishop, dated 9 November 2009 | 000580-000582 |
| F. | EN302 "Pacific-Wide Ocean of Fantasies" paper by Cadet Spadone, dated 27 October 2009 | 000583-000590 |
| G. | Text of "Pacific-Wide Ocean of Fantasies" paper by Cadet Spadone, undated | 000591-000595 |
| H. | "Lost in Translation" article by Homay King, published in Film Quarterly, 2005 | 000596-000599 |
| I. | EN302 Advanced Composition Essay #3 Assignment Sheet | 000600 |
| J. | Sworn Statement of Major Anthony George, dated 16 November 2009 | 000601-000602 |
| K. | Sworn Statement of Dr. Terri Sabatos, dated S Jan 10 | 000603-000604 |
| L. | EN302 Absence Tracking Sheet, dated 6 November 2009 | 000605 |
| M. | EN302 Absence Tracking Sheet, dated 8 December 2009 | 000606 |
| N. | Board Exhibit 3, Sworn Statement of Dr. Terri Sabatos, dated 14 December 2009 | 000607-000609 |
| O. | Board Exhibit 4, Sworn Statement of Major Anthony George, dated 12 February 2010 | 000610-000611 |
| P. | Privacy Act Statement, dated 8 March 2010 | 000612 |
| Q. | Election Statement, dated S March 2010 | 000613 |
| R. | Post-Hearing Procedures, dated S March 2010 | 000614 |

SUMMARIZED
RECORD OF PROCEEDINGS
HONOR INVESTIGATIVE HEARING

**CADET ALAN SPADONE, CLASS OF 2011, US CORPS OF CADETS**

Convened under

AR 210-26, PARA 6-16, and
USCC PAMPHLETS 15-1 and 632-1

Held At

United States Military Academy
West Point, New York 10996

On

5 and 8 March 2010

Before

| | |
|---|---|
| Cadet Donald Graves | Board President |
| Cadet Katherine Taylor | Primary Honor Representative |
| Cadet Brandon Wright | Primary Member |
| Cadet You Li | Primary Member |
| Cadet Logan Lee | Primary Member |
| Cadet Cole Holland | Primary Member |
| Cadet Nicholas LaPlante | Alternate Member |
| Cadet Andrew Schumaker | Alternate Member |
| Cadet Christopher Cox | Reserve Member |
| | |
| Captain Kyle C. Van De Water | Hearing Advisor |
| Ms. Jennifer Linnartz | Reporter |

AUTHENTICATION OF RECORD OF
PROCEEDINGS AND CERTIFICATION
OF FINDINGS AND RECOMMENDATION

I, the undersigned Hearing Advisor, authenticate that the
following transcript is an accurate representation of the
proceedings held at West Point, New York, on 5 & 8 March 2010, in
the case of Cadet Alan Spadone, Company B-1, Class of 2011,
United States Corps of Cadets, and certify that the finding and
recommendations are correct.

KYLE C. VAN DE WATER
CPT, JA
Hearing Advisor
Date:   5 APR 10

ii

000050

I hereby acknowledge receipt of a copy of the record of proceedings delivered to me at West Point, New York, _____ hours, this ___ day of April 2010.

ALAN SPADONE
Respondent
Company B-1, Class of 2011

iii

# T E S T I M O N Y

**Name of Witness**                              **Page**


**FOR THE BOARD:**

Merit

Dr. Terri Sabatos                              193-234
Major Anthony George                           247-257


General Character

Major Michael Denehy                           304-309
SFC Robert Bright                              316-319
Cadet Matthew Krause                           320-325


**FOR THE RESPONDENT:**

Merit

Providence Inquiry                             113-128
Cadet Alan Spadone, Respondent                 260-274


General Character

Lieutenant Colonel Scott Billie                311-315
Major Hannon Didier                            326-329
Ms. Laura Vetter                               330-339

iv

**BOARD EXHIBITS**

1. Sworn Statement of Cadet Alan Spadone, dated 8 Jan 10
2. Sworn Statement of Cadet Alan Spadone, dated 12 Jan 10
3. Sworn Statement of Dr. Terri Sabatos, dated 14 Dec 09
4. Sworn Statement of Major Anthony George, dated 12 Feb 10
5. EN302 "The Construction of an Image" paper by Cadet Spadone, Dated 19 Nov 09
6. Handwritten notes, undated
7. Excerpts from Hirohito, the Emperor and the Man
8. Excerpts from The History of Japanese Photography
9. EN302 Advanced Composition Course Syllabus Fall 2009
10. EN302 Advanced Composition Essay #4 Assignment Sheet
11. Hirohito, The Emperor and the Man, by Hoyt, copyright 1984
12. The History of Japanese Photography, by Tucker, Copyright 2003

**RESPONDENT EXHIBITS**

1. USCC Pam 15-1, Para 106, dated 11 November 09
2. Character Statement of Ms. Laura Vetter, dated 1 March 10

**BOARD MEMBER RECOMMENDATIONS**

1-9. Board Member Input and Recommendations

**APPELLATE EXHIBITS**

I   Allegations (Cheating & Lying)
II  Appointment of the IT & CUI Notification, dated 11 Nov 09 and 7 Jan 1024 Nov 09
III Rights Warning/Waiver Certificates of Cadet Spadone, dated 18 Nov 09, 18 Nov 09, 8 Jan 10 and 12 Jan 10
IV  Reports of the IT Inquiries, dated 18 Nov 09 and 12 Jan 10
V   RHR Recommendations, dated 19 Nov 09 and 18 Jan 10
VI  VCI Recommendations, dated 30 Nov 09 and 2 Feb 10
VII PRHP Reports and Decision Worksheets, dated 30 Nov 09 And 10 Feb 10
VIII SJA Pre-Referral Advice, dated 16 Feb 10
IX  CMDT Referral of Allegation and HIH, dated 16 Feb 10
X   Notification of Referral to HIH, dated 17 Feb 10
XI  Elements of Cheating, USCC Pam 632-1, dated 1 Feb 07
XII Elements of Cheating, USCC Pam 15-1, dated 11 Nov 09
XIII Elements of Lying, USCC Pam 15-1, dated 11 Nov 09
XIV Memorandum from COL Kerin to LTC Wilson, dated 6 Nov 09
XV  Memorandum for Record by Dr. Sabatos, dated 6 Nov 09

000053

**APPELLATE EXHIBITS** (Continued)

| XVI | Memorandum from COL Kerin to Department of English Honor Liaison, dated 9 Nov 09 |
| XVII | Memorandum from LTC Wilson to COL Kerin, dated 9 Nov 09 |
| XVIII | Memorandum for Record by Dr. Sabatos, dated 7 Dec 09 |
| XIX | E-mail from Dr. Sabatos to Dr. Sabatos, dated 7 Dec 09 |
| XX | Memorandum from COL Kerin to LTC Reich, dated 9 Dec 09 |
| XXI | Memorandum from LTC Reich to COL Kerin, dated 11 Dec 09 |
| XXII | Memorandum from COL Kerin to the Department of English Honor Liaison, dated 11 Dec 09 |
| XXIII | Motion to Reduce Charges & Plea Agreement, dated 22 Feb 10 |
| XXIV | Commandant Action, dated 23 Feb 10 |
| XXV | Motion to Delay Hearing, dated 24 Feb 10 |
| XXVI | Commandant Action, dated 25 Feb 10 |
| XXVII | Motion to exclude objectionable evidence, dated 3 Mar 10 |
| XXVIII | Privacy Act Statement, dated 5 Mar 10 |
| XXIX | Appointment Memo, dated 2 Mar 10 |
| XXX | IR Statement, dated 8 Mar 10 |
| XXXI | Findings Worksheet, dated 8 Mar 10 |

**RELATED EXHIBITS**

1. Sworn Statement of Cadet Alan Spadone, dated 18 Nov 09
2. Sworn Statement of Cadet Alan Spadone, dated 18 Nov 09
3. Sworn Statement of Dr. Terri Sabatos, dated 16 Nov 09
4. Sworn Statement of Dr. Terri Sabatos, dated 16 Nov 09
5. Sworn Statement of Cadet Adam Bishop, dated 9 Nov 09
6. EN302 "Pacific-Wide Ocean of Fantasies" paper by Cadet Spadone, dated 27 Oct 09
7. Text of "Pacific-Wide Ocean of Fantasies" paper by Cadet Spadone, undated
8. "Lost in Translation" article by Homay King, published in Film Quarterly, 200
9. EN302 Advanced Composition Essay #3 Assignment Sheet
10. Sworn Statement of Major Anthony George, dated 16 Nov 09
11. Sworn Statement of Dr. Terri Sabatos, dated 8 Jan 10
12. EN302 Absence Tracking Sheet, dated 6 Nov 09
13. EN302 Absence Tracking Sheet, dated 8 Dec 09
14. Unredacted Board Exhibit 3, Sworn Statement of Dr. Terri Sabatos, dated 14 Dec 09
15. Unredacted Board Exhibit 4, Sworn Statement of Major Anthony George, dated 12 Feb 10
16. Privacy Act Statement, dated 8 Mar 10
17. Election Statement, dated 8 Mar 10
18. Post-Hearing Procedures, dated 8 Mar 10

000054

## PROCEEDINGS OF THE PRELIMINARY SESSION

A preliminary session of an Honor Investigative Hearing (HIH) was called to order in the Staff Judge Advocate (SJA) courtroom, West Point, New York, at 1330, 5 March 2010, pursuant to the referral of the case by the Commandant of Cadets, dated 16 February 2010 (Appellate Exhibit IX).

The following individuals were present:

   Captain Kyle C. Van De Water, JA, Hearing Advisor;
   Cadet Alan Spadone, Company B-1, Class of 2011,
     Respondent;
   Cadet Kenneth Howell, Company D-1, Class of 2010,
     Investigative Representative;
   Cadet Jeremiah Zingapan, Company B-1, 1st Regimental
     Honor Representative Elect and Company B-1 Honor
     Representative;
   Ms. Jennifer Linnartz, Reporter.

**HA:**   You have submitted a motion to which I have read and I'm taking into consideration.  However, I need a further inquiry to the witness, Dr. Terri Sabatos, who is waiting outside.  She has a class that she has to attend here in twenty minutes, so my intent is to get through as much of

1    this as possible before I realize that I have to call her

2    in, so she doesn't miss her class.  Is that okay with you?

3

4    **RESP:**  That is okay, sir.

5

6    The Respondent indicated he had been provided a copy of

7    the case file (Preliminary Board Exhibits 1 through 23 and

8    Appellate Exhibits I through XXV) and stated that he was

9    ready to proceed.

10

11   The Hearing Advisor informed the Respondent of his

12   qualifications.  When questioned by the Hearing Advisor,

13   the Respondent stated that he did not wish to challenge

14   the Hearing Advisor for cause.

15

16   The Hearing Advisor introduced the Reporter, Ms. Jennifer

17   Linnartz, and stated she had been previously sworn to

18   perform her duties.

19

20   The Hearing Advisor introduced the Honor Representative,

21   Cadet Kenneth Howell, and explained that it was his duty

2

000056

1    to observe the honor proceedings on behalf of the Honor

2    Committee.

3

4    **HA:**   Cadet Spadone, your Cadet Advisor is not present in

5    the hearing room, but I'm assuming he's going to be here

6    at the regular hearing?

7

8    **RESP:**   That is correct, sir.

9

10   **HA:**   Okay.  I'm going to go through this script and I ask

11   that you provide the information that I'm about to talk to

12   you with to him.

13

14   Cadet Howell, you're now present in the hearing room,

15   serving as the IR.  And it's his duty, just so you know,

16   to observe these Honor proceedings for the Honor

17   Committee.

18

19   Who is your Cadet Advisor and what is his class?

20

21   **RESP:**   My Cadet Advisor is Joshua Young, Class of 2011,

22   Company B-1.

23

000057

1    **HA:**   Please pass the following along to Cadet Young.   Ms.

2    Linnartz, can you please ensure that at the second

3    preliminary hearing that I go over these instructions for

4    Cadet Young again?   I also ask that you remind me, Cadet

5    Spadone, that at the beginning of the second preliminary

6    hearing, I will read these instructions to your CA, Cadet

7    Advisor.

8

9    Your Cadet Advisor, Cadet Young, needs to be aware of the

10   following:

11

12   The Respondent may elect to bring any one member of the

13   Corps of Cadets with him to the HIH or to a Cadet Advisory

14   Board, which is a CAB, to act as an advisor.   The role of

15   the CA is to provide moral support and advice, not to

16   represent the Respondent.   The CA may not address the HA,

17   the Board President or BP, or other members of the

18   preliminary hearing, HIH, or CAB at any time during any

19   hearing before the announcement of findings.   If the

20   Respondent is found to have violated the Honor Code, after

21   the announcement of the findings, the Respondent may

22   choose to have the CA address the Board.   The CA should

23   not accept appointment as the CA if the CA will

4

1    potentially be a witness on the merits.   Will your CA be a

2    witness on the merits?

3

4    **RESP:**  No, he will not.

5

6    **HA:**   The CA is prohibited from advising the Respondent on

7    how to answer questions during the Respondent's testimony.

8    Communication between the CA and the Respondent is not

9    privileged, as in an attorney-client relationship.   A CA

10   is not exempt from abiding by the Cadet Honor Code, to

11   include the toleration clause, and must report any

12   suspected violation by the Respondent.   So, if you come

13   into possession of evidence or knowledge relevant to an

14   Honor violation by the Respondent, you would have to

15   report it under the Honor Code.   A Cadet may serve as a CA

16   only twice and may not be a member of the Cadet Honor

17   Committee, who has personal knowledge of or who has worked

18   on the case.

19

20   Do you know how many times prior Cadet Young has served as

21   a Cadet Advisor?

22

5

000059

1    **RESP:**   I don't believe he's ever served as a Cadet

2    Advisor.

3

4    **HA:**   Okay.   We'll have to ask him these questions again.

5    Do you know if he's a member of the Honor Committee?

6

7    **RESP:**   He is not a member of the Honor Committee.

8

9    **HA:**   All right.   Make sure that he understands, while

10   serving as a CA, that he's still subject to the Honor Code

11   and that your discussions with him are not privileged.

12   And make sure that he understands that unless he is asked

13   a question directly by myself or the BP, he may not speak

14   to us.   Make sure that he understands that effectively,

15   the only person he can speak with is you, the Respondent,

16   and not during your testimony to the Board, should you

17   elect to take the witness stand.   Do you understand?

18

19   **RESP:**   I understand, sir.

20

6

1    **HA:**   Cadet Spadone, you have certain important rights in

2    this Honor proceeding.   Some of these rights are as

3    follows:

4

5    First, you have the right to consult with a lawyer before

6    any hearing.   This lawyer may not speak for you or

7    otherwise represent you at the hearing, although you may

8    talk with the lawyer during breaks or recesses.   You may

9    obtain a civilian lawyer to advise you at no expense to

10   the government.   If you do not obtain a civilian lawyer,

11   you may request the Staff Judge Advocate to assign an Army

12   lawyer to act as your legal advisor.

13

14   It is my understanding that you have consulted with Mr.

15   Barrett, a civilian lawyer, regarding this case.   Is this

16   true?

17

18   **RESP:**   This is true, sir.

19

20   **HA:**   Are you satisfied with his advice?

21

7

1    **RESP:**   I am.

2

3    **HA:**   Second, you have the right to remain silent

4    throughout these proceedings.   Your silence is not

5    evidence and cannot be used against you.

6

7    Third, you have the right to appear personally and be

8    present during all open sessions of the hearing.

9

10   Fourth, you have the right to present evidence and have

11   witnesses testify on your behalf.

12

13   Fifth, you have the right to examine all witnesses.   This

14   simply means that you can question any witness who appears

15   at the hearing.

16

17   Sixth, you have the right to object to evidence being used

18   in this hearing.

19

8

000062

1    Seventh, you have a right to challenge, for cause, any

2    Cadet sitting as a member of the HIH or, if you admit to

3    the allegation, to the CAB, so that they will not be

4    allowed to remain as a member of the Board.  Your basis of

5    challenge is limited to matters that may prevent the

6    Member from making a fair and impartial decision, or that

7    shows the Member is not qualified to be a Member of this

8    type of Board.  You are not entitled to a peremptory

9    challenge of any Member, which simply means that the

10   challenge is not based on one of the reasons that I just

11   described.

12

13   Eighth, if you believe at any time during any of the Honor

14   proceedings something is unfair, you have the right to

15   bring the matter to my immediate attention.  A failure to

16   immediately speak up about an issue of fairness may result

17   in your giving up, or waiving, your right to raise the

18   issue at a later time.  I cannot overemphasize this point.

19   If you have any questions about procedures or think that

20   something is unfair, please tell me immediately.  I will

21   do everything I can to ensure the fairness of this

22   proceeding.

9

000063

1

2      Do you have any questions about how you challenge members

3      of the potential HIH or CAB?

4

5      **RESP:**  No, I do not, sir.

6

7      **HA:**  Ninth, you may, if you desire, admit committing the

8      alleged violation of the Honor Code.  If you wish to admit

9      to the alleged violation at this preliminary session, you

10     will have to describe to me, under oath, the facts and

11     circumstances of what you did.  Your description of the

12     facts to me is called a providence inquiry, and I must be

13     satisfied that you understand your admission, and that

14     your admission satisfies each element or part of the

15     alleged violation.  Your admission to me will then be

16     transcribed and presented to a CAB, or the tape of your

17     admission will be played for the CAB, wherein they will

18     review the facts of the case.

19

20     Along with any written character statements from you or

21     others, they CAB will make recommendations to the

10

000064

1   Superintendent on the issue of your retention in the Corps

2   of Cadets.

3

4   Tenth, you have the right to have a CA assist you during

5   this preliminary session and if you contest the

6   allegation, during the HIH.  The CA cannot speak to the

7   Board on your behalf during the hearing, except as a

8   character witness, but may advise you during the course of

9   the hearing.  If you admit to the allegations, your case

10  will be forwarded to the Cadet Advisory Board, the CAB.

11  You may have a CA at the CAB, as well.

12

13  Do you understand these rights?

14

15  **RESP:**  I understand these rights.

16

17  **HA:**  Do you have any questions concerning your rights?

18

19  **RESP:**  No, I do not.

20

11

1    **HA:**   In addition to these rights, at the HIH you will be

2    permitted to make a brief opening statement before any

3    witnesses testify.  Also, regardless of whether you choose

4    to testify, you will be permitted to make a closing

5    statement to the Members of the HIH before they recess for

6    deliberations and findings.  The opening statement and

7    closing argument give the Board your view of the case, but

8    your statements are not evidence; the case will be decided

9    based solely upon the evidence presented, and I will

10   instruct the Board to that effect.

11

12   If you desire the HIH to have the benefit of what you have

13   to say as evidence they can consider in making their

14   decision, then you will have to testify under oath.

15   However, if you testify under oath, you will be subject to

16   questions from the Board and me.

17

18   Should you choose to admit to the allegations, following

19   your admission to me, the case will be transcribed by the

20   court reporter and presented to a CAB, or the tape of your

21   admission will be played for the CAB.  The case file will

22   be compiled, along with the transcription of your

                              12

000066

1    admission or tape of your admission, and then will be

2    forwarded to the Honor Committee and the CAB will be

3    assembled.  You will have the right to testify at the

4    Board in the same manner that you would at the HIH.  That

5    is, you have the right to remain silent, you may make a

6    brief opening statement and closing argument, and you may

7    choose to testify.

8

9    Do you have any questions concerning your right to present

10   evidence or testimony at either the HIH or the CAB?

11

12   **RESP:**  I understand, sir.

13

14   **HA:**  At this point in time, I am going to break from the

15   script.  In the next portion of the script, I will

16   describe to you what's going to happen in this preliminary

17   hearing.  I'm going to sum it up real quick right now

18   because for purposes of efficiency here; I need to have

19   Dr. Sabatos answer questions that I have for her.  These

20   questions revolve around whether or not your Article 31

21   rights may or may not have been violated at the approach

13

000067

1    for clarification for your second allegation.  Your

2    attorney raised these issues in your motion.  I'm going to

3    ask her questions.  I'll even allow you to ask her some

4    questions.  And if the IR wants to ask something, I may

5    allow them to ask any questions.

6

7    When she's done with her questions, I'm going to take

8    notes of what she said and then we're going to continue on

9    with the script.

10

11    **RESP:**  And this will still be recorded?

12

13    **HA:**  It's all recorded.

14

15    **RESP:**  Okay.

16

17    **HA:**  And I'm doing it now because she cannot stay longer

18    than about ten, fifteen minutes.  So I want to make sure

19    that we get her on this preliminary hearing.

20

14

000068

1    I'm going to use her testimony when I make a final

2    decision here as to what your attorney has requested

3    should be excluded.

4

5    Do you want to grab her?

6

7    **IR:**  Yeah, go grab her and then go grab those books.  He's

8    going to grab the books too, sir.

9

10   **HA:**  Okay.  Great, thanks.

11

12   **IR:**  Yeah, we have the books.

13

14   **HA:**  Ma'am, we're being recorded right now, okay?  This is

15   what's known as the -- you can have a seat.  This is the

16   preliminary hearing of the HIH.  This is only

17   administrative, but it's also very important because we

18   decide what evidence comes in in front of the board and

19   what evidence stays out.

20

15

1   His attorney has questioned the approach for clarification

2   about the second time you approached him.

3

4   **DR. SABATOS:**   Okay, okay.

5

6   **HA:**   We're going to discuss that.   Before we go any

7   further, can you please state your name, what your

8   position is here and what city you generally live in.

9

10   **DR. SABATOS:**   Okay.   My name is Terri Sabatos.   I'm an

11   Associate Professor of Art History in the Department of

12   English and Philosophy, and I live in

13

14   **HA:**   You're a doctor, right, ma'am?

15

16   **DR. SABATOS:**   Yes, yes.

17

18   Dr. Terri Sabatos, Associate Professor, Department of

19   English and Philosophy, witness for the Board, was sworn

20   and testified as follows:

16

1

2
**QUESTIONS BY THE HEARING ADVISOR**

3

4
Q:  Okay.   It's my understanding that you conducted an

5
approach for clarification concerning the 27 October 2009

6
Advanced Composition English 302 Essay No. 3?

7

8
A:   That was the first approach.

9

10
Q:   That's the first approach?

11

12
A:   Correct, yes.

13

14
Q:   Okay.   After that approach, you gave a sworn statement

15
on 16 November 2009.   You actually made two of them.

16
Would you like to take a look at them, ma'am?

17

18
A:  Sure.

19

17

1   Q:  This really doesn't revolve around these two

2   statements that you gave, but it is important.  Okay.  You

3   can please review that statement.

4

5   HA:  This is the November 16th statement.  Do you have

6   that?

7

8   RESP:  I do, sir.

9

10  IR:  Which exhibit is that, sir?  Exhibit number --

11

12  HA:  Five.

13

14  A:  This is the sworn statement.

15

16  Q:  Okay.  Do you remember what you put in here?

17

18  A:  Yes, yes.

19

18

000072

1    Q:   Okay.   Board Exhibit No. 6 is your next sworn

2    statement, which -- it's not really relevant for these

3    purposes, but Board Exhibit 7 is my concern, okay?   Let me

4    ask you a question.   After you made the November 16th

5    statement, which you just reviewed, did you, in your mind,

6    did you suspect that Cadet Spadone had cheated on that

7    first essay, the Essay No. 3?

8

9    A:   Let me put it this way.   There was not anything in the

10   approach for clarification that cleared it up, so I

11   decided, once he had left, because there was no

12   clarification of why the two documents looked so similar,

13   we decided to put it forward.   There was no explanation,

14   so --

15

16   Q:   Okay.   That's okay.   In your mind, though, did you

17   clearly suspect that this is what -- this is --

18

19   A:   I didn't have any other explanation to the contrary.

20

19

1    Q:   Okay.  So you suspected him at that point in time.   On

2    16 November, did you suspect him of cheating on that first

3    essay?

4

5    A:   As I had no -- nothing to the contrary to explain

6    that.

7

8    Q:   Okay.   Then here's what happened.   It's my

9    understanding -- tell me if I'm wrong, okay?   Then on 19

10   November, which was three days later, Cadet Spadone hands

11   in his Essay No. 4, which is worth twenty percent of his

12   grade, okay?

13

14   A:   Right, right.

15

16   Q:   Now, at that point in time, you just told me you

17   suspected that he may have cheated on his prior essay,

18   which was the one right before, which is Essay No. 3?

19

20   A:   Right.

21

20

1    Q:   Now he turns in Essay No. 4.   You go through here, in

2    quite a bit of detail in this paragraph, and if you'd like

3    to review it, Board Exhibit No. 7, that would be okay.   If

4    you need to read through it again, you can, ma'am.

5

6    A:   I remember it.

7

8    Q:   Okay.   You did that exam --

9

10   A:   Uh-huh.

11

12   Q:   -- and you have more suspicions because of what?

13   Because his citations aren't lining up right?

14

15   A:   When I looked -- pulled the books to check, my first

16   inclination, as I said in the statement, was that this

17   Cadet was having trouble understanding how to incorporate

18   the theories, discussions, arguments of another scholar

19   and I thought, well, we need to go over this because I'm

20   not clear, from the paper, which argument was the cadet's

21   and which arguments were these other scholars'.   So let me

21

1   get those sources and then I will sit down with this cadet

2   and say, look, you see this argument that you didn't --

3

4   Q:   Okay.

5

6   A:   When I pulled the books and not one of the citations

7   matched, again, I wanted an explanation on how to

8   reconcile the fact that the paper and the books did not

9   match.

10

11   Q:   Okay.   That's kind of clear from your statement.

12

13   A:   Uh-huh.

14

15   Q:   I just need -- you know, just try to picture yourself

16   -- and this is kind of difficult.   I need you to put

17   yourself in your shoes in that time period.

18

19   A:   Right.

20

22

1    Q:  It's not -- at least -- let me ask you -- did you

2    suspect that he possibly cheated on this one, as well,

3    because you went through that analysis for this Essay No.

4    4, things weren't matching up again and you just got done

5    writing a statement about the previous essay, in which you

6    suspected he cheated.

7

8    A:  What was my initial -- are you asking me if my initial

9    was already I was suspicious immediately off the bat?

10

11   Q:  Well, not off the bat.  You said that you looked at

12   his paper and it wasn't matching up the way it was

13   supposed to, right, with the citations?

14

15   A:  Yeah.  That was later.  My first -- what you have

16   highlighted there says that I noticed that it didn't match

17   the prompt.

18

19   Q:  Didn't match the prompt?

20

21   A:  Correct.

23

1

2      Q:   And then what happened?

3

4      A:   I continued to read because my thought was while this

5      an interesting topic, I'm anxious to read this, even

6      though it doesn't match quite the prompt.  That's okay if

7      this is a good paper.  Yea, let's drive on; let's give

8      this Cadet a good grade.

9

10     Q:   Give him a chance?

11

12     A:   Absolutely, absolutely.

13

14     Q:   Okay.  So that's the first step, you realized that

15     that didn't happen.  Read through the rest of it and then

16     what happened next?

17

18     A:   As I said, as I was reading through it, there were

19     catch -- sort of buzz words from academia, "constructions

20     of masculine identity."  There were also references in the

21     body of the paper to other images and other parts of the

24

000078

1    argument, such as images of Mt. Fuji, as well as Samurai

2    values that had not been mentioned in the paper, and

3    what's when I thought hmm, I bet this is coming out of a

4    much larger discussion.  This cadet needs some help on

5    knowing how to take the arguments of another scholar and

6    incorporate them into his paper.

7

8    Again, I went to get the books so I could sit down with

9    the Cadet and say, great idea here, but this is where this

10    doesn't work.

11

12    Q:  Okay.  And then what happened when you got the books?

13

14    A:  None of the citations matched and I spoke with our

15    sort of chain of command to say I'm going to have to do an

16    approach for clarification because there are

17    inconsistencies with the citations in this paper and the

18    books that they say where they're supposed to be from.

19

20    Q:  Okay.  So it looks like three things happened.  You

21    started to read the paper and see that the paper wasn't

25

1    really addressing the prompt, but you thought to yourself,

2    well, I'll read on because if it's still a good paper --

3

4    A:  I had no problem with that.  And we were dealing with

5    images, which I'm always encouraging my cadets to do, so

6    that was not a problem.

7

8    Q:  And then you brought up the books that he addressed

9    and cited and you noticed that nothing was matching up?

10

11    A:  No.  The citations weren't matching up.

12

13    Q:  Okay.  And then at that point, you take a third step

14    and you say I've got to go to the chain of command on this

15    because --

16

17    A:  There were inconsistencies sufficient enough.

18

19    Q:  Now here's what I'm asking.  If you take a whole, big

20    picture of what you were looking at, did the fact that you

26

1     had just recently written that sworn statement that was

2     going to be used in an Honor case concerning the previous

3     essay with Cadet Spadone, did that play in your mind here

4     and you sat there and thought, "Wow, maybe he did it

5     again, maybe he cheated again?"

6

7     A:   I wanted to give him the benefit of the doubt, which

8     is why I did the approach.  I wanted an explanation.  I

9     would've done that with any other paper.  The amount of

10    material that did not match up was egregious enough that

11    an approach had to be done, regardless of who the Cadet

12    was or what he had done or not done.

13

14    Q:   No, I know.  There's nothing wrong with the approach.

15

16    A:   Okay.

17

18    Q:   It's just whether or not in your mind -- as I take a

19    look at these facts, and you clearly suspected that he

20    cheated on the first essay, the previous essay.  You even

21    go so far as to write in your sworn statement that you

27

000081

1    did, and then a couple days thereafter, his next essay is

2    handed in.  You read through that essay and you realize

3    that he didn't address his prompt, but you give him the

4    benefit of the doubt, so let me continue on.

5

6    A:  Sir, as I would with any other student.

7

8    Q:  Right, okay.  And then you'd see whether or not he has

9    a good paper.  You read through the rest of the paper and

10   you decided, well, I'm going to get the books to see

11   whether or not his citations were right, or if he's citing

12   wrong.  And then you notice that nothing in those books is

13   cited correctly.

14

15   So when I look at that stuff, I kind of think to myself

16   maybe he did it again.  Is that what you were thinking,

17   because you went so far as to go get this chain of command

18   to witness the approach for clarification?  In other

19   words --

20

21   A:  We have to.

28

1

2      Q:  -- did you suspect -- was there any suspicion in your

3      mind that maybe he cheated?

4

5      A:  I don't know how to answer it in terms of clearly

6      there was something wrong that you needed clarified.  I

7      did not know what was going on.  I wanted him to explain

8      to me what was going on, so I --

9

10     Q:  Okay, so not at all?  You never suspected him of

11     cheating?

12

13     A:  Clearly there was a problem so I guess I'm not sure

14     exactly what you mean by suspicion.  If it's egregious

15     enough that I have to do the approach for clarification,

16     clearly there's something wrong that I want explained.

17     When it's not explained, I have to push it forward.

18

19     Q:  I understand, but I guess what I'm saying is if you

20     were to take away the previous allegation, you never knew

29

1    that -- I mean, Cadet Spadone had nothing going on in the

2    past that you know of --

3

4    A:   Right, right.

5

6    Q:   To me, I would understand how you could go forward and

7    say hey, I need some answers --

8

9    A:   Okay.

10

11   Q:   -- because there could be a reasonable explanation.

12

13   A:   Right.

14

15   Q:   But my worry is that because Cadet Spadone had already

16   had these issues with you in a previous essay and the fact

17   that you wrote a sworn statement only three days prior to

18   him submitting this essay in which he's implicated for

19   cheating, that in your mind, potentially, he may have

20   cheated again.

30

000084

1

2     A:   There was already a strike against him, as soon as I

3     opened up that paper?  Is that what you're asking?

4

5     Q:   Perhaps, but even when you get to the point where you

6     realize you've got to call the chain of command, was there

7     kind of like a strike in your mind, like I think maybe

8     this kid maybe cheated again?

9

10    Because here's the other concern I have.  If I look at

11    Appellate Exhibit IV, I'm going to show this to you, this

12    is what's known as the Investigative Team Report, and it

13    says here, in the timeline or background, and I'm going to

14    read what the Investigative Team found, and this is

15    important because these guys do the investigation.  They

16    said that:

17

18    "On or about 19 November, Cadet Spadone submitted his

19    essay entitled "the Construction of an Image."  In this

20    essay, Cadet Spadone cited using the work of Edwin Palmer

21    Hoyt and Anne Tucker.  After view by Dr. Terri Sabatos,

31

000085

1    she noticed that the work attributed to these authors did

2    not match the page numbers, which Cadet Spadone noted.  In

3    addition, the ideas listed on those page numbers of the

4    sources did not match the information presented in Cadet

5    Spadone's paper."

6

7    The next paragraph of Appellate Exhibit IV-3 states:

8

9    "Dr. Sabatos grew suspicious and on 30 November 2009, she

10    set up a meeting with Cadet Spadone to discuss the paper.

11    The meeting took place on 4 December, and included Cadet

12    Spadone, Dr. Sabatos, Major Anthony George, the English

13    Department Honor Officer, and Cadet Daniel Gray, the Cadet

14    Departmental Honor Liaison."

15

16    My problem is I take a look at the surrounding

17    circumstances of this particular approach and I have to

18    factor in the fact that he's already been approached by

19    you and you've already admitted that you already suspected

20    him of cheating on the previous essay.

21

32

000086

1   And then I think that, added in with what the IT has,

2   which says that you grew suspicious on 30 November, and to

3   me, I'm having a tough time grappling with whether or not

4   you suspected that maybe he cheated.

5

6   I mean, the approach for clarification is fine, but if, at

7   a certain level in your mind, you suspected that maybe

8   Cadet Spadone, seeing how we've already got all this

9   evidence against him on that same class previous essay,

10  maybe he did it again. That's I guess what I'm asking

11  you.

12

13  A: And again, I guess I would reiterate I didn't know

14  what he had done. That's why we did the approach. This

15  wasn't intended to single out or to -- as I said, there

16  were inconsistencies. Automatically, I have to say okay,

17  I cannot explain these adequately; I need the cadet to

18  explain to me what happened.

19

20  Q: Right. Yeah, I know, ma'am, but at a certain point,

21  my job is -- and it's very difficult -- is to ensure that

33

1    his Article 31 rights weren't violated.  I mean really,

2    all that says is an approach is fine, but if the person

3    doing the questioning suspects that person of wrongdoing,

4    they have to read him the Article 31 rights prior to the

5    questioning.  And what that is, is if you have a suspicion

6    in your mind that he may have done wrongdoing like

7    cheating, then he's afforded his Article 31 rights.  If he

8    waives them thereafter and talks to you, there's nothing

9    wrong, but that's what I have to decide here, and I'm not

10   really getting a clear answer from you.

11

12   A:   And I guess I don't understand.  I guess I'm not sure

13   what you're asking me.  Are you saying did I sit there and

14   think hmm, you know, he's at it again?  Is that -- are you

15   asking if that was in my mind?

16

17   Q:   Yes.  Was there anything in your mind that said --

18

19   A:   It was literally I have an inconsistency; you need to

20   explain it to me.

21

34

000088

1    Q:  Okay.

2

3    A:  I did not know what was wrong.

4

5    Q:  Okay.

6

7    A:  And as I said, when I opened the paper and I looked at

8    it, my first inclination is I want this to be a really

9    great paper.  I want this to do really well.  Even though

10   it's not answering the prompt, this is going to be on

11   images, it's going to be great.  I can honestly say I went

12   into that paper with boy, knock this out of the ballpark,

13   this will be great.

14

15   Q:  But you did have to go get two Honor reps to go with

16   you?

17

18   A:  Excuse me?

19

20   Q:  You had to get --

35

1

2    A:   To go where?

3

4    Q:   The English Department Honor Officer and the Cadet

5    Department Honor Liaison.  So I guess --

6

7    A:   Because yes, when I have an inconsistency and again, I

8    take it to my course director and I say there's an

9    inconsistency and he'll say do you think an approach is

10   necessary, I'm like yes, we need to flesh out what

11   happened here.

12

13   Q:   Yeah, I know.  That's fine, ma'am.  So your testimony,

14   I just -- and I think I'm done with your questioning

15   ma'am, and I'll open it up to these guys, is that --

16   because what you're saying to me is that irrespective of

17   the fact that in your mind, you suspected him of cheating

18   on the Essay No. 3 and that you wrote that statement

19   thereafter --

20

21   A:   Uh-huh.

                              36

1

2    Q:   And irrespective of right after that he hands in 4 and

3    you find the citations are off and that there could be a

4    problem, when you did that approach for clarification, you

5    did not suspect him of cheating?

6

7    A:   I needed a clarification as to what happened.   I guess

8    I can only reiterate that.   I needed an explanation as to

9    what was going on, why the citations were wrong.

10

11   Q:   And you did not suspect him of cheating?

12

13   A:   Not -- no, not if you could explain to me, I guess,

14   what -- you know, tell me what's happening here.   I was --

15   again, went in with, explain this.   Explain this to me.

16   It wasn't automatically you're cheating, I caught you.   It

17   wasn't that, no.

18

19   Q:   Right.

20

21   A:   It was explain these two things to me.

37

1

2    Q:  I know.  But let me -- I guess if -- did you ask

3    questions that could've elicited an incriminating answer

4    on his part?  In other words --

5

6    A:  If you notice from my statement, I couldn't even get

7    out why he was in the room.  He jumped immediately in and

8    said, "I know why I'm here."  And I said, "Excuse me, wait

9    a minute.  Let's all, you know, we're all going to sit at

10    the table.

11

12    Q:  But you sent him an e-mail?

13

14    A:  And all the e-mail said was I have questions about

15    Essay 4.  That was all; just questions.

16

17    Q:  Right.  That's okay, but --

18

19    A:  I did not enumerate what they were and -- yeah.

20

38

1    Q:   Okay.  But just for the record, though, you didn't

2    suspect him of cheating?

3

4    A:   Not off the bat, I guess, no.  I mean --

5

6    Q:   At what point did you suspect that maybe he was

7    cheating?

8

9    A:   Again, there was no clear explanation and when Major

10   George said to me, "Are you satisfied as to what's going

11   on?" and I said "No, because there's no attributive tags

12   and because we still don't know what the sources were and

13   we still don't -- I still don't understand what part was

14   the Cadet's work and what part was my work."

15

16   Q:   Okay.  All right.

17

18   **HA:**   Do you have any questions, Cadet Spadone?

19

20   **RESP:**   No, I do not, sir.

39

1

2  **HA:**   Do you have any questions, Cadet Howell?

3  **IR:**   Yes, sir.

4

5  ### QUESTIONS BY THE INVESTIGATIVE REPRESENTATIVE

6

7  Q:   So ma'am, just to clarify, before the approach for

8  clarification, you would say that you didn't think he

9  cheated?   You were simply just trying to figure out what

10  was going on in the essay?

11

12  A:   Right.   And so again, if this --

13

14  Q:   And so that's why you had the approach for

15  clarification, to figure out what was going on, not so

16  much to have -- not so much as because you thought he had

17  cheated, and the reason you brought the Honor reps with

18  you was because that's just protocol?

19

20  A:   As I understood it, I was following proper procedure.

40

1

2    Q:  And so you didn't really think he had cheated until

3    after the approach for clarification?

4

5    A:  Yes, I didn't know, and then when they asked me, "Do

6    you -- would you -- how do you feel about this," or "Are

7    you satisfied," I said, "No, because I still don't know.

8    I still have no explanation as to why the citations that

9    is clear, why the citations are incorrect."

10

11   Q:  So really, you never really thought he cheated at all?

12   You just thought it should be looked at by the Honor

13   Committee?  You weren't sure?

14

15   A:  Again, I didn't know.  I didn't know and I wanted to

16   have it clarified.  But again, there were inconsistencies,

17   so I went through my chain of command and said, "There's

18   inconsistencies here; they're significant enough that I

19   think I need to talk to the student about what happened."

20

21   IR:  Okay.  That's all my questions.  Thank you, ma'am.

                                41

1

2     **RESP:**  Sir, could I just ask one question?

3

4     **HA:**  Sure.

5

6                    **QUESTIONS BY THE RESPONDENT**

7

8     Q:  On Appellate Exhibit 4-3, these aren't your words, but

9     these were the inferences drawn by Cadet Gibbons and Cadet

10    Zingapan, it says on the second paragraph here, "Dr.

11    Sabatos grew suspicious and on 30 November 2009, she set

12    up a meeting with Cadet Spadone to discuss his paper."

13    You maintain that you had questions that you couldn't

14    explain?

15

16    A:  Right, yeah, I could not explain.

17

18    Q:  Why would they jump to the conclusion that you grew

19    suspicious?

20

                                42

1    A:  I don't know.  You'll have to ask them.

2

3    Q:  Sir, actually, he's right here.

4

5    **CDT ZINGAPAN:**  I'm right here.  I think what I was trying

6    to get at was --

7

8    **HA:**  You've got to state for the record who you are and --

9    because you're making yourself a witness, and if you are,

10   you're going to stand up and we'll swear you in.

11

12   **IR:**  Sir, he's Cadet Jeremiah Zingapan and he's the First

13   Regimental Honor Representative Elect, and he's also a

14   Company Honor Representative right now, so that's why he

15   was a member of the investigative team.

16

17   **HA:**  Yeah, that's fine, but I mean, if I were to bring in

18   a CID officer who investigated something at a different

19   level, I'd still have to read him his rights, as a matter

20   of him trying to --

43

000097

1

2     **IR:**   That's fine.

3

4     **HA:**   What's your name?   Please state your name and your

5     class and your rank.

6

7     **CADET ZINGAPAN:**   Cadet Jeremiah Zingapan, Class of 2011,

8     Company C-1.

9

10    Cadet Jeremiah Zingapan, Company C-1, Class of 2011, First

11    Regimental Honor Representative Elect, was sworn and

12    testified as follows:

13

14                    **QUESTIONS BY THE HEARING ADVISOR**

15

16    Q:   Okay.   Have a seat.

17

18    A:   So, sir, to answer that question, I think maybe "grew

19    suspicious" was the wrong words to use.   I think what I

20    was trying to get at was curious as to like why this

                                  44

1    occurred.  Maybe suspicious was too strong, but it was

2    definitely not the intent that -- I don't think that she

3    acted suspicious, as well; more so that she was just

4    curious as to why the inconsistencies were there, which is

5    the reason why she set up that appointment.

6

7    **HA:**  Okay.  I think we're all done, ma'am.  I mean, I

8    don't want to take too much more of your time.  I really

9    appreciate you coming over.  Please don't feel like this

10   was a grilling.  I have a job here.  I've got to ensure

11   that I get facts, so I was just unclear as to what your

12   state of mind was.

13

14   **MS. SABATOS:**  My state of mind was to absolutely clarify

15   the situation and two, if possible, help a Cadet

16   understand how to better incorporate the citations.

17

18   **HA:**  Okay.  All right.  I appreciate it, ma'am.  Thank you

19   very much.

20

21   **MS. SABATOS:**  Thank you.

                              45

000099

1

2    HA:  Cadet Howell, I think, will get in touch with you to

3    ensure that on Monday, you're available to testify.

4

5    MS. SABATOS:  Now do I call you or --

6

7    HA:  You can contact him.

8

9    IR:  It'll probably be Cadet Callejas actually, ma'am.

10

11   DR. SABATOS:  Okay.

12

13   IR:  Yeah.  Someone will definitely contact you.

14

15   DR. SABATOS:  Okay.  Can I do it in the morning, because

16   if it's afternoon, so I know not to go anywhere.

17

18   IR:  Actually, let me just collect your information.  Do

19   you have class, ma'am?

46

1

2    DR. SABATOS:  Oh, I don't have class at all on Monday, so

3    -- but I'll be -- in classes, but just let me know so that

4    I make sure I don't --

5

6    IR:  I want to say probably sometime after noon.

7

8    DR. SABATOS:  That would be great.

9

10   IR:  So it depends on how the things before that take

11   place, but it's usually sometime around that 1300, 1400.

12

13   DR. SABATOS:  Okay.  Thank you.

14

15   IR:  Are you going to be in your office, ma'am?

16

17   DR. SABATOS:  Yeah.  Call my office first or send me an e-

18   mail.

19

20   HA:  One last question, ma'am, while you sit here.

47

000101

1

2      Dr. Terri Sabatos, Associate Professor, Department of

3      English and Philosophy, witness for the Board, was

4      previously sworn and testified as follows:

5

6                  **QUESTIONS BY THE HEARING ADVISOR**

7

8      Q:   "Cadet Spadone's paper named six different instances

9      of parenthetically cited information, which does not

10     appear to originate from the page numbers of the sources

11     identified in the citations, a clear case of insufficient

12     documentation and plagiarism."  Are you saying that you

13     came to that conclusion after you had the approach for

14     clarification?

15

16     A:   There was no explanation.  Plagiarism can -- is when

17     you do not document properly.

18

19     Q:   Okay.  All right.  I just wanted to make sure because

20     it was kind of like in the bottom line up there.  No, no.

21     It makes sense, ma'am.

                              48

000102

1

2    A:   That's sort of, I guess, the intro to the paper with

3    the thesis statement, perhaps?

4

5    Q:   Right, right.

6

7    A:   Okay.

8

9    Q:   I just ask that you not discuss your testimony with

10   anybody else except for Cadet Spadone and that you're

11   still going to be kind of under oath until Monday.

12

13   A:   Yes.  I recognize that, okay.

14

15   Q:   Okay.  I'll walk you out, ma'am.  I appreciate it.

16   We'll take a brief in-seat recess.

17

18   The hearing was recessed at 1405 hours, 5 March 2010.

19

49

1   The hearing was called to order at 1410 hours, 5 March

2   2010.  All parties present prior to the recess were again

3   present.

4

5   **HA:**  Cadet Zingapan, you're still under oath, and realize

6   that if this had been investigated by an MP, or if he was

7   involved here in the investigative process, which you

8   were, and there were questions about it, they needed to be

9   asked by the Board, I would have to swear in that guy.  So

10  you understand that, right?  It's different as opposed to

11  you (IR).  You understand that, right?

12

13  **IR:**  I don't really understand.

14

15  **HA:**  He's a witness.  He said he's going to add something

16  to another witness's testimony.

17

18  **IR:**  Okay, okay, yeah.  That makes sense, if he's looked

19  at as a witness.

20

50

1    HA:  Because you did the investigation on this, right?

2

3    CADET ZINGAPAN:  Yes, sir.

4

5    HA:  You have a question for him, Cadet Spadone?

6

7    Cadet Jeremiah Zingapan, Company C-1, Class of 2011, First

8    Regimental Honor Representative Elect, was previously

9    sworn and testified as follows:

10

11                QUESTIONS BY THE RESPONDENT

12

13   Q:  Cadet Zingapan, in the Appellate Exhibit IV-3, we were

14   just talking about, you used the words, "Cadet Sabatos

15   (sic) grew suspicious," and you said that was the wrong

16   use of words.  What, at the time, made you choose to use

17   those words to describe Dr. Sabatos?

18

19   A:  At the time the term "curious" didn't come to me, so

20   had I known, you know, what exactly the effects of my

21   words at the time -- I would attribute it to carelessness.

                                51

1    But it definitely was not intended to impose any feelings

2    on her part.   It was more that she was curious, which is

3    why if you read further, it says, "She set up a meeting

4    with Cadet Spadone to discuss his paper."   Nowhere in that

5    statement does it say that -- you know, to discuss his

6    Honor violation or anything like that.

7

8    **RESP:**   Thank you very much.   No further questions.

9

10   **HA:**   All right.   That questioning has now ended because

11   Dr. Sabatos needed to get back to her class.   So I'm going

12   to probably -- well, I'll get to it when we talk about the

13   evidence.   Let's get back to the script, okay?   It's my

14   questioning, but are you satisfied with the questions?

15

16   **RESP:**   I am.

17

18   **HA:**   IR, do you have any problems with my questions?   Do

19   you understand what I was getting at?

20

21   **IR:**   I understand what you were getting at, sir.

52

1

2    **HA:**   Okay.   You see the surrounding circumstances here,

3    and that's why I had to ask those questions.   And I'll put

4    on the record right now, if you didn't have that previous

5    allegation, it may really look like an appropriate

6    approach for clarification.   However, it's very difficult

7    for a reasonable person to sit back and say that there was

8    no suspicion in her mind, but I'm going to revisit her

9    testimony later and probably making a ruling on Monday.

10

11   I'm going to now explain to you what will happen during

12   this preliminary hearing.   First I'm going to address some

13   procedural issues.   Then I will explain the rules of

14   evidence that apply in this hearing and the types of

15   evidence that you may submit, through witnesses or

16   documents, during and after the hearing.

17

18   I will ensure that you have a complete copy of the

19   investigative file in this case, including all preliminary

20   Board Exhibits and Appellate Exhibits.   I will rule on any

21   objections you may have to Board Exhibits, consider any

22   exhibits you wish to have admitted and the IR's comments

53

1    on them, and then admit exhibits into the record as

2    appropriate.

3

4    Next, I will notify you of the witnesses against you in

5    this case.  Again, you may object to these witnesses, if

6    you desire, and I will rule on your objections.  You may

7    also notify me of any witnesses you wish to appear at your

8    HIH.

9

10   After we have discussed the evidence and the witnesses, I

11   will ask you if you want to admit to the alleged Honor

12   violations.  If you choose to admit to the allegations, I

13   will place you under oath and question you about your

14   admission; this is called a providence inquiry.  If you do

15   not wish to admit to the allegations, then I will discuss

16   with you some procedural issues for the HIH.

17

18   Do you have any questions for me about what will happen at

19   this preliminary hearing?

20

21   **RESP:**  No, I do not, sir.

54

000108

1

2     **HA:**   Okay.   Cadet Spadone, you were provided with a

3     notification of rights and responsibilities on 17 February

4     2010.   This is marked as Appellate Exhibit X. Do you have

5     a copy of this document?

6

7     **RESP:**   I do, sir.

8

9     **HA:**   Please turn to it.   Did you read and understand the

10    rights afforded to you at this HIH?

11

12    **RESP:**   I do understand the rights afforded to me, sir.

13

14    **HA:**   And you did at the time, when you signed it?

15

16    **RESP:**   Yes, sir.

17

18    **HA:**   I want to draw your attention to paragraph 5(g) of

19    this notification.   Female Cadets or Cadets who consider

20    themselves to be members of a minority group may request a

55

1    female Cadet or a Cadet who is also a member of a minority

2    group to be included on the panel that will decide your

3    case.  However, Cadets cannot request a member of a

4    specific minority group.  Cadet Spadone, do you identify

5    yourself as a member of a minority group?

6

7    **RESP:**  No, I do not.

8

9    **HA:**  Okay.  At this time, I need to explain to you the

10   rights under a Federal law called the Privacy Act of 1974,

11   which regulates the collection and use of personal

12   information by the Federal government.  During this

13   hearing, you may choose to offer personal information

14   about yourself to the Board Members, the Commandant, the

15   Superintendent, and other officials at the Academy.  For

16   example, you may wish to describe personal obstacles you

17   overcame to attend USMA.  Any personal information you

18   offer will become part of an official record of this case

19   and may be used for official purposes by members of the

20   Department of Defense who have a need for this information

21   in the performance of their duties.  All disclosures by

22   you are voluntary; you do not need to disclose any

56

1    personal information at any time.  Furthermore, there will

2    be no adverse effect if you choose not to disclose

3    personal information, except that this information may not

4    otherwise be available to those required to make a

5    decision in your case.

6

7    Do you have any questions concerning your privacy rights?

8

9    **RESP:**  No, I do not.

10

11   **HA:**  Okay.  Please read, sign, and date the Privacy Act

12   statement in front of you.  This will be marked as the

13   next Appellate Exhibit [XXVI] and a copy will be given to

14   you at the second preliminary hearing.

15

16   [The Respondent read and signed the Privacy Act statement,

17   Appellate Exhibit XXVI, and provided it to the Hearing

18   Advisor.]

19

20   **HA:**  Cadet Spadone, we will now discuss the evidence to be

21   used in your case.  First, I will briefly explain to you

57

1   the rules for an HIH.   The Military Rules of Evidence,

2   which apply in a court-martial, do not apply here in the

3   Honor System.

4

5   I also want to annotate for the record here that this is a

6   unique case in that one of the allegations, the first

7   allegation, occurred prior to the new 15-1 pamphlet, which

8   was signed on 11 November 2009.   So in reality, we will be

9   working under the old USCC Pam for that allegation, but

10  I'm going to stick with the new Pam and use the paragraphs

11  in that Pam when I explain things to you because it is my

12  understanding that your attorney has -- your attorney has

13  informed me that you intend on CAB'ing to the first

14  allegation.   So when we do that, if you're not provident,

15  I may have to reduce some things here in terms of the way

16  they script it.

17

18  **RESP:**   Can you explain, sir, if I am "not provident?"

19

20  **HA:**   Right.   If you admit to it and I don't believe that

21  you truly believe that you did it.

58

000112

1

2       **RESP:**  Yes, sir.

3

4       **HA:**   Okay?  So right now, we're under the new Pam, USCC

5       Pam 15-1, and that was signed on 11 November 2009.  And

6       I'm going to proceed forward with that.  Substantively and

7       procedurally, for this preliminary hearing, the two Pams

8       really aren't that different, okay?

9

10      USCC Pam 15-1, paragraph 405(g), states that an HIH may

11      accept anything, which in the mind of a reasonable person,

12      is relevant and material to whether the Respondent

13      committed the alleged Honor violation, and the

14      Respondent's intent at the time the Honor violation took

15      place.  Certain items are not admissible, however, such as

16      communications between you and your attorney, polygraph

17      tests, evidence taken in violation of your right against

18      self-incrimination, evidence taken in violation of granted

19      immunity, involuntary admissions and evidence derived from

20      unlawful searches.  Do you understand these rules as I

21      have explained them to you?

59

1

2      **RESP:**   I do, sir.

3

4      **HA:**   There are three types of evidence that may be

5      considered throughout these proceedings.  First, you may

6      present testimony or documents that show what happened and

7      whether you did or did not commit an Honor violation.

8      This information is presented before the Board decides

9      whether you violated the Honor Code.   These types of

10     witnesses are called merit witnesses.

11

12     Second, you may also call specific character witnesses to

13     testify that you possess a specific character trait, such

14     as honesty or truthfulness, which would tend to indicate

15     that you did not commit the alleged Honor violation.   You

16     may also submit written character statements with the same

17     information.   These witnesses or statements must include a

18     specific example of where you displayed your character

19     trait; for example, when a restaurant charged you too

20     little for a meal and you corrected the bill even though

21     it cost you more money.   This evidence is also presented

60

000114

1   before the Board decides whether you violated the Honor

2   Code.

3

4   The Cadet Honor Committee may solicit a specific character

5   statement and/or testimony from a Respondent's tactical

6   officer or company tactical NCO prior to the preliminary

7   hearing.  If the company tactical officer or company

8   tactical NCO is unavailable or does not have suitable

9   experience supervising the Respondent to comment on

10  specific character, then the Cadet Honor Committee may

11  solicit a specific character statement and/or testimony

12  from a former company tactical officer, former company

13  tactical NCO, or former member of the Respondent's chain

14  of command.

15

16  These specific character statements must be relevant and

17  relate to the specific character trait in question, and

18  will only be admitted on the merits prior to deliberation

19  and after the Respondent has admitted his or her specific

20  character statements.  Negative character trait evidence

21  from the company tactical officer to company tactical NCO

22  will only be admitted on the merits when one, it exists

61

1    and two, the Respondent submitted positive, specific

2    character trait evidence.  When this is not the case, the

3    company tactical officer or company tactical NCO's

4    statements will only be shared with the Board Members

5    after the Board deliberates and the Respondent is found in

6    violation of the Cadet Honor Code.  Do you understand?

7

8    **RESP:**  I do understand, sir.

9

10   **HA:**  Last, evidence or witnesses who have good things to

11   say about you generally, but who do not have information

12   concerning a specific character trait relevant to the

13   allegation is called general character evidence.  For

14   example, this evidence may show that you volunteer in your

15   community, that you are very smart, or have experience

16   that may make you a good officer.  This type of evidence

17   is presented only after the Board finds that you violated

18   the Honor Code, or if you choose to admit that you

19   violated the Honor Code.

20

62

000116

1  Do you have any questions about the type of evidence that

2  you may present?

3

4  **RESP:**  At this time I do not, sir.

5

6  **HA:**  Do you have any questions right now?  No?

7

8  **RESP:**  No, I do not.

9

10  **HA:**  All right.  Let's turn to the Board packet.  I am

11  going to go through each of the exhibits and describe them

12  for the record.  Once I am done I will consider whether

13  the marked exhibits will be admitted for use by the HIH in

14  deciding whether or not you committed the alleged Honor

15  violations.

16

17  The Hearing Advisor listed the Preliminary Board Exhibits

18  as follows:

19  1. Sworn Statement of Cadet Alan Spadone, dated 18 Nov
20     09 (2 pgs)
21  2. Sworn Statement of Cadet Alan Spadone, dated 18 Nov
22     09 (2 pgs)

63

000117

3. Sworn Statement of Cadet Alan Spadone, dated 8 Jan 10 (2 pgs)

4. Sworn Statement of Cadet Alan Spadone, dated 12 Jan 10 (2 pgs)

5. Sworn Statement of Dr. Terri Sabatos, dated 16 Nov 09 (2 pgs)

6. Sworn Statement of Dr. Terri Sabatos, dated 16 Nov 09 (3 pgs)

7. Sworn Statement of Dr. Terri Sabatos, dated 14 Dec 09 (3 pgs)

8. Sworn Statement of Dr. Terri Sabatos, dated 8 Jan 10 (2 pgs)

9. Sworn Statement of Major Anthony George, dated 16 Nov 09 (2 pgs)

10. Sworn Statement of Major Anthony George, dated 12 Feb 10 (2 pgs)

11. Sworn Statement of Cadet Adam Bishop, dated 9 Nov 09 (3 pgs)

12. EN302 "Pacific-Wide Ocean of Fantasies" paper by CDT Spadone, dated 27 Oct 09 (8 pgs)

13. Text of "Pacific-Wide Ocean of Fantasies" paper by CDT Spadone, undated (5 pgs)

14. EN302 "The Construction of an Image" paper by CDT Spadone, dated 19 Nov 09 (8 pgs)

15. Handwritten notes, undated (10 pgs)

16. "Lost in Translation" article by Homay King, published in Film Quarterly, 200 (4 pgs)

17. Excerpts from Hirohito, the Emperor and the Man (5 pgs)

18. Excerpts from The History of Japanese Photography (7 pgs)

19. EN302: Advanced Composition Course Syllabus Fall 2009 (7 pgs)

20. EN302: Advanced Composition Essay #3 Assignment Sheet (1 pg)

21. EN302: Advanced Composition Essay #4 Assignment Sheet (1 pg)

22. EN302 Absence Tracking Sheet, dated 6 Nov 09 (1 pg)

23. EN302 Absence Tracking Sheet, dated 8 Dec 09 (1 pg)

Okay.  Do you have all of these exhibits?

000118

1    **RESP:**  That is correct, sir.

2

3    **HA:**  Okay.  Your attorney has submitted a motion to

4    exclude objectionable evidence that was dated 3 March

5    2010.  Mrs. Linnartz, do you have a copy of this?

6

7    **REPORTER:**  Yes.

8

9    **HA:**  Is it marked as an Appellate Exhibit?

10

11   **REPORTER:**  Yes.

12

13   **HA:**  Okay.  In this exhibit --

14

15   **IR:**  Which Appellate Exhibit is this, sir?

16

17   **REPORTER:**  XXV.

18

19   **HA:**  In this exhibit, your attorney raises the fact that

20   there were -- he's arguing that there are Article 31

                                65

1   violations concerning Allegation No. 1.  However, he wants

2   to keep -- he's not asking to object to those allegations.

3   Is that correct?

4

5   **RESP:**  That is -- when you say he doesn't want to object

6   to these allegations, I would -- we're not objecting to

7   any evidence from the case concerning Case 1.

8

9   **HA:**  Okay.  You just said -- you're going to have to speak

10  up.

11

12  **RESP:**  Okay.  We are not objecting to any evidence from --

13

14  **HA:**  Concerning Allegation No. 1?

15

16  **RESP:**  Correct.

17

18  **HA:**  My understanding is that you're going to try to CAB,

19  at this preliminary hearing, that allegation.

20

66

1    **RESP:** Correct.

2

3    **HA:** Okay. If I find you provident and if you admit to

4    that allegation and I find that it's provident, I am

5    inclined to remove the following exhibits, and tell me if

6    you agree. Now you need to look through this list and

7    ensure -- IR, you need to look through this list. I am

8    just going to take out the statements that have to do with

9    the first allegation. Those Board exhibits will be 1, 2,

10   5, 6, 12, 13, 16 and 20. Is that correct, Cadet Spadone?

11

12   **RESP:** Sir, after talking to my lawyer, we would contest

13   1, 2, 12, 13, 6, 5, 11, 16, 22, 23 and Board Exhibit 8.

14

15   **HA:** Wait a minute. Go through them again.

16

17   **RESP:** I'm sorry. I'll try to go in order here. One --

18

19   **HA:** I'm just talking about Allegation No. 1. Don't go

20   into the other ones.

67

1

2      RESP:   Okay.   Allegation No. 1?   Yes, sir.

3

4      HA:   Right.

5

6      RESP:   1, 2, 5, 6, 11.

7

8      HA:   Wait a minute.   Okay because -- 11 because --

9

10     RESP:   It was the Cadet present at the first --

11

12     HA:   Right, okay.   Yup.

13

14     RESP:   12, 13, 22.

15

16     HA:   Why not 16?

17

18     RESP:   16 also, sir.

19

1    **HA:**   16.   What else?   What's after 16?   20?   Because

2    that's your Essay No. 3.

3

4    **IR:**   I thought you meant 22.

5

6    **RESP:**   20 is -- 20, yes.

7

8    **HA:**   Yes?   What else?

9

10   **RESP:**   22.

11

12   **HA:**   I'm going to talk about those two later.

13

14   **RESP:**   And No. 8.   And who else have you talked to?   It's

15   so confusing and it's --

16

17   **HA:**   I'll talk about those later.   8, 22 and 23 we're

18   going to address at the end.   IR, do you have any

19   objection if -- I'm not excluding it just yet.   It's all -

20   - it's dependent upon whether or not he is provident of

69

1    the first allegation for removing those documents from the

2    Board.

3

4    **IR:**   Just to clarify, it's 1, 2, 5, 6, 11, 12, 13, 20 and

5    16?

6

7    **HA:**   Correct.

8

9    **IR:**   If they're all related to the first case, then I

10   don't have any problem with it.

11

12   **HA:**   So the Honor Committee has no problem, either?

13

14   Okay.  Here's what I am going to do, though, okay?  I'm

15   willing to exclude that evidence if you're found

16   provident.  I'm still going to keep that allegation in

17   there, though, okay?  Allegation No. 1.

18

19   Your attorney has asked that Allegation No. 1 still remain

20   in front of the board when they decide the case, and for

70

000124

1   whatever reasons that may be.  Is that correct?

2

3   **RESP:**  That is correct, sir.

4

5   **HA:**  Okay.  So tentatively, 1, 2, 5, 6, 11, 12, 13, 16 and

6   20 are excluded.  Now, Mrs. Linnartz, we're going to have

7   to do a lot of juggling here because we can move on to the

8   rest of them here.

9

10   Your attorney has then said that the following exhibits be

11   excluded, and that's Exhibits 7, 9, 10, 22 and 23.  I'm

12   going to address 22 and 23 at the end, but let's talk

13   about 7, 9, 10, okay?  Those all have to do with the

14   second allegation and the third allegation and the

15   approach for clarification, correct?

16

17   **RESP:**  That is correct, sir.

18

19   **HA:**  Okay.  And your attorney has stated that -- what he

20   does is your attorney uses the Investigative Team Report,

21   prepared by the IT, who presumably interviewed Dr.

71

1    Sabatos, and who stated in his findings that Dr. Sabatos

2    "Grew suspicious on 30 November 2009, so she get up a

3    meeting with Cadet Spadone.  These parties clearly

4    suspected Cadet Spadone of misconduct, questioned him and

5    did not inform him of his right to remain silent,

6    consistent with Article 31."  Those are your attorney's

7    words taken out of Paragraph 3 of his motion.

8

9    **RESP:**  That is correct, sir.

10

11   **HA:**  Okay.  I don't find any merit in the next paragraph,

12   and let me just tell you why, okay?  The next paragraph

13   reads that "At the time of the incident, sometime three

14   months ago, USCC 15-1," he must be talking about 11

15   November 2009, "was in effect, and that it recognized the

16   right to remain silent during an approach for

17   clarification, and this approach for clarification clearly

18   violated Article 31 of the UCMJ and USCC 15-1.  Article 31

19   applies in this instance due to the fact that the

20   statements made may incriminate you under Article 133 of

21   the UCMJ, Conduct Unbecoming of an Officer and Gentleman."

72

1    And then he goes on to discuss it a little bit further.

2    He says, "Article 31 can't be limited to simply labeling a

3    violation as non-criminal."

4

5    I don't think that that's the problem here.  I think that

6    USCC Pam 15-1 allows for approach for clarification when

7    the person doing the questioning is unclear or believes

8    that there's a reasonable explanation as to what the

9    discrepancy may be.  If it rises to a level of suspicion

10   that you committed an Honor Code violation or a violation

11   under the UCMJ, your Article 31 rights must be triggered

12   in questioning must cease and stop.  You must be read your

13   Article 31 rights.  That's how 15-1 is, and I'm

14   paraphrasing that, obviously.

15

16   So here's what I need to do just to ensure that I'm going

17   to do this as thorough as possible.  Let's see.  Hang on.

18   Your attorney has also -- let me just state that Article

19   31 rights are required for administrative proceedings such

20   as this, even -- you know, even if, in the minds of the

21   people questioning you that it's not going to go to a

22   court-martial, it's going to be for an administrative

73

000127

1    adverse action, Article 31 rights do need to be raised

2    when the questioner suspects you of committing some type

3    of wrongdoing, an Honor violation or UCJS Code, okay?

4

5    **RESP:** Yes, sir.

6

7    **HA:**  So he is correct there.  And then he talks about some

8    other issues which he raises in terms of speedy trial, and

9    I can understand that because we are well beyond that

10   forty-day process.  However, there are a number of

11   different allegations here, and they all go down a time

12   line ranging from the end of October to the beginning of

13   December.  Then you have your winter break and although it

14   has taken some time here to get this case going, but I

15   also note for the record that your attorney has asked for

16   multiple delays.  He has made requests to the Commandant,

17   which has also delayed the process.  I understand that he

18   has raised the speedy trial issue, and I'm putting it on

19   the record because he did raise it, okay?  So I'm

20   solidifying it for the record, for your attorney.  But I'm

21   also clarifying for the record as to why we're so late in

22   the process.

74

1

2    **RESP:**  Okay, sir.

3

4    **HA:**  You did ask for a number of delays, correct?

5

6    **RESP:**  We first asked for a delay that was granted for two

7    days, and then my Cadet Advisor was away from the Academy

8    for one week because he was on emergency leave.

9

10   **HA:**  Right.  So then there was a delay for that, and then

11   there was a delay also to have the Com [Commandant] maybe

12   take action on it, correct?

13

14   **RESP:**  That was the first incident, sir.

15

16   **HA:**  Okay.  But then there's this last delay because you

17   requested more time, also, to gather more evidence, too,

18   right?

19

75

1    **RESP:**  Sir, it is my knowledge right now that we only had

2    two delays in the case.

3

4    **HA:**  Okay.  Nevertheless, I note that it's been raised.

5

6    Here's what my intent is.  I'm going to re-listen to Dr.

7    Sabatos's testimony that she provided here today,

8    including Cadet Zingapan.  I just want you to know [Cadet

9    Zingapan], I know you're supposed to be viewing these

10   proceedings, but now you've kind of got a vested interest

11   in it, and I'll leave it up to Major Baka as to how he

12   wants you to shadow the rest of this proceeding for the

13   IR, but please note, for Major Baka, that you made

14   yourself a witness by making statements on the record,

15   okay?

16

17   **CDT ZINGAPAN:**  Yes, sir.

18

19   **HA:**  Okay.  All right.  So I am going to reserve my ruling

20   on Board Exhibits 7, 9 and 10 for Monday morning because I

21   want to re-listen to the tapes and I want to take notes

76

1    and also reread all of these statements for the fourth

2    time.

3

4    So understand that if you are provident to the first

5    allegation, we will take away all those exhibits, as

6    previously mentioned, but if I come in on Monday and say I

7    think that Dr. Sabatos answered my questions in a way that

8    leads me to believe that it was an appropriate approach

9    for clarification, then that means that 7, 9 and 10 are

10   going to come in.  Do you understand?

11

12   **RESP:**  I understand, sir.

13

14   **HA:**  Okay.  So you need to be prepared to proceed as if

15   those three exhibits are going to come in, okay?

16

17   **RESP:**  Yes, sir.

18

19   **HA:**  Now let's look at Board Exhibit 8.  IR, please do me

20   a favor and take a look at Board Exhibit 8 and tell me why

77

1    that's relevant and why that should be included in front

2    of the board.

3

4    **RESP:**  Sir, one quick question before we move on.

5

6    **HA:**  Sure.

7

8    **RESP:**  I thought one of the times you said 7, 9, 10 and

9    11, but the last time you said 7, 9 and 10.  Board Exhibit

10   11 --

11

12   **HA:**  We're going to talk about that.

13

14   **RESP:**  Okay.

15

16   **HA:**  Because that has to do with the first one.

17

18   **RESP:**  Yes, sir.

19

78

000132

1    **HA:** I already told you that for the first one, that's

2    going to be gone if you're provident.

3

4    **RESP:** Okay.

5

6    **HA:** We'll go through them one more time at the end and

7    we'll all be on the same line.

8

9    Number 8; what do you say, IR?

10

11   **IR:** These are just procedural, sir, so it's okay if

12   they're excluded.

13

14   **HA:** So the Honor Committee is okay with excluding 8?

15

16   **IR:** Yes, sir.

17

18   **HA:** Okay. Eight is gone. Now, let's look at Board

19   Exhibit 22 and 23. Why are those relevant, IR?

20

79

1    **RESP:**  Sir, I don't see any reason that they're relevant,

2    either.  They can be excluded.

3

4    **HA:**  All right.  So 22 and 23 are also excluded.

5

6    Here's how we're going to proceed; it's going to make it

7    real efficient, simply because we're really running late

8    because we had that witness testimony.  I'm going to

9    withhold on my rulings here and we're going to talk about

10   what's outstanding, okay?  Just so you know, Board

11   Exhibits 7, 9 and 10 I'm going to reserve my ruling until

12   Monday, but we're going to go over what Board Exhibits are

13   left after the providence inquiry, all right?

14

15   **RESP:**  Yes, sir.

16

17   **HA:**  Cadet Spadone, do you have any documents, sworn

18   statements or other items you want me to consider by the

19   HIH at this time?

20

80

1    **RESP:**  Would this be for character witnesses?

2

3    **HA:**  Yes.  What's this?

4

5    **RESP:**  This is an envelope with a character witness in it.

6

7    **HA:**  No.  I'm not doing envelopes.  You have to open it up

8    and give it to me as an exhibit, because I don't know what

9    you're handing me.  You understand?

10

11   **RESP:**  I understand, sir.

12

13   **HA:**  All right.  I can't admit something that I don't know

14   what's in there, and I'm not going to open up letters.  Is

15   this a general character statement?

16

17   **RESP:**  Yes, sir.

18

19   **HA:**  So you want this to come in front of the Board if

20   you're provident to this allegation and you go to the CAB

81

000135

1    portion, correct?

2

3    **RESP:**  That is correct, sir.

4

5    **HA:**  Okay.  This will be Respondent Exhibit No. 1.  Are

6    there any other statements or evidence?

7

8    **RESP:**  Not at this time.

9

10   **HA:**  Not at this time.  Please do me a favor, and if

11   you're going to have a laundry list full of statements,

12   try to get them to me by COB today.  Of course, I will

13   always consider anything you would provide me on Monday,

14   as well.

15

16   **RESP:**  Yes, sir.

17

18   **HA:**  But please get them to me earlier than later.

19

20   **IR:**  Sir, is that a character statement?

82

1

2      **HA:**   Yeah, it's for if he is found.

3

4      **IR:**   Oh, okay.

5

6      **HA:**   Okay?   General character statement; it's not

7      specific, correct?

8

9      **IR:**   That is correct, sir.

10

11     **HA:**   Okay.   You must provide all documents to me or the

12     court reporter so that I may rule upon the admissibility

13     of the proposed evidence for the inclusion in the packet,

14     to be presented to the HIH or CAB.   I will inform you, in

15     writing, of any written submission that you may have, and

16     will not admit any evidence received after adjournment.

17     If I rule favorably upon the evidence submitted by you and

18     include it in the packet for the HIH or CAB, I will do so

19     without notifying you.   Do you understand me in terms of

20     this requirement?

21

83

1    **RESP:**  Yes, sir.

2

3    **HA:**  Okay.  Respondent Exhibit 1 is admitted into evidence

4    for the CAB portion of the hearing.

5

6    Cadet Spadone, please turn to the Appellate Exhibits,

7    which are marked with Roman numerals.  Only Appellate

8    Exhibits I and XI, XII and XIII, the allegations and

9    elements, will be part of the Board folder provided to the

10   Members of the HIH or to the Members of the CAB.

11

12   The elements of cheating under the 1 February 2007 Pam is

13   that on or about a certain date, a Cadet did a certain act

14   and that the Cadet did so with the intent to gain or give

15   an unfair advantage, or with the intent to deceive another

16   person.

17

18   The elements of cheating under the new Pam are identical,

19   that on or about a certain date, the Cadet did a certain

20   act, that the Cadet did so with the intent to gain or give

84

1    an unfair advantage, or with the intent to deceive another

2    person.

3

4    The elements under the new Pam for lying, because it

5    occurred after 11 November 2009, are that on or about a

6    certain date, the Cadet made a certain statement or

7    communication, that such a statement or communication was

8    false, or that the Cadet believed the statement or

9    communication to be false, that the Cadet knew that such a

10   statement or communication was false at the time he or she

11   made it, or did not believe the statement or communication

12   to be true at the time it was made, that the Cadet made it

13   with the intent to deceive or mislead another person.

14

15   Now let's discuss the witnesses for the hearing.  The

16   following witnesses have been identified by the Honor

17   Committee as witnesses who can testify on the merits and

18   will testify at the HIH:

19       1.  Dr. Terri Sabatos
20       2.  Major Anthony George
21       3.  Cadet Adam Bishop
22       4.  Cadet Matthew Krause, Company Commander B-1, Class of
23            2010 (Character Witness)

85

5.   Major Michael Denehy, Tactical Officer, Company B-1
     (Character Witness)

Do you have any objections to these witnesses?

**RESP:** No, I do not.

**HA:** You should, if I exclude the second approach for
clarification.  In that case I would find that Major
Anthony George and Cadet Adam Bishop are not relevant to
the case at hand.  Or, if you're provident, then Cadet
Adam Bishop is not relevant, correct?  Do you agree?

**RESP:** That is correct.

**IR:** I agree, sir.  I also have these books.

**HA:** Let me get to that.  You're right.  Thank you.  I
appreciate that.

86

1    Cadet Adam Bishop, if you're provident, he won't be

2    called, okay?

3

4    **RESP:**  Yes, sir.

5

6    **HA:**  Major Anthony George, if I decide to exclude the

7    approach for clarification, he will not be relevant, but

8    Dr. Terri Sabatos I find to be relevant, correct?

9

10   **RESP:**  That is correct, sir.

11

12   **HA:**  Be prepared, though, to question Major Anthony George

13   on Monday.

14

15   **RESP:**  I understand, sir.

16

17   **HA:**  Okay.  Let me go back to your motion.  You also asked

18   to have certain evidence, correct?  What was that?

19

87

1    **RESP:**  Sir, we asked for the books.  We also asked for the

2    sworn statement of Cadet Gray, who was present during the

3    second approach for clarification.

4

5    **HA:**  Okay.  If I find that -- you need to tell me, why

6    would Cadet Gray -- do you have any reasonable argument to

7    suggest that Cadet Gray is going to say something that is

8    not in line with Major George or Dr. Sabatos?  Dr. Sabatos

9    is a professor here who made a sworn statement under oath.

10   Major Anthony George is a commissioned officer who was

11   also present.  Is it really necessary to have -- do both

12   of their statements, in terms of that approach, seem to be

13   completely in line?  Tell me why Daniel Gray would be

14   required as a third witness to talk about exactly what's

15   happened?

16

17   **RESP:**  It's just that everything here is extremely

18   thorough.  His absence of a sworn statement was just; I

19   guess you could say surprising that it wasn't there.

20

88

000142

1    **HA:**   Okay.   I understand and I note it for the record.

2    IR, do you see what he's saying here?  And tell me why you

3    think Daniel Gray is not -- why wasn't a statement taken?

4

5    **IR:**   What role was Daniel Gray?

6

7    **HA:**   He was a witness to the second approach for

8    clarification.

9

10   **IR:**   Sir, honestly, I don't think his statement was taken

11   because it's not relevant.  He was really secondary to

12   Major George and the instructor.  They were both there, so

13   I don't see the need for his statement when two other

14   people --

15

16   **HA:**   I'd tell you if there was a reason to -- if you had

17   some reasonable basis to suggest that Daniel Gray would

18   say something different from Dr. Sabatos and Major Anthony

19   George concerning that approach for clarification, I would

20   certainly request that they get a sworn statement from

21   him.   But if you don't have anything, I'm going to say to

89

1    you that I would see it as redundant because Major George

2    and Dr. Sabatos appear to be on the same line when they

3    described what occurred in that approach for

4    clarification.  A third witness statement to it doesn't

5    really do anything for the case.

6

7    IR:  Additionally, sir, Cadet Gray is away from the

8    Academy, so --

9

10   HA:  We could get him telephonically.

11

12   IR:  Okay.

13

14   RESP:  I understand, sir.

15

16   HA:  Okay.  As of right now, I don't see the need to call

17   Cadet Gray if I include the approach for clarification.

18   However, if between now and Monday you come upon any

19   inclination or even an iota of evidence that would suggest

20   that Daniel Gray would say something opposite than what

21   Major George would say or that Terri Sabatos would say,

                              90

1    then I would certainly call him, at a minimum, during your

2    HIH, okay?

3

4    **RESP:** Yes, sir.

5

6    **HA:** All right. Let's see. You also asked for these

7    books, and the IR has studiously come into this

8    preliminary hearing with both of the books that you

9    requested. Are those the books that you requested?

10

11   **RESP:** Those are the books that I requested.

12

13   **HA:** Okay. Do you need to take a look at them?

14

15   **RESP:** Do I have to do that right now or after the --

16   or --

17

18   **HA:** No, you don't have to do that.

19

91

**000145**

1    **RESP:**   Okay.   So I will be able to have those in my

2    possession?

3

4    **HA:**   Yes, you can.

5

6    **RESP:**   Okay.

7

8    **HA:**   IR, I have no problem with him taking these books

9    that he requested and he's going to use them as his

10   evidence.

11

12   **IR:**   As long as he gives them back.   I mean, they're mine.

13   I don't own these.

14

15   **HA:**   Hey, do you agree that you will give those books

16   back?

17

18   **RESP:**   I will agree to give the books back.

19

92

1    **HA:**  Okay, because otherwise we have problems with the

2    library.

3

4    **IR:**  They're the library's books.

5

6    **HA:**  But I will say this, though.  Whatever pages you are

7    going to use from that book, you need to tell the IR.  Try

8    to tell him by COB today.  Say I am going to refer to all

9    these pages out of both books, because I want them to be

10   able to make copies of those pages, okay, because those

11   pages are going to have to be viewed by the Board.  Do you

12   understand?

13

14   **RESP:**  Yes, sir.

15

16   **HA:**  And for time and efficiency and logistical purposes,

17   they should have that ahead of time so that it makes the

18   whole process easier on everybody, okay?

19

20   **RESP:**  Yes, sir.

21

93

000147

1    **HA:** And on a side note, IR, I expect that the witness

2    statements will be in a binder, as they were last time,

3    tabbed out so that the witnesses aren't fumbling through

4    the plethora of sworn statements that we have here.   Can

5    you just take a note, please?

6

7    **IR:** I don't understand what you're asking for, sir.

8

9    **HA:** In the past, you guys take the sworn statements and

10   put them in a pile in front of the witnesses, and then we

11   spend probably a cumulative of twenty minutes of all the

12   witnesses fumbling through all of those papers, to find

13   out which one is their sworn statement.   I'm asking that

14   when the witnesses sit down at the witness stand, that all

15   of your statements, instead of just being loosely put

16   together on the table, are put in a binder and that

17   they're tabbed out, so that I can say --

18

19   **IR:** For the witness or for every Board member?

20

94

1    **HA:**   No.   I'm saying for the witnesses at the witness

2    stand.   Okay?

3

4    **IR:**   Okay.   So just make sure that they have their

5    statement in front of them?

6

7    **HA:**   Tabbed out, so that I can say, please turn to Board

8    Exhibit 5, and they can just flip to five because that's

9    their statement.   Because otherwise, every witness leaves

10    all the statements all mismatched, and it takes forever to

11    get through.   Do you understand?

12

13    **IR:**   Yes, sir.

14

15    **HA:**   Thank you.   I appreciate that.   And likewise, you

16    will please have those pages available for them because

17    they're going to need to make copies of them, and I want

18    them to also have those pages in that binder, readily

19    available for witnesses to refer to, okay?

20

21    **IR:**   Yes, sir.

000149

**HA:** Make it nice, easy and efficient.

**IR:** So whatever he wants to call attention to, sir, just to clarify, he should probably just make a copy of it, and then he can give it to us and --

**HA:** That would be great, if you could do that.

**IR:** Yeah. So whatever you want, just make a copy.

**HA:** Because you're going to have custody of those books. If you don't have the ability to make a copy of them, then I ask that you get to the proceeding early, provide those pages to the Honor Committee and they'll make a copy for you there, okay?

**RESP:** Yes, sir.

The hearing was recessed at 1448 hours, 5 March 2010.

96

1

2     The hearing was called to order at 1459 hours, 5 March

3     2010.  All parties present prior to the recess were again

4     present.

5

6     **HA:**  Okay.  We're back on the record.  The time is 1500

7     hours.  We had to take a short recess.  I also asked that

8     Cadet Spadone talk to his attorney about Cadet Zingapan's

9     presence here, and what does your attorney say?

10

11     **RESP:**  There is no problem with him.

12

13     **HA:**  Okay, no problem, great.  Are there any issues that

14     I'm missing from your motion?

15

16     **RESP:**  No.  Everything was spelled out in the motion

17     itself.  We noted in the motion that Dr. Sabatos grew

18     suspicious before the second approach for clarification?

19

20     **HA:**  Well, I think that that was just addressed by

21     Zingapan and Dr. Sabatos, so you've noted it in your

97

1   motion.  I need to reevaluate it.  When this preliminary

2   hearing is over, I'm going to re-listen to her testimony;

3   Zingapan's testimony.  I'm going to reread the statements,

4   which will be my fourth time reading them, and I'm going o

5   tell you on Monday morning which ones -- if I'm going to

6   exclude them or not.  And if I'm not, you need to be

7   prepared, when you leave here today, to proceed as if

8   everything's coming in, okay?

9

10  **RESP:**  Yes, sir.

11

12  **HA:**  All right.  Anything else I might have missed?  (No

13  response.)  Your attorney notes, in Paragraph 8(c), that

14  not all the evidence was reviewed by the IT team.  I kind

15  of see what he's saying.  However, the evidence to proceed

16  forward is substantial evidence, not preponderance of the

17  evidence, and that's the lowest standard.  And he notes

18  the speedy trial issues.

19

20  Anything else?

21

98

1    **RESP:**  No, sir.

2

3    **HA:**  All right.  Do you have any witnesses that are going

4    to testify on your behalf?

5

6    **RESP:**  I do, sir.

7

8    **HA:**  Who?

9

10   **RESP:**  It would be LTC Billie.

11

12   **HA:**  I need his full name if you have it and his unit.

13

14   **RESP:**  I don't have his first name, but last name, B-i-l-

15   l-i-e.  Major Hannon --

16

17   **HA:**  What is he doing?  Where is he?

18

19   **RESP:**  He is in the Systems Engineering Department.

99

1

2    **HA:**  Systems Engineering Department.  Okay.  Character?

3

4    **RESP:**  Yes, sir.

5

6    **HA:**  For if you're found?

7

8    **RESP:**  Yes, sir.

9

10    **HA:**  Okay.  Who else?

11

12    **RESP:**  Major Hannon Didier in the Geography Department.

13

14    **HA:**  Didier.  Spell that, please.

15

16    **RESP:**  D-i-d-i-e-r.

17

18    **HA:**  Okay.

19

100

1     **RESP:** And Ms. Vetter, V-e-t-t-e-r.

2

3     **HA:** V-e-t-t-e-r, okay.

4

5     **RESP:** Yes. And she's from the Center for Enhanced

6     Performance.

7

8     **HA:** All character?

9

10    **RESP:** Yes, sir.

11

12    **HA:** Okay. As discussed previously, you have the right to

13    have witnesses testify on your behalf on the merits of the

14    case, about any relevant or specific character trait, such

15    as honesty or truthfulness that you have, or simply good

16    things to say about you generally, but who do not have

17    information concerning a specific character trait relevant

18    to the allegation. If you choose to admit to the

19    allegation, then you will only call specific or general

20    character witnesses and not merit witnesses at the CAB.

21    You are responsible for notifying your witnesses of the

000155

1 time and location of the HIH to determine if they're

2 available to testify. However, the IR and the Honor

3 Committee can assist you should an instructor or Tactical

4 Officer be unwilling to release a Cadet to testify for

5 you. So if you want any more witnesses, you've got to let

6 me know, preferably before we start the second preliminary

7 hearing at 0800.

8

9 Okay. Cadet Spadone, I need to ask you if you wish to

10 admit to an Honor violation. So, before we proceed I am

11 going to again inform you of your Article 31 rights. I am

12 doing this just to ensure that you understand your rights

13 and because the law requires me to advise soldiers of

14 their Article 31 rights in situations where they are

15 suspected of misconduct. Do you understand?

16

17 **RESP:** I do understand, sir.

18

19 **HA:** Cadet Spadone, I am a Judge Advocate serving as the

20 Hearing Advisor for this proceeding. The offense you are

21 suspected is, in Allegation 1, cheating, in Allegation 2,

000156

1    cheating, and in Allegation 3, lying.  You have the

2    following rights:

3

4    You do not have to answer my questions or say anything.

5

6    Anything you say or do can be used as evidence against you

7    in an adverse action.

8

9    You have the right to talk privately to a lawyer before,

10   during, and after questioning.  This lawyer can be a

11   civilian you arrange for at no expense to the Government

12   or of a military lawyer detailed for you at no expense to

13   you, or both.

14

15   You have a right to stop answering questions at any time,

16   or to speak privately with a lawyer before continuing to

17   answer my questions.  Do you understand your rights?

18

19   **RESP:**  I do understand my rights.

20

103

000157

1    HA:  Do you want to speak with Mr. Barrett at this time?

2

3    RESP:  No, I would not.

4

5    HA:  All I am going to do is ask you whether or not you

6    want to admit to the alleged Honor violations, and I'm

7    going to ask you one at a time.  At this time are you

8    willing to answer my question?

9

10   RESP:  Yes, I am, sir.

11

12   HA:  Do you wish to admit to Allegation Honor Violation 1?

13

14   RESP:  Yes, I would.

15

16   HA:  Do you wish to admit to Honor Violation Allegation

17   No. 2?

18

19   RESP:  No.

20

104

000158

1  **HA:**  Do you wish to admit to Honor Violation Allegation

2  No. 3?

3

4  **RESP:**  No.

5

6  **HA:**  In a moment, I'm going to place you under oath and

7  ask you about the alleged violation, but before doing so,

8  understand that if you admit to the alleged violation, you

9  will waive or give up three very important rights.   These

10  rights are as follows:

11

12  First, you give up the right to remain silent.

13

14  By the way, for the record, I am only going to ask you

15  questions concerning Allegation No. 1, understand?

16

17  **RESP:**  Yes, sir.

18

19  **HA:**  First, you give up the right to remain silent during

20  my inquiry into your admission; that is, your right to say

105

000159

1    nothing at all which might support a finding that you

2    violated the Honor Code;

3

4    Second, you give up the right to a full hearing of the

5    facts by the HIH, which would have to find that the

6    evidence established that it's more likely than not that

7    you violated the Honor Code before a violation could be

8    found;

9

10   And third, you give up the right to cross-examine any

11   witnesses against you.  That is the right to hear

12   witnesses testify and question them concerning their

13   testimony, except for those character witnesses called by

14   you at the CAB.

15

16   Do you still wish to admit to Allegation 1 of the Cadet

17   Honor Code?

18

19   **RESP:**  Yes, sir.  I would.

20

000160

1     **HA:**   Cadet Spadone, you're advised that if I accept your

2     admission that you violated the Cadet Honor Code, you have

3     the right to present evidence and submit any matters that

4     you wish for consideration on the issue of your retention

5     in the Corps of Cadets and to the CAB.  You may submit, as

6     evidence, any written statements or documents relevant to

7     your case.  These statements may be from you or from

8     people such as your Cadet Advisor, your attorney, staff

9     and faculty members, other Cadets, family members and

10    friends.  You may also request oral testimony from the

11    same witnesses; however, if they testify on your behalf,

12    they will be subject to examination by the CAB.  Should

13    you desire to submit any written statements or have any

14    witnesses testify, you must provide that information to me

15    or the court reporter prior to the CAB hearing, in order

16    for us to include it in the packets that will be

17    considered at the CAB.

18

19    In addition to any written statements you provide and the

20    witnesses that testify on your behalf at the CAB, you will

21    be permitted to make a statement to the Board and if you

107

000161

1    wish, subject yourself to examination or questioning by

2    the CAB.

3

4    The Board will also consider any documents you have

5    entered into evidence at the preliminary hearing and will

6    consider an authenticated transcript of this proceeding.

7    Really, what's going to happen is they're going to hear --

8    in a moment we're going to switch tapes and when that tape

9    clicks on, they're going to listen to everything that we

10   say, okay?  That will be presented to them only at the CAB

11   portion of the HIH.  They will not hear that recording

12   considering the other two violations -- do you understand

13   -- or other two allegations.

14

15   **RESP:**  I do, sir.

16

17   **HA:**  Additionally, the Regimental Honor Representative

18   that is present may offer comments concerning your

19   testimony during the providence inquiry.

20

21   Please switch the tapes.

108

1

2      IR:   Sir, just to reiterate, there will be two separate

3      hearings?

4

5      HA:   No.

6

7      IR:   So there will be just a regular Cadet Advisory Board?

8

9      HA:   Is that what the Honor Committee wants?   Do you guys

10     want another CAB for this?

11

12     IR:   I mean, I honestly --

13

14     HA:   You should probably go check.

15

16     IR:   Yeah.   Let me go make a call.

17

18     HA:   Because here's what my intent is, okay?   If he's

19     provident, what I will do is keep the first allegation for

20     the Board to read, okay?   And his attorney has asked that

109

1    I do that, so his attorney has asked that I keep it in

2    there. I will exclude the evidence that revolves around

3    that first allegation, which we already went over. The

4    Board will not see that evidence because he's already

5    admitted to that allegation. Then the Board will hear

6    only the evidence concerning Allegations 2 and 3, and they

7    will have to make their findings based upon the evidence

8    presented to them.

9

10   Whether or not they find him on two or three, there will

11   be a CAB thereafter in which they're going to play this

12   providence inquiry.

13

14   IR: All right. Let me -- is it okay --

15

16   HA: Or, if they find him on 2 and 3, then they're also

17   going to hear the providence inquiry, and then they're

18   going to take into consideration that they found him on

19   the other two.

20

21   IR: Let me go ask Major Baka.

110

000164

1

2  **HA:** Please. We'll take a two-minute in-seat break.

3

4  The hearing was recessed at 1509 hours, 5 March 2010.

5

6  The hearing was called to order at 1520 hours, 5 March

7  2010. All parties present prior to the recess were again

8  present.

9

10  **HA:** Major Baka does not have an issue with us going

11  forward as I proposed, correct?

12

13  **IR:** No, sir.

14

15  **HA:** And you have a question?

16

17  **RESP:** So the character witnesses would only be heard

18  during the Cadet Advisory Board, the segment?

19

000165

1    **HA:**  That's right.  Unless you have specific character

2    evidence that you want to present on the merits of

3    Allegations 2 and 3 if you're provident.  You can raise

4    that with me at the second preliminary hearing, all right?

5    Let's just get through this providence inquiry.

6

7    **HA:**  I'm just going to go over the rights.

8

9    You give up your right to remain silent during my inquiry

10   and to the admission; that is your right to say nothing at

11   all which might support a finding that you violated the

12   Honor Code.

13

14   Second, you give up the right to a full hearing of the

15   facts by the HIH, which would have to find that the

16   evidence established that it was more likely that you

17   violated the Honor Code than not before a violation could

18   be found; and

19

20   Third, you give up your right to cross-examine any

21   witnesses against you; that is the right to hear witnesses

000166

1   testify and question them concerning their testimony,

2   except those character witnesses called by you at the CAB.

3

4   Do you still wish to admit to the alleged violation?

5

6   **RESP:**  I would, sir.

7

8                    **PROVIDENCE INQUIRY**

9

10  Cadet Alan Spadone, the Respondent, Company B-1, Class of

11  2011, was sworn and testified as follows:

12

13            **QUESTIONS BY THE HEARING ADVISOR**

14

15  Q:  Cadet Spadone, I'm going to list the elements of the

16  offense to which you say you will admit.  By elements, I

17  mean those facts, the existence of which the HIH Board

18  would have to find by a preponderance of the evidence

19  prior to returning a verdict that an Honor violation was

20  committed.  As I state each of these elements, ask

                          113

1    yourself whether or not it's true and whether you wish to

2    admit that it's true.   After I list the elements for you,

3    be prepared to talk to me about the facts regarding this

4    case.

5

6    You are facing the allegation of cheating.   In order for

7    the Board to have found that you violated the Cadet Honor

8    Code by cheating, it must find that there is more evidence

9    than not for them to conclude that each of the following

10   evidence is more likely true than not that the action

11   actually occurred.

12

13   That on or about 27 October 2009, you, Cadet Spadone,

14   plagiarized all or part of your Advanced Composition

15   English 302 Essay No. 3 and submitted it as your own,

16   without proper documentation, and that you did so with the

17   intent to gain an unfair advantage, or with the intent to

18   deceive another person.

19

20   I will now explain some of the terms used.

21

114

1    "On or about" means on the date stated, or on a date close

2    to or about that date.

3

4    "Unfair advantage" is obtained when a person violates laws

5    or conventions to gain a benefit or profit.

6

7    "Intent to deceive" means a purpose or intention to

8    mislead another, to trick another or to cause another to

9    believe as true that which is false.

10

11    Do you understand the elements and definitions as I've

12    read them to you?

13

14    A:   I do, sir.

15

16    Q:   Do you have any questions about any of them?

17

18    A:   No, I do not, sir.

19

000169

1    Q:  Do you believe and admit that these elements and

2    definitions taken together correctly describe what you

3    did?

4

5    A:  I do, sir.

6

7    Q:  Do you understand that your admission to me admits

8    that these elements for the allegation accurately describe

9    what you did?

10

11    A:  Yes, sir.

12

13    Q:  At any point, at any time, has anyone compelled you to

14    make a statement?

15

16    A:  No.

17

18    Q:  Did you give your statement included as a Board

19    Exhibit voluntarily?

20

21    A:  Yes, I did, sir.

116

000170

1

2    Q:  Are you admitting to the facts in this allegation

3    voluntarily and of your own free will?

4

5    A:  Yes, I do, sir.

6

7    Q:  Okay.  Why don't you just tell me what happened with

8    Allegation 1?

9

10   A:  I guess you could say when I came to the Academy, I

11   always wanted to do great things for the Academy and live

12   up to my own potential and represent the Academy to the

13   highest possibility.

14

15   And since I was here, I was working for a semester abroad

16   to the University of Cambridge.  Approximately a year and

17   a half of work went into it.  When it fell through in the

18   early part of September of last year, I guess you could

19   say the wheels kind of fell off for me, and I think I

20   started to develop -- I entered into a period of

117

000171

1    depression and I think I started to exhibit self-

2    destructive thoughts and actions.

3

4    I violated something that I held sacred.  I violated

5    myself; I violated the United States Military Academy, the

6    Honor Code and my fellow Cadets.  And I know that this

7    incident will be a callus in my life as I go forward.  And

8    the allegations are true, as you stated.  I turned in a

9    paper that was not my own.

10

11   I don't that this incident captures my character.  I think

12   if you look at my past record here, I think that it will

13   speak to my future development as an Army officer.

14

15   Q:  Okay.  You're going to have to tell me what you did,

16   though, for me to find you provident.

17

18   A:  I turned in a paper that was plagiarized.

19

118

1    Q:  You're going to have to explain to me how.  What

2    happened?

3

4    A:  The paper was taken from an online journal.

5

6    Q:  So you had a paper that was due, and that was this

7    Essay No. 3, correct?

8

9    A:  That is correct, sir.

10

11   Q:  And instead of doing your own work, you lifted a paper

12   off of the Internet and made it as your own paper?

13

14   A:  It was an online journal that was on the Internet.

15   Yes, sir.

16

17   Q:  And how did you do that?  Did you cut and paste?  What

18   did you do?  Did you copy it directly?  How did you do it?

19


119

000173

1    A:   I think it was cut and paste.   It was cut and paste,

2    sir.

3

4    Q:   And you did it without proper documentation?

5

6    A:   That is -- that is correct, sir.

7

8    Q:   And why don't you tell me why you did it.

9

10   A:   To this day, I still don't -- haven't -- I can't

11   believe I did it.   I think I just -- I testified to the

12   fact that when the semester abroad to Cambridge University

13   was taken away, I think it kind of confronted my belief

14   that if you're reasonable smart and you work hard, you

15   know, the sky's the limit.   And I really think that West

16   Point does afford you those opportunities, more than any

17   other institution in America.   And when something -- when

18   this opportunity was taken away after two years of work, I

19   think I just -- I lost sight of what was truly important

20   here.

21

120

000174

1    Q:   Okay.   Now do you believe that -- I mean, when you did

2    this, did you intend to deceive your professor?

3

4    A:   I don't think I was -- that was not the thought that

5    was going through my head.   I think when you are under

6    significant stress, you tend to exhibit self-destructive

7    behaviors and thoughts because clearly, the paper didn't

8    -- it didn't hurt anybody else.   It didn't hurt Dr.

9    Sabatos, who I have the utmost respect for.

10

11   Q:   Yeah, but would you agree that it kind of hurts the

12   institution?

13

14   A:   It does hurt the institution.   That's one of the

15   reasons.

16

17   Q:   Okay.   But did you understand that when you lifted

18   that paper and used it as your own, that you would

19   possibly mislead the professor?

20

121

**000175**

1    A:  I think when you turn in a paper that's not your own,

2    it does mislead the professor.

3

4    Q:  Okay.

5

6    A:  I don't think that would -- I don't --

7

8    Q:  So in other words, your actions could've caused her to

9    believe that that paper was yours when, in fact, it was

10    not?

11

12    A:  That is correct, sir.

13

14    Q:  Or, in any event, would you agree that you would've

15    gained some type of unfair advantage over your peers by

16    doing this?

17

18    A:  Clearly that would've happened, yes.

19

122

1    Q:  Okay.  So you're telling me that essentially, you were

2    in kind of a hole, so to speak, psychologically and

3    mentally and emotionally, and you made unwise decisions?

4

5    A:  That is correct, sir.

6

7    Q:  Okay.  So just to clarify, is it true that on or about

8    29 October 2009, you plagiarized all or part of this

9    Composition English 302 Essay No. 3?  Is that true?

10

11   A:  Yes, sir; on the 27th.

12

13   Q:  And you submitted it as your own, without proper

14   documentation.  Is that true?

15

16   A:  Yes, sir.

17

18   Q:  And in doing so, you either gained an unfair advantage

19   or you deceived or misled another person, which would be

20   the professor?

21

                              123

1    A:  That is true, sir.

2

3    Q:  Has anyone made any threat or tried in any other way

4    to force you to admit to this violation of the Cadet Honor

5    Code?

6

7    A:  No, they have not.

8

9    Q:  Has anyone made any promise to you in connection with

10   your admission?

11

12   A:  No, sir.

13

14   Q:  Are you making this admission because you feel, in

15   your own mind, that you have violated the Honor Code, and

16   not just to improve your chances of being retained in the

17   Corps of Cadets?

18

19   A:  This admission is my own, sir.

20

124

1   Q:  Do you understand that even though you believe that

2   you have committed the Honor violation, you have a right

3   to a full hearing of the facts by the HIH?

4

5   A:  Yes, sir.

6

7   Q:  Do you have any questions as to the meaning and effect

8   of your admission?

9

10  A:  No, I do not, sir.

11

12  Q:  Do you understand how your admission is going to be

13  utilized at the CAB?

14

15  A:  It will be used to show that I violated the Honor

16  Code, sir.

17

18  Q:  Okay.  Do you understand that what will happen is when

19  the CAB is assembled this tape and this recording will be

20  replayed for them?

125

1

2    A:   Will it be replayed in front of the whole CAB, or just

3    for the jury members?

4

5    Q:   The CAB members; the Board.

6

7    IR:   Just the jury members.

8

9    A:   Yes, sir.

10

11    Q:   Okay.   And we discussed that previously.   You

12    understood that, correct?

13

14    A:   I do now sir, yes.   I understood that, yes.

15

16    Q:   Okay.   And did you have sufficient time to discuss

17    this with your attorney?

18

19    A:   Yes, I did, sir.

20

126

000180

1    Q:  Okay.  And your attorney -- okay.  And you still wish

2    to admit to this allegation, correct?

3

4    A:  Yes, sir.

5

6    Q:  Do you understand the process that will continue after

7    we adjourn here today?  Specifically, do you understand

8    the process and procedures of the CAB and what your rights

9    and responsibilities are as they relate to the Board?

10

11   A:  Yes, sir.

12

13   Q:  Okay.  I find that your admission concerning the

14   allegation of the Honor violation of cheating on 27

15   October 2009 is made voluntarily and with full knowledge

16   of its meaning and effect.  I further find that you have

17   knowingly, intelligently and consciously waived your right

18   to remain silent, to a full hearing of the facts by the

19   HIH, and to confront witnesses against you pertaining to

20   this allegation.

21

127

1    Accordingly, your admissions are provident and are

2    accepted.   Following the CAB, you may submit to your legal

3    assistance attorney any additional written statements or

4    other relevant documents concerning your retention in the

5    Academy.   These statements will be provided to the

6    Superintendent with the Staff Judge Advocate's review.

7    These statements you submit may be from you and from other

8    people, such as your attorney, hearing members, staff

9    members, fellow cadets, family members and friends.

10

11                **END OF PROVIDENCE INQUIRY**

12

13    **HA:**  That's what's going to be played in front of the

14    Board, okay?

15

16    Among other things, the Superintendent considers the

17    following factors when making a decision concerning your

18    retention in the Corps of Cadets:

19          - the extent of your knowledge or experience
20            concerning the Honor Code;
21
22          - whether you have shown a resolve to live
23            honorably in the future;
24

000182

1        - whether duress was a factor at the time the
2          violation was committed;

4        - the manner in which the case was reported to
5          the Honor Committee; and

7        - your overall performance and conduct history.

9    Cadet Spadone, I will now explain to you the procedures

10   for the contested portion of the HIH.  The HIH Board will

11   consist of nine Cadet voting Members; four from the Honor

12   Committee and five from the Corps of Cadets at-large.  The

13   purpose of the HIH is to determine whether or not a

14   violation of the Honor Code has occurred, specifically

15   Allegations 2 and 3, if so, to provide input to the

16   Superintendent regarding your retention at the Academy.

17   Six out of the nine Members must find, by a preponderance

18   of the evidence that each element of the alleged violation

19   occurred before they can find that you in fact violated

20   the Honor Code.

22   At the HIH, you will have several rights.  You may

23   question and challenge potential Board Members if you feel

24   they cannot fairly decide your case.  You may choose to

25   remain silent and no adverse inference will be drawn from

26   your choice not to testify.  You may also choose to

000183

1  testify, and if so, you are subject to questioning by the

2  Board.  Regardless of whether you choose to testify, you

3  may make an opening statement and a closing argument to

4  the Board.  During the hearing, you may present evidence

5  and witnesses and you may cross-examine the witnesses

6  against you.

7

8  Do you have any requests, objections, questions or any

9  other matters you wish me to consider at this time?

10

11  **RESP:**  No, I do not, sir.

12

13  **HA:**  Okay.  Let's go back to the Board Exhibits.  Because

14  I have found you provident, I have excluded the following

15  Board Exhibits.  Previously, I've excluded Exhibits 8, 22,

16  23 and based upon that, that I have found you provident

17  and that I'm not going to include those documents relating

18  around your providence inquiry and your admitting to

19  Allegation No. 1.  I'm going to exclude Board Exhibit 1,

20  Board Exhibit 2, Board Exhibit 5, Board Exhibit 6, Board

21  Exhibit 11, Board Exhibit 12, Board Exhibit 13, Board

22  Exhibit 16, and Board Exhibit 20.

130

1

2     That leaves Board Exhibits 3, 4, 7, 9, 10, 14, 15, 17, 18,

3     19 and 21.  Do you agree?

4

5     **RESP:**  I do agree, sir.

6

7     **HA:**  Do you agree, IR?

8

9     **IR:**  I agree, sir.

10

11     **HA:**  I'm going to reserve my ruling on Board Exhibits 7, 9

12     and 10 for the second preliminary hearing and, for the

13     record, I'm doing this to thoroughly evaluate the evidence

14     because I just had testimony today that I'd like to

15     review, as well as I'm going to look over the statements

16     one more time.

17

18     I will mark these accordingly on Monday morning, so we

19     need to be prepared to have these things marked and then

20     copied, IR.  Logistically, these things turn into a

21     nightmare.  Let's ensure that as soon as we make our

22     rulings, that that's done so that members of the Board

23     have the correct Board Exhibits and that you guys make up

131

1    your book that's going to be read by the witnesses with

2    all the Board Exhibits tabbed out.

3

4    Once again, I ask that you either copy the pages you're

5    going to refer to in those two books or, at a minimum, if

6    you have no ability to copy those pages, that you come

7    early to the HIH on Monday morning to have the Honor

8    Committee help you copy them.

9

10   **IR:** Is this going to take place here, sir, or at

11   Nininger?

12

13   **HA:** My understanding is Nininger.

14

15   **IR:** Nininger, right.  Just --

16

17   **HA:** Okay.  Your HIH will take place at 0800 in Nininger

18   Hall on Monday.  At that time, you may present any

19   additional matters you wish me to consider.  We'll begin

20   the HIH after that second preliminary hearing.  Normally I

21   like to kick those off at 0900.  Are you going to be

22   prepared at that time?

23

132

000186

1    **RESP:**   I should be, sir.

2

3    **HA:**   Okay.   Do you have any more questions before we

4    adjourn this hearing?

5

6    **RESP:**   Yes.   I would like character witnesses to testify

7    both in the HIH part of the Board and the --

8

9    **HA:**   Okay.   I already explained to you a number of times

10   in the script that the only character witnesses that can

11   testify on the merits are witnesses that have specific

12   character evidence about you.   In other words, you can't

13   just have like your best friend come in and say I just --

14   you know, he's an honest guy, I just know him to be

15   honest.

16

17   What you can do is have your best friend come on in and

18   say, "Let me give you an example of why Cadet Spadone is

19   an honest guy.   He and I went out to eat a couple months

20   ago and when we got our bill, we realized that the

21   waitress made a mistake and it was to our benefit because

133

000187

1    it would've saved us thirty bucks, but Cadet Spadone,

2    being the honest guy that he is, got that waitress,

3    corrected the bill and we ended up paying the correct

4    amount."  That's a perfect example, okay?

5

6    Or another great example is someone says Cadet Spadone is

7    such an honest guy that when we were in our history class,

8    he got his test back and he realized -- he got a ninety on

9    his test and after reviewing the remarks made by the

10   professor and the corrections made, he realized that the

11   professor actually made a mistake and that he should've

12   actually had an eighty, as opposed to a ninety, and he

13   brought it to the professor's attention and the professor

14   corrected his grade and lowered it to an eighty, which is

15   what it should've been.  Those are great examples of why

16   you're an honest guy.

17

18   So if you can provide that, I'll certainly hear that on

19   the merits.  Otherwise, witnesses that have generally

20   great things to say about you, those will come in after --

21   you know, at the CAB portion.

22

134

000188

1    **RESP:**  Okay.

2

3    **HA:**  Which we're inevitably going to have now because

4    you've been found on the first allegation.

5

6    **RESP:**  Yes.

7

8    **HA:**  Okay?  So I'll certainly take that into

9    consideration, but I really -- you've got to do me a favor

10   and please give me a heads up.  Otherwise, the second

11   preliminary hearing is quite long.

12

13   **RESP:**  Yes, sir.  What is going to be the notification

14   procedures for the witnesses?

15

16   **HA:**  Okay.  That's a great question, if it wasn't

17   addressed for one reason or another.

18

19   The Board members will be notified by the Honor Committee.

20   You're responsible for your witnesses being there, okay?

135

1     If, however, you're having trouble because a professor is

2     refusing to allow a Cadet to leave a class, or someone is

3     refusing to come or they have a conflict, you can tell the

4     IR, Cadet Howell, e-mail him and tell him I need help.

5     They are tasked to help you if you need it.  But it is

6     ultimately your responsibility.

7

8     That being said, I'll give you a roundabout timeline.  If

9     you're going to have witnesses come that are going to be

10    general character evidence witnesses, that are going to

11    say great things about you but they can't be heard on the

12    merits because they don't have specific evidence to offer,

13    you probably -- they need to be available at around 1500

14    and after.  And they could be -- it could be a very late

15    -- I've gone as late as 2100.  That's how long I've gone

16    on some of these.

17

18    **IR:**  So Major Didier and all those other guys, you

19    probably want them to be on standby for sometime around

20    three, just to clarify.

21

000190

1    **RESP:**  Okay.

2

3    **HA:**  1500 military time, right?

4

5    **RESP:**  I got it, sir.

6

7    **HA:**  Okay.  Any other questions?

8

9    **RESP:**  If I have any questions, do I direct those to the

10   Cadet Honor Committee after this?

11

12   **HA:**  Right.  You can direct them to your attorney and if

13   there's any issues, like logistically, make sure that they

14   know and if it needs to rise to my level, please have your

15   attorney contact me and I will ensure that you are

16   afforded every opportunity to present your evidence and

17   that everything is fair, and that you are afforded every

18   right that you deserve.  Okay?

19

20   **RESP:**  Yes, sir.

137

1

2    **HA:**   All right.

3

4    **RESP:**   And will we know seven -- the results of your

5    further investigation on 7, 9 and 10 before the

6    preliminary hearing or --

7

8    **HA:**   You'll know at eight o'clock.

9

10    **RESP:**   Eight o'clock.

11

12    **HA:**   You know, it's very late in the day right now.  My

13    intent is to listen to it, think about it over the

14    weekend, come in a little bit early, and I told you, you

15    need to proceed as if those statements are going to come

16    in.

17

18    **RESP:**   Okay.

19

138

000192

1    **HA:**  It's the way it is because that issue is very much on

2    the fence, okay?  And I determined that the best way to

3    figure out whether or not your violations were -- whether

4    or not your Article 31 rights were violated was to

5    actually speak with her.  And I think she really went

6    through some intense questioning by me and I made it

7    because I want to make sure that this is right, and that

8    if I go one way or the other, that I'm sure that I'm

9    making the right call here and that you're afforded due

10   process, okay?

11

12   So as of right now, like I said, it's the way that it is

13   because we're kind of late here.  I'd say that you need to

14   prepare as if it's coming in.  Okay?

15

16   **RESP:**  All right.  Yes, sir.

17

18   The hearing was adjourned at 1545 hours, 5 March 2010.

19

20

21

139

PROCEEDINGS OF THE SECOND PRELIMINARY SESSION

A second preliminary session of an HIH was called to order at Nininger Hall, West Point, New York, at 0852 hours, 8 March 2010, pursuant to the referral of the case by the Commandant of Cadets, dated 16 February 2010 (Appellate Exhibit IX).

The following individuals were present:

   Captain Kyle C. VanDeWater, JA, Hearing Advisor;
   Cadet Alan Spadone, Company B-1, Class of 2011,
      Respondent;
   Cadet Joshua Young, Company B-1, Class of 2011,
      Cadet Advisor;
   Ms. Jennifer Linnartz, Reporter.
   James Gibson, Company A-2, Class of 2011, Honor
      Secretary

**HA:**  Cadet Spadone, you've been provided by a copy of the IR statement, correct?

**RESP:**  Yes.  Not the new one, though, sir.

140

000194

1    **HA:**   I just want to articulate for the record what has

2    transpired in the preceding half an hour or so.

3

4    We went through a number of matters, which I'm going to

5    articulate for the record and sum them up and Cadet

6    Spadone, if I leave something out, it's incumbent upon you

7    to tell me what I did leave out, okay?

8

9    **RESP:**   Yes, sir.

10

11   **HA:**   Let's go over them one at a time.   We saw the IR

12   statement.

13

14   **RESP:**   That is correct, sir.

15

16   **HA:**   And you disagreed with some of the things in the IR

17   statement, correct?

18

19   **RESP:**   That is correct, sir.

20

141

1    **HA:**  And I redacted them so that -- I basically ruled that

2    your objections were good to go?

3

4    **RESP:**  That is correct, sir.

5

6    **HA:**  Okay.  And now the IR is redoing the IR statement,

7    and we're going to look at it one more time before he

8    reads it, to ensure that it is accurate, okay?

9

10   **RESP:**  All right, sir.

11

12   **HA:**  All right.  Now, at the end of the second preliminary

13   hearing, I left open the issue of the approach for

14   clarification because we had Professor Sabatos come and

15   testify at the initial preliminary hearing.  I want you to

16   know that right after that second preliminary hearing

17   (sic) I went over her statement and Major George's

18   statement again, and then I replayed her testimony, which

19   was recorded at the initial preliminary hearing, and

20   pondered the issue of whether or not your Article 31

142

1  rights were violated, or was it an appropriate approach

2  for clarification.

3

4  After reviewing the statements for the fourth time and

5  then listening to her testimony, I concluded that it was

6  an appropriate approach for clarification because she

7  vehemently stood upon the ground that she legitimately

8  thought that there could have been a reasonable

9  explanation for the improper citations concerning your

10  second allegation. And that's why she did an approach for

11  clarification.

12

13  I questioned her, "Well, why the need for the Honor

14  Committee to be there?" And she said that that was the

15  department's standard operating procedure and she really

16  did believe that there could've been a reasonable

17  explanation for why the citations were off, as well as the

18  possibility, too, she even stated, that she wanted to sit

19  down with you and show you how to cite in accordance with

20  her guidelines.

21

143

000197

1   So that being said, her statements on 14 December 2009

2   will come in.  And I'm going to go over some of the

3   redactions that we did talk about, because it will come

4   in, as redacted, as well as Major George's 12 February

5   2010 sworn statement.  That will also come in.

6

7   So let's go through the Board packet.  Have you been

8   provided a copy of the new and updated Board packet, Cadet

9   Spadone?

10

11   **RESP:**  No, I have not, sir.

12

13   **HA:**  Okay.  Let's get him a copy of that.

14

15   Cadet Spadone, while they're going over the Board

16   Exhibits, I have in my hand the corrected IR statement.

17   It appears to me that the allegations are accurate.  I'm

18   going to hand them to you, for you to double check, and I

19   want you to also read through the facts of the case and --

20

21   **RESP:**  Sir, I was given a new one, too.

144

1

2    **HA:**  Okay.  Why don't you read through it and tell me if

3    you have any objections because we've already made

4    redactions and corrections prior to coming on the record,

5    and I think that this is accurate of our changes that we

6    made.

7

8    (Respondent reviews IR statement.)

9

10   **RESP:**  One other thing, sir.  I received the COR for the

11   approach for clarification on the 7th of December, and the

12   approach was on the 4th of December.  I don't know if

13   that's a fact of the case to put in.  I don't think it

14   really matters, but --

15

16   **HA:**  What do you mean by the COR?

17

18   **RESP:**  I did not receive notification that the approach

19   was forwarded to the Honor Investigative Team until the

20   7th of December.

21

145

000199

1    **HA:**  Okay.  I'm not sure if that's really a big deal for

2    the facts of the case.

3

4    **RESP:**  Okay.

5

6    **HA:**  IR, do you have a problem with saying that if he

7    wants it in there?

8

9    **IR:**  Given what?

10

11   **HA:**  That he was given the COR on 7 December, three days

12   after the approach?

13

14   **IR:**  The COR for what?

15

16   **RESP:**  I was contacted by Cadet Gray on the 7th of

17   December, saying the case was forwarded to the Honor

18   Investigative Team.  And then soon thereafter, I received

19   -- because anytime there's an approach for clarification,

20   a COR is generated.

146

1

2    **HA:**   Okay.  And you want that in here?

3

4    **RESP:**  Sir, I don't think we -- it will be fine without

5    it.

6

7    **HA:**  Are you sure?

8

9    **RESP:**  We're fine, sir.

10

11    **HA:**  Okay, because I'll allow it in, but if you're okay

12    with it, that's fine.

13

14    Do you have any other issues with the IR statement?

15

16    **RESP:**  On 30 January, I was requested to give the notebook

17    to the Investigative Team.  I think it was either the next

18    day or -- it wasn't exactly on 30 January that I gave the

19    notebook to the Investigative Team, but it was like the

20    next day or the day after that.

147

000201

1

2      **HA:**   Okay.   Do you want to just write in there "on or

3      about?"   Okay.   You have to write it in and then hand this

4      to -- do you have any other issues above and beyond that?

5

6      **RESP:**   (No verbal response.)

7

8      **HA:**   So how about Paragraph K saying, "On or about 30

9      January, Cadet Spadone gave the notebook."   Is that okay?

10

11      **RESP:**   That is okay, sir.

12

13      **HA:**   On or about.   Any other issues?

14

15      **RESP:**   Not at this time, sir.   No.

16

17      **HA:**   Okay.   IR, please hand this to the Court Reporter.

18      It will be marked as the next Appellate Exhibit.

19

20      Now do you have a copy of the Board Exhibits at this time?

000202

1

2     **RESP:**  I do, sir.

3

4     **HA:**  All right.  Let's go through them and ensure, for

5     purposes of the record, what is going to be a Board

6     Exhibit in front of the Board and the redactions that I

7     did make.

8

9     Board Exhibit 1-1 is your sworn statement made on 8

10    January 2010.  Is that correct?

11

12    **RESP:**  That is correct, sir.  Are we going to get a new

13    cover sheet for this, or is this all we're getting for --

14

15    **HA:**  Here's what the Board will see.  They'll see the

16    allegations, and right under the allegations they'll have

17    the elements of lying and cheating.  And then the next

18    thing that they'll see are these Board Exhibits.  So, any

19    issues with Board Exhibit 1-1 and 1-2?

20

21    **RESP:**  No, sir.

149

000203

1

2      **HA:**   Board Exhibit 2-1 and 2-2 is your sworn statement

3      made on 12 January 2010, correct?

4

5      **RESP:**   Yes, that was my sworn statement.

6

7      **HA:**   Okay.   Board Exhibit 3-1 and 3-2 and 3-3, as

8      redacted?

9

10     **RESP:**   And these are Dr. Sabatos's sworn statements?

11

12     **HA:**   Yes.   Do you agree with the redactions?   There was a

13     redaction in Paragraph 1, which I determined was a

14     conclusion of -- that was inappropriate, that you had also

15     requested be redacted, and I acquiesced and said yes, that

16     should be redacted.   Do you agree?

17

18     **RESP:**   That is correct, sir.

19

150

1   **HA:**   Okay.   So that's accurate, 3-1 with the one

2   redaction, which you asked for, correct?

3

4   **RESP:**   That is correct, sir.

5

6   **HA:**   Okay.   Now 3-2, there were two redactions and I, on

7   my own, redacted the last portion of the last sentence

8   because it was a conclusion of law which was inappropriate

9   and improper, and then you also asked that the last

10  sentence to the second-to-the-last paragraph, a portion of

11  it -- or that last sentence be redacted, correct?

12

13  **RESP:**   That's correct, sir.

14

15  **HA:**   And I redacted that for you, correct?

16

17  **RESP:**   Yes.

18

19  **HA:**   Yes?

20

21  **RESP:**   Yes.   Yes, sir.

                        151

000205

1

2      **HA:**  Okay.  So do you have any issues with Board Exhibit

3      3?

4

5      **RESP:**  No, I do not, sir.

6

7      **HA:**  Okay.  Board Exhibit 4, as redacted.  You requested

8      that Paragraphs 1 and 2 be redacted of Major Anthony

9      George's sworn statement that he made on 12 February 2010,

10     correct?

11

12     **RESP:**  That is correct.

13

14     **HA:**  And that was because it talks a little bit about the

15     first approach for clarification on the one allegation

16     that you've already admitted to, correct?

17

18     **RESP:**  That's correct, sir.

19

000206

1    **HA:**  And you have no problem with the beginning of that

2    sworn statement reading, "At the second approach?"

3

4    **RESP:**  No problem, sir.

5

6    **HA:**  Okay.  So your redactions, as requested -- any issues

7    with Board Exhibit 4?

8

9    **RESP:**  No, sir.

10

11   **HA:**  Okay.  Board Exhibit 5 is eight pages long, and that

12   is your essay on 19 November 2009, your English essay.  Is

13   that correct?

14

15   **RESP:**  That is correct, sir.

16

17   **HA:**  Any issues?

18

19   **RESP:**  No.

20

153

000207

1    **HA:**   Okay.   Board Exhibit 6 is ten pages long, and those

2    are notes taken from the notebook, correct?

3

4    **RESP:**   That is correct, sir.

5

6    **HA:**   It's also come to my attention that your attorney had

7    requested that you actually get the notebook in your

8    hands, correct?

9

10   **RESP:**   That is correct, sir.

11

12   **HA:**   And that did happen this morning, correct?

13

14   **RESP:**   That is correct, sir.

15

16   **HA:**   And did you have sufficient time to go through that

17   notebook?

18

19   **RESP:**   I did, sir.

20

154

000208

1    **HA:**  And is there anything else that you want from that

2    notebook included as an exhibit for the Board?

3

4    **RESP:**  No, sir.

5

6    **HA:**  Okay.  So these ten pages on Board Exhibit 6 are

7    sufficient for your purposes?

8

9    **RESP:**  Yes.

10

11    **HA:**  And for the record, let it note that if you had asked

12    that anything else be included, I would've included it

13    because it would've been a complete record of that

14    notebook.  Okay?

15

16    **RESP:**  Yes, sir.

17

18    **HA:**  Board Exhibit 7 is <u>Hirohito, the Emperor and the Man</u>,

19    right?

20

155

000209

1    **RESP:**  That is correct, sir.

2

3    **HA:**  That's an article and that's five pages long,

4    correct?

5

6    **RESP:**  That is correct, sir.

7

8    **HA:**  All right.  And no issues with that, correct?

9

10   **RESP:**  Correct, sir.

11

12   **HA:**  And then Board Exhibit 8 is The History of Japanese

13   Photography, the essay, and that is seven pages long.  Any

14   issue with that?

15

16   **RESP:**  No, sir.

17

18   **HA:**  All right.  Board Exhibit 9 is four pages long.  It

19   is the course syllabus for your English 302 Advanced

156

1    Composition class, correct?

2

3    **RESP:**  Board Exhibit 9, sir?

4

5    **HA:**  Nine.

6

7    **RESP:**  Mine's showing that's seven pages long.

8

9    **HA:**  Okay, I'm sorry.  You're right.  It is seven pages

10   long.  Any issues with that?

11

12   **RESP:**  No, sir.

13

14   **HA:**  Okay.  And then Board Exhibit 10 is one page and it

15   is the prompt for Essay 4.  Any issues with that?

16

17   **RESP:**  No, sir.

18

000211

1    **HA:**  Okay.  Here you go, IR.  The Board Exhibits, as

2    redacted, are entered into evidence for the purposes of

3    Allegations 2 and 3.

4

5    Any outstanding issues with the Board Exhibits?

6

7    **RESP:**  No, not at this time, sir.

8

9    **HA:**  Okay.  Please take a look at the Board Appointment

10   Memorandum.  Have you been given a copy of this?

11

12   **RESP:**  The Board Appointment is who's going to be serving

13   on the Honor Board, sir?

14

15   **HA:**  Yes.

16

17   **RESP:**  Yes, I have that.

18

19   **HA:**  Okay.  Prior to us going on the record here, I asked

20   that you look at 15-1 and you looked at the normal Board

000212

1    composition for an HIH during a second semester academic

2    year, correct?

3

4    **RESP:**  We did, sir.

5

6    **HA:**  And you'd agree that's where we're at, right?

7

8    **RESP:**  Yes, sir.

9

10   **HA:**  And you went through the Board composition for a

11   second-class cadet, correct?

12

13   **RESP:**  We did, sir.

14

15   **HA:**  And you believe that it's accurately reflected in the

16   Board Appointment Memorandum, as it is drafted?

17

18   **RESP:**  Yes, that's correct, sir.

19

159

000213

1   **HA:**   Okay.   That is going to be marked as the next

2   Appellate Exhibit.   Mrs. Linnartz, can you please take

3   that from the IR as soon as he comes in because he went to

4   go make a copy?

5

6   Okay.   For Respondent Exhibits, what do we have again,

7   Mrs. Linnartz?

8

9   **THE REPORTER:**   We have one character statement of Mrs.

10   Laura Vetter.

11

12   **HA:**   That's it, right?

13

14   **THE REPORTER:**   Yes.

15

16   **HA:**   Do you have any other Respondent Exhibits, Cadet

17   Spadone?

18

19   **RESP:**   No, not at this time.

20

160

1    **HA:**   No?

2

3    **RESP:**   No.

4

5    **HA:**   Okay.   You've had sufficient opportunity to gather as

6    many as you wanted, correct?

7

8    **RESP:**   Yes, sir.   Most of those are being prepared for the

9    second -- the CAB later this afternoon, sir.

10

11   **HA:**   I need them now.

12

13   **RESP:**   I don't have them right now, sir.

14

15   **HA:**   You're going to add more sworn statements, then?

16

17   **RESP:**   They might -- the people that are testifying might

18   come with sworn statements.

19

161

000215

1    **HA:**   Okay.   That's no problem then.   Right now there's

2    Respondent Exhibit 1, which I reviewed and I already

3    admitted it into evidence as a general character

4    statement, correct?

5

6    **RESP:**   That's correct, sir.

7

8    **HA:**   You have no statements or evidence to bring on the

9    merits for specific character evidence, correct?

10

11   **RESP:**   No, sir.

12

13   **HA:**   Okay.   Did you give a copy to Mrs. Linnartz?   She

14   needs a copy of the Board Appointment Memorandum because

15   it'll be an Appellate Exhibit.

16

17   **IR:**   She's got it.

18

19   **HA:**   Okay, great.

20

000216

1    All right.  We also now have the Cadet Advisor present at

2    this second preliminary hearing.  Please state, for the

3    record, your name and your class and your rank.

4

5    **CA:**  Cadet Joshua Young, 2011, Cadet Sergeant.

6

7    **HA:**  Okay.  And you were not present at the initial

8    preliminary hearing, correct?

9

10    **CA:**  No, sir.

11

12    **HA:**  All right.  I'm going to read some instructions to

13    you.  I need you to pay attention.  What's your last name

14    again?  Young?

15

16    **CA:**  Yes, sir.

17

18    **HA:**  Cadet Young, you need to be aware of the following:

19

163

000217

1      The Respondent may elect to bring any one member of the

2      Corps of Cadets with him to an HIH or Cadet Advisory Board

3      (CAB) to act as an Advisor.   The role of the Cadet Advisor

4      is to provide moral support and advice, not to represent

5      the Respondent.    The Cadet Advisor may not address the

6      Hearing Advisor (HA), the Board President (BP) or members

7      of the preliminary hearing, HIH, or CAB at any time during

8      any hearing before the announcement of findings.  If the

9      Respondent is found to have violated the Honor Code after

10     the announcement of the findings, the Respondent may

11     choose to have you address the Board.  The Cadet Advisor

12     should not accept appointment if he or she will

13     potentially be a witness on the merits.  The Cadet Advisor

14     is prohibited from advising the Respondent on how to

15     answer questions during the preliminary testimony.

16     Communication between the Cadet Advisor and the Respondent

17     are not privileged, as in an attorney-client relationship.

18     The Cadet Advisor is not exempt from abiding by the Cadet

19     Honor Code, to include the toleration clause, and must

20     report any suspected violation by the Respondent.  So, if

21     you came into possession of evidence or knowledge relevant

22     to an Honor violation by the Respondent, you would have to

23     report it under the Honor Code.  A Cadet may serve as a

                              164

000218

1    Cadet Advisor only twice, and may not be a member of the

2    Cadet Honor Committee, who has personal knowledge of or

3    who has worked on the case.

4

5    Cadet Young, how many times prior, if any, have you served

6    as a Cadet Advisor?

7

8    **CA:**  Never, sir.

9

10   **HA:**  Are you a member of the Honor Committee?

11

12   **CA:**  No, sir.

13

14   **HA:**  Do you anticipate being called as a witness in this

15   matter, and if so, why?

16

17   **CA:**  No, sir, I do not.

18

19   **HA:**  Understand that when we get to the CAB portion, which

20   will inevitably happen because Cadet Spadone has already

165

000219

1    admitted to the first allegation, at that point in time,

2    you may take the stand and be a general character witness.

3

4    Do you understand that while serving as the Cadet Advisor,

5    you are still subject to the Honor Code and that your

6    discussions with the Cadet Respondent are not privileged;

7    that is you may be ordered to testify about those

8    discussions?

9

10   **CA:**  Yes, sir.

11

12   **HA:**  Do you understand that unless you are asked a

13   question directly by myself or the Board President, you

14   may not speak to us?

15

16   **CA:**  Yes, sir.

17

18   **HA:**  Effectively, the only person you can speak with is

19   the Respondent, and not during his testimony to the Board,

20   should he elect to do so.  Do you understand?

166

1

2      CA:  Yes, sir.

3

4      RESP:  I understand, sir.

5

6      HA:  Okay.  You have no additions to your Respondent

7      Exhibits, except that you may have some more if the

8      witnesses bring in statements, correct?

9

10     RESP:  That's correct, sir.

11

12     HA:  Do you have any changes or additions to your witness

13     list?

14

15     RESP:  No, I do not, sir.  Do you want to go over the

16     witness list again?

17

18     HA:  We can do that.  Who do you have?

19

167

1    **RESP:** It's LTC Billie. I think I might have misspelled

2    his name last time, but it's B-i-l-l-e. I think I might

3    have added another l. Major Didier and Ms. Vetter.

4

5    **HA:** Okay.

6

7    **RESP:** And I told them to be ready around 1500.

8

9    **HA:** All general character witnesses?

10

11   **RESP:** All general character witnesses.

12

13   **HA:** Okay. Do you have any other questions or matters to

14   discuss before we call in the Board President for voir

15   dire?

16

17   **RESP:** No. Could we take a five-minute recess just to use

18   the restroom?

19

168

1    **HA:**  Sure.   The time is now 0915 hours.   We'll take a

2    five-minute recess.

3

4    The hearing was recessed at 0915 hours, 8 March 2010.

5

6    The hearing was called to order at 0920 hours, 8 March

7    2010.   All parties present prior to the recess were again

8    present.

9

10   **HA:**  Cadet Spadone, before we call in the Board President

11   for voir dire, I'd also like to note for the record that

12   the exhibits that we excluded because they related to your

13   allegation that you've already been provident to, which is

14   going to go to a CAB, those will only come in front of the

15   Board Members after the merits portion of this HIH and

16   when we start the CAB portion, okay?

17

18   **RESP:**  Okay.

19

169

1   **HA:**  And they will come in front of them as marked as

2   Related Exhibits.  And what are they marked as?  Related

3   Exhibits 1 through what, Mrs. Linnartz?

4

5   **THE REPORTER:**  Related Exhibits 1 through 10.

6

7   **HA:**  And you had an opportunity to read through those

8   Related Exhibits, Cadet Spadone, when we looked at them

9   earlier?

10

11   **RESP:**  These ten exhibits here, sir?

12

13   **HA:**  I don't know.  Do they say Related Exhibits?

14

15   **RESP:**  I never got a copy of the Related Exhibits.

16   They're in the previous packet that was excluded?

17

18   **HA:**  Yeah.  And when we went over them, do you agree that

19   Related Exhibits 1 through 10 are accurate?  It's

20   everything that we excluded.

21

170

000224

1    **RESP:**   That is correct, sir.

2

3    **HA:**   Okay.   And I'd also like to note for the record that

4    originally, at the preliminary hearing, I said I needed to

5    go over Board Exhibits 7, 9 and 10, to determine whether

6    or not they would be appropriate in terms of the Article

7    31 issue that was raised by your attorney.   In actuality,

8    it was only Board Exhibits 7 and 10, because 9 was Major

9    George's sworn statement pertaining to the first

10   allegation and the approach for clarification, which I

11   excluded for the purposes of this HIH on the merits, and

12   that is marked as Related Exhibit No. 10.   Is that

13   correct, Mrs. Linnartz?

14

15   **THE REPORTER:**   Original Board Exhibit 9, yes.

16

17   **HA:**   Okay.   And that will come in front of the Board, just

18   for purposes of the CAB.   Do you agree, Cadet Spadone?

19

20   **RESP:**   That is correct, sir, yes.

21

000225

1    **HA:**  All right.  Is there anything else that we discussed

2    that needs to be articulated on the record?

3

4    **RESP:**  No, not at this time, sir.

5

6    **HA:**  Okay.  Let's bring in the Board President, the

7    potential Board President.

8

9    **RESP:**  Sir, are we going to go through them one at a time,

10   the Board Members, or is this going to be like an en

11   masse, while they're here?

12

13   **HA:**  I explained to you at the preliminary hearing and

14   I'll briefly explain to you again, what we're going to do

15   here is pick out who the Board President is.  If he's okay

16   to sit as the Board President, then we go to group voir

17   dire, which is very brief, and then we bring them in

18   individually, okay?

19

20   **RESP:**  Okay.

21

172

1     Cadet Donald Graves, Company H-4, Class of 2010, entered

2     the hearing room, was sworn in as the Board President, was

3     provided and read a copy of the allegations.

4

5     The Hearing Advisor and the Respondent conducted an

6     individual voir dire inquiry of Cadet Graves's potential

7     grounds for disqualification. Cadet Graves stated that he

8     could be fair and impartial when deciding facts in this

9     case and serving as Board President. The Respondent did

10    not object to or challenge Cadet Graves serving as Board

11    President.

12

13    **HA:** Cadet Graves, you will be the Board President today.

14    Come here and sit down. Take a look at the Findings

15    Worksheet. You are going to use this worksheet during

16    deliberations. Please familiarize yourself with it, and

17    if you have any questions about how to use it, please ask

18    me before deliberations.

19

20    When we reconvene, we're going to conduct voir dire with

21    the other potential members.

22

173

000227

1   Cadet Spadone, do you have any questions before we take a

2   very brief recess here, in-seat?

3

4   **RESP:**  Just one, sir.  I don't believe I got a new facts-

5   of-the-case sheet after we changed it to "on or about."

6

7   **HA:**  I think you penciled -- it's penciled in.

8

9   **IR:**  Yeah, it's just penciled in.

10

11  **RESP:**  Okay.

12

13  **HA:**  Yeah.  So it's penciled in, and did you initial next

14  to it?

15

16  **IR:**  No.

17

18  **HA:**  All right.  Why don't you initial next to it because

19  it's penciled in on or about, and it's an Appellate

20  Exhibit now.   Okay?

21

22  Do you have any other questions before we take a real

23  quick recess here, in-seat?

174

1

2      **RESP:**  No, I do not, sir.

3

4      There being no further matters to be discussed, the second

5      preliminary session was ended at 0920, 8 March 2010.

6

7                          END OF PAGE

8

175

000229

**PROCEEDINGS OF THE HONOR INVESTIGATIVE HEARING**

1

2

3   The HIH was called to order in the Nininger Hall, West

4   Point, New York, at 0934, 8 March 2010, pursuant to AR

5   210-26, paragraph 6-16, and USCC Pamphlet 15-1, dated 11

6   November 2009.

7

8   The following individuals were present:

9

10   Captain Kyle C. VanDeWater, JA, Hearing Advisor;

11   Cadet Alan Spadone, Company B-1, Class of 2011,

12    Respondent;

13   Cadet Joshua Young, Company B-1, Class of 2011,

14    Cadet Advisor;

15   Cadet James Gibson, Honor Secretary;

16   Cadet Kenneth, Howell, Investigative Representative;

17   Ms. Jennifer Linnartz, Reporter; and

18   All Cadets named in the Memorandum of Appointment,

19   except Cadets Mulligan, Quimby, Ramia, Swanson, Hauck,

20   Clegg, Pappas, Anthony, Periola and Myers, who were all

21   excused by the Secretary of the Honor Committee.

22

23   The Members of the HIH were sworn by the Board President.

24

176

000230

1    The Board President stated that the general nature of the

2    HIH in this case was to review the evidence and determine

3    whether the Respondent violated the Honor Code by cheating

4    and lying.

5

6    The Board Members were provided a copy of the allegations.

7

8    The Respondent indicated that he had sufficient time to

9    prepare for the hearing.

10

11    The Board President read an instruction on voir dire.  The

12    Board President, the Hearing Advisor, and the Respondent

13    conducted group voir dire of the Board Members.

14

15    The hearing was recessed at 0947, 8 March 2010.

16

17    A closed session was called to order at 0948, 8 March

18    2010, attended by the Hearing Advisor, the Board

19    President, the Respondent, his Cadet Advisor, and the

20    Reporter.  The Secretary of the Honor Committee was also

21    present in the courtroom.

22

000231

1    Nine Primary Board Members and one non-voting Class of

2    2013 Member were questioned individually.  Nine stated

3    that they could be fair and impartial while performing

4    their duties as Board Members.  Cadet Marc Orozco, Company

5    C-4, Class of 2011 was excused due to his friendship and

6    bias for the Respondent.

7

8    The Board President and the Respondent discussed the

9    Members who would be serving on the Board.  When

10    questioned, the Respondent had no further objections or

11    challenges of the Board Members.

12

13    The closed session was recessed at 1110 hours, 8 March

14    2010.

15

16    The hearing was called to order at 1113 hours, 8 March

17    2010.  All parties present prior to the individual voir

18    dire sessions are again present.

19

20    The Board President listed the Board Members as follows:

21    CDT Donald Graves, Board President, Class of 2010;

22    CDT Katherine Taylor, Primary Honor Rep, Class of 2010;

23    CDT Nicholas LaPlante, Alternate Honor Rep, Class of 2011;

178

1    CDT Christopher Cox, Primary Honor Rep, Class of 2011;

2    CDT Brandon Wright, Primary Member, Class of 2010;

3    CDT You Li, Primary Member, Class of 2011,

4    CDT Andrew Schumaker, Alternate Member, Class of 2011;

5    CDT Logan Lee, Primary Member, Class of 2012; and

6    CDT Cole Holland, Primary Member, Class of 2013.

7

8    All remaining Alternate and Reserve Board Members were

9    excused and took no further part in the proceedings.

10

11   The Board President gave preliminary instructions to the

12   Members.

13

14   The Members were provided copies of Appellate Exhibit I,

15   XII and XIII, Board Exhibits 1 through 10 regarding the

16   alleged Honor violation of the Respondent.

17

18
19   **BP:**  Board Members, we will now hear a short statement

20   from a representative from the Honor Committee, who is

21   called an Investigative Representative.  The Investigative

22   Representative's statement is not evidence and may not be

23   considered as such.  Its purpose is to familiarize us with

179

1    relevant facts and issues which are present in this case.

2    We may question the Investigative Representative after he

3    makes his statement, but our questions must be related to

4    clarification of facts discussed by the Investigative

5    Representative and not to the merits of the case, as the

6    Investigative Representative is not a witness in the case.

7

8    Cadet James Gibson, Honor Secretary, read the IR

9    statement, Appellate Exhibit XXVIII, to the Members of the

10   Board as follows:

11

12   **IR:** Facts of the Case: On or about 19 November 2009,

13   Cadet Alan Spadone submitted an EN302 essay entitled "The

14   Construction of an Image." Cadet Spadone used information

15   from Edwin Palmer Hoyt and Anne Tucker and provided

16   citations, including page numbers. On or about 30

17   November 2009, Dr. Terri Sabatos reviewed Cadet Spadone's

18   paper and noticed inconsistent sentences within the

19   overall scheme of the paragraph the aforementioned

20   sentence was placed. Noticing that said sentences had

21   accompanying citations, Dr. Sabatos reviewed the page

22   numbers associated with those citations to gain a better

23   understanding of what Cadet Spadone may have been trying

180

1    to convey in his essay.   At this time, Dr. Sabatos noticed

2    that the information provided in Cadet Spadone's citations

3    were not found on the page number listed.   On 30 November

4    2009, Dr. Sabatos arranged for a meeting with Cadet

5    Spadone to discuss his paper and to serve as an approach

6    for clarification.   The approach for clarification

7    occurred on 4 December 2009 with Cadet Spadone, Dr.

8    Sabatos, Major Anthony George, the English Department

9    Honor Officer, and Cadet Daniel Gray, the Cadet

10    Departmental Honor Liaison in attendance.   During the

11    approach for clarification, Cadet Spadone stated that he

12    may have inadvertently transferred his page citation notes

13    from his notebook onto his paper.   When asked by Dr.

14    Sabatos if Cadet Spadone had the notebook on his person at

15    the time, he replied negatively.   With no further

16    questions, Cadet Spadone was released and on the

17    recommendation of Major George and Cadet Gray, the event

18    was forwarded to the Cadet Honor Committee for

19    investigation.   On or about 30 January, Cadet Spadone gave

20    the notebook to the Investigative Team.

21

22    The Members had no questions for the IR.

23

181

1    **BP:**  The hearing is recessed to allow you time to read the

2    case folder.  We will reconvene at --

3

4    **HA:**  Take a brief, one-minute recess.  I need all the

5    Board members to step outside.  That includes you.

6

7    The hearing was recessed at 1127 hours, 8 March 2010.

8

9    A closed session was called to order at 1130 hours, 8

10    March 2010.  All parties present prior to the recess were

11    again present except for the Members of the Board and the

12    Board President.

13

14    **HA:**  I just want to clarify something, now that I think

15    about it.  When I gave my explanation as to why I allowed

16    in the approach for clarification evidence, which was in

17    Dr. Sabatos's statement, as well as Major George's, you

18    understand why I did that, correct?

19

20    **RESP:**  I do believe I understand.

21

22    **HA:**  Okay.  And I just want to clarify and hammer it down

23    for the record.  After reviewing those tapes and after

000236

1    reading their statements for the fourth time, and most

2    importantly, after listening to Dr. Sabatos, it was clear

3    to me that she did not suspect you of cheating, but she

4    had questions, and she believed that there would be a

5    reasonable explanation as to how the citations were wrong,

6    okay? I just want to put that on the record and ensure

7    that you understand that based upon her testimony, she

8    stated that she did not suspect you of cheating, just that

9    you had cited things incorrectly. Do you understand?

10

11   **RESP:** I understand, sir.

12

13   **HA:** Okay. That's why that evidence is coming in and

14   that's why we are where we're at.

15

16   Now, logistically -- do you have any other questions about

17   that?

18

19   **RESP:** Could I still question her during -- like after you

20   question her about it? Because the approach for

21   clarification happened on the 4th of December, and she

22   wrote in her sworn statement on the 14th.

23

183

1    **HA:**  That's fine.  Sure.

2

3    **RESP:**  If she really had just questions about the case,

4    why didn't she ask to see the notebook in between?

5

6    **HA:**  That's fine.  No problem.  It's 1130 hours.  So the

7    Article 31 issue, I think, is sufficiently articulated on

8    the record, including my reasoning as to why I allowed it

9    in.

10

11   **RESP:**  Is there an official -- did you type -- or was that

12   just included?

13

14   **HA:**  No.  It's on the record.

15

16   **RESP:**  Okay.

17

18   **HA:**  I'm just putting it on there because if she had said

19   that she had suspected you of cheating, I would have

20   excluded that evidence, but she did not.  She clearly

21   stated, over and over again on the record at that

22   preliminary hearing that she didn't know what was going on

23   and she thought there could've been a reasonable

184

1    explanation as to why the cites were wrong, and she also

2    wanted to potentially even afford you an opportunity, if

3    that was the case, to sit down with you and show you how

4    to do it.

5

6    **RESP:**  When I testify -- could I also question Dr.

7    Sabatos?  Could I state that the Investigative Team stated

8    that she was suspicious in their --

9

10    **HA:**  I don't see that that's relevant because at this

11    point, I've already ruled upon it.  The approach is what

12    it is, okay?  It's coming in.

13

14    **RESP:**  Okay.

15

16    **HA:**  So you want to focus on the merits and the elements,

17    because then you kind of -- it's already on the record.

18    You've already noted that.  You see what I'm saying?

19

20    **RESP:**  I got it, sir.

21

22    **HA:**  If you want to talk about how they did they

23    investigation and if they did it improperly, that's

185

000239

1   relevant, if that's what you're trying to get to.  But if

2   you're going to ask her -- if you're going to bring up

3   something that you already asked her, based upon the

4   approach, I don't see how that's relevant to the merits

5   unless you can explain to me why.

6

7   **RESP:**  I guess you could say that between the time that

8   she approached for clarification on the 4th and the time

9   she wrote her sworn statement on the 14th, if she really

10  did have questions, she could've made a further attempt to

11  clarify, based on the fact that Major George said that.

12

13  **HA:**  Okay.  That's relevant because of the whole notebook?

14

15  **RESP:**  Yes.

16

17  **HA:**  That's fine.  You can have that.  That's fine.  Yeah,

18  you can ask that.

19

20  **RESP:**  Okay.  And that is almost -- that belief is

21  supported by the fact that the Investigative Team did say

22  that she grew suspicious.  That's the only reason why I --

23

186

000240

1    **HA:**  Why don't you focus it on the timeline and tell me if

2    I'm wrong here, but it looks like you're asking -- is it

3    that you're trying to get at that if you had presented

4    more stuff to her and the team, that you wouldn't even be

5    here, that type of thing?

6

7    **RESP:**  That is what Major George's sworn statement kind of

8    alludes to, so yes.

9

10   **HA:**  That's fine.  But remember, that IT guy already

11   explained his reasoning for putting that in there, and you

12   can focus on that.  That's fine.  Okay.

13

14   It's 1135 hours.  I think that -- and it's up to you.

15   I'll give you the option.  I'll give them twenty-five

16   minutes to review this packet, although this packet is

17   quite long, come back in, and if they're done, if you

18   want, which would be around noon, you can do your opening

19   then, or you just let them read through it and as soon as

20   they're done, they go get their lunch, we come back on the

21   record at 1255 hours and start from there.  You might be a

22   little bit hard-pressed for time here because it is pretty

23   thick.

187

000241

1

2      **RESP:**  1255, sir.

3

4      **HA:**  Okay.  Let's get everybody back in here.  You don't

5      have to tell them to sit.  Just bring them in the room.

6      Actually, they probably do need to sit because they've got

7      to review their packets.

8

9      The closed session of the hearing was recessed at 1133

10     hours, 8 March 2010.

11

12     The hearing was called to order at 1135 hours, 8 March

13     2010.  All parties present prior to the recess were again

14     present.

15

16     **HA:**  The closed session has closed.  This open session has

17     now come to order.  The Members of the Board have just

18     reentered the room, to include the Board President, who

19     had just stepped out for my closed session, which was just

20     the Respondent, the Cadet Advisor, the IR, the Court

21     Reporter and myself.

22

188

1    Take your time and read through the packet.   The Board

2    President is going to read the recess instructions.   As

3    soon as you're done thoroughly reviewing the Board packet,

4    you're free to go to lunch.   Don't bring the packet with

5    you.   You have to be back here in your seats at 1255,

6    ready to proceed.

7

8    **BP:**   You are again advised that during the recess, we must

9    not discuss this case with anyone else, permit others to

10   discuss it in your presence, consult any materials or

11   sources other than the Board Exhibits or your personal

12   notes.

13

14   The hearing was recessed at 1134 hours, 8 March 2010, to

15   afford the Members time to review the Board packet.

16

17   The hearing was called to order at 1258 hours, 8 March

18   2010.   All parties present prior to the recess were again

19   present.

20

21   **HA:**   Cadet Spadone, you're advised that you have the right

22   to make a brief opening statement before the first witness

23   is called.   Would you like to make an opening statement at

189

1   this time?

2

3   **RESP:** I would.

4

5   **BP:** Members of the Board, the Respondent is permitted to

6   make both an opening statement and later a closing

7   statement. Neither statement is evidence. The purpose is

8   solely to familiarize you with the Respondent's view of

9   the case.

10

11  The Respondent, **Cadet Alan Spadone,** elected to make an

12  opening statement and stated in substance as follows:

13

14  To start off, I want to apologize that you have to be here

15  today. I also want to apologize that the time for the

16  Board today was moved around so frequently.

17

18  I've always strived to represent myself, the United States

19  Military Academy, the Honor Code in the best possible

20  light. I've always tried to live my life never having to

21  say "what if?"

22

190

000244

1      Unfortunately, my actions on October 27th violated this

2      most strongly held belief.  On October 27th, I turned in a

3      paper that was not my own.  It was plagiarized.  I

4      violated myself, the Honor Code, the United States

5      Military Academy and my fellow cadets.

6

7      I know nothing I say will take away from the seriousness

8      of my actions, and I accept the full consequence of my

9      actions.  I am sorry that you have to be here today, but I

10     appreciate that you are all here today.  Eventually, I'll

11     have to stand before the Commandant and the Superintendent

12     to answer for my actions.  It is my belief, however, that

13     having to answer to my peers is far more important.

14

15     Sitting where I am today, I wish that this was the end of

16     the story, but on December 4th of last year, I was accused

17     again of cheating.  The question you have to ask yourself

18     is why would I cheat again?  What motivation would I have

19     to commit this act?  I already admitted to the first

20     violation.  There is none.

21

22     I do not blame Dr. Sabatos for bringing me up on Honor

23     again.  It is a natural by-product of my earlier actions.

191

000245

1   In the end, the documents will show that I'm not guilty of

2   the second offense and I'm certainly not guilty of lying

3   simply by defending myself to the first offense.

4

5   I am sorry that you have to sit through this Honor

6   Investigative Hearing.  I really am.  I only ask for mere

7   patience throughout these proceedings and judge the case

8   based on the evidence.  Thank you again for all being

9   here.

10

11  The Board President gave a brief explanation about

12  procedural rules for questioning witnesses.

13

14  The Board President listed all Witnesses expected to

15  provide testimony at the HIH as follows:

16

17  For the Board

18  1.  Dr. Terri Sabatos, Associate Professor, Department of
19      English
20  2.  Major Anthony George, Instructor, Department of
21      English
22
23
24

192

000246

1    Dr. Terri Sabatos, Associate Professor, Department of

2    English, was called as a witness by the Board, was sworn,

3    and testified as follows:

4

5              QUESTIONS BY THE BOARD PRESIDENT

6

7    Q:  Ma'am, could you please state your full name, city and

8    state of residence and occupation for the record, please?

9

10   A:  My name is Dr. Terri Sabatos.  I'm an Associate

11   Professor of Art History in the Department of English and

12   Philosophy at the United States Military Academy, and I

13   live in ████████████████████

14

15   Q:  Thank you, ma'am.  Do you know the Cadet Respondent,

16   ma'am?

17

18   A:  Excuse me?

19

20   Q:  Do you know the Respondent, ma'am?

21

22   A:  The Cadet?

23

                        193

1    Q:  Yes, Cadet Spadone, ma'am.

2

3    A:  Yes, I do.

4

5    Q:  Could you please state how you know him?

6

7    A:  He was in my EN302 class last semester, so that

8    would've been Fall 2009.

9

10    Q:  Okay.  Thank you, ma'am.  Could you please look at

11    Board Exhibit 3-1, ma'am?

12

13    A:  How do I find it?

14

15    Q:  I believe it's about six pages in, ma'am.

16

17    A:  Got it.

18

19    Q:  Can you tell us what this document is?

20

21    A:  This is a sworn statement that I made concerning an

22    approach for clarification I conducted with Major George

194

1   and I believe Daniel Gray was with us, as well, concerning

2   some citations in a paper that were inaccurate.

3

4   Q:  Have you had a chance to review this exhibit, ma'am?

5

6   A:  Yes, I've seen it.

7

8   Q:  Have any new facts or circumstances come to your

9   attention which would cause you to make additions or

10  corrections to your statement?

11

12  A:  No.

13

14  Q:  I'll begin questioning and then open it up to the

15  Board and the Respondent for questions.

16

17  Ma'am, can you kind of give a brief overview of what

18  happened with this allegation, kind of what made you think

19  that a potential Honor violation had been committed?

20

21  A:  When I began reading the paper, I noticed that there

22  were certain academic key phrases used, and certain

23  references made to what seemed to me a much larger

195

1   argument, but that was not included in the paper.  I

2   looked at the citations.  My initial thought was the

3   student does not know how to adequately and correctly

4   incorporate the ideas of another scholar into his own

5   ideas, and I probably was going to have to go over those

6   with him.  In order to do that, I needed to know what the

7   other scholars were saying.  I looked at the citations in

8   the back, the bibliography.  I went to the library to get

9   the books.  As I began to open up to the pages, I realized

10   that none of the citations matched the argument or the

11   discussion that was in the paper.

12

13               **QUESTIONS BY THE BOARD MEMBERS**

14

15   Q:  Ma'am, have you had any similar problems with other

16   papers that Cadet Spadone turned in incorrect citations?

17

18   A:  Yes.

19

20   Q:  You mentioned that all five citations --

21

22   A:  I believe there were six.

23

000250

1    Q:  All six citations in the essay were incorrect?

2

3    A:  Yes.  I believe there are six.  I would have to check,

4    though, but I believe there were six citations.  But every

5    citation was incorrect.

6

7    Q:  And correct in being not the formatting, but the --

8    like intent or --

9

10   A:  There were no attributive tags and no quotes.  The

11   only quote, if I remember correctly, that was in the paper

12   was the quote of a name of a military maneuver.  There

13   were no attributive tags, "as John Smith says."  When I

14   went to look up the citations and match the discussion in

15   the book with the discussion in the paper, it was

16   completely -- they did not connect.  In fact, some of the

17   pages were photographs of landscapes from Japan.  They did

18   not match the discussion on Hirohito or whatever

19   specifically was in the paper did not match, in any way,

20   with what was going on in the pages that were cited.

21

22   Q:  Was he ever able to find the exact pages that he had

23   cited?  Like he cited them wrong, but did he find the

197

1    correct ones later on?

2

3    A:  I don't know.  When I conducted the approach for

4    clarification, the Cadet said that there was a notebook,

5    but no notebook was brought to the approach.  I believe

6    Daniel Gray asked if he remembered any of the other books.

7    He said he did not.  So to this day, I do not know what

8    other sources were used or saw any other further

9    documentation to correct.

10

11   Q:  You said there were six sources, but in the essay on

12   Board Exhibit 5 there's only four sources in the back.

13

14   A:  Citations.  I apologize.  I'm talking about how many

15   citations there were, and I said I would have to check.  I

16   can't remember if there were five or six different

17   citations in the body of the paper, and I apologize for

18   that.  There were then two books that I remember

19   specifically being used, one by Anne Wilson Tucker, I

20   believe, and another person, by Hoyt I believe was the

21   other one.

22

198

1   Q:   Okay.   And then all of these sources were available at

2   the Cadet Library?

3

4   A:   The two books that I found were at the Cadet Library.

5   Yes, that's where I found them.

6

7   Q:   And then in the allegations it mentions Essay No. 3?

8

9   A:   Yes.

10

11   Q:   What does that have to do with Essay No. 4?

12

13   A:   The two essays were linked as prompts.   Essay 4 was to

14   build off the key ideas that were established in Essay 3.

15

16   Q:   Okay.   But did you believe that Cadet Spadone had any

17   violations of the Honor Code in Essay 3?

18

19   A:   I had to do an approach for clarification on that

20   paper.   Yes, I did.   And we had to push it forward for

21   investigation because no clarification of the issues were

22   made at the time of the approach.

23

199

1   Q:   Could you describe what exactly happened at the first

2   approach for clarification?

4   A:   May I ask a question?   I'm understanding that this was

5   only on the fourth -- on the fourth essay, so I'm a bit

6   confused.   I just wish -- could someone clarify for me?

8   **HA:**   For all purposes of the Board, you heard in the

9   opening statement the Respondent has admitted to

10   Allegation No. 1.   So I mean, it's relevant because it is

11   the essay immediately preceding Essay No. 4, but try to

12   tie in your questions to make it relevant for your

13   findings for the second and third allegation.

15   **THE WITNESS:**   Okay, thank you.   May I answer that

16   question?

18   **HA:**   So does everybody understand?   Do you guys understand

19   now?   Is it a little more clear?   Okay.   Go ahead, ma'am.

21   A:   Okay.   Please ask your question again so I make sure I

22   answer is properly.

200

**BM:**  I'm not sure it's relevant if we're focusing on the second one.

Q:  If Essay 3 was used in Essay 4, and he's admitted to plagiarizing in Essay 3, is there any plagiarizing in Essay 4 that deals with Essay 3, as well?  Does he reuse it or --

A:  The two essays were remarkably different.  As I state in my sworn statement, Essay 4 had nothing to do with the topic of Essay 3.  The two were on completely different topics.

Q:  So it's my understanding that it's because after you read Essay 4 that you went back to Essay 3 to consult?

A:  No.  I think 3 was a separate incident.  Essay 3's approach for clarification, I would have to check the timeline, but I believe the investigation had already -- I had been talked to about that.  As far as I was concerned, that was a separate incident.

201

000255

1    Q:   Okay.   And that's why it wasn't included in this

2    notebook?   Okay.

3

4    A:   Yes.   This was a separate approach for clarification.

5    This was a separate paper, different topic.

6

7    **HA:**   Yeah.   Let me just clarify for the record one more

8    time.   Apparently it's not clear.   I didn't bring this up

9    in the beginning because Cadet Spadone's attorney had led

10   me to believe that he was going to admit to it in his

11   opening statement, which he did.

12

13   Cadet Spadone has already admitted to Allegation No. 1,

14   okay?   He's admitted to it.   You don't have to make a

15   finding on it.   So, therefore, you can focus on 2 and 3,

16   the allegation of cheating that occurred in November and

17   the allegation of lying.

18

19   Are there any questions?   It may be relevant, the first

20   allegation.   Cadet Spadone has already brought it up in

21   his opening statement, but try to focus on the fact that

22   your findings will be strictly for Allegations 2 and 3.

23   Does everybody understand?   Are there any questions?

202

1

2    **BM:**  Can you clarify Allegation 3 again?  It says

3    something about -- it's about lying?  What exactly was

4    Cadet Spadone lying about?

5

6    **HA:**  That's why you guys have to ask the witnesses.  Okay?

7    Does everybody understand here?  You've got to draw the

8    questions that you may have to find whether or not there's

9    enough evidence to find Cadet Spadone for the second and

10   third allegation, okay?

11

12   So you need to direct your questions towards the witness

13   here, to see whether or not there's enough evidence to see

14   if he did or did not cheat for the second allegation, or

15   if he did or did not lie.

16

17   Is anyone confused?  Does anyone have any more questions

18   before we proceed?  Does everyone understand what's going

19   on now?  Okay.  Go ahead.

20

21                  **QUESTIONS BY THE BOARD MEMBERS**

22

23   Q:  I was reading through his essay.

                              203

1

2      A:  Yes.

3

4      Q:  He was using some bigger words.  Is that kind of a

5      trend for the first two -- the first two essays, that he

6      kind of used the same wording?

7

8      A:  I'm not sure I understand what you mean by "bigger

9      words."  Can you give me a phrase that you --

10     "constructions of masculine identity," something like

11     that?

12

13     Maybe this will help you.  I did not have the class in the

14     first part of the semester.  One of my colleagues took

15     another job, so I did not grade or direct those first two

16     essays.  The only papers I saw and had responsibility over

17     as the instructor were Essays 3 and 4.  I took over the

18     class, I believe, October 23rd.  I'd have to check the

19     date, but I believe that was the date I took over the

20     class.

21

22                QUESTIONS BY THE BOARD PRESIDENT

23

                              204

1    Q:  During your approach for clarification, was there

2    anything that led you to believe that in the notebook that

3    wasn't available during your approach for clarification,

4    was there anything that led you to believe that he

5    actually did have the correct authors and page numbers

6    written down in that notebook, and just didn't bring the

7    notebook and then lied to you about it, or was there

8    anything like that?

9

10   A:  I have no way of knowing because he stated that he did

11   have a notebook, that he must have messed up when he was

12   taking the notes, he wrote what, where, when and what

13   page.  Cadet Gray asked if he remembered any of the other

14   texts he used.  He said no and he was also asked if he

15   just got the pages correct, but author's wrong or author's

16   -- the pages wrong, and again, he could not say yes or no.

17   He did not know.

18

19                 **QUESTIONS BY THE BOARD MEMBERS**

20

21   Q:  Would you say that you're familiar enough with Cadet

22   Spadone's writing to be able to tell if this was his style

205

**000259**

1    or not?

2

3    A:   No.  Well, I could make a claim about general college

4    writing, yes; probably not about Cadet Spadone's.  As I

5    said, the first two essays I did not have responsibility

6    for as the instructor.

7

8    Q:  So you're saying that the words that he used in his

9    essay could -- may or may not have been his own, but you

10   don't know?

11

12   A:  Correct, in that there were not attributive tags, no

13   direct quotes and because there are mentions of

14   specifically the Samurai and Mount Fuji in one section of

15   the paper that were not alluded to earlier, they seem to

16   me part of a much larger argument and that, in and of

17   itself, is fine if properly attributed, meaning

18   incorporating his own ideas with those of another scholar.

19

20   Q:  Do you remember what time and day the essay was turned

21   in, and if it was at all turned in for, I guess, a prior

22   review?

23

1    A:   No, there was no AI session.   I never saw the paper

2    ahead of time and it was turned in on time on whatever

3    day.   I don't have any -- I usually make marks if the

4    essay is turned in late or in any other unusual way, and

5    there was none.   It was turned in on time.

6

7    Q:   So, ma'am, in your eyes, the potential Honor violation

8    lies not in lifting someone else's idea and playing it off

9    and Cadet Spadone's, but in the -- like incorrect

10   citation, as in like leading someone to believe that

11   that's where he found the idea, instead of the idea was

12   his?

13

14   A:   It would have to be both because there's no

15   attributive tags.   If you look at the paper, generally,

16   when you're going to incorporate somebody else's ideas,

17   you say, "As John Smith claims," and either quote directly

18   or make a comment, summarize their argument.   There are --

19   none of that occurs in the paper.

20

21   So, as I stated, I had no idea of what to make of the

22   paper in that it was extremely unclear which were the

23   Cadet's ideas, which were incorporated ideas, or I agree

207

1    with this author, or with the author's -- what were the

2    author's ideas alone.  Does that make it clear?  There was

3    complete un-clarity as to all of those different things,

4    compounded by the fact I couldn't find them, the correct

5    authors.

6

7    Q:  You said in your statement that Cadet Spadone, he was

8    already aware of the issue with his essay when you came to

9    meet with him, before you even discussed what your

10   concerns were?

11

12   A:  Yes.  When I approached for clarification, I try to do

13   it the same way.  I announce to the Cadet it's an approach

14   for clarification.  I introduce who's sitting with me, our

15   Honor Rep.  In this case it was Major George and Dan Gray,

16   our liaison for the English Department.

17

18   Before I even began to identify the documents on the

19   table, Cadet Spadone said, "Ma'am, I know why I'm here.  I

20   know exactly what happened."  And I said, "Stop," because

21   I did not want any misunderstanding about what I was going

22   to ask.  I then stopped him, said, "Please let me finish

208

1    about what I want to ask you about," and then we

2    continued.

3

4    **BP:**  Cadet Spadone, do you have any questions?

5

6    **RESP:**  I do.

7

8    **QUESTIONS BY THE RESPONDENT**

9

10   Q:  Ma'am, what day was the approach for clarification on?

11   Do you remember?

12

13   A:  I believe, and I would have to check, that I sent the

14   e-mail on a Monday.  I did not get the reply until, I

15   believe, Thursday morning, so it was either the Thursday

16   or Friday.  I would have to check my notes.

17

18   Q:  Okay.  The records show that it's 4 December.  Would

19   you agree with that?

20

21   A:  Yes.  As close to my recollection, yes.

22

209

1    Q:  Okay.  I'm just going to first refer to Board Exhibit

2    4-1.  It's Major George's sworn statement.  It was

3    delivered on February 12th of this year.

4

5    A:  Okay.

6

7    Q:  Okay.  Near the third-to-last line of full text there,

8    it says, "I noticed that he had gone to the trouble of

9    going to the library to check books out in preparation for

10   this approach for clarification, but he did not bring his

11   notebook to the approach, which might have helped clarify

12   the situation."  So after the approach for clarification,

13   did you discuss that with Major George, saying would this

14   notebook have helped to clarify the situation?

15

16   A:  I don't recall.  I recall asking -- after the

17   approach, I recall asking Major George and Dan Gray what

18   they thought.  I thought that I still was not clear.  They

19   were not clear.  We determined that because of the un-

20   clarity, that the matter needed to be turned over for

21   investigation.  The approach for clarification, as I

22   understand it, is supposed to clarify the situation and

23   find the explanation for the questions that the instructor

210

1    has.  Because those were not answered, I still did not

2    know what sources were used, which were your ideas and

3    which were the ideas from other scholars.  I felt I had no

4    other choice but to turn it over for investigation.

5

6    Q:  Okay.  So the approach for clarification was made on

7    the 4th of December, and you wrote your own personal sworn

8    statement, Board Exhibit 3-1, on the 14th of December.  Is

9    that correct, ma'am?

10

11   A:  I believe, yes.  If that was the day the Cadet came

12   for the investigation.

13

14   Q:  Okay.  So we have Major George's statement that if the

15   notebook would've been brought, it would have potentially

16   helped to clarify the situation.  And I said that I had

17   the notebook, it's just I didn't have it on my person.

18   And my question is, if you really wanted to help clarify

19   the situation, between the 4th and the 14th, why didn't

20   you ask to see the notebook?

21

22   A:  Please understand, we have very strict rules on what

23   we are allowed and allowed to not do as instructors, and I

211

1       believe I am right in say that would've been

2       investigation, and we are not allowed to do that.

3

4       Q:  Okay.  If it was something to help -- is that what you

5       were told specifically, that you could not ask for this

6       notebook?  Or was that a personal belief that your

7       department has strict guidelines, that that would be an

8       investigation?

9

10      A:  I don't believe it's just our department.  I believe

11      we're all, as instructors, are not allowed to investigate.

12      I did the approach for clarification.  You did not clarify

13      the situation at the approach.  I had no other resource at

14      the end of that, as I understood it, but to send it over

15      for investigation.

16

17      Q:  So you were not specifically told that?

18

19      A:  I was not told to ask for the notebook, and I was not

20      told not to ask for the notebook.  As I said, after the

21      approach, the situation had not been clarified, so it was

22      turned over for investigation.

23

                                212

1   Q:  But you didn't write your personal sworn statement

2   until the 14th?

3

4   A:  When the investigators came.  Yes, I believe that was

5   the day the investigators came.

6

7   Q:  The only reason I'm asking this is because it would

8   seem, in my opinion, if somebody was concerned about

9   clarifying the situation, they would have taken the time

10  to look at the notebook that I mentioned during my

11  questioning.

12

13  A:  Am I allowed to respond to that?  Why didn't you bring

14  the notebook with you, then?  You claimed you knew why --

15

16  **HA:**  No, you can't ask him questions, ma'am.  I'm sorry.

17

18  **THE WITNESS:**  Okay.  No, that's fine.

19

20  **HA:**  He's not on the stand.

21

22  **THE WITNESS:**  Okay.  No problem.  I just wanted to talk,

23  but --

213

1    Q:   I would actually respond that if the notebook was

2    needed to help clarify the situation, I could've got it at

3    any point in between these ten days, and I would've

4    happily gone and got the notebook.   I was actually in your

5    class three times between the time this personal statement

6    was written and the time of the approach for

7    clarification.   That's the only reason.

8

9    The next thing --

10

11   **HA:**   Cadet Spadone, try to couch it in questions, okay,

12   instead of making declarations?

13

14   **RESP:**   Okay.

15

16   **HA:**   You've got an opportunity to do that, okay?

17

18   **RESP:**   Okay.   Yes, sir.

19

20   Q:   The next exhibit I would like to direct the Board to

21   is the essay itself, which is Board Exhibit 5, and the

22   handwritten notes that accompany it, which is Board

214

1    Exhibit 6. So you might need to do a little bit of

2    flipping in between the two sources.

3

4    Okay. So I guess the first parenthetical citation occurs

5    on Board Exhibit Page 5-2. It's the first page of the

6    essay. And this refers to the Hokkaido military

7    maneuvers. Board Exhibit 6 is the notebook from the class

8    with the relevant pages before and after the subject

9    dealing with Essay No. 4, and I apologize. The writing is

10    a little sloppy, but it's my writing style. The thing I

11    would like to draw your attention to is I refer to Hoyt in

12    that -- the author who wrote that passage right there, and

13    in my notebook, I referenced -- I said the divided image,

14    emperor on the white horse, and the Hokkaido visit, and

15    this is mentioned in Hoyt. Do you see that, ma'am?

16

17    A: No, I don't. I'm not sure what you're referring to in

18    your notebook.

19

20    **BM:** Can you point out where in the notebook?

21

22    Q: Okay, yeah. So Board Exhibit 6-4 is when the notes

23    for Essay No. 4 begin. It says "Essay 4" at the top.

215

1

2       A:   Uh-huh.

3

4       Q:   Does everybody see that right there?  All right.  Then

5       if you move down to, I guess you could say the last full

6       chunk of notes there, it says "Hokkaido Visit."  Does

7       everybody see that?  Okay.  And then in the paper, the

8       first attributive tag is -- not the first attributive tag,

9       but the first parenthetical citation is "The Imperial

10      Visit to Hokkaido."  Okay?  Do you see that, ma'am?

11

12      A:   I see it in the notebook.

13

14      Q:   Okay.  And do you also see it in the paper, on page --

15      Board Exhibit 5-2?

16

17      A:   Yes.  There's no page number, though, in the notes.

18

19      Q:   That is correct, ma'am.  The one question is, I'm just

20      going to go through here and show every -- how every

21      parenthetical citation is included in the notes, and then

22      we'll proceed from there.  Is that all right, ma'am?

23

216

1    A:  Continue.

2

3    Q:  Okay.  Awesome.  The next one is -- it occurs at the

4    bottom of Page 6-4, and "Who is the real emperor?"  And

5    that's attributed to Hoyt in the notes.  And then on page

6    -- Board Exhibit 5-3 is the second page of the essay.  I'm

7    sorry, it's a little bit confusing, but on the second

8    paragraph here, it talks about, "It is difficult to gain

9    much sense of the feelings and thoughts of the real

10   emperor, and perhaps because of this, there has been so

11   much made about his wartime responsibility."

12

13   So it was mentioned in Hoyt and it was included in the

14   paper.  Is that true, ma'am?

15

16   A:  I'm sorry.  I do apologize.  I can't make head or tail

17   out of this, and without Hoyt in front of me and the pages

18   from the book, again, I can't check the veracity of Hoyt's

19   actual text against your citations.

20

21   Q:  Okay.  Well, I guess you could look at my own personal

22   statement in reference to the particular course.  My

23   personal statement is Board Exhibit 1.  Actually, the one

217

1    we're looking at is 2-1.  Okay.  I'm just going to read

2    the personal statement because I think it will help

3    clarify what's going on right now.

4

5    "To be honest, I do not exactly know what I am being

6    accused of.  After reviewing my paper, I can see that the

7    information cited does not exactly line up with the page

8    numbers in the texts.  I have no idea how this happened

9    and it must have been an honest mistake.  However, it is

10   clear to note that any outside idea present in my paper is

11   cited even if the numbers are off.  Although this is a

12   documentation error, I cannot see how it violates any

13   tenet of the Honor Code or any of the rules of thumb.

14   When I first met with my professor during the approach for

15   clarification, it seemed like there was a little bit of

16   indecision on whether or not the English Department was

17   going to forward this to the Honor Committee.  I was only

18   made aware that the case was forwarded when Cadet Gray,

19   after four days, notified me that the English Department

20   decided to forward the case.  Additionally, I have not had

21   the opportunity to review the sources that I used in the

22   essay to see how some of the page numbers were off."

23

000272

1    My whole point in reviewing that, ma'am, is if these page

2    numbers don't exactly match up, and I don't know how far

3    they don't match up, is that more than an Honor violation?

4    Does that warrant the Honor violation?

5

6    A:   In many of the instances, the Tucker especially, I

7    have no understanding of why you would use that text

8    because there is no reference, except for a small

9    footnote, in that book on the images of Douglas MacArthur

10   with the emperor and I believe, yes, Tucker is who you

11   cite, and in that text specifically, if I remember

12   correctly, only a footnote, way at the end of the book.

13   So my confusion was not that the pages were a few pages

14   off.  As I put in, I believe, my report, I couldn't

15   understand how, for example, that Tucker was even used at

16   all.

17

18   Q:   Okay.  The book Tucker is referring to, could you say

19   the full name of that book?

20

21   A:   History of Japanese Photography by Anne Tucker.

22

219

1    Q:  Okay.  So this paper was in reference to "Construction

2    of an Image," mainly dealing with Japan, and so many of

3    the images I used were referenced in Tucker.

4

5    Now you say that the page numbers don't exactly mesh

6    fully, but there's really no way to know how correct or

7    not correct they were.  Is that correct, ma'am?

8

9    A:  No, that's not what I'm saying at all.  The other two

10   photographs were projected as -- showed MacArthur with his

11   eyes closed and the other depicted the emperor with his

12   mouth open.  It was fortunate that there was one image

13   that deemed acceptable.

14

15   The only reference that I am aware of, of this photograph

16   in Tucker, was a footnote.  It does not discuss, I

17   believe, MacArthur's eyes being open.  It does not discuss

18   which of many images was used.  As I could find looking

19   through the index and through the book, I could not find

20   any references that matched what you were saying in these

21   sentences to that citation.  And again, my initial

22   response to this was to sit down with you and show you how

220

000274

1    to do this properly.  But when the text did not match so

2    egregiously, I was unclear as to what was going on.

3

4    Q:  Okay.  So my question is, I guess, I reference USCC

5    Pam 15-1 in my Board Exhibit 2-1, if this is just a

6    question of not having the page numbers correct, would you

7    consider this an attempt to gain an unfair advantage?

8

9    A:  Again, I was not sure and that's why I turned it over

10   for investigation.

11

12   Q:  Okay.

13

14   A:  This seems, to me, that proper authors are not being

15   attributed to proper ideas in the paper.  As I said, in

16   Anne Tucker, it was not a matter of being pages off.

17

18   Q:  But there's no way to know that for sure.  Is that

19   correct, ma'am, because you included the exact page

20   numbers that are referenced, but none of the surrounding

21   pages?

22

221

000275

1    A:  I looked at all the surrounding pages.  Yes, I did.

2    As a scholar, I understand, unfortunately sometimes I

3    meant Page 132, but it's actually on Page 134.  That does

4    happen.  So I did look through the text to make sure that

5    it wasn't just a matter of inverting numbers.

6

7    Q:  Okay.  But those pages were not included in the pages

8    you copied.  Is that correct?

9

10   A:  I copied -- no, I did not copy the entire book.  The

11   Honor investigator, somebody came to get the books from my

12   office several days ago, so they are available, I would

13   believe.

14

15   Q:  Okay.  The other question I'd like to ask is in

16   reference to some of the previous questions that were

17   asked, you say I mentioned various elements that were

18   outside of the traditional paper, and my question is, you

19   specifically mention the Samurai and Mt. Fuji, and correct

20   me if I'm wrong, but aren't those pretty well-known

21   symbols of Japan, especially to a Cadet who took a course

22   on Japan for nearly a whole semester?

23

222

**000276**

1      A:   The emperor was displayed as human and the loaded

2      images of Mt. Fuji, along with representations on Samurai

3      values, these are in specific references to other

4      discussions of other images of the emperor, not already

5      included in your paper.   That's why I made the comment to

6      the side.   You didn't already discuss these.   These were

7      references that were not made earlier and they were not

8      explained.   Loaded images of Mt. Fuji tells me nothing

9      and, to me, seems to indicate a much larger discussion

10     about Mt. Fuji and Samurai values that was not included in

11     this paper.

12

13     Q:   Couldn't that have been in reference to many of the

14     images we saw previous to this essay?   I mean, Mt. Fuji

15     and Samurai are things that we saw during the course of

16     the class and really, anybody who did not even take the

17     course, I think, could reference that and not be out of

18     place, I guess you could say.

19

20     A:   Hence my comment that they aren't well-explained and

21     because you have Hoyt, 162 after that, again, I am not

22     clear on what are your ideas or what are Hoyt's ideas or

23     what ideas you're referencing to the photographs.

223

1

2    Q: Okay. The next question -- I'm sorry for jumping

3    around so much. It's going to back on your own personal

4    statement, which is Board Exhibit 3, 3-2. It's going to

5    be on the last page of your -- when you say "I recommended

6    that this case be forwarded to the Cadet Honor Committee

7    for further investigation, Cadet Spadone did not have any

8    unexpected explanation," could you perhaps explain what

9    the "expected explanation" would be?

10

11    A: I can't speculate. I mean, I could give you examples.

12    I don't know what you were going to say. Again, perhaps I

13    just had the page numbers wrong, or there was nothing that

14    clarified the situation.

15

16    Q: But if you classified this as an unexpected

17    explanation, what would you have classified as an expected

18    explanation?

19

20    A: I'm not sure what you're asking me. I'm sorry.

21

22    Q: Okay.

23

224

1    A:  Could you be clearer?  Are you asking me to speculate

2    what --

3

4    Q:  Well, you conclude that this is unexpected.  What

5    would've been an expected?  What made you use the word

6    "unexpected explanation" there?

7

8    A:  I guess unexpected meaning circumstances that we never

9    would've even thought of, that explained the situation.

10

11   Q:  Okay.  I think I'm going to shift gears and talk about

12   this second charge here.  It says, "On or about 4

13   December, Cadet Spadone violated the Cadet Honor Code by

14   stating to Dr. Terri Sabatos, Associate Professor,

15   Department of English, that he did not accurately write

16   down the authors or page numbers in his notebook, or words

17   to that effect, knowing said statement was false at the

18   time he presented it, or not then believing it to be true,

19   and doing so with the intent to deceive or mislead another

20   person."

21

22   My guess is how do you interpret that charge of me lying

23   to you on December 4th?  Because clearly there are notes

225

1    that reference to various authors and there are no page

2    numbers, but I mean, it's like I referenced to you I must

3    have made a mistake in transferring the page numbers, and

4    that seems to be what happened here.  Do you know --

5

6    A:  It still doesn't explain -- I had no -- there was no

7    proof of that.  There was no evidence of that at the time

8    we did the approach for clarification.  And again, after

9    the approach, we had not clarified the situation.  It is

10   turned over to the Cadets for investigation.  If that is

11   not proper procedure, then that needs to be made known to

12   me and many other instructors; but as I understood, that

13   was the proper procedure.  The approach did not clarify

14   the situation.  We were still very unsure and it still

15   does not explain the use of Anne Tucker, who I can't find

16   any reference where -- except for that one footnote, to

17   the information.

18

19   Q:  Ma'am, after you have inspected this notebook, do you

20   think it helps clarify the situation in any way?

21

22   A:  The pages here?

23

226

1    Q:  The notebook pages.  Mainly starting on Page 6-4 and

2    going to 6-6.  The next following pages have to do with

3    what was going to be on the TEE.

4

5    A:  Does this clarify the situation?  Is that what you're

6    asking me?

7

8    Q:  Does it help clarify it?

9

10   A:  Not at all, not at all.  There's no author's names

11   here that are author, title, publisher.

12

13   Q:  There are author -- titles.

14

15   A:  You have Hoyt.  You don't have a title of a book.  You

16   do not have publisher.  You do not have clear separation

17   between -- I'm not even sure I can read your handwriting

18   well enough to determine Anne -- the Tucker text.  And

19   again, I'm not sure.  No, this doesn't seem to clarify and

20   seemingly after the fact is --

21

227

000281

1    Q:  Okay.  So the references to the authors about Japan,

2    this did not at all help clarify the situation.  Is that

3    true?

4

5    A:  From what I can tell from your notes, no, this does

6    not particularly make it much clearer.

7

8    Q:  I guess my other question is, in reference to the

9    second charge, is if I'm being brought up on lying for

10    saying that I had this notebook where I must've made a

11    mistake in documentation, wouldn't that have warranted a

12    second approach for clarification, for me to come in and

13    show you this notebook?

14

15    A:  Again, the approach was done.  The ideas were not

16    clarified.  You claimed that you knew why I asked you in,

17    and that there was a notebook.  The notebook was not

18    brought at the approach.  It was not clarified.  I turned

19    it over for investigation.

20

21    Q:  Okay.  I'm going to try to wrap things up here.  It

22    just appears that you have an approach for clarification

23    on the 4th.  I'm notified around the 7th that you're going

000282

1    to forward the case, and then you write your sworn

2    statement on the 14th and there is no attempt to further

3    clarify the situation by seeing the notebook, even though

4    it would've been very easy, during any period of the

5    class, to come and see it.

6

7    That's my only question.  Major George does say that

8    seeing the notebook would have helped clarify the

9    situation.

10

11    I do not have any further questions, ma'am.  Thank you for

12    coming in today.

13

14    **BP:**  Are there any further questions by the Board?

15

16               **QUESTIONS BY THE BOARD MEMBERS**

17

18    Q:  I have one.  Just to clarify, trying to figure out

19    what you're saying, with the procedures that the

20    instructors have for dealing with an Honor situation, you

21    have your approach and if you're not satisfied, you turn

22    it over to the Honor Committee and leave it at that?

000283

1    You're done with it until the investigator comes to talk

2    to you?

3

4    A:  As I understood it, correct, that we get briefed every

5    year.  I also understand I am not allowed to investigate.

6    So --

7

8    Q:  I have two questions.  You said that you read through

9    the book because you've had a situation where you've made

10   mistakes, been a couple pages off.

11

12   A:  Everybody has, yes.  Yes, of course.

13

14   Q:  How far did you go in each direction from the cited

15   page?

16

17   A:  Chapters.  I looked through almost an entire book.  I

18   looked through the index.  I looked through the beginning

19   of the chapter titles at the beginning of the book.  I

20   looked at the index several times.  I scoured footnotes,

21   trying to find where this could have possibly come from in

22   the Tucker text.  Did I read it cover to cover?  No.

23

000284

1    Q:  And my second question is if he had come back after

2    the initial approach to you, you or Major George, with the

3    notebook, would you be able to look at that?

4

5    A:  I believe I would've consulted Major George and asked

6    him if this was permissible, yes.

7

8    Q:  You said you did not ask Cadet Spadone for the

9    notebook.  Did he, at any point between your approach for

10   clarification and the day when you gave a sworn statement,

11   did he offer to produce the notebook?

12

13   A:  Not once.

14

15   **BP:**  Any further questions by the Board?  Cadet Spadone,

16   do you have any further questions?

17

18   **RESP:**  Just one question.

19

20            **QUESTIONS BY THE RESPONDENT**

21

22   Q:  If I recall correctly, at the end of the approach for

23   clarification, you stated to me that you would have to

                        231

1    confer with Major George and Cadet Gray on whether or not

2    the event should be forwarded or not. So we have the

3    opening of approach for clarification. Major George

4    states that if I have the notebook, it would've helped

5    clarify the situation. Why not, at that point, did you

6    say we need to see the notebook, go back and see the

7    notebook?

8

9    Because it seems there's no specified guidelines on when

10   an approach for clarification basically ends. You

11   could've said we need to see this notebook immediately.

12

13   A:  And as I stated, I believed that was overstepping my

14   bounds after the approach for clarification, and it

15   wandered into the realm of investigating. I did not know

16   about a notebook until it was brought up at the approach.

17

18   **RESP:**  No further questions.

19

20   **BM:**  Can I get one more?

21

22              QUESTIONS BY THE BOARD MEMBERS

23

                              232

000286

1    Q:   So in your statement you said his essay did not

2    discuss any of the course text.  Did you tell the class

3    that -- did you recommend the class to use course text?

4

5    A:   The Essay 4 was intended to play off of, to funnel in

6    from the ideas of Essay 3.  That did not.  And also no,

7    the students did not have to necessarily go into the

8    course text and, in fact, when I looked at what the paper

9    topic was, I thought it was very interesting and thought

10   ooh, it mentioned Emperor Hirohito, very interesting.

11

12   I did remark that it wasn't dealing with anything we

13   talked about in class, but that was not necessarily a

14   negative.

15

16   Q:   Okay.  So was it necessary, just by relying on the

17   course text, was it -- actually, was it enough to just

18   rely on the course text to finish the essay, or would

19   Cadets need to go to outside sources to complete the

20   essay?

21

233

1    A:   They would've been more than able to write the Essay 4

2    without going to any other text, except those that we had

3    been using in class.

4

5    Q:   So Hoyt and Tucker were not course texts?

6

7    A:   Absolutely not, no.

8

9    **BP:**   Any further questions?

10

11   **HA:**   Cadet Spadone, do you have any further questions for

12   this witness?

13

14   **RESP:**   No, I do not, sir.

15

16   **HA:**   I just want to say to the Board, please ensure that

17   you -- if you have any questions lingering in your mind

18   about the situation that you need to ask the professor,

19   that you do it now.   We can certainly recall her if

20   there's other outstanding questions later, but if there's

21   any question marks, now's the time to ask it, before the

22   Board President here reads the instruction to her.

23

234

1    There being no further questions, the witness was duly

2    warned, excused subject to recall, and withdrew from the

3    hearing room.

4

5    **BM:**   Is there any way that we can get a hold of the actual

6    Hoyt and Tucker texts?

7

8    **BM:**   I was going to ask, is Board Exhibit 7-1 what we're

9    talking about?

10

11   **BM:**   Seven is the Hoyt text and eight is the Tucker text,

12   but it's only pieces of it.  The direct pieces that link

13   up to the page numbers in the essay, I'd like to see the

14   actual --

15

16   **BM:**   Those exhibits were provided by Professor --

17

18   **HONOR SECRETARY:**   Those exhibits were copied by members of

19   the Investigative Team.

20

21   **BM:**   Okay.

22

23   **HONOR SECRETARY:**   I'll ask.  I'll see if we can do it.

235

1

2     **HA:**   Okay.   What was on the record because I just stepped

3     out real briefly?   What just transpired that I missed,

4     after the witness walked out of the room?

5

6     **BM:**   I asked if we could get the full text of the Hoyt and

7     Tucker that was used, because what's given in the Board

8     packet are only the pages that were specifically cited in

9     the essay.   But what he's been arguing is that he was just

10    incorrect in what pages they were, and I would like to see

11    the entire text.

12

13    **HA:**   So you guys want to look through the books?

14

15    **BM:**   If those ideas are in the text or not is a major

16    question that was brought up by the witness.

17

18    **HA:**   Does someone want to second it?

19

20    **BM:**   I'll second it.

21

22    **HA:**   Okay.   Now here's the problem.   If you guys are going

23    to use the entire book and, at some point in time, it's

236

1    going to have to be made part of the packet here, so I ask

2    that if you review the book and you have pages that you're

3    going to refer to and that you'd like to use, well, then

4    we'll make photocopies of it.  Otherwise, it'll be noted

5    for the record as to what the exact book was and the year.

6    That way, if you look through the entire thing and nothing

7    else is going to be extracted from it, at least it's noted

8    on the record that you reviewed those books for the

9    purposes of keeping the record as tight as possible.

10

11    But if you do pull things that are outside of the pages

12    that have been referenced and in your Board packet, that

13    the IR, you're going to have to make copies of those and

14    provide them to everybody on the Board on the Respondent.

15    And we're also going to make it as another exhibit.

16

17    So IR, can you go get those books?

18

19    **RESP:**  We actually have the books.

20

21    **HA:**  You've got them right now?

22

23    **RESP:**  Yes.

237

1

2    **HA:**   Where are they?

3

4    **RESP:**   They're right here in my backpack.

5

6    **HA:**   Okay, great.  Those are two big books.  It's got to

7    be seconded, by the way.  It can't be -- so Cadet Cox,

8    you're the one who motioned for it?

9

10   **BM:**   Yes, sir.

11

12   **HA:**   Who seconded it?

13

14   **BM:**   Cadet Wright, sir.

15

16   **HA:**   Cadet Wright?  Okay.  So it's seconded for the

17   record.  It takes two to add another exhibit here.  And,

18   for the record, IR, can you describe the book and the

19   copyright here, as well?  Both of the books, because

20   there's two new exhibits.

21

238

1    **HONOR SECRETARY:** Would you be okay with just maybe like

2    doing ten pages before and after the written citations, to

3    verify whether or not there's consistency or maybe --

4

5    **HA:** Here's what I'm going to do. Just put on the record

6    as to what the books are and what the copyright is.

7

8    **IR:** The first book is Hirohito, The Emperor and the Man,

9    by Hoyt, copyrighted 1984. And the second book is The

10   History of Japanese Photography by Anne Wilkes Tucker,

11   copyright 2003.

12

13   **HA:** And Cadet Spadone, those were actually in your

14   possession, correct?

15

16   **RESP:** Since Friday.

17

18   **HA:** Since Friday, right. So you had them on Friday. You

19   asked for them. The IR gave them to you. You've had them

20   for the whole weekend?

21

22   **RESP:** That's correct, sir. I actually asked for them

23   since the initial approach for clarification.

239

000293

1

2      **HA:**   Okay, but you've had them over the weekend?

3

4      **RESP:**   Yes.

5

6      **HA:**   I guess what I'm going to do right now is -- Board

7      President, it's your show here.  I'm just trying to

8      accommodate the request.  How many minutes do you guys

9      want to review the books, because now you've added them in

10     as exhibits.  I expect that you guys do it as a group

11     because you're each going to have to take a look at it.

12     We're not going to photocopy the whole book.  You've

13     deemed it relevant, so how many minutes, Board President?

14     Do you want a half an hour?

15

16     **BP:**   Half an hour sounds good to me, sir.

17

18     **HA:**   Okay.  The time is now 1355 hours.  And I'm going to

19     be back here at 1425 for Major George.  It's up to you,

20     Board President.  Do you want to call Major George first

21     and then review the books, or do you want to review the

22     books and then talk to Major George?  Major George appears

23     to be a witness talking about the approach.  It might be

                                240

1  better that you review these books now because if you have

2  any more questions for the professor, you're going to have

3  to call her back.

4

5  **BP:**  I think we'll review the books first, sir, because --

6

7  **HA:**  Right.

8

9  **RESP:**  Sir, could I just ask to talk with the Hearing

10  Advisor without the Board present?  Is that -- before the

11  recess?

12

13  **HA:**  Yeah, okay.  You guys can step out of the room,

14  please.  We're going to enter into a closed session here.

15  All members of the Board, including the Board President,

16  are leaving the room.

17

18  The hearing was recessed at 1355 hours, 8 March 2010.

19

20  A closed session was called to order at 1356 hours, 8

21  March 2010.  The Members of the Board and the Board

22  President are not present in the hearing room.

23

241

000295

**HA:** The Members of the Board have requested to look at both of those books. It was seconded, as pursuant to the rules. Pursuant to 15-1, a consensus of two of the Board members may vote to recall witnesses, call unscheduled witnesses or obtain additional documents. These documents, which are both of the books, were called back.

The IR has just asked that we just give the books to the Board during their deliberations. I've decided against that and I'm allowing them to review it for half an hour now because I don't want them to go into deliberations, read through the books and then still have more questions for some of the witnesses. I'd rather that they read through the books now and if they have any additional questions, they can call back the professor.

So you wanted a closed session, Cadet Spadone?

**RESP:** Yeah. For something to be included into evidence doesn't it need to be included from the start, I guess you could say?

242

1  **HA:**  Well, these books were requested by you.  They were

2  provided to you and they're obviously relevant to this

3  case.  They are allowed to ask for additional documents,

4  only, I mean, if they're really relevant, and these are

5  very relevant.

6

7  **RESP:**  That's true.

8

9  **HA:**  You were provided the books over the weekend to

10  review and they're extremely important because they go

11  towards the nexus of the second allegation, because you

12  apparently have used these books in your paper.

13

14  So based upon what the last witness said and, more

15  importantly, what you raised by your questions to her

16  surrounding the book, I think that it's not unreasonable

17  to ask them -- they've asked to look at those pages and I

18  don't see why it would be unreasonable.

19

20  And if you didn't have the book, though, Cadet Spadone, I

21  just want to put for the record, I may have ruled

22  differently on this, because I know that there was an

23  issue for you obtaining the book and who was in possession

243

000297

1   of them. But you were provided the book at the second

2   preliminary hearing.

3

4   **RESP:** Yes. I'd just like to point on the record that I

5   repeatedly asked for it, from the moment of the approach

6   for clarification through --

7

8   **HA:** Yeah, absolutely. The Respondent had made requests

9   to the Commandant and Honor Committee to get the books

10   because it was out of possession to him. Via his

11   attorney, the investigators -- I don't know what happened

12   with that, but you were provided the books on Friday,

13   correct?

14

15   **RESP:** Yeah.

16

17   **HA:** All right. Any other issues that you need to resolve

18   with me now; because here's the way I see it going. I'm

19   going to give them a half an hour. They're fairly large

20   books. If they need more time, I'll give them a little

21   bit more time, and we'll proceed with Major George. And

22   any other issues that are after, we'll see what happens.

23   Any concerns or questions for you that we might be able to

000298

1   address now?

2

3   **RESP:**  No, not at this time.

4

5   **HA:**  Okay.  Let's see.  The time is now 1400 hours.  Let's

6   bring the Board Members back in.  And we'll step out and

7   give them time to review the documents.

8

9   The hearing was called to order at 1400 hours, 8 March

10   2010.  All parties present prior to the closed session

11   were again present.

12

13   **HA:**  Board, you've requested the two books.  You have half

14   an hour to look at them.  I'm going to kind of do it like

15   you did when you first got your Board packet.  You had

16   time to review them.  There's only two books, so utilize

17   your resources to the best of your ability.

18

19   Board President, it's your show.  We'll recess until 1430

20   hours.

21

22   The hearing was recessed at 1400 hours, 8 March 2010 to

23   afford the Board time to review Board Exhibits 11 and 12.

000299

1

2    The hearing was called to order at 1437 hours, 8 March

3    2010.  All parties present prior to the recess were again

4    present.

5

6    **HA:**  Board President, have you and the members of the

7    Board had ample opportunity to go through the two books

8    that were just referenced to and are admitted into

9    evidence?

10

11   **BP:**  Yes, sir.

12

13   **HA:**  Okay.  As of right now, do you have any pages that

14   you need copied, that you would like to be inserted into

15   the record?

16

17   **BP:**  No, sir.

18

19   **HA:**  Okay.  Based upon your review of those books, do you

20   find it necessary to call back the Professor?

21

22   **BP:**  No, sir.

23

000300

1    **HA:**   Okay.   So proceed, then.

2

3    Major Anthony George, Instructor, Department of English,

4    was called as a Board witness, was duly sworn and

5    testified as follows:

6

7                    **QUESTIONS BY THE BOARD PRESIDENT**

8

9    Q:  Sir, could you please state your full name, rank and

10   position?

11

12   A:   Anthony Lee George, Major, Philosophy Instructor,

13   Department of English and Philosophy, and Department Honor

14   Liaison for the English Department.

15

16   Q:  Sir, do you know Cadet Spadone?

17

18   A:   No, not other than having sat in two approaches for

19   clarification.

20

21   Q:   Okay.   So that approach for clarification was your

22   only interaction with Cadet Spadone?

23

                                247

**000301**

1    A:  Yes.

2

3    Q:  Okay.  Thank you, sir.  Sir, could you please turn to

4    Board Exhibit 4?  It should be on the fourth tab there,

5    fourth or fifth tab.

6

7    **HA:**  It will say on the bottom, sir, what Board Exhibit it

8    is.

9

10   A:  Okay.

11

12   Q:  Can you tell us what this document is, sir?

13

14   A:  It's part of the sworn statement that I made.

15

16   Q:  Have you had a chance to review this exhibit, sir?

17

18   A:  I have.

19

20   Q:  Have any new facts or circumstances come to your

21   attention which would cause you to make any additions or

22   corrections to your statement?

23

                                248

000302

1    A:   Yeah.   Actually, I was told to put who else have you

2    talked to concerning this case and I put no one.   But

3    actually, that's not entirely correct because in my role

4    as the Department Honor Liaison, I watched the process of

5    -- the Department put together a packet, which includes

6    the case being reviewed by the course director, the

7    department head and a reviewer that the department head

8    assigns and while doing that, I did -- while that was

9    happening, people are discussing the case.   So this is not

10   entirely accurate, although it was -- although nothing

11   from those conversations would change anything in this

12   report.

13

14   Q:   Okay.   Thank you, sir.   Sir, I'll go ahead and begin

15   the questioning, and then I'll open it up to the Board and

16   Cadet Spadone for further questioning.

17

18   Sir, can you describe what happened on the day that you

19   sat in on the approach for clarification of Cadet Spadone?

20

21   A:   At this approach, Cadet Bishop came to my office and

22   when there's an approach, I contact -- in this case, I

23   contacted Cadet Bishop.   He came to my office.   We went

                              249

1    down to my office, to the student library, and I don't

2    remember who was in the room first, but it ended up being

3    Cadet Bishop, myself, Dr. Sabatos, asked Cadet Spadone

4    about a paper that he had written.  I didn't look at the

5    paper.  The things that Dr. Sabatos put out in front of

6    Cadet Spadone I didn't look at.

7

8    I sat there with Cadet Bishop, ensuring, at least

9    perceived myself to be ensuring that nothing got

10    accusatory and that nothing happened that would cause me

11    to think that we needed to stop and read him his rights or

12    something like that.

13

14    She asked him numerous questions.  He gave answers.  I

15    wasn't entirely clear on all of the meanings of his

16    answers, and at some point, it became apparent that the

17    answers he was giving was not clarifying the situation,

18    which was the purpose of the approach, so when it seemed

19    that wasn't going to happen, I don't remember who -- I

20    think we just, by consensus stopped.  I don't think any

21    particular person stopped it, but when it seemed apparent

22    that it wasn't going to become clear, the clarification

23    was stopped, Cadet Spadone left and Cadet Bishop, Dr.

000304

1    Sabatos and myself agreed that the instructor wasn't

2    satisfied by the approach and therefore, this should be

3    looked into by an Honor investigation.

4

5    **BP:**   Thank you, sir.  Board Members, are there any

6    questions?

7

8    **RESP:**   Can I just jump in one second?  We were talking

9    about the second approach for clarification, which is what

10   we're deciding today.

11

12   **HA:**   Is that what you're talking about, sir?  You're

13   talking about that second approach, what's in front of

14   you?

15

16   **RESP:**   Because you mentioned Cadet Bishop, which was the

17   first approach for clarification, and I admitted to that,

18   and so --

19

20   **THE WITNESS:**   Yeah.  I'm sorry.  I meant to say Cadet

21   Gray.  I meant Cadet Gray.

22

23   **HA:**   Okay.  Thank you for clarifying that.

251

1

2      **THE WITNESS:**  I apologize.

3

4      **BP:**  Board Members, you can ask questions.  Are there any

5      questions from the Board at this time?  Cadet Spadone, do

6      you have any questions?

7

8      **RESP:**  Yes, I do.

9

10                    **QUESTIONS BY THE RESPONDENT**

11

12     Q:  Just one question.  This is in reference to the second

13     approach for clarification.  It says, "I noticed that he

14     had gone to the trouble of going to the library to check

15     the books out in preparation for this approach for

16     clarification, but he did not bring his notebook to the

17     approach, which might have helped to clarify the

18     situation."

19

20     You wrote this on February 12th of 2010.  Is that correct,

21     sir?

22

23     A:  Yes.

                            252

1

2       Q:  Were you aware -- did the Honor Committee inform you

3       that the notebook was turned over to them on or around 30

4       January?

5

6       A:  No.

7

8       Q:  As you said, would that have helped to clarify the

9       situation, if you were informed of that, sir?

10

11      A:  If -- can you say the question again?

12

13      Q:  Would you have liked to be informed of that?  Would

14      that have helped to clarify the situation?

15

16      A:  If the notebook would've been at the approach for

17      clarification, it might have clarified it.  Once the

18      approach for clarification was over, the investigating

19      people were telling me about them having the notebook

20      doesn't mean anything to me.

21

22      **RESP:**  No other further questions.  Thank you.

23

253

BP:   Any questions by the Board?

### QUESTIONS BY THE BOARD PRESIDENT

Q:   Sir, I have one question.   In the Department of English, I ask this because you are the Department of English Honor Liaison, correct?

A:   Yes.

Q:   Okay.   In the Department of English, there's a procedure that's followed whenever there's a potential Honor violation, correct, sir?

A:   Yes.

Q:   In that procedure, is there any obligation to the instructor, after an initial approach for clarification, that they need to continue to go back and talk to the potential violator after the approach for clarification, sir?

254

000308

1    A:  Specifically with regard to the potential violation?

2

3    Q:  Yes, sir.

4

5    A:  No.

6

7    Q:  Okay.  Thank you, sir.

8

9    A:  There might be another reason not to.

10

11    Q:  Okay.  Thank you, sir.

12

13    **RESP:**  Can I ask one more question?

14

15    **BP:**  Absolutely.

16

17                 **QUESTIONS BY THE RESPONDENT**

18

19    Q:  Is there any way, within the English Department SOP,

20    Honor SOP, in that if an approach was not fulfilling

21    enough, let's say the material was not at the approach for

22    clarification, there could've been a suspension of the

23    approach for clarification and have the one individual go

255

1    and get the material that could've helped to clarify the

2    situation, or is any approach for clarification just you

3    only have like that set amount of time to do it?

4

5    A:   The issue is that once you do an approach, if you

6    start digging, that could be interpreted as conducting an

7    investigation, and that we explicitly cannot do.  Does

8    that answer your question?

9

10   Q:   I guess it's just what is the -- I mean, I guess just

11   what is the interpretation of what is an investigation, of

12   what it's helping to interpret the situation.

13

14   A:   Yeah.  It's a difficult fine line, in my opinion, to

15   try to walk, but the approach for clarification is not an

16   accusation and it's not an investigation.  That's not the

17   purpose of it.  The purpose of it is to see if the Cadet

18   has some sort of explanation that would clarify it, and if

19   the Cadet doesn't have an explanation that clarifies it,

20   then it moves out of our realm and into the Honor

21   Committee realm.

22

256

1    Q:  Do you think it would be possible for an investigation

2    to clear up what an approach for clarification could not

3    clear up?

4

5    A:  Yes.

6

7    **RESP:**  Okay.  No further questions.

8

9    **BP:**  Any further questions by the Board?

10

11    There being no further questions, the witness was duly

12    warned, excused subject to recall, and withdrew from the

13    hearing room.

14

15    **BP:**  All Board witnesses and those witnesses called by the

16    Respondent have now testified.

17

18    **HA:**  Just to make sure, do you have any witnesses?

19

20    **RESP:**  No.

21

22    **HA:**  Okay.

23

000311

1    **BP:**   Cadet Spadone, you have been advised that you have

2    the right to either testify before this Board or to remain

3    silent.  Do you wish to testify at this hearing?

4

5    **RESP:**  I would.

6

7    **BP:**   Okay.  Cadet Spadone, you've indicated a desire to

8    testify at this HIH, so before we proceed, I'm going to

9    again inform you of your Article 31 right.  I'm doing this

10   just to ensure that you understand your rights and because

11   the law requires me to advise soldiers of their Article 31

12   rights in situations where they're suspected of

13   misconduct.  Do you understand?

14

15   **RESP:**  I do.

16

17   **BP:**   Cadet Spadone, I'm Cadet Donald Graves, Class of

18   2010, a Cadet Lieutenant, serving as Board President in

19   this proceeding.  The offense that you are suspected of is

20   cheating and lying.  You have the following rights:

21

22   You do not have to answer any questions by the Board or

23   say anything.

                                258

1

2     Anything you say or do can be used as evidence against you

3     in an adverse action.

4

5     You have the right to talk privately to a lawyer before,

6     during and after questioning.  This lawyer can be a

7     civilian you arrange for at no expense to the government,

8     or a military lawyer detailed for you at no expense to

9     you, or both.

10

11    You have a right to stop answering questions at any time,

12    or to speak privately with a lawyer before continuing to

13    answer the Board's questions.

14

15    Do you understand your rights?

16

17    **RESP:**  I do understand my rights.

18

19    **BP:**  Have you ever requested a lawyer after being read

20    your rights?

21

22    **RESP:**  I have.

23

                              259

1    BP:   Do you want to speak with your lawyer at this time?

2

3    RESP:  No, I would not.

4

5    BP:   Okay.  Cadet Spadone, you may testify before this

6    hearing in any manner.  If you wish, you may start by

7    making a narrative statement, or you may simply open

8    yourself to questioning by the Board.  How do you wish to

9    proceed?

10

11   RESP:  Narrative questioning by the Board (sic).

12

13   Cadet Alan Spadone, the Respondent, Company B-1, Class of

14   2011, was sworn and testified as follows:

15

16               QUESTIONS BY THE BOARD PRESIDENT

17

18   Q:   You can begin with your statement.

19

20   A:   As a narrative -- I meant why don't we just ask

21   questions.  I'm sorry.

22

23   Q:   You just want to open it up?

                              260

000314

1

2      A:  Sure.

3

4      **BP:**  Board Members, you may now question the Respondent.

5

6                    **QUESTIONS BY THE BOARD MEMBERS**

7

8      Q:  When you went to the approach for clarification with

9      Dr. Sabatos, why did you say that you already knew what

10     she was going to talk to you about?

11

12     A:  I guess you could say that this was my second approach

13     for clarification with Dr. Sabatos, and the --

14

15     **HA:**  Can you just speak up, Cadet Spadone?

16

17     **RESP:**  Yes.  I'm sorry.  Can everybody hear me right now?

18

19     A:  This is my second approach for clarification with Dr.

20     Sabatos, and the e-mail that she sent me looked like a

21     form e-mail that would be sent to any approach for

22     clarification, so that's the reason why I thought I knew

23     what it was going to be about.  And obviously, when an

                              261

000315

1      approach for clarification comes up, you review your

2      essay.

3

4      Q:  When you reviewed your essay, you went to the approach

5      like with the idea that like her issue with your paper was

6      a discrepancy with page numbers and citations?

7

8      A:  I wouldn't say that.  I think when she asked me, she

9      was -- her statement was -- I don't know how she opened

10     it, but I opened it before she could finish, "I know why

11     I'm here," and that was true.  I kind of knew what it was

12     for, an approach for clarification.

13

14     Major George was in there again.  He was the Department

15     Honor Representative, and another cadet was in there, who

16     I assumed was an Honor liaison.

17

18     Q:  When you went there and had gone to the library first

19     to find books, and then you mentioned about your notebook.

20

21     A:  Yes.

22

262

000316

1    Q:  Why didn't you offer to go get the notebook at that

2    time, or bring it in in a timely manner?

3

4    A:  When I was first there, I don't recall, but I think I

5    did offer to go get the notebook.  I would like to have --

6    I asked for the actual books, but they weren't provided to

7    me at the time.

8

9    The reason I didn't go and expressly get the notebook at

10   that time was at the conclusion of the approach for

11   clarification, she said that they would have to consult

12   with her peers to decide whether or not it was to be

13   forwarded, and I didn't hear anything for three and a half

14   days, so I was under the impression if they wanted to see

15   the notebook, they could've asked for it, but I think I

16   was wrong in that assumption.

17

18   Q:  When you were writing your essay, do you recall where

19   you got the page numbers from that you put in your

20   citations?  Like did you have the books in front of you?

21   Were you going off your notes?

22

263

1    A:   Obviously, I was looking at the books because I didn't

2    have the page numbers in the notes, but to be completely

3    honest, I don't know exactly what as -- this was back, I

4    think, ninety something days ago.  But I was in

5    combination the notes and the books, but there must've

6    been a problem either transferring it from the notes to

7    the books or the books to the paper or some way in between

8    there.

9

10   Q:   So you had the books open in front of you as you were

11   writing this paper?

12

13   A:   Not as I was specifically writing the paper, but I

14   wrote it over the course of two nights in the library, so

15   the books were there when I was writing the paper.

16

17   Q:   So you said you wrote this essay in two nights.  Do

18   you recall the dates of those nights you were writing it?

19   It was like two days prior to when the paper was due?

20

21   A:   To be honest, I don't exactly remember exactly when.

22   It was over the course of two nights, but I don't know.

23

264

000318

1    Q:  You just turned in the final paper, or did you have

2    like a conference?

3

4    A:  For this one, there wasn't a -- if there was an early

5    assignment, it would've been included.

6

7    Q:  Looking at the syllabus, it says there's like a

8    conference?

9

10   A:  Yeah.

11

12   Q:  But you didn't have a conference?

13

14   A:  No.

15

16   Q:  You're sitting in the library, you say that the books

17   are there, but you're going off of your notes.  I'm just

18   confused of where these page numbers came from if they're

19   not in the notes, and the books were there but they

20   weren't opened, like where you got the numbers themselves?

21

22   A:  The books were there and they were opened.  It was

23   just -- I think I was going off them in tandem.

265

1

2    Q:   I'm sorry?

3

4    A:   I was going off of them in tandem at the same time.

5

6    Q:   Would you be able to find, in those books, where you

7    got that information from?

8

9    A:   To be honest, I don't know if I would be able to at

10   this point.  When I first turned the essay in I requested

11   them, and I wasn't able to get them back until Friday at 5

12   p.m., so I really would have to go back thoroughly and do

13   that.  So that's -- I'd have to read the book again and,

14   you know, go in there.

15

16   Q:   At any point, when you were writing your essay, did

17   you ever feel rushed or did you ever feel like there was a

18   lot of pressure on you to complete the assignment?

19

20   A:   There's always a time constraint here, but for this

21   one, not more than any other, I guess you could say.

22

266

000320

1    Q:  A follow-up question.   Did you have anybody peer

2    review your essay prior to submission?

3

4    A:  I don't remember exactly.   I'm sure I did, but I can't

5    remember who, exactly, at this time.

6

7    Q:  Did you have any other sources, like during your

8    initial research for this paper or while you were writing

9    it, that you looked at?

10

11    A:  There might've been, but when I turned the paper in, I

12    was pretty much a hundred percent confident that my

13    documentation was correct.

14

15    Q:  So if you were given enough time now, ninety days

16    after the turn-in date, if you reviewed your paper and the

17    books, would you be able to point out, at all, where your

18    ideas came from in the books?

19

20    A:  Potentially, but I mean, I don't -- I can't give you a

21    hundred percent on that.

22

267

000321

1    Q:   When did you say you turned the notebook in to the

2    Honor Committee?

3

4    A:   I only mentioned that I had it in my possession.   I

5    met with the Honor Committee on -- I don't know the

6    specific date, but around -- it was 30 January I turned in

7    the notebook.

8

9    Q:   Okay.   Did they ask you for it?

10

11   A:   Yes.

12

13   Q:   And did you produce it right then, or did you have

14   to --

15

16   A:   What happened was it was in my trunk room, so our

17   trunk room was locked for a period of about five days

18   because we lost the keys, but as soon as it -- it was like

19   the next day, I produced it for them, as soon as I could

20   get into the trunk room.

21

22   I mean, the notes are in a chronological order, if you

23   look at them.   And it's a spiral notebook.   Nothing

268

1    could've been taken out or put in, if that was the root of

2    your question.

3

4    Q:  As you were writing your notes in here, did you write

5    the authors in at the same time that you wrote the

6    information in?

7

8    A:  Yes, I did.

9

10   Q:  I was wondering, the two photos, the one with General

11   MacArthur and the emperor on the horseback, were those

12   found in books, as well, or elsewhere?

13

14   A:  Then mentioned the photos in the source, and when I

15   got the photo, let me just make sure here, I actually got

16   the exact, you know, where it was from inside of it.

17

18   Q:  So you had like the actual photo?

19

20   A:  I actually had the actual photo, yes.

21

22   Q:  Where did those photos come from?

23

                              269

000323

1    A:  One was from Kyodo News International and the other

2    one was from the Hokkaido, which is where the military

3    review took place, Government Office.

4

5    Q:  Those were acquired from the library?

6

7    A:  Those were acquired through the library.  But that was

8    -- I think those photos were in the book, and those were

9    the sources of the photos.

10

11   Q:  They were found in the books, you said?

12

13   A:  Yes.

14

15   Q:  How did you go about finding your sources for the

16   essay?  Did you just do a search of Japanese or

17   whatever --

18

19   A:  Obviously it was constructing an image on Japan, and

20   so I thought, through the use of images of the emperor, it

21   kind of presented a prime example to show and contrast how

22   that changed over time, and that was this idea that kind

270

000324

1    of came to me, and that's what I hoped to do in the paper.

2    And then I sought for sources to kind of show that.

3

4    Q:  So after the approach for clarification by Dr.

5    Sabatos, you did not go in and add any new notes into your

6    notebook or anything like that?  Is that correct?

7

8    A:  No, that is correct.  I think, if you look at the

9    notes there, merely following when the end of the notes on

10   the essay, which is on the 6th, it begins to go into

11   there's a presentation we did on the Shinto perspectives,

12   but there's not a lot there, and then immediately

13   following that, it goes into what was going to be on the

14   TEE.  On Page 9 there's the Thayer Room 328, which was on

15   the TEE, and then there's some notes about what you should

16   bring in.

17

18   **BM:**  I don't know if this is a question better answered by

19   like the Board President or you, sir, but if we're

20   supposed to be asking questions right now about the second

21   and third allegations, I don't really understand the way

22   the second -- or the third allegation is written in

23   reference -- like in conjunction with the second one, like

271

1    the lying -- like what they're exactly saying he lied

2    about, if it's supposed to be in concurrence with the

3    plagiarizing allegation.

4

5    **HA:**   What's your question?

6

7    **BM:**   I don't know if the allegation is poorly worded or

8    I'm just not understanding it correctly, but it's saying

9    that "Cadet Spadone did violate the Cadet Honor Code by

10   lying, by stating that he did not accurately write down

11   the authors or page numbers in his notebook, or words to

12   that effect."   So they're saying, if they're accusing him

13   of lying because he said he did not accurately write it

14   down, that means they believed that he believed that he

15   did it accurately and was saying otherwise?

16

17   **HA:**   I can't tell you what they meant when they wrote it

18   down in terms of how the allegation is written.   I can

19   just read you the instruction on preponderance of the

20   evidence and the evidence that's out there.   I mean, you

21   were given instructions on the elements of lying, correct?

22

272

000326

1    **BM:**  I was, sir.  And I understand the elements.  I just

2    don't understand why there would be the initial allegation

3    of plagiarism and then the second allegation saying that

4    he was saying an untruth when he said that he did not do

5    it accurately.

6

7    **HA:**  I can't answer that for you.  You have to evaluate

8    that in terms of your analysis of the evidence.  Am I

9    missing something?  What's your name again?

10

11   **BM:**  Cadet Taylor.  I don't know if I'm the only one that

12   just misunderstands this or is confused by this.

13

14   **BP:**  I think I understand what you're saying, but it's

15   something that we're going to have to go into in

16   deliberations.  It's not like -- it's more of a matter of

17   fact than a matter of law.

18

19   **BM:**  Okay.

20

21   **HA:**  Yeah.  That's the best way to put it.  Thank you.

22   That was fantastic.  That's right.  That's a matter of

23   fact, and that's what you're all here to determine, what

                              273

1     the facts are.  If it was a matter of law, I'd probably be

2     able to guide you on that.  But your question pertains to

3     evidence, and that's what your job is here, to evaluate

4     that evidence and determine whether or not, by the

5     standard of proof, which is a preponderance of the

6     evidence, Cadet Spadone committed Allegations 2 and/or 3.

7

8     **BM:**  Okay.

9

10    **BP:**  Are there any further questions for the Respondent by

11    the Board?  Okay, no further questions.

12

13    Cadet Spadone, you will be given an opportunity to make a

14    closing statement after a brief recess.  Do you have

15    anything further you wish to submit for the Board's

16    consideration at this time?

17

18    **RESP:**  No.

19

20    **BP:**  Okay.  Board Members, does anyone desire to have any

21    witnesses recalled, documents obtained or additional

22    witnesses called before the hearing is closed for

274

000328

1   deliberations to resolve this case?  All negative

2   responses.

3

4   The hearing will now close for the purpose of discussing

5   the Respondent the instructions I will give to the board.

6   Board Members, before you leave I'm going to give you the

7   recess instructions one more time.

8

9   You are again advised that during the recess, we must not

10  discuss this case with anyone else, permit others to

11  discuss it in your presence, consult any materials or

12  sources other than the Board Exhibits or your personal

13  notes.  You guys can step outside.  Thank you.

14

15  **HA:**  We're going to take a brief recess.  Cadet Spadone,

16  you and your Cadet Advisor can come up here and the way

17  that this is going to go is that we'll take the recess;

18  all the Board Members have left the room, including the

19  IR, except for the Board President.  We discuss the

20  instructions and then we go back on the record and

21  summarize what had occurred on the recess, okay?

22

23  **RESP:**  Okay.

275

1

2 **HA:** So let's go off the record and we'll be back on in a

3 couple of minutes. And the reason why, Cadet Spadone, is

4 I give you an opportunity to read all of the instructions

5 and answer any questions that you may have about them, and

6 then we go back on and discuss what you already asked,

7 okay?

8

9 **RESP:** Okay.

10

11 The hearing was recessed at 1510 hours, 8 March 2010.

12

13 The closed session was called to order at 1527 hours, 8

14 March 2010. All parties present prior to the recess were

15 again present, including the IR.

16

17 **HA:** We just reviewed all the instructions. Cadet

18 Spadone, were you given an opportunity to read all the

19 instructions?

20

21 **RESP:** I was.

22

276

1    **HA:**   Okay.   Are you -- and you were given the opportunity

2    to object to any instruction being read, correct?

3

4    **RESP:**   That is correct, sir.

5

6    **HA:**   And were any of your objections overruled?

7

8    **RESP:**   No, they were not.

9

10   **HA:**   Okay.   So all of the instructions that you want read

11   are going to be read, correct?

12

13   **RESP:**   That's correct, sir.

14

15   **HA:**   Okay.   I'm going to also note that you have asked

16   that the three rules of thumb, which is on Page 1-4 of 15-

17   1, you wanted that as a procedural instruction.   I believe

18   that because it's a principle, it's not a legal

19   instruction that needs to be read; however, I've given you

20   the opportunity to have this page, 1-4, photocopied and

21   admitted into evidence as a Respondent Exhibit, for the

22   Board to review while they deliberate.   And I've given you

23   the opportunity that you can read it during your closing

                             277

1    statement.  You can do both or either one, and you have

2    chosen to not have it included as a Respondent Exhibit for

3    deliberations, but you have chosen to read it during your

4    closing statement.  Is that correct?

5

6    **RESP:**  That is correct, sir.

7

8    **HA:**  And you fully understand that I'm allowing you to

9    enter this as a Respondent Exhibit, but you've declined?

10

11   **RESP:**  That is correct, sir.

12

13   **HA:**  Okay.  Are there any other matters that we need to

14   take up before -- you've asked for some more time to

15   confer with your Cadet Advisor, which I'm going to readily

16   allow.  Are there any other outstanding issues that we

17   need to address?

18

19   **RESP:**  Can we include the "Three Rules of Thumb" as a

20   Respondent -- that would take just like two seconds,

21   right?

22

278

1    **HA:** Yeah, no problem. The Respondent has just requested

2    that the "Three Rules of Thumb" Principle be included as a

3    Respondent Exhibit. Please make the requisite copies,

4    Cadet Gibson, and ensure that the Court Reporter marks it

5    as a Respondent Exhibit, and we will include it for each

6    one of the Board Members to have.

7

8    You have also asked me to give an instruction that

9    clarifies to the Board that their role was to look at

10    Allegations 2 and 3, because you've already admitted to 1.

11    I'm going to clarify that for the Board, probably twice,

12    during these instructions, pursuant to your request, okay?

13

14    **RESP:** Okay.

15

16    **HA:** Are you satisfied with that?

17

18    **RESP:** I am satisfied with that.

19

20    **HA:** Okay. Let's take a five-minute break, and we'll meet

21    back here at 1537 hours.

22

000333

1    The closed session was recessed at 1532 hours, 8 March

2    2010.

3

4    The hearing was called to order at 1542 hours, 8 March

5    2010.  All parties present prior to the recess were again

6    present, including the Board Members.

7

8    **BP:**  Board Members, you will now hear the Investigative

9    Representative's statement.  I remind you that the

10    Investigative Representative's statement, as well as the

11    Respondent's closing argument, are not evidence and may

12    not be considered as such.  Their purpose is to

13    familiarize you with the relevant facts and issues which

14    are present in this case.

15

16    Cadet Kenneth Howell read the IR statement, Appellate

17    Exhibit XXVIII, to the Members of the Board as follows:

18

19    **IR:**  Facts of the case:  On or about 19 November 2009,

20    Cadet Alan Spadone submitted an EN302 essay entitle "The

21    Construction of an Image."  Cadet Spadone used information

22    from Edwin Palmer Hoyt and Anne Tucker and provided

23    citations, including page numbers.  On or about 30

000334

1    November 2009, Dr. Terri Sabatos reviewed Cadet Spadone's

2    paper and noticed inconsistent sentences within the

3    overall scheme of the paragraph where the aforementioned

4    sentence was placed.  Noticing that said sentences had

5    accompanying citations, Dr. Sabatos reviewed the page

6    numbers associated with those citations to gain a better

7    understanding of what Cadet Spadone may have been trying

8    to convey in his essay.  At this time, Dr. Sabatos noticed

9    that the information provided in Cadet Spadone's citations

10    was not found on the page numbers listed.  On 30 November

11    2009, Dr. Sabatos arranged for a meeting with Cadet

12    Spadone to discuss his paper and to serve as an approach

13    for clarification.  The approach for clarification

14    occurred on 4 December 2009, with Cadet Spadone, Dr.

15    Sabatos, Major Anthony George, the English Department

16    Honor Officer, and Cadet Daniel Gray, the Cadet

17    Departmental Honor Liaison in attendance.  During the

18    approach, Cadet Spadone stated that he may have

19    inadvertently transferred his page citation notes from his

20    notebook onto his paper.  When asked by Dr. Sabatos if

21    Cadet Spadone had the notebook on his person at the time,

22    he replied negatively.  With no further questions, Cadet

23    Spadone was released and on the recommendation of Major

281

1 George and Cadet Gray, the event was forwarded to the

2 Honor Committee for investigation.   On or about 30

3 January, Cadet Spadone gave the notebook to the

4 Investigative Team.

5

6 **BP:**   Are there any questions of the Investigative

7 Representative?

8

9 Cadet Spadone, you may now make an argument on the

10 evidence or any matters you wish considered before we

11 start deliberation.   Cadet Spadone, you may proceed.

12

13 The Respondent, **Cadet Alan Spadone,** elected to make a

14 closing statement and stated, in substance, as follows:

15

16 I'd just like to make a final closing statement.   I want

17 to appreciate that you're all here today (sic).   I know

18 it's been a long day, and I appreciate your thought

19 process going forward.

20

21 Looking at the case, it's clear that the approach was

22 necessary, but I didn't think the approach was complete,

23 and I think the investigation cleared up what was unclear.

000336

1

2      Before we go forward, and I just like to kind of read you

3      the "Three Rules of Thumb." We all have to learn it

4      during Beast, and it kind of like internalizes the spirit

5      of the Honor Code. And it says:

6

7      "An action that is dishonorable or unethical is not

8      necessarily a Cadet Honor Code violation; hence, the Honor

9      System emphasizes striving for the higher standard, rather

10     than adhering to the explicit prohibitions of the Cadet

11     Honor Code. The 'Three Rules of Thumb' are as follows:

12     Does this action attempt to deceive anyone or allow anyone

13     to be deceived? Does this action gain or allow the gain

14     of privilege or advantage to which I or someone else would

15     not otherwise be entitled? Would I be dissatisfied by the

16     outcome if I were on the receiving end of this action?'"

17

18     And with that in mind, I think I made a mistake, an error

19     in documentation, but I had no intent to gain an unfair

20     advantage over my peers or to hurt Dr. Sabatos or to gain

21     an unfair advantage. I mean, I admitted to the previous

22     infraction. I would have no -- there would be no reason

23     for me to gain an unfair advantage again. There's no

283

000337

1   motive in the world.  I know I'll trust whatever you guys

2   recommend, and I just thank you again for being here.

3   That's it.

4

5   **BP:**  Board Members, at this time I will instruct you on

6   the procedures to be applied in this case.  When we close

7   to deliberate and vote on the findings, each of us must

8   resolve the ultimate question of whether Cadet Spadone

9   violated the Honor Code based upon the evidence and

10   instructions I will give you.

11

12   I advised you at the outset, in my preliminary

13   instructions, that the standard of proof is whether the

14   evidence is sufficient to support a conclusion that it is

15   more likely than not that Cadet Spadone violated the Honor

16   Code.  In other words, is there more evidence supporting a

17   conclusion that the Respondent violated the Code than

18   evidence supporting a conclusion that he did not.

19

20   In order to reach such a finding, we much consider each

21   element or part of the alleged violation.  Only if the

22   evidence convinces us that each element of the allegation

284

1   is more likely true than not true can we find that a

2   violation occurred.

3

4   Again, this is a preponderance of the evidence standard.

5   It does not require proof beyond a reasonable doubt.   The

6   weight of evidence is not determined by the number of

7   witnesses or volume of exhibits.   By considering all the

8   evidence and evaluating such factors as the witness's

9   demeanor, opportunity for knowledge, information

10   possessed, ability to recall or relate events, and other

11   indications of voracity.

12

13   Only matters properly before this hearing as evidence may

14   be considered in your deliberations.   But in weighing the

15   evidence, you are expected to utilize your common sense

16   and your knowledge of human nature.   The determination as

17   to the weight of the evidence in this case rests solely

18   with us.   If we find that any of the elements or parts of

19   the allegation is more likely to be untrue rather than

20   true, then we must find that a violation did not occur.

21   Similarly, if we find that the evidence is evenly balanced

22   so that it cannot be determined whether an element or part

285

1   is true or untrue, we must find that a violation did not

2   occur.

3

4   We heard a short statement from a representative of the

5   Honor Committee at the outset and closing of this hearing.

6   You are reminded that the Investigative Representative's

7   statement is not evidence and may not be considered as

8   such. We should not attempt to infer the attitude of the

9   Cadet Honor Committee toward the merits of this case based

10  on the Investigative Representative's presentation.

11

12  We also heard a short opening statement and closing

13  statement from Cadet Spadone. These statements are not

14  evidence and may not be considered as such.

15

16  Finally, we should not attempt to infer the Hearing

17  Advisor's attitude towards the case based on actions he

18  has taken and the questions he has asked.

19

20  **HA:** In this case, it is apparent that certain items have

21  been redacted or omitted from the Board Exhibits. USCC

22  Pam 15-1 lays out the rules for admissibility of evidence.

23  Only evidence properly admitted may be considered for your

286

000340

1    deliberation.   In my role as the Hearing Advisor, I

2    reviewed the investigative packet prior to dissemination

3    of the Board Members, to ensure that it contains only

4    relevant and admissible information.

5

6    During the preliminary hearing, I made a determination to

7    redact information based on the rules set in USCC Pam 15-

8    1.  You are not to draw any negative inference from the

9    redactions.  You can in no way hold the ruling against the

10   Cadet Respondent.  Does everyone understand?

11

12   Just to make it crystal clear for you, he has already

13   admitted to Allegation 1.  You are to determine whether or

14   not he committed Allegations 2 and 3.  Does everybody

15   understand that?  Apparently so.

16

17   **BP:**  Cadets violate the Honor Code by lying if they

18   deliberate deceive another person by stating an untruth,

19   or by any direct form of communication, to include the

20   telling of a partial truth, or the vague or ambiguous use

21   of information or language with the intent to deceive or

22   mislead.

23

287

000341

1    In order for you to find that Cadet Spadone violated the

2    Cadet Honor Code by lying in this case, you must find, by

3    a preponderance of the evidence, that the evidence is

4    sufficient for you to conclude that each of the following

5    elements is more likely true than not true:

6

7    1.   That on or about a certain date, the Cadet made a

8    certain statement or communication;

9

10   2.   That such statement or communication was false, or the

11   Cadet believed the statement or communication to be false;

12

13   3.   That the Cadet knew such statement or communication

14   was false at the time he made it, or the Cadet did not

15   believe the statement or communication to be true at the

16   time he made it;

17

18   4.   That the Cadet made it with the intent to deceive or

19   mislead another person.

20

21   I will now explain some of the terms used.

22

288

1    "On or about" means on the dates stated, or on a date

2    "close" to or about that date.

3

4    "Communication" means anything that creates an impression

5    or conveys a message to someone else in lieu of an oral or

6    written statement.  This includes non-verbal actions that

7    substitute for oral or written statements.  Examples

8    include nodding one's head, raising one's hand or giving a

9    thumbs up.  Other examples of non-verbal communication

10   include displaying another person's driver's license or

11   identification card as one's own and wearing items, such

12   as wristbands or ink stamps that indicate a person is of

13   legal drinking age when he is not.

14

15   "False" means that something is untrue, incorrect or

16   contrary to the facts.

17

18   "Knew such statement is false" means that he actually knew

19   this.

20

21   "Did not believe the statement to be true" means that at

22   the time of making the statement, he was not sure about

23   the truth of the statement, but nevertheless, asserted as

289

1   being true, or knew nothing at all about the matter

2   asserted in the statement, or otherwise did not believe

3   the statement to be true.

4

5   "Intent to deceive or mislead another person" means a

6   purpose or intention to trick another, or to cause another

7   to believe as true that which is false.

8

9   The Honor offense of cheating is committed when a Cadet

10   fraudulently acts out of self interest, or assists another

11   to do so with the intent to gain or give an unfair

12   advantage, or with the intent to deceive or mislead.

13

14   In order for us to find Cadet Spadone violated the Cadet

15   Honor Code by cheating in this case, you must find that

16   the evidence is sufficient for you to conclude that each

17   of the following elements is more likely true than not

18   true.   The elements of cheating are:

19

20   1.   That on or about a certain date, the Cadet did a

21   certain act;

22

290

2.   That the Cadet did so with the intent to gain or give

an unfair advantage, or with the intent to deceive another

person.

I will now explain some of the terms used.

"On or about" means on the date stated, or on a day

"close" to or about that date.

"Intent to deceive" means a purpose or intention to

mislead another, to trick another, or to cause another to

believe as true that which is false.

You have the duty to determine the credibility or

believability of the witnesses.   In performing this duty,

we must consider each witness's intelligence and ability

to observe and accurately remember relevant details, in

addition to the witness's sincerity and conduct in the

hearing, and prejudices and character for truthfulness.

Consider also the extent to which each witness is either

supported or contradicted by other evidence, the

relationship each witness may have with Cadet Spadone, or

291

000345

1    anyone else involved in this case, and how each witness

2    might be affected by the finding.

3

4    Taking all these matters into account, we should then

5    consider the probability of each witness's testimony and

6    the inclination of the witness to tell the truth.   The

7    believability of each witness's testimony should be our

8    guide in evaluating testimony, and not the number of

9    witnesses called.   These rules apply equally to the

10   testimony given by Cadet Spadone.

11

12   **HA:**   You are advised that you may not, in any way, base

13   your decision on the fact that there are three allegations

14   in this case, as opposed to a lesser number.   In other

15   words, merely because there are several allegations in

16   this case, you may not infer that Cadet Spadone is more

17   likely to have committed at least one.

18

19   Equally as important, the fact that he has admitted to the

20   first allegation should in no way affect your decisions

21   about the second and third allegation.   They are three

22   separate instances.   Does everybody understand that?   You

23   must weigh the credibility and weigh the evidence for each

                                292

1    allegation separately, and because he's admitted to the

2    first one, it does not mean that he is guilty of two and

3    three.  Does everybody understand that?

4

5    **BP:**  I have advised that intent to deceive or mislead, or

6    intent to gain or give an unfair advantage must be proved

7    by the evidence as being more likely true than not true in

8    order to find that a violation occurred.  Direct evidence

9    is based on actual knowledge or observation.  Direct

10   evidence of intent is often unavailable.  Cadet Spadone's

11   intent, like any other fact, may be proved by

12   circumstantial evidence.

13

14   Circumstantial evidence is indirect evidence or

15   circumstances which convince you that some fact may or may

16   not exist.  For example, if you wake up in the morning,

17   look out the window and see a wet street, that

18   circumstance may cause you to conclude that it rained

19   during the night.  In addition, we may assume that Cadet

20   Spadone intended the natural and probable consequences of

21   any act purposely done by him.

22

293

000347

1  I advised earlier that to find Cadet Spadone has violated

2  the Honor Code by lying or cheating, you must find that it

3  is more likely true than not true that he had the intent

4  to deceive or mislead, or the intent to gain or give an

5  unfair advantage.

6

7  The evidence has raised the issue of whether Cadet Spadone

8  was, at the time of the alleged violation, actually

9  ignorant of the fact that he had lied to Dr. Terri

10  Sabatos.  Evidence of ignorance or a mistake about an

11  element or part of the allegations, even if unreasonable,

12  may alone, or with other evidence, convince us that Cadet

13  Spadone did not have the intent to deceive or mislead, or

14  the intent to gain or give an unfair advantage.

15

16  On the other hand, evidence of Cadet Spadone's ignorance

17  or mistake about intent to deceive or mislead, or intent

18  to gain or give an unfair advantage may be outweighed by

19  the other evidence supporting a conclusion that Cadet

20  Spadone was not ignorant or mistaken.

21

22  In deciding whether the Respondent was actually ignorant

23  of the fact that he had lied to Dr. Terri Sabatos, we

294

000348

1    should consider the probability or improbability of the

2    evidence presented on the matter.  In making this

3    assessment, we should consider the evidence presented,

4    Cadet Spadone's class and experience, and our own common

5    sense.

6

7    The following procedural rules pertaining to voting on

8    findings and recommendations must be observed.  Each

9    Member has an equal voice and vote with other Members when

10   deliberating upon and deciding all questions pertaining to

11   Cadet Spadone's alleged Honor violations.  The influence

12   of superiority in rank or class will not be employed in

13   any manner in an attempt to control the independence of

14   any Member in the exercise of his or her personal opinion.

15   Our deliberations should properly include a full and free

16   discussion of all the evidence that has been presented.

17   Voting on the findings will be by secret written ballot,

18   and all Members of the hearing are required to vote.

19   Whereas here there are multiple allegations, we will vote

20   on each allegation separately.  Moreover, a decision shall

21   be reached on each of the allegations before us.  We are

22   permitted only one ballot on each allegation, which is

23   taken at the close of the discussion.  I will divulge the

295

000349

1    count to the Members and thereafter the ballots will be

2    destroyed.  At least six of the nine members are required

3    to find a violation of the Cadet Honor Code.

4

5    We are not permitted to make a recommendation regarding

6    the retention of Cadet Spadone until after the

7    announcement of the findings.  Furthermore, our discussion

8    will be limited to whether or not a violation of the Cadet

9    Honor Code occurred.  We will not discuss the effects of a

10   found result on the Respondent.  If we find that the

11   Respondent has violated the Honor Code, I will provide

12   additional instructions at that time concerning our

13   recommendation as to his retention in the Corps of Cadets.

14

15   After the vote is collected, if we believe that other

16   recommendations are appropriate in this case, we may make

17   them and announce them with our findings.  We do not vote

18   on recommendations, which may be made by each Member or on

19   behalf of the Board as a whole.  Recommendations may be

20   made to the Honor Committee, the Commandant, the Dean, or

21   any other official we deem appropriate.  For example, if

22   we feel that another Honor violation was committed by

23   either the Respondent or another witness, we may make

296

000350

1   appropriate recommendations to the Vice Chairman for Honor

2   Investigations.  However, we are not required to make any

3   recommendations.

4

5   Once the hearing closes for deliberations, we will not be

6   permitted to reopen for the purpose of recalling witnesses

7   or obtaining additional evidence.  As soon as we reach our

8   findings, the hearing will be opened, and I will announce

9   the findings in the presence of all parties.

10

11  Members of the Board, this completes my instructions.

12

13  Are there any questions or requests for additional

14  instructions?  Apparently not.

15

16  **HA:**  I'm going to stress to you one more time that you're

17  looking at Allegations 2 and 3.  Allegation 1 has already

18  been admitted to.

19

20  Nobody has requested a page from those books, correct?

21  Okay.  So you've looked at the books.  The books are noted

22  as exhibits, but they're not going to be used in your

23  deliberations then, correct?  Is there any request for any

297

1   pages out of that, after you guys reviewed it?  Okay.

2   Anybody have any other questions?

3

4   **BP:**  This hearing is closed for deliberations.  The time

5   is 1601 hours, 8 March 2010.

6

7   The hearing was called to order at 1645 hours, 8 March

8   2010.  All parties present prior to the recess were again

9   present.

10

11   **BP:**  Will the Respondent and the Cadet Advisor please rise

12   so the finding can be read?

13

14   Cadet Spadone, the finding of the Honor Board, at least

15   six of the nine voting Members concurring, is that the

16   following allegation is supported by the preponderance of

17   the evidence, and that:

18

19   Cadet Alan Spadone, Company B-1, Class of 2011, did,

20   at or near West Point, New York, on or about 19 November

21   2009, violate the Cadet Honor Code by cheating, by

22   plagiarizing all or part of his Advanced Composition

23   EN302, Essay No. 4, and submitting it as his own without

298

1  proper documentation, and doing so with the intent to

2  gain an unfair advantage, or to deceive another person.

5  The Board further finds that the other allegation is not

6  supported by a preponderance of the evidence.

8  Please be seated.  At this time, Cadet Spadone may present

9  matters for the Board's and the Superintendent's

10  consideration on the question of his retention in Corps of

11  Cadets.

13  Cadet Spadone, you should provide any additional documents

14  you wish the Board, the Superintendent and the Commandant

15  to consider.  Are there witnesses you wish to have testify

16  about your general character?  If so, are they prepared to

17  testify at this time?

19  **HA:**  For the record, Cadet Spadone, Major Denehy

20  apparently couldn't be here.  He's asked that the TAC NCO

21  go in his place.  Do you have any objection to that?

23  **RESP:**  No, I do not.

299

1    **HA:**   Okay.  Even though he wasn't on the witness list, is

2    that okay?

3

4    **RESP:**  That is fine.

5

6    **HA:**   Okay.  And then you've also requested that we do our

7    best to get Major Denehy telephonically?

8

9    **RESP:**  Yes.

10

11   **HA:**   The Honor Committee is looking into that right now

12   and we'll try to make that happen for you, okay?

13

14   **RESP:**  Okay.

15

16   **HA:**   Board Members, as you know, the Respondent had

17   admitted to Allegation 1, and during a providence inquiry

18   at the preliminary hearing, I asked him questions to

19   ensure that he knowingly is waiving his rights and

20   admitting to the violation.  It's known as a providence

21   inquiry.  That's taped and had you not found him on

22   Allegations 2 and 3, you would've heard this,

23   nevertheless.

300

1

2      So the Court Reporter is going to play that providence

3      inquiry for you.  As soon as it's done, Board President,

4      please come outside and grab me, and then we will hear the

5      first witness.  Does everybody understand?

6

7      Okay, Board Members.  Prior to you listening to this

8      providence inquiry, you have been given a set of documents

9      called Related Documents, okay?  These Related Documents

10     are the evidence that supports the first allegation, to

11     which Cadet Spadone had previously admitted to.  You're

12     not to read it now.  You can read it during your

13     deliberations after you've heard all of the witnesses

14     talk.  But you are to listen to this providence inquiry.

15

16     And Cadet Spadone, we've gone through these Related

17     Documents, correct?

18

19     **RESP:**  Yes.

20

21     **HA:**  Okay.  Cadet Spadone, it has come to my attention

22     that Major Denehy is very busy with whatever mission he's

23     on right now, but he is available to speak for a period of

000355

1    time right now, if you'd like.  It's up to you.  I leave

2    the ball in your court.  You can either play the

3    providence inquiry and hopefully we can catch him later,

4    or we call him now.

5

6    **RESP:**  Let's talk to Major Denehy right now.

7

8    **BP:**  I intend to take the testimony of Major Denehy

9    telephonically.  The call will be made via the

10   speakerphone system.  The system will allow everyone in

11   the hearing room to question the witness.  When asking the

12   witness a question, please speak into the microphone.  The

13   reporter will record the entire conversation.

14

15   (Telephonic connection established with Major Michael

16   Denehy.)

17

18   **BP:**  Sir, this is Cadet Donald Graves.  I'm calling from

19   West Point, New York.  I'm the Board President in the

20   Honor Investigative Hearing of Cadet Spadone.  My purpose

21   in calling you is to take your testimony in this case.

22   Present in the hearing room with me are the Respondent,

302

000356

1    the Cadet Advisor, the Hearing Advisor, the Court

2    Reporter, spectators and anyone else in the room.

3

4    Sir, there are eight Board Members present.  Would you

5    like me to identify them by name?

6

7    **MAJOR DENEHY:**  No, I don't need that.

8

9    **BP:**  Okay.  We're using a speakerphone system so everyone

10   in the hearing room can hear whatever you say into the

11   telephone.  Do you agree to this arrangement?

12

13   **MAJOR DENEHY:**  I do.

14

15   **BP:**  I also want to record your testimony so that all

16   questions you are asked and everything you say will be

17   recorded.  The reason for this is so that a record of

18   these proceedings may be transcribed.  Do you agree to

19   this conversation, sir?

20

21   **MAJOR DENEHY:**  Yes.

22

303

1    **BP:**  I must clarify for the record that you are aware that

2    this call is on a speakerphone system and being recorded.

3    You've consented to this procedure.  Is that correct, sir?

4

5    **MAJOR DENEHY:**  Yes.

6

7    **BP:**  Again, please note that your voice is projected

8    throughout the hearing room, so that all present may hear

9    what you say.  Will you please state your full name, rank

10   and organization please, sir?

11

12   **MAJOR DENEHY:**  Michael Christopher Denehy, Major, B-1.

13

14   Major Michael Denehy, Tactical Officer, Company B-1, was

15   called as a general character witness telephonically by

16   the Board, was sworn, and stated as follows:

17

18   **BP:**  Sir, I'm going to open you up to questions by Cadet

19   Spadone, so the next voice you hear will be his, sir.

20

21   **MAJOR DENEHY:**  Okay.  Not a problem.

22

23              **QUESTIONS BY THE RESPONDENT**

                          304

000358

1

2   Q:  Sir, this is Cadet Spadone.  Thank you for agreeing to

3   do this, and I will try to keep this brief because I know

4   you're busy.

5

6   A:  I wish I could be there.  I apologize.  I have other

7   obligations right now.  I wish I could, though.

8

9   Q:  Okay.  I just have to ask you some questions here,

10  procedural.  What relationship do you have with the

11  Military Academy and how do you know me through that?

12

13  A:  I'm the tactical officer for Company B-1 at the

14  Military Academy, and you are one of the Cadets underneath

15  my command.

16

17  Q:  During the time that you have known me, have you had

18  the opportunity to observe me and to form an opinion about

19  me?

20

21  A:  I have.

22

305

000359

1    Q:   Okay.   What is your opinion of me, sir, in general?

2

3    A:   I have a very high opinion of you.  I think you have

4    an extremely hard work ethic and I believe that the

5    current situation that you're in right now reflects you at

6    a low point, and I think, at the end of all this, it would

7    be in the interest of the Military Academy to retain you,

8    and that you will have learned a lesson from all of this.

9    I think you're an incredibly intelligent person.  Perhaps

10   you drive yourself a little too hard sometimes.  I think

11   that's a large contributing factor to all of this.  I

12   think that you've not -- your standards are so high that

13   you've not been exposed to a lot of failure in your past.

14   In this particular case, you didn't necessarily get what

15   you wanted and I think you reacted poorly.  However, I

16   believe that's very, very far out of character for you.

17

18   Q:   Yes, sir.  My next question is -- it might be personal

19   in nature, but have you made any mistakes while in the

20   Army and if so, if you'd like to go into them that would

21   be good, but did you react in a way that was not

22   beneficial?

23

                                 306

1    A:  I have.  I have.  Yes, I did.  Yes, I've made mistakes

2    and yes, I reacted in a way that wasn't necessarily

3    beneficial in the short term, but frankly, in the long

4    term, I learned some lessons from them.

5

6    I guess I equivocated.  I was a young specialist.  I

7    didn't like, but didn't necessarily volunteer the fact

8    that I screwed up to my first sergeant and yeah, I learned

9    from that.  I believe that people do learn from their

10   mistakes.  In that particular case, I believe I did.

11

12   Q:  Thank you, sir.  Sir, I think the Board might have a

13   few questions.

14

15   A:  Okay.

16

17              **QUESTIONS BY THE BOARD PRESIDENT**

18

19   Q:  I just have one question for you, sir.  With Cadet

20   Spadone's Honor infraction in mind, would you be willing

21   to have him as a lieutenant under your command, sir?

22

23   A:  Yes.

                              307

000361

1

2    Q:  You would, sir?

3

4    A:  I would.

5

6    BP:  Board Members, are there any questions from you?

7

8                    QUESTIONS BY THE BOARD MEMBERS

9

10   Q:  You had said that this violation occurred due to Cadet

11   Spadone pushing himself too hard.

12

13   A:  Uh-huh.

14

15   Q:  Do you feel that if put in a similar situation, Cadet

16   Spadone will make a similar decision, or do you think that

17   he will use this as a learning point to make a better

18   decision later on?

19

20   A:  I think the latter, and I think his actions since all

21   of this have come down on him prove that.  He has been

22   seeking some help.  Cadet Spadone can go into further

23   detail.  I don't want to violate his privacy, but I think

                                308

1    he's been very proactive about seeking help in this

2    particular case.  He and I have sat down a few times and

3    discussed it.

4

5    People learn from their mistakes, more so than their

6    successes, in most cases.  And I think this particular one

7    has cut him very deep, and he has to learn from it; learn

8    from it or fail.  I mean, those are his two choices.  I

9    think he's making the right one and I think his

10   proactivity since his mistakes to seek the help he needs,

11   in order to overcome all this are, you know, proof of

12   that.

13

14   There being no further questions, the witness was duly

15   warned, excused subject to recall and withdrew from the

16   hearing room.

17

18   **HA:**  Okay.  At this time, you guys can listen to the

19   providence inquiry.  Realize that a witness was going to

20   be unavailable, probably, for the rest of the day, so

21   that's why we had to listen to this testimony now.

22   Understood?

23

000363

1    The providence inquiry audio was played for the Members of

2    the Board.

3

4    **HA:**   You guys all heard the providence inquiry?   If you

5    guys would like, I'll give you time now to read through

6    these exhibits.   Do you need more time?

7

8    Just to articulate for the record, during the providence

9    inquiry, I popped back in here and advised the Board that

10   they could also read through the documents as the

11   providence inquiry was being played.

12

13   Do you guys want more time to read those Related Documents

14   that pertain to the first allegation?   Does anyone need

15   more time?   Apparently not.   Go ahead.

16

17   **HA:**   You want SFC Bright, right?

18

19   **RESP:**   Yes.   Can Colonel Billie -- is he alright to stay,

20   though, after?

21

000364

1    **HA:**   Whatever Cadet Spadone is going to be -- is good for

2    your hearing here.   Who would you like?

3

4    **RESP:**   Yeah, let's do Colonel Billie first.

5

6    Colonel Scott Billie, Instructor, Systems Engineering

7    Department, was called as a character witness by the

8    Respondent, was sworn and testified as follows:

9

10                **QUESTIONS BY THE BOARD PRESIDENT**

11

12   Q:  Sir, could you please state your full name, rank and

13   position?

14

15   A:  Certainly.   John Scott Billie, Lieutenant Colonel,

16   currently serving in the Systems Engineering Department in

17   the Operations Research Center of Excellence.

18

19   Q:  Do you know Cadet Spadone, sir?

20

21   A:  Yes, I do.

22

23   Q:  How do you know him?

                              311

000365

A:  I was an instructor in the Department of Mathematical Sciences, and I was his MA206 instructor.

BP:  Thank you, sir.  Cadet Spadone, you can begin questioning.

### QUESTIONS BY THE RESPONDENT

Q:  Sir, thank you for coming in today.  How long have you known me, would you say?

A:  Well, you were in my 2009 second semester MA206 class, so since then.

Q:  During the time that you have known me, have you had the opportunity to observe me and form an opinion about me?

A:  Yes.  Academically, certainly.

312

1    Q:  When you first found out about the charges that I

2    admitted to, what was your initial reaction?

3

4    A:  I was very surprised.  It was uncharacteristic.

5

6    Q:  Have you -- this might be kind of personal, but have

7    you ever made any mistakes when you were in the Army, sir?

8

9    A:  I think everybody makes mistakes.

10

11   Q:  Is there anything you'd like to add?

12

13   A:  I thought you were a squared-away student.  You often

14   would turn in projects prior to the due date so that I

15   could look at them and give any feedback prior to the

16   actual due date.  You actually did very well in my course.

17

18   Q:  And even with this admission, would you feel confident

19   in me being a lieutenant?

20

21   A:  Yes, I would.

22

23   **RESP:**  No further questions at this point.

313

000367

**BP:**  Board Members, do you have any questions?

QUESTIONS BY THE BOARD MEMBERS

**Q:**  When Cadet Spadone was in your class, did you ever experience any situations where he had issues with documentation?

**A:**  Yes, I did.  He was required to document on group projects, and I didn't find any discrepancies.

**BP:**  Any other questions by the Board?

**HA:**  Let's keep your questions geared towards character and retention at the Academy.

**Q:**  Sir, it's been brought up that Cadet Spadone did these violations as a result of experiencing great stress and great disappointment.  Given your career in the Army, is that disappointment something to be expected throughout a career in the Army?

314

1    A:  I can unequivocally say that you will experience

2    disappointments throughout your Army career.

3

4    Q:  And given that there will be that, if Cadet Spadone is

5    faced with another severe disappointment and severe

6    stress, like he was in this case, do you think he will

7    react the same way, or do you think he will use this as a

8    learning point?

9

10   A:  I would think that he would use it as a learning

11   point.

12

13   BP:  Any further questions by the Board?  Cadet Spadone,

14   do you have any further questions?

15

16   RESP:  No, I don't, sir.  Thank you.

17

18   There being no further questions, the witness was duly

19   warned, excused subject to recall and withdrew from the

20   hearing room.

21

315

000369

1    Sergeant First Class Robert Bright, Tactical NCO, Company

2    B-1, was called as a character witness by the Board, was

3    sworn and testified as follows:

4

5                    **QUESTIONS BY THE BOARD PRESIDENT**

6

7    Q:  Please state your full name, rank and position?

8

9    A:  I'm Robert Aaron Bright, Sergeant First Class.  I am

10   the B-1 TAC NCO.

11

12   Q:  Do you know Cadet Spadone, Sergeant?

13

14   A:  Yes, I do.

15

16   Q:  How do you know him?

17

18   A:  Interaction as his TAC NCO.

19

20   Q:  Cadet Spadone, you can question him.

21

22                    **QUESTIONS BY THE RESPONDENT**

23

                             316

1    Q:  Sergeant, how long have you known me?

2

3    A:  Since December of 2009.

4

5    Q:  Okay.  And would you consider yourself as knowing me

6    well enough to testify as far as my character?

7

8    A:  Yes, I do.

9

10    Q:  Okay.  During the time that you have known me, have

11    you had the opportunity to observe me and to form an

12    opinion about my character and about me?

13

14    A:  Yes, actually, I have.

15

16    Q:  Okay.  Well, what would that opinion be?

17

18    A:  Okay.  Let me see here.  I think you strive to be

19    excellent.  You put a lot of effort into stuff.  It's hard

20    for you to accept failure.  You sit here and you work

21    really hard at your grades.  You're not bad in all three

22    pillars.  You're actually, if I -- I mean, since we're at

317

West Point, if I have to put a grade on it, you're about a

B, maybe a B plus like overall, combined.


The biggest problem that I actually see with you is that I

don't think that you've suffered much failure in your

life, realistically, and now that you have, it's kind of

hard to deal with because you don't know what to expect.


Q:  And let's say a couple of years down the line you're a

platoon sergeant and I was your lieutenant.  Would you be

all right with me serving as the lieutenant?


A:  Actually, yeah.  If you have the opportunity to stay

here and learn from failure, I think that's going to be

the best thing, and I would -- I would accept you as my

lieutenant.


**RESP:**  No further questions.


**BP:**  Board Members, do you have any questions?  No

questions by the Board?


QUESTIONS BY THE BOARD PRESIDENT

318

1

2  Q:  Sergeant, do you feel that if Cadet Spadone is faced

3  with a similar situation in the future, that he would

4  react in a similar way that he did with this past

5  situation, or do you feel that he'd use it as a learning

6  point and act differently?

7

8  A:  I think it would based on the consequences of what

9  happens from here on out.  I mean, if he stays here and

10  he's forced to learn from his mistake, from this point on,

11  the next time it happens I think he'll learn.  If you sit

12  here and you just kick him to the curb and don't give him

13  the opportunity to learn, I think he'll repeat the same

14  thing over again.

15

16  **BP:**  Thank you, sir.  Any other questions by the Board?

17  Cadet Spadone, any further questions?

18

19  **RESP:**  No, thank you.

20

21  There being no further questions, the witness was duly

22  warned, excused subject to recall and withdrew from the

23  hearing room.

319

**000373**

1

2       **RESP:**   Cadet Krause.

3

4       Cadet Matthew Krause, Company Commander B-1, Class of

5       2010, was called as a character witness by the Board, was

6       sworn and testified as follows:

7

8                   **QUESTIONS BY THE BOARD PRESIDENT**

9

10      Q:   Would you please state your full name, company and

11      class?

12

13      A:   Matthew Robert Krause, B-1, 2010.

14

15      Q:   Do you know Cadet Spadone?

16

17      A:   Yes, I do.   He's been in my company for the last two

18      years.

19

20      Q:   Okay.   Is that the only way you know him, through your

21      company?

22

23      A:   Yes.

                              320

Q:  Okay.  Cadet Spadone, you can start questions.

### QUESTIONS BY THE RESPONDENT

Q:  You stated how long you knew me.  Two years, right?

A:  Yes.  Yes, two years.

Q:  Okay.  And would you consider this time enough to testify as far as my character?

A:  I feel I know you well enough to testify on certain elements of your character.

Q:  Okay.  So would you say that you've had the opportunity to observe me and to form an opinion about me?

A:  I'm sorry.  I missed the last part of that.

HA:  Can you just speak up, Cadet Spadone, because I can't even hear you.

321

000375

1    **RESP:**  Yes.  I'm sorry.

2

3    A:   I have definitely been able to form an opinion on you.

4

5    Q:   And what would that opinion be?

6

7    A:   I have a very positive opinion of Cadet Spadone.

8    Overall, I mean, to my knowledge, this is the only issue

9    he's been involved in, in a derogatory manner.  He carries

10   himself with -- I mean -- he's very well-respected by

11   everyone in his class, his subordinates and the

12   upperclassmen, as well.  All my interactions with Cadet

13   Spadone have been positive.  I was personally very

14   surprised to hear of this case because I totally feel it's

15   out of the character I know from Cadet Spadone.

16

17   Q:   In the future, in light of this, would you still feel

18   that you could serve with me?

19

20   A:   Yes.

21

22   Q:   And during your time here at West Point, have you made

23   mistakes?

322

000376

1

2      A:   Absolutely.

3

4      Q:   Do you feel that -- how do you feel that you overcame

5      them?

6

7      A:   I guess you see how to learn from mistakes, serve the

8      punishment and, you know, be sure to make a conscious

9      effort not to make the same mistakes again.  I feel that

10     in most cases, it's better to make little mistakes here, I

11     guess, because I feel I've learned a lot more --

12

13     **HA:**   Cadet Li?

14

15     **BM:**   Sorry, sir.

16

17     A:   I've learned a lot more from my mistakes than, you

18     know, had I not made them in the first place, and just

19     carried on going as I was, you know, being corrected on

20     the spot.  I feel like I was able to address the issue and

21     learn from those mistakes.

22

323

000377

1    Q:  Is there anything else you'd like to add?

2

3    A:  (No verbal response.)

4

5    **RESP:**  Okay.  No further questions, sir.

6

7                    **QUESTIONS BY THE BOARD PRESIDENT**

8

9    Q:  I'll start off with the first question.  Would you

10   feel comfortable turning your company over to Cadet

11   Spadone as a company commander next semester, if he stayed

12   at the Academy, knowing about this Honor violation?

13

14   A:  I think I would.

15

16   Q:  And you stated earlier, I think the question was

17   similar to this, just to clarify -- a couple years down

18   the road you guys are both in a country overseas together.

19   Would you feel comfortable knowing that he's on your left

20   or your right in Iraq or Afghanistan?

21

22   A:  Yes.  I absolutely would.

23

                              324

000378

**BP:**   Board Members, are there any other questions?

### QUESTIONS BY THE BOARD MEMBERS

**Q:**   Do you think of Cadet Spadone was faced with another similar situation of great stress and great disappointment, that he will react different or the same has he's done under these instances?

**A:**   From what I know of Cadet Spadone, I think he's learned his lesson.   I don't think he'll ever make this mistake again.

**BP:**   Any further questions?   Cadet Spadone, any further questions?

**RESP:**   No.   Thanks for coming in.

There being no further questions, the witness was duly warned, excused subject to recall and withdrew from the hearing room.

325

000379

1  Major Hammon Didier, Assistant Professor, Geography

2  Department, was called as a character witness by the

3  Respondent, was sworn and testified as follows:

4

5  **QUESTIONS BY THE BOARD PRESIDENT**

6

7  Q:  Sir, could you please state your full name, rank and

8  position?

9

10  A:  Major Hannon Didier.  I'm an Assistant Professor in

11  the Geography Department.

12

13  Q:  Thank you, sir.  Do you know Cadet Spadone, sir?

14

15  A:  I do.  He was my student when he was a Plebe in my

16  dirt class, and we've talked since then for the past three

17  or four semesters.

18

19  **BP:**  Okay.  Thank you, sir.  Cadet Spadone, you can go

20  ahead and open up with questions.

21

22  **QUESTIONS BY THE RESPONDENT**

23

326

1    Q:  Sir, you stated you know me since first semester of

2    Plebe year.  Is that enough time to form an opinion of a

3    person?

4

5    A:  Yeah, I think so.  Again, Al and I haven't talked as

6    much as we did first semester, seeing him every other day,

7    but I've seen him sporadically, probably ten or fifteen

8    times since then.  He did an IED with our department, as

9    well, and we talked about that before he went, so yeah, I

10    think so.  I feel comfortable talking about you and your

11    character.

12

13    Q:  And what is your opinion of my character?

14

15    A:  Very high, up until this point.  Obviously, I'm

16    disappointed, but from an academic standpoint, from a

17    character standpoint, he excelled in class, did very well.

18    Open communication in class.  And then we talked about the

19    Army and other things after that, as well.  Positive.

20

21    Q:  And let's say a couple years in the future you're a

22    battalion commander.  Would you feel comfortable with me

327

1    serving under you as a lieutenant?

2

3    A:  Yes, absolutely.

4

5    Q:  This is a personal question, but when you were in the

6    Army, did you make mistakes?

7

8    A:  Yes.  Yeah, absolutely.  And that's a good question.

9    There are times to make mistakes.  Some are worse than

10    others, obviously.  But I think one good thing about this

11    place and the Army, if you are able to make a mistake and

12    recover from it, learn from it, I think that that's a good

13    thing, if you can take from that experience and ensure

14    that something doesn't happen again, so yes.

15

16    **RESP:**  I have no further questions.

17

18    **BP:**  Are there any questions from the Board?

19

20    **THE WITNESS:**  Nothing?  I came all the way down here.

21    Okay.

22

23                 **QUESTIONS BY THE BOARD MEMBERS**

328

1

2      Q:   If Cadet Spadone is faced with another situation of

3      great stress and great disappointment, do you think that

4      he will lose his drive for his morals?  Do you think that

5      he will act in another dishonorable way, or do you think

6      that he's going to do what he needs -- do the right thing?

7

8      A:   I would hope not.  Again, I think that's -- you know,

9      that's on an individual, case-by-case basis.  I've seen

10     him in the classroom, where he's very competent and we've

11     had, you know, a few discussions outside of there.   I

12     don't see anything in his character to make me think that

13     given the same situation that he would not learn from

14     this.  And this is a place to learn, in a way.  That's my

15     opinion.

16

17     **BP:**   Any further questions by the Board?  Cadet Spadone,

18     any further questions?

19

20     **RESP:**   No, not at this time.  Thanks for coming.

21

329

000383

1    There being no further questions, the witness was duly

2    warned, excused subject to recall and withdrew from the

3    hearing room.

4

5    Ms. Laura Vetter, RS103 Course Director, Center for

6    Enhanced Performance, was called as a character witness by

7    the Respondent, was sworn and testified as follows:

8

9                    **QUESTIONS BY THE BOARD PRESIDENT**

10

11   Q:  Ma'am, could you please state your full name, city and

12   state of residence and occupation?

13

14   A:  Okay.  Laura Vetter,                          I'm the

15   course director for RS103, the Critical Thinking class

16   over in the Center for Enhanced Performance.

17

18   Q:  Thank you, ma'am.  Do you know Cadet Spadone?

19

20   A:  Yes, I do.

21

22   Q:  How do you know him?

23

                              330

1    A:   Should I address you or them?

2

3    Q:   You can address whoever's asking the question.   That's

4    fine.

5

6    A:   I met Cadet Spadone on the first day of class, Plebe

7    year, when he was a student in my RS103 class.   I've known

8    him closely since then.   I've counted up this afternoon,

9    and I've seen him in twenty-eight different one-hour

10   appointments since that time, so he's staying in contact.

11   I feel like I know him well.   He's been -- well, I kind of

12   sponsor him, but I've also been very intricately involved

13   with his scholarship process.

14

15   **BP:**   Thank you, ma'am.   Cadet Spadone, you can begin

16   questions.

17

18                 **QUESTIONS FROM THE RESPONDENT**

19

20   Q:   So, ma'am, would you consider the time I've known you

21   to be enough time to form a general opinion on my

22   character?

23

                                331

1    A:   Absolutely, and particularly when I compare it with

2    other relationships that I've had with past cadets.

3

4    Q:   And during that time that you've known me, have you

5    formed a favorable opinion or a non-favorable opinion?

6

7    A:   Absolutely.  From the very time I met Alan, I mean, he

8    was a leader in my class.  We engage in some pretty

9    controversial subjects in my class.  I could always count

10   on him being honest in his approach and being forthright

11   and no matter what other opposition would come up in

12   class; I could always count on Alan to give me kind of the

13   straight story on whatever was going on.

14

15   Q:   And, ma'am, how many Cadets do you interact with?

16

17   A:   Well, I teach four classes of RS103 in a semester.

18   That's eighty-some Cadets.  I'll do that again in the

19   spring.  I've done that for the past ten years.  I also

20   log over a thousand half-hour appointments with over 300

21   different Cadets in any given year.

22

332

000386

1    Q:   And if you were to rank my -- I guess you'd say my

2    character as a Cadet, where would you put that amongst

3    other --

4

5    A:   Well, I would put you in the top ten percent.  I have

6    never had any inkling that he would -- you know, is not

7    honorable or has been, you know, not been trustworthy or

8    have been honest with me on anything.  And there's been

9    occasions where he could've easily, you know, tried to get

10   over or whatever.  I mean, I've known Alan for a long time

11   and I've never had any doubt whatsoever.

12

13   Q:   And I know you like to stay in touch with a lot of

14   former Cadets who are in the Army now.  Would you feel

15   confident in me serving with those Cadets that you have

16   known, those literally hundreds of Cadets that are in the

17   Army right now?

18

19   A:   Without reservation.

20

21   Q:   Is there anything else you'd like to add to the

22   proceedings?

23

                                333

A: Yes. Yes, there is, and actually, that's the reason that I stayed late tonight, that I insisted on coming in and addressing you all personally.

I'm aware -- because I've been in such close contact with Alan, he was selected into the scholarship group the spring of his Yearling year. That means that he has to have had to logged 3.667 or above to be considered in that group. I followed him along through that process. In the fall of his Cow year -- well, actually it was that year, it was last year when Alan, as he was preparing, getting his personal policy -- you know, proposal together, his resume prepared, he kind of dropped off the radar for a little bit, and I was wondering, where's Alan?

Finally, he came in and he had informed me that he was -- he wanted to go to Cambridge. He wanted to go to Cambridge and do a semester abroad. That had never been done before at West Point, ever. And so it's a new thing. You know, 200 years of tradition, that's a tough thing to do. All right, so he kind of dropped off the radar.

334

1    And then, about oh, I don't know, six, eight weeks that I

2    saw him again and I said, "Well, how's that process

3    going?"  And he had applied and then a few months later he

4    found out he was accepted.  That is such a prestigious

5    appointment.  They only allow ten students in the world an

6    opportunity like that.

7

8    And so Alan then, you know, drove right ahead and, you

9    know, started jumping through the hoops, trying to find

10    out how he could make this happen.  And it was favorably

11    reviewed by department after department after department.

12    I know I went and inquired with several colonels, several

13    department heads, you know, to see how we could make this

14    happen.  You know, we knew it was the first time, there

15    was going to be some obstacles.  But every person that I

16    talked to supported this.  Over at Econ, they shifted his

17    schedule around.  Over the Dean's office, you know, they

18    listened.  There were people working hard with him, and I

19    know that it was like, okay, this is going to happen.

20    We've just got to get over the obstacles.

21

22    It went on for months and months and months, and we

23    couldn't get any final determination.  Last summer, this

000389

1    past summer, as the date was coming closer for Alan to

2    start his Cow year and go to class on that first day, we

3    were still trying to get information and answers from

4    departments.  And there was TDY.  I mean, we understand in

5    the summertime, you know, there's lots of people gone, but

6    he still diligently -- he flew back here on his own money

7    to go into one of those meetings to find out if, in fact,

8    they were going to allow him to do this.  Because the

9    thought was, well, if it came down absolutely no, we're

10   not going to allow this, well then he had an opportunity

11   to determine whether he was going to sit out a year and go

12   take advantage of this once-in-a-lifetime opportunity, or

13   whether he was going to attend class and just forget about

14   the whole thing.

15

16   He finally got -- it was like push comes to shove and he

17   finally got to talk to General Finnegan, and the answer

18   that came down was this is too expensive.  You know, we

19   could send three Cadets abroad for the same amount of

20   money what they're going to charge.  And so, you know, I

21   can't support it for that reason.

22

336

1    Alan went out and within two weeks, had the money from an

2    outside source that was going to pay for this opportunity.

3    So okay, we thought wow, we got that big hurdle over.  He

4    got the money on his own.  This could've put West Point,

5    you know, favorably on the map, as well, to have one in

6    ten in the world, you know, be selected from here.

7

8    Okay.  Long story short, and this has bothered me so much,

9    ever since -- well, the whole year and then specifically

10   since this came up, that this young man, I never saw

11   anybody work as hard as Alan Spadone did, and he did it

12   all himself.  He checked with everyone for the appropriate

13   approvals.  You know, he wrote the essays.  He wrote the

14   questions out, you know, whatever he was asked to.  And

15   nobody gave him an answer in a timely manner.  I know it

16   drove him absolutely crazy.

17

18   His mother called me once during the summer.  She was

19   worried.  She was really worried about his state of mind.

20   I saw that he sought out CPD to help him deal with the

21   stress of this situation.  And that's how he entered the

22   fall semester here.  And he never -- he didn't even get an

23   answer up until like the first day of classes, I think it

337

1    was.  It was way past the time when he could've made any

2    other determination.  And I quite literally think that it

3    is a real shame that we couldn't have come to some

4    conclusion earlier so that we could've at least taken a

5    little bit of the stress off of him.

6

7    He was -- well, I was worried.  I know he wasn't sleeping.

8    I know that every time I saw him, he was, you know, on

9    pins and needles, well, I've got to hear from here and

10   I've got to run over here and I've got to go to this

11   department and I've got to go here.  And I'm certain that

12   if all of you will sit back and think about your

13   experiences here, that each one of you has had somewhat of

14   an experience like that, where you just can't get the

15   answer and you can't go forward until you get the answer,

16   and you can't really get back into your own schedule until

17   you get the answer.  And then finally the answer came

18   down, absolutely no.

19

20   But that was in October, I think late September, before he

21   ever got an answer.  And then it was even later, toward

22   the end of the semester that he finally had to call

23   Cambridge or let them know that he had finally gotten an

                          338

000392

1    answer and he wasn't going to be able to fulfill that

2    opportunity.

3

4    It was extremely important to me that I be able to convey

5    that to you.  This is a quality Cadet.  He has worked

6    really hard.  I mean, he has an exemplary standard in all

7    three pillars, and I think he has been saddled with undue

8    stress that could lead to any sort of unraveling of day-

9    to-day activities or whatever he's guilty of here, and I'm

10   not going to talk about that, the case in chief.  I don't

11   really know a lot about it.  But I know that I was in

12   absolute shock when Alan came to me and told me that he

13   had been approached for clarification.

14

15   **RESP:**  Does the Board have any questions?

16

17   **BP:**  No additional questions by the Board?  Cadet Spadone,

18   do you have any additional questions?

19

20   **RESP:**  No.  Ma'am, thanks.  Thank you for coming in today.

21

22   **THE WITNESS:**  Okay.  Thank you all very much.

23

339

1    There being no further questions, the witness was duly

2    warned, excused subject to recall and withdrew from the

3    hearing room.

4

5    **BP:**  Are there any further witnesses, Cadet Spadone?

6

7    **RESP:**  No, there are not.

8

9    **BP:**  Okay.  Cadet Spadone, do you wish to address the

10   Board?

11

12   **RESP:**  Yes, I would.

13

14   **BP:**  Okay.

15

16   **RESP:**  So I didn't have anything scripted for this last

17   speech here, but I think it will be probably the most

18   important.

19

20   I honestly didn't agree with what you found in the second

21   case, but I don't think that really matters right now.

22   I'll speak in regard to the first case.

23

340

000394

1   I obviously made a mistake, a huge mistake, as I've said.

2   It's really been hard to try to live that down.  When you

3   make a mistake, you really should be kind of reaching out

4   to people, but you tend to kind of clam up and that really

5   furthers the damage, I guess you could say.

6

7   I think, if you're going to have to go through something

8   like this, I think it's better to go through it here than,

9   you know, six months in, into Afghanistan, because really,

10  right here, you have four years to get out some problems

11  that you have.

12

13  I know that this will be a catalyst going forward and once

14  again, I appreciate you all being here for today.  It's

15  been a real long day.  Thank you again.  That's it.

16

17  **BP:**  Additional character statements have been

18  distributed.  Please check the documents you receive to

19  determine if the following exhibits are present.

20

21  [Board Members review Related Documents 1 through 10.]

22

23  **HA:**  Were you given Respondent Exhibit 2?

341

**000395**

1

2 **BP:** Respondent Exhibit 2 is the sworn statement by Ms.

3 Vetter. Does everyone have that?

4

5 **HA:** Do you have anything else to offer, Cadet Spadone?

6

7 **RESP:** No, I do not.

8

9 **HA:** Okay.

10

11 **BP:** Okay. Everyone has all of these exhibits.

12

13 A questionnaire will now be distributed that is designed

14 to aid the Superintendent in making a decision concerning

15 Cadet Spadone's retention in the Corps of Cadets. You

16 should devote your full attention to this form, as it is

17 an important part of what the Superintendent considers in

18 deciding what actions to take in this case. You should

19 write clearly and legibly because the Superintendent will

20 read your form. After completing this form, turn it in to

21 me prior to departing the hearing room.

22

342

1    In making your recommendation, you must not disclose how

2    you or any other member voted in this hearing, and you may

3    not discuss the rationale for your vote, or for the

4    Board's decision.   Your comments must be limited to the

5    factors relating to Cadet Spadone's retention in the Corps

6    of Cadets.   The form asks you to comment on some of the

7    factors the Superintendent considers in deciding whether

8    to retain a Cadet.

9

10   Prior to completing the form, review the Respondent's

11   Exhibits you have just received.   If you have any

12   questions, please let me know.

13

14   The HIH was adjourned at 1752 hours, 8 March 2010.

15

16                          END OF PAGE

343

BOARD EXHIBITS

000398

# SWORN STATEMENT
For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

### PRIVACY ACT STATEMENT

| | |
|---|---|
| AUTHORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| PRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| C-1 Study Room, Sherman 510 | 20100108 | 1800 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Spadone, Alan, M. | N/A | CDT/Active |

| 8. ORGANIZATION OR ADDRESS |
|---|
| USCC Company B-1 |

9.

I, Alan M. Spadone _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

Who have you talked to about this case?
No one.          *AMS*

Who else should we talk to about this case?
Cadet Honor Liason          *AMS*

What else do you have anything else to add concerning this case?

If you look through the paper in question it is clear that I sighted all outside information and ideas. In relooking at the paper it is evident that the citations do not line up perfectly with the pages in the texts. Although this is incorrect documentation I had no intent to decieve or gain and unfair advantage. To this date I have not had a chance to review the two books in question to wither the page citations were on different pages. It seems as though I made a mistake in documentation, yet as I stated earlier their was no attempt to decieve or gain and unfair advantage.          *AMS*

I would still like to look at the actual books to see if the information I cited is actually around the page numbers I listed.

Could you please explain why the information you cited is not on the page numbers you cited?
It might have been an honest mistake. I would have to see the actual books in question to see how close the information I used was to the page numbers I cited.

*AMS*

*nothing else follows*

*AMS     AMS     AMS     AMS*

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT *AMS* | PAGE 1 OF 2 PAGES |
|---|---|---|

ADDITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.

**DA FORM 2823, DEC 1998**          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V 1.00

BOARD EXHIBIT 000399

STATEMENT OF _Alan M. Spadone_     TAKEN AT _1800_     DATED _JAN082010_

STATEMENT _(Continued)_

AmS
AmS   AmS
AmS

**AFFIDAVIT**

■ Alan M. Spadone _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _____ I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

WITNESSES:

_John T. Gibbons_

_ORGANIZATION OR ADDRESS_

_USCC, C-1_

_ORGANIZATION OR ADDRESS_

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _8_ day of _January_, _2010_ at _C-1_

_(Signature of Person Administering Oath)_

_JEREMIAH ZITHCAPAI?_
_(Typed Name of Person Administering Oath)_

_USCC Honor Committee_
_(Authority To Administer Oaths)_

INITIALS OF PERSON MAKING STATEMENT _AmS_

PAGE _2_ OF _2_ PAGES

**BOARD EXHIBIT** 000400 **2**

# SWORN STATEMENT

For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

## PRIVACY ACT STATEMENT

| | |
|---|---|
| ‍THORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| PRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Sherman 519 | 20100112 | 2030 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Spadone, Alan, M. | N/A | CDT/Active |

8. ORGANIZATION OR ADDRESS
USCC Company B-1

9.

I, Alan M. Spadone _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

The following statements were made on January 8th at 1800 hours.

Who have you talked to about this case?
No one.

Who else should we talk to about this case?
Cadet Honor Liason

What else do you have anything else to add concerning this case?
If you look through the paper in question it is clear that I sighted all outside information and ideas. In relooking at the paper it is evident that the citations do not line up perfectly with the pages in the texts. Although this is incorrect documentation I had no intent to decieve or gain and unfair advantage. To this date I have not had a chance to review the two books in question to see wither the page citations were on different pages. It seems as though I made a mistake in documentation, yet as I stated earlier their was no ‍mpt to decieve or gain and unfair advantage.

I would still like to look at the actual books to see if the information I cited is actually around the page numbers I listed.

Could you please explain why the information you cited is not on the page numbers you cited?
It might have been an honest mistake. I would have to see the actual books in question to see how close the information I used was to the page numbers I cited.

Please note that this statement was written four days after I met with the Cadet Investigation Team on January 12th at 2030 hours.

To be honest I do not exactly know what I am being accused of. After reviewing my paper I can see that the information cited does not exactly line up to the page numbers in the texts. I have no idea how this happened and it must have been an honest mistake. However, it is clear to note that any outside idea present in my paper is cited even if the page numbers are off. Although this is a documentation error I cannot see how it violates any tenet of the honor code or any of the rules of thumb. When I first met with my professor during the approach for clarification it seemed that there was a little bit of indecision on whether or not the English Department was going to forward this case to the Honor Committee. I was only made aware that the case was forwarded when Cadet Gray, after four days, notified me that the English department decided to forward the case. Additionally I have not had the opportunity to review the sources that I used in the essay to see how some of the page numbers could have been off.
After reviewing USCC PAM 15-1 I believe the following passage is relevant.
"Failure in Documentation. Unintentional failures to properly document sources of assistance will be dealt with by the individual academic department. Professors normally reduce grades and/or request disciplinary action from the Brigade Tactical Department in such cases. Any attempt to deceive or to gain unfair advantage, however, will be subject to investigation by the Cadet Honor Committee. Cadets must know, understand, and adhere to the requirements for proper documentation to avoid these serious

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 2 PAGES |
|---|---|---|

‍ ITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____

*THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.*

**DA FORM 2823, DEC 1998**          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V 1.00

BOARD EXHIBIT 2-1
000401

STATEMENT OF Alan M. Spadone          TAKEN AT 2030          DATED 12JAN10

STATEMENT *(Continued)*
consequences"
As I have state before I had no intention to deceive of gain an unfair advantage, I merely made a mistake in transcribing the page numbers. Although this is a failure in documentation, I do not believe it is a violation of the honor code. AmS

Nothey Follows

AmS

AmS          AmS

AmS

**AFFIDAVIT**

Alan M. Spadone _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE ____ I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES: John T. Gibbons

ORGANIZATION OR ADDRESS
USCC, C-1

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 12 day of January , 2010 at Sherman 519

*(Signature of Person Administering Oath)*

JEREMIAH ZINGAPAN
*(Typed Name of Person Administering Oath)*
USCC Honor Committee
*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT AmS

PAGE 2 OF 2 PAGES

BOARD EXHIBIT 2
00203
USAPA V 1.00

## SWORN STATEMENT

For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

### PRIVACY ACT STATEMENT

| | |
|---|---|
| AUTHORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 (SSN). |
| PRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE (YYYYMMDD) | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Lincoln Hall | 20091214 | 1000 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| SABATOS, TERRI RENEE | | Associate Professor |

8. ORGANIZATION OR ADDRESS
Department of English and Philosophy

9.

I, Terri Renee Sabatos _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On 19 November 2009, CDT Spadone, a student in my EN302 Advanced Composition class (Section I10), turned in his Essay 4, which is 20% (200 pts) of his course grade. I took over this section of EN302 from Dr. Karen Peirce on October 21 (Lesson 23). CDT Spadone's paper contains 6 different instances of parenthetically cited information which does not appear to originate from the page numbers of the sources identified in the citations,                                    CDT Spadone's subsequent explanation of the circumstances behind his failure to document properly did not resolve my questions, leaving me concerned that dishonorable documentation may have occurred.

Essay 4 required students to compose a 3-4 page essay complicating the conventional views of Japan that they had introduced in Essay 3. On November 30, I began reading CDT Spadone's essay "Contructions (sic) of an Image" about photographs of Emperor Hirohito made before and after WWII. I noticed immediately that the essay did not address the prompt by revising the theme of his Essay 3, and did not discuss any of the course texts. As I read the essay I also noticed that while CDT Spadone used particular academic phrases such as "masculine display and commemoration," (p. 1) and "embodiment of a type of masculine identity," (p. 2) these ideas were not clearly supported or well explained in the paper. He also made an oblique reference to images of Hirohito constructed by the allies after the war that "displayed [the emperor] as human, and the loaded images of Mt. Fuji, along with any representations of samurai values were completely left out of the new representation (Hoyt 162)" (p. 2). Because he had not referenced either Mt Fuji or samurai values earlier in his essay, it seemed as if these ideas were part of a much larger discussion from one of his sources. My initial thought was that CDT Spadone needed more instruction on how to appropriately incorporate other scholar's viewpoints into his own discussion. Since this sentence had a parenthetical citation, I decided to look it up to see if I could better understand the original discussion in the source as well as how CDT Spadone was trying to incorporate it. When I arrived at the page in the source, the text and ideas therein did not even remotely match what was presented in CDT Spadone's paper; moreover, none of the other 5 citations did either. For example, page 110 of The History of Japanese Photography by Anne Wilkes Tucker, does not discuss photographs taken of Emperor Hirohito and Douglas Macarthur as claimed in CDT Spadone's essay. This page in Tucker discusses the photographic industry and photographic journals in early 20th century Japan. In fact, according to the index of the Tucker text, there is only one brief mention of this photograph in the entire book on page 323.

On 30 November I sent CDT Spadone an email requesting a meeting and explaining that I had questions concerning his essay 4. I did not detail what those questions were. On 4 December I conducted an approach for clarification with CDT Spadone; MAJ Anthony George, the English Department's Honor officer, and CDT Daniel Gray, the CDT Departmental Honor Liaison, were also present. I showed CDT Spadone his paper and the books from the USMA library that were listed on his works cited page. Before I could finish, he said that as soon as he received my email, he knew what the problem was and went to the library to find the books cited in his paper, but that they were not there and that he could explain what happened. I explained that it was clear from the ideas in the paper that academic sources were used in preparing the paper. However, because the ideas were not well connected or well explained, it was not clear to me what he was trying to do with them. When I looked up the sources listed in the works cited page to clarify the ideas in the paper, and turned to the specific authors and page numbers cited in the body of the paper, not one of the citations was correct. It was not a matter of being "off" by a page or two; one of the sources he claimed to have used had nothing to do with the topic of his paper. CDT Spadone's response was that he was careless when taking notes from the many texts he used and did not write down the authors or page numbers accurately in his notebook.

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING 'STATEMENT OF ___ TAKEN AT ___ DATED ___

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

| DA FORM 2823, DEC 1998 | DA FORM 2823, JUL 72, IS OBSOLETE | USAPA V 1.00 |
|---|---|---|

BOARD EXHIBIT 31
000403

USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.

STATEMENT OF Terri Renee Sabatos      TAKEN AT 407 Lincoln Hall      DATED 20091214

9. STATEMENT *(Continued)*

He said he had the notebook, but neglected to bring it with him, despite claiming he knew, from my initial email, why I wanted to meet with him. MAJ George asked if I was satisfied as to what constituted CDT Spadone's work from the ideas of the sources he used and I said no. Because he used no quotes, nor attributive tags in the body of the essay, and the citations were all completely incorrect, I had no way of knowing what were CDT Spadone's interpretations and what were the ideas from his sources. CDT Gray asked if the page numbers were accurate, but the authors name were just incorrect, and CDT Spadone said he did not know, he would have to check his notebook. CDT Gray asked if he remembered the names of the other books he used and CDT Spadone said he did not remember the names of any of the other books he used. As he had no other explanations and there were no further questions, we released him. After CDT Spadone left, I consulted with MAJ George and CDT Gray and we determined that CDT Spadone's explanations were not adequate to explain the inaccuracies and this case warranted an investigation.

I also conferred with CDT Spadone's former instructor Dr. Karen Peirce and she was very clear that she covered the requirements to write papers in accordance with the Dean's Documentation of Written Work at Lesson 4, as stated in her syllabus. According to the attendance log, CDT Spadone was present at this class.

CDT Spadone's paper does not use appropriate attributive tags nor is it cited accurately or correctly so it is impossible to determine which ideas are his, and which are those of other scholars.

I recommend that this case be forwarded to the CDT Honor Committee for further investigation. CDT Spadone did not have any unexpected explanation for why he did not attribute ideas appropriately in his paper or why the citations in his paper were completely inaccurate.



— *Nothing Follows* —

INITIALS OF PERSON MAKING STATEMENT

PAGE 2 OF 3 PAGES

BOARD EXHIBIT 3-2

000040

STATEMENT OF Terri Renee Sabatos          TAKEN AT 407 Lincoln Hall          DATED 20091214

STATEMENT (Continued)

**AFFIDAVIT**

☒ Dr Terri Sabatos _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 2. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_____
(Signature of Person Making Statement)

WITNESSES:

_____

_____

ORGANIZATION OR ADDRESS

_____

_____

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 14 day of December, 2009 at 407 Lincoln Hall

_____
(Signature of Person Administering Oath)

MAJ Anthony L. George
_____
(Typed Name of Person Administering Oath)

_____
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT

PAGE 3 OF 3 PAGES

BOARD EXHIBIT 3-3
000405

# SWORN STATEMENT
For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

## PRIVACY ACT STATEMENT

| | |
|---|---|
| AUTHORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| PRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Lincoln Hall | ~~20100211~~ 20100212 | 1200 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Georg, Anthony, Lee | | MAJ |

| 8. ORGANIZATION OR ADDRESS |
|---|
| Department of English and Philosophy |

9.

I, __Anthony Lee George_____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

At the second approach, the situation seemed less straightforward. Dr. Sabatos said that she had been unable to determine what, in this second paper, were interpretations that belonged to CDT Spadone and what were interpretations that CDT Spadone had taken from secondary sources. In order to help determine this, Dr. Sabatos had referred to the works in CDT Spadone's Works Cited. But, when checking them, she found that CDT Spadone's citations were completely inaccurate. So, CDT Spadone's documentation was not faulty in that one could not determine what was his and what wasn't, but his documentation was also wrong in that where he did document, he cited books that had nothing to do with the material he wrote. CDT Spadone said that he knew why he had been called to an approach this time; he said that after Dr. Sabatos had emailed him, telling him that she wanted to see him, he had gone to the library to check out the books he'd cited and found that they'd been checked out already. Although he stated that he knew what this approach was for, he did not bring any materials with him to clarify the situation. Specifically, he said that he had sloppily taken notes about what books he had referenced (which he used while writing his paper) and when Dr. Sabatos asked him what books he might have been referencing, given that the one's he cites in his paper are not accurate, CDT Spadone said that he'd have to look at that notebook. I noticed that he had gone to the trouble of going to the library to check books out, in preparation for this approach for clarification, but he did not bring his notebook to the approach- which might have helped clarify the situation. Once it seemed clear that CDT Spadone's explanation wasn't helping to clarify anything or to resolve suspicions about his documentation, we released him. CDT Gray, Dr. Sabatos, and I agreed that this situation warranted an investigation by the honor committee.
Question: Who else have you talked to concerning this case?
Answer: Noone. ALG
Question: Who else should we talk to concerning this case?
Answer: I don't know. Noone that I can think of, who isn't mentioned above. ALG
Qustion: Do you have anything else to add?
Answer: No. ALG
———— NOTHING FOLLOWS ————

ALG

ALG          ALG

ALG

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 2 PAGES |
|---|---|---|
| | ALG | |

ADDITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____

*THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.*

**DA FORM 2823, DEC 1998**          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V 1.00

BOARD EXHIBIT 000404

STATEMENT OF Anthony Lee George        TAKEN AT 412 Lincoln Hall        DATED 20100212

STATEMENT (Continued)

ALG

ALG

ALG

ALG

**AFFIDAVIT**

■Anthony Lee George _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 2 ____. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_____
(Signature of Person Making Statement)

WITNESSES:

John T. Gibbons
_____

ORGANIZATION OR ADDRESS

USCC, C-1
_____

_____

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 12 day of February , 2010 at 412 Lincoln Hall

_____
(Signature of Person Administering Oath)

JEREMIAH ZINGARAN
MAJ Anthony L. George  ALG
_____
(Typed Name of Person Administering Oath)

USCC Honor Committee
_____
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT
ALG

| PAGE 2 OF 2 PAGES |

USAPA V 1.00

BOARD EXHIBIT 42
00049

UNITED STATES MILITARY ACADEMY

THE CONTRUCTION OF AN IMAGE

EN302: ADVANCED COMPOSITION

SECTION I14

PROF. SABATOS

BY

CADET ALAN SPADONE '11, CO B1

WEST POINT, NEW YORK

19 NOVEMBER 2009

AMS MY DOCUMENTATION IDENTIFIES ALL SOURCES USED AND ASSISTANCE
RECEIVED IN COMPLETING THIS ASSIGNMENT.

_____ NO SOURCES WERE USED OR ASSISTANCE RECEIVED IN COMPLETING THIS
ASSIGNMENT.

SIGNATURE *Alan Spadone*

BOARD EXHIBIT 5-1

000408

Sixty years after the conclusion of the Second World War, it is still difficult to comprehend the process by which the Japanese people came to image themselves as a distinctive nation centered on the Emperor. For better or for worse, the Emperor was used to help define Japan as a nation and photography played a significant role in representing him. Throughout Emperor Hirohito's reign his image was reconstructed numerous times. His legitimacy was associated with having been part of a divine "unbroken" imperial line during Japan's imperial expansion. At the end of the war the allies did away with his divine image and constructed his image in a less favorable light. Finally, in the aftermath of the war, the Emperor sought to re-craft his image as a man of science and of rationality. *What will you argue?*

Emperor Hirohito was portrayed as a godlike figure of authority in the years leading up to the Second World War. One of the best visual representations of this is the imperial visit to Hokkaido. The emperor visited the city in late 1936. The visit referred to as "Special Army Maneuvers and Regional Tour of the Emperor" was significant in that it was one of a series of regional tours that served to help mobilize Japan for the war effort (Hoyt 113). As the name suggests, it fulfilled a dual role of a large scale military exercise and a propaganda event.

The symbol of the emperor has been a site on contestation and debate. Yet whatever one's views of his wartime role and degree of responsibility might be, the trip to Hokkaido helps us to see how the figure of Hirohito came to represent that of a wartime military leader. One photograph in particular shows the construction of an identity, through masculine display *such as?* and commemoration (appendix one). The emperor atop the lone white horse rides out front, reviewing troops lined up before him. He is

*You need to explain how.*

*how is this about Commemoration?*

**BOARD EXHIBIT 5·2**

000409

Spadone 2

confident, sitting up straight with one hand on the reigns, the other raised in salute. His

staff ride cautiously a few passes of his flank. Not too close to infringe of the emperors

*how is it "godlike"?*

godlike aura, yet not too far away for fear of being labeled impious.

*how does this perform masculinit*

In a way, the Emperor was the embodiment of a type of masculine identity and

the tour to Hokkaido represented a performance for the national identity. It is difficult to

*how?*

gain much sense of the feelings and thoughts of the "real" emperor and perhaps because

of this there has been so much debate about his wartime responsibility (Hoyt 125). A

sense of the emperor as a real person was not as necessary as whether or not, there was a

sense that there was a type of mystical radiance that emanated from him whether he could

truly be seen or not.

Immediately after the war, during the Allied Occupation of Japan, imperial visits

were used again as a source of propaganda. While Emperor Hirohito showed that he was

*served*

a monarch of the people, his visits also swerved to unite the population during a

potentially divisive time. Once again the image of the emperor was constructed. This

time, however, the image was built by the Allies and not by the Japanese. The emperor

was displayed as human, and the loaded images of Mt. Fuji, along with any

*But you don't mention these so why include the reference*

representations of samurai values were completely left out of the new representation

(Hoyt 162).

One image captures this new construction. Japan's defeat saw emasculation of its

*how so?*

military forces, and of the Emperor. A photograph taken on September 27, 1945,

juxtaposed the body of the emperor against the bulk of General Douglas MacArthur

(appendix 2). It was one of three photographs taken at what was the first meeting

between the Emperor and MacArthur. The other two photographs were rejected as one

**BOARD EXHIBIT 5-3**

showed MacArthur with his eyes closed and the other depicted the emperor with his

mouth open. It was fortunate that there was one image that was deemed acceptable

(Tucker 110). It famously conveyed the powerful message that it was a folly for the

Japanese to have thought that they might defeat such a towering foe. Apart from the

differences the physiques, and the changed power-relations which the juxtaposition

represented, the unemotional face of the emperor reveals little. The double portrait does

not so much reveal the emperor's feeling as to mask them. [*how so?*] The body positions of the two

figures reveal much however. MacArthur standing confidently with his hand on his hips,

seems to be thrusting his manhood out establishing his dominance reminiscent of a Henry [*? I'm not sure he is doing that.*] [*— reference which pose of H5 do you mean*]

V pose. The Emperor on the other hand seems to be standing at attention, awaiting

orders from the unseen photographer.

The symbolic power of the emperor continued on after Japan's defeat. This owed

something to the example of the British royal family. In late 1945, the Emperor was

given a book in English on the British monarch, which included photographs showing the

king mingling with the people and even visiting the coal mines (Tucker 115). It sent a

[*I'm not clear as to how the Royal Family helped with this.*] powerful and timely message to Hirohito. During his visit to Osaka in 1947, the Emperor

walked near the crowds who wanted to see him, duly inspecting the infrastructure such as

waterworks, and acknowledging the power of the press by visiting the printing plant of

the newspaper *Mainichi Shinbun* (Tucker 117).

Postwar photographs of the emperor effectively re-narrate the story of his life and

cast him as a man of peace, of science, and of the family. Indeed, we can view the [*You haven't substantiated this*]

emperor's life as a series of transformations, from warrior to an almost salary man-like

existence. His transformation into the people's Emperor reflected the democratic

BOARD EXHIBIT 5-4

000411

Spadone 4

*now?*

aspirations of the Japanese people. The media itself and the very reproducibility of the images served to democratize the appeal of the Emperor, allowing access to him by one and all.

Throughout Emperor Hirohito's life his image, and by extension the image of the Japanese people was reconstructed numerous times. Photography played an important role in shaping the imperial identity of the Japanese people, firstly through the propagation of the imperial portrait. Images of military victories and a godlike Emperor combined to present the Japanese people with a collective sense of superiority over other Asian peoples. In defeat and the loss of the empire, Emperor Hirohito became a man of science and reason. It was as if Japan had, courtesy of the atomic bomb, decided to tie its future to empiricism and put its belief in the Emperor as a living deity aside. The numerous press photographs of the newly "human" Emperor served to erase wartime memories. Despite the widespread association of photography with realism, the images *you need to explain this.* of the reinvented Emperor became, ironically, a way to repress representations of the Emperor as a wartime leader.

**BOARD EXHIBIT 5-5**

000412

Appendix One



Source: *Emperor Hirohito dressed in military uniform and on horseback.* 1936. Photograph. Hokkaido Government Office, New York.

BOARD EXHIBIT 5-6

Appendix Two   of



Source: Ishizaki, Yuichi. *Emperor Hirohito and General Dougals MacArthur at the US Embasy in Tokyo*. 1945. Photograph. Kyodo News International, New York.

BOARD EXHIBIT 5-7

## Works Cited

*Emperor Hirohito dressed in military uniform and on horseback.* 1936. Photograph.
    Hokkaido Government Office, New York.

Hoyt, Edwin Palmer. *Hirohito the emperor and the man.* New York: Praeger, 1992. Print.

Ishizaki, Yuichi. *Emperor Hirohito and General Dougals MacArthur at the US Embasy
    in Tokyo.* 1945. Photograph. Kyodo News International, New York.

Tucker, Anne. *History of Japanese photography.* New Haven: Yale UP in association
    with the Museum of Fine Arts, Houston, 2003. Print.

**BOARD EXHIBIT 5-8**

— 1st Olden sea everything in different light

life has real

2

Personnal ~~experience~~ experiences ~~of~~ illustrates
what I read in WWT and the Gooly
and the News

Is this belief that you can leave all
off your assumptions at home and completly
lose ~~you~~ lose yourself in a calm cell

BOARD EXHIBIT 6·2

000417

3

856

*med*

*med m*

*drive to tell a story*

*Inventive vs Order*

$3\frac{1}{2}$ GDP

*Orlando*

4

*[scribbled out text]*

complicate and explore the convalicrel
view of Japan

Image of the Emperor

Largely constructed
being constructed says, smelling alone
the image being produced

1.) Divine
→ X → allies descended Our divine image
3.) → Japan recrafled man or man
of radiant and serene

Human image
Emperor on the White Horse

Hokkaido Visit
Rides on horse
interpreter flanked behind him
alone white horse
constructed
who is the "real" emperor    heart

000419

5

American Construction of image
— human
"Representation of American" — boy

MacArthur Portrait
juxtaposition of MacArthur and the
Emperor
— 3 photographer taking "Truth"
Physical difference
confident vs weak
& Japan Conclusion
man of the People, Rationality, Modernity
Sincere

— coal mine and the newspaper Truth

— Coal miner average Joe

— newspaper, new found freedom of a
democracy

BOARD EXHIBIT 6·5

000420

6

Shinto perspectives                    December 7th,

plot — see to ~~Jepen~~ Japan
       plot line
       character relationships

~~three~~ major themes
       ~~the~~
       modernity
       traditional concepts
       how do these things interact

       cultural stereotypes

BOARD EXHIBIT 6·6

000421

7

Sofia Coppola's Opinion

Consider take _____

Sofia's Coppola take on it

varied reviews what is Coppola lrg to
portray

modernity vs tradition

Madrid

character transition fully

Coppola saying another

BOARD EXHIBIT 6-7

8



homeroom.

learly this

follows travel   travel thing

madrid

way fun

time goes by slowly
absurdness in prevalent
only one class left
close read
18 Eighteen words for everything

fifteen minutes left
I am eighth school girl
get me out of here

Going To Madrid

Israel

Russia   Spain

U.S.A.
Canada
Mexico
England
France
Belgium
The Netherlands
Germany
Switzerland
Austria

BOARD EXHIBIT 6-8

000423

9



~~This is a joke~~

Player 328

Ae~~flight~~ important information
with a written ~~report~~

Brandon common theme
What is different
Brandon question

12 new
12 noon
    Old Essays
1200 v
Hardcopy
Essays in a Brown Border

Bus To JFK

BOARD EXHIBIT 6-9

000424

10

2nd Japan
Buddhism
Shintoism
polite
~~careful~~ serious
humble
Tea Room
Jammin

What complicates our stereotypical image
"western s image of Japan
~~doted sure~~

BOARD EXHIBIT 6·10

000425

# HIROHITO
## THE EMPEROR AND THE MAN

EDWIN P. HOYT

PRAEGER

New York
Westport, Connecticut
London

BOARD EXHIBIT 7-1



## Copyright Acknowledgments

The author and publisher are grateful for permission to reprint from the following source:

All photographs are from *The Japanese Emperor through History* (The International Society for Educational Information: Tokyo, 1984), copyright © 1984, The International Society for Educational Information, Inc., and are reproduced by permission.

## Library of Congress Cataloging-in-Publication Data

Hoyt, Edwin Palmer.
   Hirohito : the emperor and the man / Edwin P. Hoyt.
      p.     cm.
   Includes bibliographical references and index.
   ISBN 0-275-94069-1 (alk. paper)
   1. Hirohito, Emperor of Japan, 1901–1989.   2. Japan—Emperors—
Biography.   3. Japan—History—Showa period, 1926–1989.   I. Title.
DS889.8.H69   1991
952.03'3'092—dc20
   [B]                                                                     91-4189

British Library Cataloguing in Publication Data is available.

Copyright © 1992 by Edwin P. Hoyt

All rights reserved. No portion of this book may be reproduced, by any process or technique, without the express written consent of the publisher.

Library of Congress Catalog Card Number: 91-4189
ISBN: 0-275-94069-1

First published in 1992

Praeger Publishers, One Madison Avenue, New York, NY 10010
An imprint of Greenwood Publishing Group, Inc.

Printed in the United States of America

⑧"

The paper used in this book complies with the
Permanent Paper Standard iss     y the National
Information Standards Organiza......n (Z39.48-1984).

10 9 8 7 6 5 4 3 2 1

22 June 92

BOARD EXHIBIT 7-2

000427

Introduction

1
2
3   EMPE
4
5   A
6
7
8   T
9   AG
10   T
11   T
12   FOU

of any of the events of this China campaign, in Tokyo the apologies were profuse, and from the navy, sincere. But a few days later Nanking fell and was subject to a campaign of attrition so violent that it has gone down in history as the Rape of Nanking. Hundreds of thousands of Chinese were killed needlessly.

The die was now cast for conquest. Hirohito objected, but Prince Konoye said the best way to end the war was to persuade the Chinese to abandon Chiang Kai-shek. So Konoye declared a policy of nonrecognition of the Republic of China and set up a government in Nanking under Wang Ching-wei, a longtime associate of Chiang in the nationalist movement.

With Japanese soldiers sacrificing their lives in China, Hirohito could hardly come out openly against the war. That last chance to prevent protracted war in China had been lost.

General Tojo, who had followed orders to restrain the Kwantung Army's anti-Soviet ambitions, was rewarded by being made vice war minister. The army, drunk with its power, contemplated Tojo's plan of attack on the Soviet Union. Hirohito said no, but in Tokyo, Army Vice Chief of Staff Hayao Tada conspired with the commander of the Korea garrison to stage an incident that should provoke the desired war with Russia. On July 3, 1938, Soviet troops at Lake Khasan, where the Siberia, Manchuria, and Korea borders meet, saw Japanese soldiers taking up field positions on the far side of the hill overlooking the lake. The Soviet forces moved up on their side and dug in. On July 13 the Korea garrison's commander reported to Tokyo that Russian soldiers were acting offensively (saying nothing about the Japanese soldiers) and asked permission to take military action.

Tojo put tongue in cheek and counseled diplomatic action, but said that if that failed, then the commander should "push them back by force." So the Japanese Nineteenth Division moved up to Lake Khasan. War was very near.

Hirohito knew nothing about it. He was summering at Hayama, and it was five days before he heard that he had troops on the Soviet border in great force. When he did hear, the messenger arrived late and delayed for two hours the Emperor's trip out on the bay to hunt specimens. So the imperial temper was up even at the beginning of the meeting. Hirohito took steps to stop the incident. He called War Minister Itagaki to the summer villa and spoke sharply. In the future not one more soldier was to be moved anywhere without the Emperor's permission. And the Nineteenth Division was to be brought back before there was trouble.

But on July 29, despite receipt of direct orders from the war minister, the commander of the Nineteenth Division started an attack on the Soviet positions.

The Japanese had bitten off more than they could chew. The Soviets were waiting and responded with tanks, guns, and an air attack, and since the attack was unauthorized, the Nineteenth Division could not call for help. From July 29 to August 10 the division took a terrible beating. To stop the fighting, General Tojo sent up two trustworthy colonels to command the fighting regiments, and told them to make a cease-fire. In Moscow, negotiations finally did bring about an end to the fighting, but only after the Nineteenth Division had been decimated.

The army had once again overstepped itself, and it had paid a heavy price, in loss of men and loss of confidence of the Emperor. Quietly a number of officers were transferred. But equally quietly, the "strike north" faction of the army determined that it would try again.

As for the campaign in China, virtually nothing about it was known at the Imperial Palace. Hirohito did observe to Army Chief of Staff Sugiyama that this month had long since come and gone and the fighting was still going on. Sugiyama blenched, but said nothing.

Abroad, the Rape of Nanking started a major campaign of sympathy for the Chinese, but in Japan neither Hirohito nor any one else outside the army knew anything about the matter. Even foreign publications were thoroughly censored before being allowed into Japan, and in those days the United States was not using radio to bypass the news blocks, as it later would with the Voice of America. The Japanese had no way of getting information the government did not wish them to have. And neither did Hirohito.

124                                   Hirohito

He had a vague hope that this slow, plodding officer would prove more amenable than any of the others and that there still might be a chance for peace. But Hirohito did not know his man well enough. Tojo had already decided that the United States was the enemy, and that the United States could be defeated by Japan.

The Emperor held out one proviso when he appointed Tojo; the prime minister—designate must agree to retract the decision for war, made on September 6 over the Emperor's objections.

By this time Hirohito was definitely decided against war and wondering what he could do in the face of the military machine, which had seized power and rejected his every express wish to turn from war to peace. "If war... was apparent to me now," he told Hidenari Terasaki years later, "that if I invoked a veto power on their ability to make war, chaos would result. I might be killed, the whole Imperial system might be disrupted, certainly the polity of Japan would be destroyed. So I did not do what I wished to do."

As promised, the Tojo cabinet restudied the question of war or peace, but the ultimate conclusion was the same. The army was bent on war, and really there was no force in Japan powerful enough to stop the military junta.

At the end of November Hirohito made one last effort to stop the war, as he later told his confidant, Minister Terasaki: The Emperor's ultimate effort was to stop the course of events already decided upon. He wanted to summon the Jushin, the association of former prime ministers, to meet with the cabinet.

Hirohito asked the Marquis Kido to try to arrange such a meeting through Prime Minister Tojo, but Tojo refused. Then the Emperor called a meeting of the Jushin himself and questioned each of the former prime ministers on the subject.

Should it be war or should it be peace? Each of the Jushin was posed that direct question, so embarrassing for a Japanese to face directly and alone. But there was no gainsaying the Emperor. Years later, Hirohito recalled what their answers had been.

Prince Konoye: "Konoye spoke loftily about the importance of preserving peace . . . but . . . it was all very abstract and nothing practical was offered."

Baron Hiranuma: "Peace was highly to be preferred to war . . . again abstract and no suggestions of a course of action."

Admiral Yonai: "He spoke of our need for oil and the grave difficulties of securing it, but he spoke of peaceful means as far preferable to others. He went around in circles."

125                                     War!

Admiral Okada: "He said he agreed with Yonai. More going around in circles."

Koki Hirota, the only "common man" in the Jushin, the only former prime minister with neither the pedigree of nobility nor that of military service: "Because he was a diplomat he seemed to be on both sides simultaneously. He spoke a lot of nonsense."

General Abe: "At this point there was no road of return. Japan was committed to war."

General Senjuro Hayashi: "He too was very clearly for war."

"So I was faced with two sets of opinions," continued the Emperor. "Those who wanted peace were rambling and indefinite about what was to be done. They really had no program, nor any helpful suggestions. Those who wanted war were positive and very strong."

"But," said Terasaki, "you wanted peace. Why didn't you stop them?"

"Because I was afraid of a coup d'etat. I was afraid of the power of the army."

Therefore the last possible date to preserve peace and call back the striking force that had already set sail from the Kuril Islands, December 1, passed and nothing was done, although the Jushin and the Tojo cabinet were well aware of the Emperor's wish that the peace be preserved.

At this point the Emperor felt he had no recourse but to support his subjects, his countrymen who would fight and die in the war—all in his name.

Also, through its secretary of state, Cordell Hull, the United States had demanded the complete withdrawal of Japanese troops from China and Indochina and the scrapping of the Berlin-Rome-Tokyo axis. To accept those terms would be to lose face, which was impossible. On December 7, 1941 (December 8 in the eastern hemisphere), simultaneous attacks were made on Pearl Harbor, the Philippines, and Malaya. A few hours later the Emperor issued his first imperial rescript of the war:

Patiently have We waited and long have We endured in the hope that Our government might retrieve the situation in peace, but Our adversaries, showing not the least spirit of conciliation, have unduly delayed a settlement. In the meantime they have intensified the economic and political pressure, thereby to compel Our Empire to submission. We have therefore resolved to declare war on the United States and Britain for the sake of the self-preservation and self-defense of the Empire and for the establishment of enduring peace in East Asia.

Did the Emperor really believe this statement? Certainly it was not hard for him to believe. From the Japanese point of view, the demands

waddle back across the boulevard to the moat, the policemen stop traffic, as they do for nothing else, and everyone smiles and laughs—it is all symbolic of goodwill and national pride, and all associated with the royal presence.

To say that the Emperor today has no political influence would be wrong. Certainly, however, his influence is not the same as in the days when cabinet ministers could go directly to the Emperor. Through the Imperial Household Agency, no longer a ministry, as it was before 1947, the imperial attitude toward affairs of state is often transmitted to the ruling cabinet. Generally the Emperor speaks up, even though quietly, only on basic issues of national policy. He might, for example, counsel the government to go slowly in its efforts to get around those troublesome elements of the constitution and the basic law that tried to limit the Japanese military spending to 1 percent of the national income.

But his views are never forcefully imposed on the nation; indeed, there is no avenue through which they could be imposed, since it is no longer the Emperor who selects a prime minister, but the ruling party, and the Emperor's views are never openly sought by a prime minister on any subject.

Today it is all much more subtle than that. In a nation where the business image is of a man in a dark gray or black suit, black shoes, black socks, white shirt, and black tie, carrying a dispatch case, the Emperor has a special image. The palace and everything in it are a reminder of the Japaneseness of Japan. On a busy Tokyo street, where the bus stop or subway station may be flanked by a McDonald's hamburger restaurant and a Kentucky Fried Chicken establishment, sometimes the Japanese people feel the need for reminders that theirs is an ancient Oriental civilization.

As I write this on a word processor, in a room overlooking the university district, against the background noise of the Japanese baseball world series on television, with cars and buses speeding along the busy streets, only the Chinese characters and Japanese furigana of the signs and billboards make this appear any different from a European or American city. Half a block away, a new fast-food establishment, "Moskur-gers," has opened. Fast food, fast pace, fast life, make Tokyo people, most of whom are commuters by American standards, although their homes and business offices may both be within the limits of the great Tokyo sprawl, feel very much part of the racing twentieth century.

Only the Emperor and the relative handful of temples and shrines bring a sense of continuity with the past. And to the Japanese, it is very

important to feel their essentially Japanese nature and their oneness with other Japanese. They are extremely conscious that theirs is a small country, theirs a secondary language, and that their culture is unique. It is the Emperor and the occasional airing on television of one of the imperial affairs at court that bring all this home in a satisfying manner. Some of the functions of royalty—the opening of celebrations and the visiting of fairs and other events—are still carried out by members of the royal family other than the Emperor, but the problem is that in the rearrangement of Japanese society under the occupation, the peerage was dissolved, and in one generation or two the collateral lines of the royal family will become ordinary citizens. Thus the Showa Emperor's four surviving daughters are princesses, but their children are not princes and princesses. Indeed, in two or three generations the imperial system may collapse completely, from lack of stock to perpetuate it. As noted, Crown Prince Akihito married a commoner, although she would have been of the peerage had it not been destroyed. After death she will be known as the Heisei Empress. Perhaps after one or two generations of this sort of mingling the Japanese will see the monarchy as irrelevant. It is a definite possibility. But, for the moment, in the Heisei era, the imperial succession seems safe enough.

The present Emperor, Akihito, has two sons, Crown Prince Naruhito was educated at the Gakushuin, the special royal school established for Hirohito, whose lines he kept for Akihito. But then, this being a modern world, Naruhito spent two and a half years at Merton College at Oxford University, thus fulfilling another of Hirohito's dreams.

As for the succession of the monarchy in case Naruhito should be unable to take over, the Showa Emperor made provision some time ago. Prince Fumihito, the second son of Akihito, was in 1985 granted a coming-of-age ceremony, a traditional royal place function redolent of ancient times and involving hundreds of thousands of dollars worth of imperial costumes, in which the robes of manhood were granted to the prince. The real significance of this action was not just to prop up the national morale, but to make sure that Fumihito could succeed to the throne if something untoward happened to his brother. Without this action, the imperial line would fall into a regency.

In the last half of his reign, Emperor Hirohito proved unusually thoughtful and farseeing. From time to time since 1945, and particularly in the hectic days of the 1960s, there were cries from the left, some greeted with public acclaim, for the abdication of the Emperor and the abolition of the imperial system. But a Japan without an Emperor would

BOARD EXHIBIT 7-5
000430

# THE HISTORY OF JAPANESE PHOTOGRAPHY

ANNE WILKES TUCKER

DANA FRIIS-HANSEN

KANEKO RYUICHI

TAKEBA JOE

**WITH ESSAYS BY**

IIZAWA KŌTARŌ

KINOSHITA NAOYUKI

EDITED BY
John Junkerman

EXECUTIVE COORDINATOR
Ishiwata Maya

COORDINATORS FOR THE JAPANESE EDITION
Imai Rie
Kuriyama Masayuki

YALE UNIVERSITY PRESS, NEW HAVEN AND LONDON
IN ASSOCIATION WITH THE MUSEUM OF FINE ARTS, HOUSTON

BOARD EXHIBIT 0043

TR105
.H57
2003

FRONTISPIECE: Umesaka Ōri, *Pumpkin*, 1930. Gum-bichromate photograph, 12 x 15 1/4 in. (30.5 x 38.7 cm). Yokohama Museum of Art.

© 2003 The Museum of Fine Arts, Houston
All rights reserved.
This book may not be reproduced, in whole or in part, including illustrations, in any form (beyond that copying permitted by Sections 107 and 108 of the U.S. Copyright Law and except by reviewers for the public press), without written permission from the publishers.

*The History of Japanese Photography* exhibition has been organized by the Japan Foundation and the Museum of Fine Arts, Houston. The national tour of the exhibition is made possible by Continental Airlines. Additional support is provided by the National Endowment for the Arts and the National Endowment for the Humanities.

The calligraphy that appears on p. i and on the chapter-opening pages is the Japanese kanji for *photography*. It was painted by Kaneko Ryūichi.

EXHIBITION ITINERARY
The Museum of Fine Arts, Houston
March 2–April 27, 2003

The Cleveland Museum of Art
May 25–July 27, 2003

DESIGN AND ART DIRECTION: Erin Mayes, Pentagram Design, Austin, Texas
CREATIVE DIRECTION: DJ Stout, Pentagram Design, Austin, Texas
FONT: FFCeleste type by FontFont
MAP: Melissa Jolin-Hauffe

Printed in Italy by Mondadori.

Library of Congress Cataloging-in-Publication Data
Tucker, Anne.
    The history of Japanese photography / Anne Wilkes Tucker,
    Dana Friis-Hansen, Ryūichi Kaneko.
        p. cm.
"The History of Japanese Photography has been organized by the
Museum of Fine Arts, Houston, and the Japan Foundation."
Includes bibliographical references and index.
    ISBN 0-300-09925-8 (cloth)    ISBN 0-89090-112-0 (pbk.)
1. Photography—Japan—History. I. Friis-Hansen, Dana.
II. Kaneko, Ryūichi, 1948– III. Museum of Fine Arts, Houston.
IV. Kokusai Kōryū Kikin V. Title.
    TR105 .T83 2003
    770' .952—dc21                                        2002013593

A catalogue record for this book is available from the British Library.

10 9 8 7 6 5 4 3 2 1

BOARD EXHIBIT 8.2
000482

This perspective was, as far as it went, exceptionally modern: the pursuit of the unique expression of photography based on the premise that its true character derives from light. But Fukuhara's style of modernism did not depart from the fundamentally romantic contemplation of nature that had been the territory of art photography up until that time. In this sense, it did not go nearly as far as the modernist photographic expression established in the 1930s.

Nonetheless, Fukuhara's "light with its harmony" thesis exerted a profound influence on large numbers of amateur photographers, and it grew into a major current of the mid-1920s. The expressions that Fukuhara and his group created were received, reiterated, and reproduced, not in the spirit of questioning the fundamental meaning of the photograph but rather as an element in the sensibility of the times—as mass modernity.

The diffusion of photography that had begun in the last half of the Meiji period accelerated into mass popularization in the Taishō years. This popularization was driven by advances in the use of film and techniques for enlargement and, most significant, by the appearance of small, metal, popular-model cameras, especially the Vest Pocket Kodak camera, which was first marketed in the United States in 1912.

World War I dealt a serious blow to the European-centered photography industry, resulting in a restructuring of the marketplace in which the American industry stepped to the fore. Leading these developments was the Eastman Kodak Company, whose Vest Pocket Camera soon spread throughout the world. It was first imported into Japan around 1915, where it was instrumental in extending the reach of photography virtually overnight to the salarymen of the newly emerging urban middle class and even to shopkeepers and factory workers. A number of domestically produced inexpensive camera models also hit the market, including Konishiroku's Minimum Idea Camera in 1911 and Sone Shunsuidō's Sweet Camera in 1918, all of which contributed to the boom in photography.

In this environment Miyake Kokki, a watercolor painter and amateur photographer, published *Shashin no utsushikata* (How to Take Photographs) in 1916, an introduction to photography that became a phenomenal, long-running bestseller. This pocket-sized book, aimed at the photography fan who lacked fundamental knowledge, avoided difficult scientific explanations in favor of a thoroughly "how-to" approach. However, dry-plate photography was the main technique discussed in the book. A truly revolutionary development came several years later with the introduction of roll film, which vastly simplified the process of taking photographs. Takakuwa Katsuo's *Firumu shashinjutsu* (Film Photography, 1920) also became a bestseller. These two manuals marked the beginning of a new era, the transition from dry-plate photography to film, and led to the growth of a broad-based class of amateur photographers.

In 1921 Ars began publishing the photography magazine *Camera*, with Miyake Kokki as adviser and Takakuwa Katsuo as editor-in-chief. In contrast to the established photography magazines—*Shashin geppō, Shashin shimpō,* and *Shashinkai* (Photographic Journal)—which were published under the sponsorship of photography supply houses, *Camera* was entirely supported by its amateur photographer readers. The following year Kinseidō began publishing the magazine *Amateur,* under the direction of Sugiura Hisui, and it was similarly aimed at the general amateur reader. This combination of inexpensive cameras, introductory manuals, and magazines created an environment in which literally anyone could take photographs, transforming art photography from the intellectual hobby of the affluent into a mass activity of the urban population.

In this environment, *Geijutsu shashin kenkyū* (Art Photography Studies), a monthly that Ars began publishing in 1922 with Minami Minoru as editor-in-chief, was established to pursue pure art

BOARD EXHIBIT 8·3

000433



History of Japanese Photography          pg 114

BOARD EXHIBIT 8-4

000434



PLATE 72
Ogawa Gesshū,
*Doro Gorge*, 1927.
Bromoil photograph,
10 3/8 x 22 3/8 in. (26.4 x
56.8 cm). Tokyo Metro-
politan Museum of
Photography.

History of Japanese Photography. pg 115

BOARD EXHIBIT 8·5
000435

PLATE 73
Kurokawa Suizan,
Untitled, n.d.
Gelatin-silver photo-
graph, 22 1/2 x 16 1/2 in.
(57.3 x 42 cm). Tokyo Met-
ropolitan Museum
of Photography.



PLATE 74
Nojima Yasuzō,
*Muddy Sea*, 1910.
Gum-bichromate photo-
graph, 6 3/4 x 9 5/8 in.
(17.3 x 24.4 cm). The
National Museum of
Modern Art, Kyoto.

JAPANESE ART PHOTOGRAPH

117

BOARD EXHIBIT **8·6**

000436

## 1942

* The Taiwan Photography Association (Taiwan Shashin Kyōkai) is established through the combined efforts of the Taiwan branch of the extraprovincial Photographic Association and the information bureau of the secretariat of the Government-General of Taiwan.
* Katō Kyōhei, Ishizu Ryōsuke, and Hayashi Tadahiko establish the North China Public Relations Photography Association (Kahoku Kōhō Shashin Kyōkai), an extragovernmental organization affiliated with the Japanese embassy in Beijing. They travel between Tokyo and Beijing, taking propaganda photographs.
* Kokusai Hōdō Kōgei changes its name to Kokusai Hōdō (International Press).
* **JANUARY** A photograph taken during the attack on Pearl Harbor the previous month is carried in the Jan. 1 edition of all major newspapers. *Front* begins publication. The first, double issue is devoted to the Japanese navy and is published in fifteen foreign languages.
* **FEBRUARY** *Chōkō gakan* (Chang Jiang [the formal name of the Yangzi River] Pictorial), a magazine published as part of the pacification effort in China and produced by the China bureau of Kokusai Hōdō, begins publication.
* **APRIL** *Asahi Camera* suspends publication.
* **JUNE** *Nippon-Philippines*, a magazine for the pacification program in the Philippines produced by Nihon Shashin Kōgeisha, begins publication. The Pleasant Club changes its name to East Asia Photography Society (Tōa Shashinkai). At its tenth annual exhibition, held the same month, the group adds a photojournalism section to its established art photography section.
* **AUGUST** On the occasion of the tenth anniversary of the establishment of Manchukuo, a photography mission to Manchuria is organized. Watanabe Yoshio, Koishi Kiyoshi, Katō Kyōhei, Oda Masutarō, and Aida Katsuo participate, each assigned his own theme: military preparations, industry, culture, transportation, and land reclamation.
* **DECEMBER** The first Ars Photographic Culture Award is given to Domon Ken, recognizing the work he published during the year in *Shashin bunka*: "Jimbutsu shashinshū" (Collection of Human Figure Photographs; January) and "Domon Ken senshū" (Selected Photographs by Domon Ken; November).
* Miyatake Tōyō publishes photographs that he took with a handmade camera of Japanese detainees at the Manzanar (California) Relocation Center.

## 1943

* War-related exhibitions that appear in Tokyo during the year include the *Exhibition of the Rapid Advance in Northern China*, Matsuya department store in the Ginza district (Mar. 25–31); the *Great Manchurian Ally Photography Exhibition*, Mitsukoshi department store in the Shinjuku district (Mar. 26–31); *Decisive Air Battle Exhibition*, Matsuzakaya department store in the Ueno district (October); and the *Exhibition of On-the-Scene Press Photographs from Independent Philippines*, Mitsukoshi department store in the Shinjuku district (Nov. 13–21).

* **MARCH** A giant photo mural, entitled *Fight to the End* (Uchiteshi yamamu), is displayed on the facade of the Nichigeki theater in Tokyo's Yūrakuchō district. Produced by the Yamahata Photographic Science Institute (Yamahata Shashin Kagaku Kenkyūjo), it is the size of a hundred *tatami* mats (approximately 1,780 sq. ft.). Supervised by the Imperial General Headquarters Army Information Bureau, with Kanamaru Shigene as the photographic director, the mural is later displayed on the facade of the Takashimaya department store in Osaka.
* **JULY** The Greater Japan Photography Patriotic Society (Dai Nippon Shashin Hōkokukai) is established. To mark Ocean Day (a Japanese holiday), a photo mural entitled *Go, to the Fighting Seas!* ("Yuke, tatakau umi e," approx. 6.5 x 20 ft.) is displayed on the side of the Matsuzakaya department store in the Ginza district.
* **SEPTEMBER** Domon Ken publishes a critical essay about graphic propaganda magazines in the September issue of *Nihon hyōron* (Japan Review), which is consequently banned. A roundtable discussion about ethnic customs and photography is published in *Shashin bunka*. Participants include the ethnologist Yanagita Kunio and photographers Domon Ken, Hamaya Hiroshi, Sakamoto Manshichi, and Tanaka Toshio. Around this time, many photographers begin taking ethnographic photographs, led by Hamaya Hiroshi, who begins an extended period of photographing in a remote, rural district of Niigata Prefecture.
* **NOVEMBER** *Shashin bunka* (Photographic Culture) changes its name to *Shashin kagaku* (Photographic Science). With Itō Ippei as editor, the magazine publishes many photographs of ecology and science.

## 1944

* Hasegawa Denjirō photographs the Buddhist sculptures at Hōryūji, Tōdaiji, and Yakushiji, ancient temples of Nara, under commission from the former king of the Korean Lee dynasty, who fears that they will be destroyed in Allied bombing raids.
* Natori Yōnosuke, working in the pacification program in Nanjing, makes an appeal against Japanese military atrocities with a poster displaying the slogan, "Don't burn, don't steal, don't kill."
* The Oriental School of Photography is closed.
* **FEBRUARY** The *Great Photography Exhibition to Raise the Spirit of Annihilation* is held at the Daimaru department store, Kyoto (Feb. 24–27), followed by the *Fighting Photojournalism Exhibition* at the Mitsukoshi department store in the Nihonbashi district (March).

* **MARCH** The Japan Photographic Society is dissolved by direction of the military. The chairman, Fukuhara Shinzō, moves from Tokyo to the town of Gōra in Hakone. Kokusai Hōdō publishes *Kikuwanshiya no hanashi* (The Story of a Locomotive), a photographic picture book, an unusual move for a company engaged in propaganda. The Tokyo College of Photography changes its name to the Tokyo Technical College of Photography.
* **MAY** Miki Shigeru publishes *Yukiguni no minzoku* (Folk Customs of the Snow Country), with commentary by folklorist Yanagita Kunio. The book contains 367 photographs of folk life in the Ojika region of Akita Prefecture, taken over a year-long period beginning in July 1940 during the production of a documentary film entitled *Tsuchi ni ikiru* (Living on the Land). *Hōdō shashin* (Photojournalism) changes its name to *Nihon shashin* (Japan Photography). *Manshū Graph* and *Kaitaku gahō* (Development Pictorial) are merged into *Manshū* (Manchuria).

## 1945

* **MARCH** The Allied firebombing of Tokyo destroys much of the city. The photography unit of the Metropolitan Police photographs the devastation.
* **MAY** In an air raid on the west side of Tokyo, the school buildings of the Tokyo Technical College of Photography are destroyed. An office for the reconstruction of the college is set up at the Konishiroku plant in the Yodobashi district of the city.
* **AUGUST** Atomic bombs are dropped on Hiroshima (Aug. 6) and Nagasaki (Aug. 9). Matsushige Yoshito and Kishida Mitsugi photograph the aftermath of the bomb in Hiroshima, and Yamahata Yōsuke and others photograph Nagasaki. Photographs of the immediate aftermath of the bomb in Nagasaki are published in Japanese newspapers at the end of August. Hamaya Hiroshi photographs the sun on the day of Japan's surrender (Aug. 15) in the town of Takada in Niigata Prefecture, where he has been evacuated. With Japan's defeat, Tōhōsha is dissolved. Former staff members of the company, including Kimura Ihee, set up Bunkasha.
* **SEPTEMBER** The General Headquarters of the Allied occupation (GHQ) bans all reporting on the atomic bombs in the Japanese media. A Japanese scientific survey team is formed to make a documentary record in photographs and film of the effects of the atomic bombs. Photographers Kikuchi Shunkichi and Hayashi Shigeo participate. Kikuchi accompanies the medical survey unit to Nagasaki and photographs the effects of the bomb on people, while Hayashi accompanies the physical survey unit to Hiroshima and Nagasaki and photographs the effects of the bomb on the landscape. The GHQ confiscates the survey team's film and prints and ships them to the United States. A photograph of Emperor Hirohito visiting Gen. Douglas MacArthur, Supreme Commander for the Allied Powers, at the American Embassy is published in Japanese newspapers on Sept. 29. The Home Ministry bans publication of the photograph on the grounds that it compromises the dignity of the emperor, but the GHQ overrules the ban.
* **OCTOBER** Yamahata Shōgyoku, with the support of Mainichi Shimbunsha, establishes Sun News Photos.

BOARD EXHIBIT 8-7

000437

| EN302: Advanced Composition | Syllabus—Fall 2009 |
|---|---|
| **Sections:**   D 14 | **Thayer Hall 427** |
|   E 14 | **Thayer Hall 372** |
|   I 14 | **Thayer Hall 471** |
|   J 14 | **Thayer Hall 471** |

| | |
|---|---|
| Dr. Karen Peirce | Phone: |
| Office: Lincoln Hall 412 | E-mail: |
| Course Director: LTC Justin Gage | **Office:** Lincoln Hall |

**Course Goals:** Advanced Composition is the capstone core course for the Department of English. It builds upon the rhetorical and communicative skills you worked on in EN101; refines the imaginative and critical reading skills developed in EN102; and exercises in a specific cultural context the ethical and critical thinking skills studied in PY201. To that end, cadets who pass EN302:

- *Interpret a variety of media—text, image, and speech— creatively, accurately, and critically.*

The overarching questions in every discussion of text, image, or speech will be: what does the source say? Why does it say it? How does it say it? What do you think of either the matter or the art of the source? Coming to each class meeting having already answered those questions will be important to your success.

While the principal medium through which you will demonstrate your writing skill is the short academic essay, I will also call on you to write in other forms. Successful writers in Advanced Composition:

- *Create academic texts exhibiting control over a writing process and an awareness of rhetorical situations (writer-audience-medium-context). Specifically, they can revise (add, delete, substitute, or reorder) ideas in their writing at various levels (sentence, paragraph, or essay,) and they can edit prose for clarity, coherence, and rhetorical effect.*

EN302 also plays a significant though less central role in the Academy's intent to produce officers aware of culture. Our contribution to that goal is to foster "an informed and adaptive attitude towards other cultures" as it is thus described in the Dean's *Educating Future Army Officers for a Changing World*. Cadets who succeed in this course:

- *Can learn about cultures (their own or others') in terms of relationships among knowledge, power, and language.*

While these are skills expected of any educated person, they are especially vital in a world where cultural symbols can be the flashpoints of war. The life of an Army officer is usually one of travel. Once commissioned, you will be a part of the Army's "deployment culture." Many of you will travel to parts of the country or parts of the world that you have not directly experienced before, will be confronted with languages you have never heard and images that you have never seen before. We will thus focus in the classroom on how words and images created by or about a particular culture shape people and their regard for one another. We will "deploy" to a particular place—this year it will be Japan—through a variety of sources: fiction, poetry, graphic art, film, essays, and other sorts of non-fiction prose.

1

**BOARD EXHIBIT 9-1**

000438

**Course Components:** Your diligence and skill in these components directly leads to your degree of success.

> ➤ *Classroom discussions* of assigned readings, images, and videos hone your interpretive abilities and critical thinking. Helping create a class dialogue among your peers helps you with interpreting and evaluating the assigned materials.

> ➤ *In-class writing workshops* will enable you to learn and practice means of inventing, drafting, revising, editing, and proofreading poor or good writing into better or great writing.

> ➤ *Instructor-student conferences* allow you to explore your writing project, identify and understand both strengths and weaknesses of your writing process, and understand techniques for improving your written products.

> ➤ *Writing assignments* and *homework exercises* allow you to measure the success of your efforts and identify ways to strengthen your writing.

**Additional Instruction:** Should you desire more one-on-one feedback than class time and conferences allow, you may schedule Additional Instruction (AI) with me. I may also approach you to suggest that you attend AI if I feel your performance in the class merits such additional attention. The last day for AI this term is Friday, 11 December.

**Writing Portfolios:** Maintain all written work and feedback in a standard brown folder with a name and class designation label on the cover. Tab each final copy essay and include the graded essays in chronological order.

**Term End Examination:** The final examination validates your achievement of the course goals. However, merely passing the TEE does not guarantee that you will pass the course, for you must accumulate at least 670 course points out of the course total of 1000 points (earning a letter grade of **D**). In all cases, if you fail the TEE you will fail the course unless the course director and I determine that your writing portfolio clearly demonstrates proficiency in our course goals.

**Essay Format:**
- **A title page** formatted in accordance with *Dean's Documentation of Written Work*, Appendix 1 Enclosure 1;
- **Essay pages** typed in 12-point Times New Roman font; double-spaced; 1" margin top, bottom, left, and right, with a ½ inch left gutter; last name and page number in the top right header;
- **A Notes page**, if required, describing collaboration or assistance as detailed in section VII of *DDWW (see page 12 for samples)*;
- **A Works Cited page** in MLA style for all sources, collaboration, or assistance (See *Little, Brown Handbook* chapters 47 and 48).

**BOARD EXHIBIT 9-2**

**000439**

**Documentation:** Use Modern Language Association (MLA) in-text parenthetical references. Consult *Little, Brown Handbook,* Chapter 47, "Using MLA Documentation and Format," for examples. To cite assistance, use superscript notes and a Notes page inserted before your Works Cited page. Acknowledge all homework assignments.

**Late Work:** Work is late if it is not handed in at the beginning of class on the date due. I will submit a COR for all late assignments unless the Surgeon, Dean, or Department Head have granted permission for them to be late. Anyone with a scheduled absence the day an assignment is due must still hand in the assignment by the due date. In the case of severe illness or other severe, unexpected circumstance, you must notify me as soon as possible following the absence to make arrangements for turning in the assignment. The later after the due date your work is handed in, the more severe the penalty. Graded assignments up to eight hours late will lose one full grade (e.g., B+ → C+); graded assignments more than eight hours but fewer than twenty-four hours late will be marked down two full letter grades (e.g., B+ → D). Papers late by twenty-four to forty-eight hours will fail (grade F, 60% of available points). For papers more than 48 hours late, I have the option, in consultation with the Course Director, of giving you fewer than the usual 60% of possible points for an F. <u>Regardless of the penalty, you must submit all assigned work to pass the course.</u>

**Grading Standards.** Successful authors of college essays demonstrate an astute sense of the ***rhetorical situation*** to which they respond—an awareness of each writing project's audience, context, and purpose. Successful authors also efficiently use a ***writing process***—a methodical approach to composing that uses generative writing, drafting, feedback, revising, editing, and proofreading. Successful essays are ***substantial***—insightful, original, thorough, and compelling texts that use reason to persuade audiences that something is true. They are ***well-organized***—transitions are smooth, paragraphs are unified, and main ideas logically presented. They are ***stylistically*** clear and graceful—their language is exact, jargon-free, and appropriate to the argument and audience addressed. They follow the ***conventions*** of standard academic discourse—including correct grammar and mechanics. Effective college writing demonstrates proficient ***collaboration and citation*** techniques—the responsible and acknowledged use of other people's ideas, wherever they may be obtained. They correctly and completely document the sources of ideas, words, and data borrowed from other people and specify the relationships of those ideas to the writer's own.

**Points Distribution:**

| ESSAY 1 | 100 |
|---|---|
| ESSAY 2 | 200 |
| ESSAY 3 | 100 |
| ESSAY 4 | 200 |
| INSTRUCTOR POINTS | 150 |
| TERM-END EXAMINATION | 250 |
| TOTAL | 1000 |

BOARD EXHIBIT 9·3

000440

**Resources:**  The following items constitute the primary material for the course, with syllabus references in parentheses.

> *Dean's Documentation of Written Work.*  West Point, New York: Office of the Dean, August 2009. (DDWW)
>
> (http://usma-portal/dean/Academic%20Administration%20Collection/DWW2009.pdf)
>
> Fowler, H. Ramsey and Jane E. Aaron.  *The Little, Brown Handbook.*  10[th] Edition.  New York: Pearson Longman, 2007.  (LBH)
>
> Murray, Donald M.  *The Craft of Revision.*  5[th] Edition.  Boston: Thomson-Wadsworth, 2004.  (Murray)
>
> Iyer, Pico.  *The Lady and the Monk: Four Seasons in Kyoto.*  New York: Vintage-Random, 1991.  (Iyer)
>
> Keene, Donald.  *Modern Japanese Literature: An Anthology.*  New York: Grove, 1956.  (Keene)
>
> Morton, W. Scott and J. Kenneth Olenik.  *Japan: its History and Culture.*  4[th] Edition.  New York: McGraw-Hill, 2005.  (Morton)
>
> Course website (website):
>
> http://www-internal.dean.usma.edu/departments/eng/en302/EN302%20Website/EN302index.html

4

BOARD EXHIBIT 9.4

| LSN | DATES | HOMEWORK | IN CLASS |
|-----|-------|----------|----------|
| **Block I: Writing after Writing** | | | |
| 1 | 17/18 Aug | Read/Print Out EN302 Syllabus | Course Introduction<br>Read Murray ch. 2, "How to Get the Writing Done" (8 pp.) |
| 2 | 19/20 Aug | Read Iyer "Why We Travel" (website—under Course Documents) | Discuss the theme of travel |
| 3 | 21/24 Aug | Read Iyer "Autumn" chs. 1-3 (26 pp.) | Discuss Iyer |
| 4 | 25/26 Aug | Read Iyer "Autumn" chs. 4-5 (22 pp.) | Discuss Iyer<br>Discuss how to document sources |
| **Block II: Revising for Substance** | | | |
| 5 | 27/28 Aug | Read Murray ch. 1, "Rewrite Before Writing" (23 pp.) | **ASSIGN ESSAY 1**<br>Begin writing essay 1 |
| 6 | 31 Aug/1 Sep | **WRITE ESSAY 1 DRAFT**<br>Read Murray ch. 3, "Reading for Revision" (12 pp.) | **ESSAY 1 DRAFT DUE**<br>Discuss how to give and receive feedback<br>Peer Review of Essay 1 |
| 7 | 2/3 Sep | **WRITE ESSAY 1 FINAL DRAFT** | **ESSAY 1 DUE**<br>Reflecting on and celebrating your work<br>Write note to readers for Essay 1<br>**ASSIGN ESSAY 2** |
| 8 | 4/8 Sep | Read Iyer "Autumn" chs. 6-8 (26 pp.) | Discuss Iyer |
|  | 7 Sep | **LABOR DAY** | **NO CLASS** |
| 9 | 9/10 Sep | Read Iyer "Autumn" chs. 9-10 (25 pp.) | Discuss Iyer |
| 10 | 11/14 Sep | Read Iyer "Autumn" chs. 11-13 (25 pp.) | Discuss Iyer |
| 11 | 15/16 Sep | Read Iyer "Autumn" chs. 14-15 (19 pp.) | Discuss Iyer |
| 12 | 17/18 Sep | Read Murray ch. 6, "Rewrite with Structure" (14 pp.)<br>Bring Essay 1 to class | Work with Murray |
| 13 | 21/22 Sep | **WRITE ESSAY 2 DRAFT** | **ESSAY 2 DRAFT DUE<br>CONFERENCES<br>(NO CLASS MEETING)** |
| 14 | 23/24 Sep | **WRITE ESSAY 2 DRAFT** | **ESSAY 2 DRAFT DUE<br>CONFERENCES<br>(NO CLASS MEETING)** |
| 15 | 25/28 Sep | Read Murray ch. 4, "Rewrite with Focus" (31 pp.) | Work with Murray |
| 16 | 29/30 Sep | Read Murray ch. 8, "Rewrite to Develop" (28 pp.) | Work with Murray |

5

BOARD EXHIBIT **9.5**

000442

| LSN | DATES | HOMEWORK | IN CLASS |
|-----|-------|----------|----------|
| 17 | 1/2 Oct | **WRITE ESSAY 2 FINAL DRAFT** | **ESSAY 2 DUE**<br>Reflecting on and celebrating your work<br>Write note to readers for Essay 2<br>**ASSIGN PRESENTATION 1** |
| | | **Block III: Reading and Writing Other "Texts"** | |
| 18 | 5/6 Oct | Read Morton—group assigned chapters (TBD) | Group Work |
| 19 | 7/8 Oct | Read LBH ch. 56, "Oral Presentations"<br>Read Muth and Kitalong "Part I: Strategies for Designing Your Document" (posted to Blackboard) | Group Work |
| 20 | 9/13 Oct | Group Work | Group Work |
| | 12 Oct | **COLUMBUS DAY** | **NO CLASS** |
| 21 | 14/15 Oct | **PREPARE FINAL PRESENTATION 1** | **PRESENTATION 1 DUE—Groups 1-4** |
| 22 | 16/19 Oct | **PREPARE FINAL PRESENTATION 1** | **PRESENTATION 1 DUE—Groups 5-7** |
| | | **Block IV: Rewriting for Style** | |
| 23 | 20/21 Oct | Read Iyer "Spring" chs. 1-3 (29 pp.)<br>Bring Murray to class | **ASSIGN ESSAY 3**<br>Begin writing essay 3 |
| 24 | 22/23 Oct | **WRITE ESSAY 3 DRAFT** | **ESSAY 3 DRAFT DUE**<br>Peer Review of Essay 3 |
| 25 | 26/27 Oct | **WRITE ESSAY 3 FINAL DRAFT** | **ESSAY 3 DUE**<br>Reflecting on and celebrating your work<br>Write note to readers for Essay 3<br>**ASSIGN ESSAY 4** |
| 26 | 28/29 Oct | Read Iyer "Spring" chs. 4-6 (21 pp.) | Read Iyer "Spring" chs. 7-8 (13 pp.)<br>Discuss Iyer |
| 27 | 30 Oct/ 2 Nov | Read Iyer "Summer" chs. 1-4 (23 pp.) | Discuss Iyer |
| 28 | 3/4 Nov | Read Iyer "Summer" chs. 5-9 (31 pp.) | Discuss Iyer |
| 29 | 5/6 Nov | Review Murray ch. 6, "Rewrite with Structure"<br>Write Outline of Essay 3<br>Write Outline of Essay 4 | Write Essay 4 Draft |

BOARD EXHIBIT 9·6

000443

| LSN | DATES | HOMEWORK | IN CLASS |
|-----|-------|----------|----------|
| 30 | 9/10 Nov | Review Murray ch. 4, "Rewrite with Focus" Review Murray ch. 8, "Rewrite to Develop" Determine Priorities for in class work | Work with Murray |
| | 11 Nov | **VETERAN'S DAY** | **NO CLASS** |
| 31 | 12/13 Nov | Read Murray ch. 9, "Rewrite by Ear" (22 pp.) **WRITE ESSAY 4 DRAFT** | **ESSAY 4 DRAFT DUE CONFERENCES (NO CLASS MEETING)** |
| 32 | 16/17 Nov | Read Murray ch. 9, "Rewrite by Ear" (22 pp.) **WRITE ESSAY 4 DRAFT** | **ESSAY 4 DRAFT DUE CONFERENCES (NO CLASS MEETING)** |
| 33 | 18/19 Nov | **WRITE ESSAY 4 FINAL DRAFT** | **ESSAY 4 DUE** Reflecting on and celebrating your work Write note to readers for Essay 4 **ASSIGN PRESENTATION 2** |
| | | **Block V: Reading and Writing Other "Texts"** | |
| 34 | 20/23 Nov | Read Keene—group assigned chapters (TBD) | Group Work |
| 35 | 24/25 Nov | Group Work | Group Work |
| | 26-29 Nov | **THANKSGIVING LEAVE** | **NO CLASS** |
| 36 | 30 Nov/1 Dec | Write Portfolio Reflection Group Work | **SELECTED WRITING CONFERENCES (NO CLASS MEETING)** |
| 37 | 2/3 Dec | **PREPARE FINAL PRESENTATION 2** | **PRESENTATION 2 DUE— Groups 1-4** |
| 38 | 4/7 Dec | **PREPARE FINAL PRESENTATION 2** | **PRESENTATION 2 DUE— Groups 5-7** |
| | | **Conclusion: Reassessing Ourselves as Writers** | |
| 39 | 8/9 Dec | Read Iyer, "The Writing Life" (website) | Taking stock of (re)writing skills |
| 40 | 10/11 Dec | Read Murray ch. 11, "The Craft of Letting Go" (8 pp.) | Setting goals as writers and editors TEE instructions and course review |
| | TBD | **TERM-END EXAM** | |

BOARD EXHIBIT 9.7

000444

## EN302: Advanced Composition
### Essay 4: Japan and the "I Say" Argument (instructor-devised)
### (200 points)

In *Clueless in Academe* Gerald Graff suggests that good academic writing engages in what he calls "planting a naysayer" in the text, where the writer responds to someone "who is sufficiently 'other'" to require persuasion (160). This naysayer could be another writer or it could be "hypothetical," an imagined reader whose skepticism helps the writer conceive of the "thesis in a contrastive or counterfactual way" (Ibid.). In essay 3, you wrote about how a given source interpreted the Japanese in a standard or well-worn way. That interpretation of the Japanese now represents your "naysayer." To be successful, you do not have to completely overturn conventional wisdom, but you do have to present an alternative perspective, what Iyer called in "Why We Travel" a "crooked angle" on Japanese culture. You may use examples and ideas from your own research or your own travel experiences to support your main claim.

> Rewrite essay 3 to complicate or even explode the conventional view of the Japanese you presented, using other texts, films, or images for support.

Due: at the beginning of Lesson 33 on 18 November 2009.

**Essay Format:**
- **A title page** formatted in accordance with *Dean's Documentation of Written Work*, section X (pages 21-23) and appendix 1;
- **Essay pages** typed in 12-point Times New Roman font; double-spaced; 1" margin top, bottom, left, and right, with a ½ inch left gutter; last name and page number in the top right header;
- **A Notes page**, if required, describing collaboration or assistance as detailed in section VII of *DDWW*;
- **A Works Cited page** in MLA style for all sources, collaboration, or assistance (See *Little, Brown Handbook* chapters 47 and 48).

**Documentation:** Use Modern Language Association (MLA) in-text parenthetical references. Consult *Little, Brown Handbook,* Chapter 47, "Using MLA Documentation and Format," for examples. To cite assistance, use superscript notes and a Notes page inserted before your Works Cited page. Acknowledge all homework assignments according to Appendix 6 of *DDWW*.

**USMA Writing Standards:** We evaluate writing in four interdependent dimensions. Competent writing observes all four of these dimensions: substance, organization, style, correctness and conventions. These standards are more fully explained in the course syllabus.

**Turn-in procedure:** Acknowledge your work electronically via CIS and e-mail me a copy of your essay.

BOARD EXHIBIT 10

000445

RESPONDENT EXHIBITS

**A Cadet is Truthful, Fair, Respectful, and Responsible.** This intent of the Cadet Honor Code not only shapes the West Point environment, but sets the ethical standards for leadership in the Army itself. Each cadet progresses from adhering to a code that explicitly outlines unacceptable behavior to internalizing the fundamental principles of integrity that promotes honorable living. Therein lays the essence of becoming a *leader of character*, dedicated to living a life of personal integrity in selfless service to the Nation.

**105. STEWARDSHIP OF THE CODE.** West Point cadets are active duty soldiers and, as such, statutory requirements necessitate the active involvement of the leadership of the Military Academy and Department of the Army Staff in the administration of the Cadet Honor System.

Moreover, the Cadet Honor Code represents a revered American institution. The Cadet Honor Code is indeed a national treasure, the touchstone of ethical excellence for the Army and for the nation. Therefore, although the Corps of Cadets is charged with the immediate stewardship of the Code, the Cadet Honor Code "belongs" to all those who share a similar commitment to the values manifest in the Code. Lieutenant General Dave R. Palmer, the 53rd Superintendent of the Military Academy, clearly described the concept of "ownership,"

*Cadets today know that while they are clearly custodians of the Code, they are joined by graduates and friends in veneration of it and share with the institution's leadership a responsibility for administering the system, which includes educating each incoming class. All of us here, whether in gray or green, are partners in this critical element of the West Point experience. Upon graduating, cadets shed their immediate responsibility as keepers of the Code, but acquire that lasting interest in its health held by members of the Long Gray Line. In fact, their devotion to and interest in the Honor Code will actually grow deeper with the fuller understanding that comes from immersion in the world outside our walls. In this sense, then, each of us who cherishes the ideals of West Point "owns" the Code.*

**106. THE "THREE RULES OF THUMB" PRINCIPLE.** In keeping with the positive nature and purpose of the Cadet Honor Code, the "Three Rules of Thumb" act as a guide for behaving honorably. These rules aid cadets in determining whether an action is honorable or not. If a cadet can answer "Yes" to any of these questions, the act is likely dishonorable. An action that is dishonorable or unethical is not necessarily a Cadet Honor Code violation; hence, the Honor System emphasizes striving for the higher standard rather than adhering to the explicit prohibitions of the Cadet Honor Code.

The "Three Rules of Thumb" are as follows:

**a. Does this action attempt to deceive anyone or allow anyone to be deceived?**

**b. Does this action gain or allow the gain of privilege or advantage to which I or someone else would not otherwise be entitled?**

**c. Would I be dissatisfied by the outcome if I were on the receiving end of this action?**

**RESPONDENT EXHIBIT** |

**000447**



**DEPARTMENT OF THE ARMY**
**UNITED STATES MILITARY ACADEMY**
**WEST POINT, NEW YORK 10997-1779**

MACC-USCC-D3                                                    1 March 2010

MEMORANDUM FOR RECORD

SUBJECT: Character Statement for CDT Alan Spadone, class of 2011, B1

    The purpose of this memorandum is to communicate my perspective of the moral character of CDT Alan Spadone.

    I have known CDT Spadone since he was a student in my RS 103 Critical Thinking class during his first semester Plebe year. In class, Alan was always engaged and prepared to participate. Peers viewed him as a leader in the class and the go-to person for many issues relating to freshman transition into West Point and the nuances of the three-pillar approach to cadet leader development. Since that initial course, I have met with CDT Spadone on numerous occasions in individual appointments. This one-on-one time offered me the opportunity to learn more about him as an individual and we have talked at length about his plans for success here at the academy. I feel confident that I know him well.

    CDT Spadone is of the highest moral character and our conversations often reflected his personal beliefs regarding the importance of the West Point tradition of developing character in future officers. He takes seriously the many lessons and opportunities to practice ethical behavior and it is my belief that he sets a high standard and positive example for subordinates in his company. CDT Spadone is accountable for shortcomings and when corrected, works diligently to overcome all deficiencies, thus following the model set for all cadets to seek peak performance in all endeavors. In terms of honor, I trust his word without question.

    I am aware of the current charge against CDT Spadone and find it totally out of character. If he, in fact, misled or misspoke on some issue, I truly believe it was unintentional and must have been due to extreme stress. Throughout the past year, Alan, an exemplary student, has been working hard to gain permission to study abroad for a semester at Cambridge as an exchange student. His invitation to participate in this prestigious program is an accolade afforded to few as the program only selects ten students from hundreds of applicants from around the world. Alan worked diligently with three different departments for over eight months to obtain the necessary funding and permissions. He finally obtained the funding himself and then, at the very last minute, the Academy denied his request. This was a tremendous blow to Alan; he was devastated and sunk into a depression that resulted in counseling with the Center for Professional Development. I firmly believe this cadet would never intentionally attempt to mislead and the instance in question is nothing more than a misunderstanding which resulted in an error in judgment; one that will not be repeated!

    I have had the honor of working with many outstanding individuals during my ten years in the Center for Enhanced Performance.  In terms of honor, integrity and character, CDT Spadone exemplifies the best of this group. I am confident that once he has the opportunity to state his case, a reasonable explanation will come forth and this cadet will successfully continue his preparation for commissioning.

    The point of contact for this memorandum is the undersigned at        or email at

Laura Vetter
Course Director – RS 103
Academic Excellence Program
Jefferson Hall – 161
West Point, NY 10997

**RESPONDENT EXHIBIT** 2

000448

BOARD MEMBERS RECOMMENDATIONS

HEARING MEMBER WORKSHEET

MACC-CPME-H                                           Date: *08 MAR 2010*

MEMORANDUM FOR Honor Board Member, Case of Cadet  *Spadone, ▓ Alan*

SUBJECT: Hearing Member Worksheet

1.  I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.  During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted.  To make the first decision I will consider due process and the facts of the case.  To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.  Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

Board
Recommendation 1-1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes\_\_\_\_ No ✓

Explain the basis for your response.

Cadet Spadone's academic and character history all reflect that he is a studious and well focused individual. He has never had any other Honor issues or problems involving his character, so it appears this case is an isolated incident brought on by unusual circumstances.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes ✓ No\_\_\_\_

Explain the basis for your response.

Judging by the effort that he has put forth in this case, it appears that Cadet Spadone wishes to remain at the Academy and continue with his character development. It seems, based off the confidence of his instructors and his peers, he will use this experience to help guide his future actions

1

000452

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

3. **Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, <u>unusual external personal circumstances such as a death in the family or a similar family crisis</u> may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress <u>does not include</u> the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes ✓   No ____

Explain the basis for your response.

Leading up to this case, Cadet Spadone was actively involved with trying to get approval for a semester-abroad program never before done by a West Point cadet. Cadet Spadone's passion for trying to get this approval became his life and he never gave up even against the many obstacles he faced. So when he received the final word, the impact of that decision negatively affected his decision-making skills at that time. Since he had invested so much time and effort into it, the devastation could have easily affected his judgement.

4. **Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes ✓   No ____

Explain the basis for your response.

Cadet Spadone received high praise from all of his instructors and his peer despite their initial disappointment of knowing that Cadet Spadone is involved in an Honor Violation case. The Officers and Sergeant brought in as witnesses were confident that Cadet Spadone would still serve as an excellent Officer, based from their experience interacting with him.

000451-3

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent <u>may grant discretion</u> and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES ✓ NO____

**If you answered <u>YES</u> to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend? In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

a. Allow to graduate On Time with Current Class.

b. Delay graduation by six months as a December Graduate.

c. Delay graduation by a one year as a Full Year Turn Back.

**If you answered <u>NO</u> to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes____ No____

Explain the basis for your response.

000453-4

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

X  Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

b. Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

c. Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

X  Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

Yes ✓  No____

**If you answer Yes to Question #6,** please **cross out** those administrative sanctions you **do not want** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

Cadet Spadone's experience with this case can hopefully be beneficial not only to himself but to those in his chain of command and those under his command as well. By keeping him in a leadership position, he can hopefully begin applying the lessons he learned in order to become a better leader of character. This reasoning also applies to him being allowed to participate in sports/activities since the teams are based off of teamwork and trust.

4

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

7. **Other Factors.**  Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

000456 -6

# HEARING MEMBER WORKSHEET

MACC-CPME-H

Date: 0̸8̸ MAR 10

MEMORANDUM FOR Honor Board Member, Case of Cadet ___Spadone___

SUBJECT: Hearing Member Worksheet

1.  I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.  During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted.  To make the first decision I will consider due process and the facts of the case.  To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.  Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes____ No ☒

Explain the basis for your response.

Although this lapse in judgement does not reflect his character, it was ignited and then amplified by external factors. I do not know why his "self-destructive" behavior was not observed and ~~was~~ tended to earlier, but I know that this could have happened to many other cadets if placed in similar situations because of the duress. The Honor violation should not have occured, because the CDT's character demonstrates this this case is an extraordinary one, and it should not define him.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes ☒ No____

Explain the basis for your response.

He demonstrates that he is a hardworker and will strive to correct himself. However, he will need guidance throughout the remediation process.

1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

**3.** **Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, unusual external personal circumstances such as a death in the family or a similar family crisis may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress does not include the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes _X_   No ____
to an extent.

Explain the basis for your response.

After working so hard for something and then be gravely disappointed, I can see how there was a significant rise in duress in his life. However, just that one element should not have forced him to commit an Honor violation. I can understand if there were other reasons.

**4.** **Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes ____   No ____

Explain the basis for your response.

I do not feel qualified to answer this question with a yes/no. I know that he must work hard to prove, both to himself and his peers, that he is capable of living honorably.

2

000458

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent may grant discretion and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES _X_ NO____

**If you answered YES to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend? In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

a. Allow to graduate On Time with Current Class.

b. Delay graduation by six months as a December Graduate.

(c.) Delay graduation by a one year as a Full Year Turn Back.

**If you answered NO to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes____ No____

Explain the basis for your response.



Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

a. Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

b. Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

c. Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

d. Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

Yes ☒   No ____

**If you answer Yes to Question #6,** please **cross out** those administrative sanctions you **do not want** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

*He needs time to ~~assess~~ assess his situation and decision making process. During this time he should be removed from leadership decisions.*

4

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

7. **Other Factors.** Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

Although he made a mistake and violated other people's trust, this could have been prevented before it happened. He endured a great disappointment after being let on to have high hopes. This can be very devastating, especially in an environment with very few freedoms. All of these factors can make a cadet lead himself to certain "self-destructive" behaviors, not all of which must be physical in nature. This cadet needs to be watched and mentored, but he has potential to make better decisions in the future. He needs to learn how to better handle disappointments better.

000461 2.6

HEARING MEMBER WORKSHEET

MACC-CPME-H                                    Date: 8 Mar 2010

MEMORANDUM FOR Honor Board Member, Case of Cadet Alan Spadone

SUBJECT: Hearing Member Worksheet

1.  I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.  During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted. To make the first decision I will consider due process and the facts of the case. To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.  Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes____ No ✓

Explain the basis for your response.

From the testimony, CDT Spadone spent a great amount of energy on trying to improve himself and get a scholarship. When this fell through, it seemed like all his work was for nothing. This would cause great depression in almost anyone and they may do something that they would not do under normal circumstances.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes ✓ No____

Explain the basis for your response.

In his admittance to copying essay #3, CDT Spadone seemed extremely distraught about his own actions. He seemed to generally be disappointed with himself and devastated at his lack of fortitude. All of the witnesses that came to testify on his character painted him in the light of someone who would be able to take this crucible and better themselves from it.

000463

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

3. **Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, unusual external personal circumstances such as a death in the family or a similar family crisis may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress does not include the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes ✓  No____

Explain the basis for your response.

Although he did not have the example of losing his parents occur to him, CDT Spadone had a major blow struck to him by being denied his scholarship. After close to two years of intense work on the scholarship, while at the same time maintaining all pillars, and having it all stripped away after making such a huge decision as staying at the academy, I can see how he'd be under a great amount of duress.

4. **Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes ✓  No____

Explain the basis for your response.

As we learn in PL300, Failure is a chance to learn and grow. CDT Spadone has had a few quick failures, all from one event, that I think he has had time to reflect on and learn from the mistakes he made. Because of his high standing in the class, I feel that he will be able to learn greatly from this experience and excel as an officer.

0004**33**

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent may grant discretion and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES ✓   NO____

**If you answered YES to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend? In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

a. Allow to graduate On Time with Current Class.

b. Delay graduation by six months as a December Graduate.

c. Delay graduation by a one year as a Full Year Turn Back.

**If you answered NO to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes____   No____

Explain the basis for your response.

3

3.4

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

    **a.** Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

    **b.** Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

    **c.** Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

    **d.** Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

                                                  Yes √ No____

**If you answer Yes to Question #6**, please **cross out** those administrative sanctions you **do not want** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

I think CDT Spadone should be allowed to represent the academy in any way possible (positively). Having been through an HIH and learning from his failures, thus improving himself, CDT Spadone could be beneficial in relating his story.

4

3.5

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

7. **Other Factors.** Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

All members called to testify thought highly of CDT Spadone. Even after hearing the verdict, CDT Spadone continues to say that he did not cheat on essay #4. I honestly belief that he is a good guy that got stuck in a rut and has had some unfortunate thing happen to him recently. Because of this, I belief his sentence should be minimal.

000461

3-6

HEARING MEMBER WORKSHEET

MACC-CPME-H                                   Date: _O8 MAR 2010_

MEMORANDUM FOR Honor Board Member, Case of Cadet _SPADONE, MATTHEW_

SUBJECT: Hearing Member Worksheet

1.  I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.  During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted. To make the first decision I will consider due process and the facts of the case. To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.  Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

4-1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes_____ No __✓__

Explain the basis for your response.

IT APPEARS THAT CDT SPADONE HAS LOST TOUCH OF HIS VALUES AND NEEDS TO BE REMINDED OF THE IMPORTANCE OF TRUTH & HONESTY. WHILE HIS CHARACTER APPEARS TO BE ~~████████~~ AT A LOW POINT, CDT SPADONE DEFINITELY APPEARS TO BE AN INDIVIDUAL WHO WILL LEARN FROM HIS MISTAKES AND SERVE THE ARMY WELL.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes _✓_ No_____

Explain the basis for your response.

I BELIEVE CDT SPADONE IS BEGINNING TO REALIZE THAT ONE CANNOT CHOOSE A LIFE OF INTEGRITY, TRUTH, AND HONESTY SOMETIMES, BUT RATHER THAT HE MUST EMBODY THOSE VALUES IN HIS EVERYDAY LIFE. WITH PROPER ASSISTANCE, I BELIEVE REMEDIATION TO BE POSSIBLE.

000469

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

**3. Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, unusual external personal circumstances such as a death in the family or a similar family crisis may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress does not include the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes____ No __✓__

Explain the basis for your response.

ALTHOUGH CDT SPODANE WAS NOT ALLOWED TO GO ON A SEMESTER ABROAD, I DO NOT BELIEVE THAT THIS FACTOR PLAYED A CHIEF ROLE THAT WOULD HAVE CAUSED HIM TO BLATANTLY CHEAT. GIVEN THAT THIS INFRACTION WAS COMMITTED ON ESSAY # 3, I BELIEVE THAT CDT SPODANE'S ACTIONS WERE COMMITTED ON HIS OWN ACCORD TO GET AHEAD.

**4. Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes __✓__ No____

Explain the basis for your response.

IT APPEARS THAT CDT SPODANE HAS THE NECESSARY BRAIN POWER TO BE A SUCCESSFUL OFFICER, SO GIVEN TIME TO ADEQUATELY LEARN AND GROW FROM HIS PERSONAL FAILURES, HE WILL ADD VALUE TO THE US ARMY OFFICER CORPS.

000470

4-3

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent may grant discretion and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES ✓  NO ____

**If you answered YES to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend?
In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

a. Allow to graduate On Time with Current Class.

(b) Delay graduation by six months as a December Graduate.

c. Delay graduation by a one year as a Full Year Turn Back.

**If you answered NO to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes____  No____

Explain the basis for your response.

AFTER HEARING THE TESTIMONIES DELIVERED BY SEVERAL FIELD GRADE OFFICERS AND ABOVE, TO INCLUDE CDT SPODANE'S TAC NCO, ~~I~~ ~~AM~~ I AM CONVINCED THAT RETAINING CDT SPODANE IS THE RIGHT DECISION.

3

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

    **a.** Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

    **b.** Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

    **c.** Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

    **d.** Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

                                        **Yes\_\_\_\_ No ✓**

**If you answer <u>Yes</u> to Question #6,** please **cross out** those administrative sanctions you **do not want** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

CDT SPODANE'S ACTIONS ~~WANTED~~ WARRANT HIM WITH THE INABILITY TO REPRESENT THE ACADEMY IN A SPECIFIC CAPACITY ON THE BASIS OF MULTIPLE HONOR INFRACTIONS. THUS, THIS CONSEQUENCE IS <sup>SUBSEQUENTLY</sup> JUSTIFIABLE.

000472

4.5

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

7. **Other Factors.**  Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

*NONE.*

4-6

000473

HEARING MEMBER WORKSHEET

MACC-CPME-H                                    Date: 8 MAR 2010

MEMORANDUM FOR Honor Board Member, Case of Cadet ___Spadone   2011 B'1___

SUBJECT: Hearing Member Worksheet

1.  I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.  During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted. To make the first decision I will consider due process and the facts of the case.  To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.  Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent



Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes X   No ~~~~

Explain the basis for your response.

I believe, even after listening to the character statements that HDS is a true reflection of cadet Spadone's character. The character statements given were supportive of cadet Spadone and that he has good character, however the ~~~~~ ~~~~~~~~ attempt to deceive on not one but two of his essays demonstrates his inability to learn from his mistakes and demonstrates poor character.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes____   No____

Explain the basis for your response.

I can not conclude if cadet Spadone will dedicate himself to remediating this ethical failure. He has not demonstrated that he is or is not dedicated to living honorably in the future.

1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

3. **Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, unusual external personal circumstances such as a death in the family or a similar family crisis may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress does not include the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes ✗   No ____

Explain the basis for your response.

As shown in the character statement, specifically, Respondent Exhibit 2 by Laura Vetter, cadet Spadone gave his full attention to the success of his semester abroad. When confronted with the fact that he would not be able to so, it would certainly put him under a lot of duress.

4. **Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes ✓   No ____

Explain the basis for your response.

The respondent does have potential to serve as an officer in the U.S. Army in my opinion. This opinion is based on the fact that several other officers that gave character statements were unanimous in saying they would be happy to have cadet Spadone as a 2LT under their command.

2

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent may grant discretion and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES____ NO X

**If you answered YES to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend?
In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

a. Allow to graduate On Time with Current Class.

b. Delay graduation by six months as a December Graduate.

c. Delay graduation by a one year as a Full Year Turn Back.

**If you answered NO to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes X No____

Explain the basis for your response.

I feel that people can change their selves and that after a period of time the respondent should be allowed to re-apply.

3

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

    **a.** Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

    **b.** Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

    **c.** Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

    **d.** Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

Yes_____ No_ X

**If you answer Yes to Question #6,** please **cross out** those administrative sanctions you **do not want** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

I do not believe Cadet Spadone stands the honor code as other members of the corps do and he should therefore not be allowed to represent the academy.

4

5-5

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

7. **Other Factors.** Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

Cadet Spadone attempted to decieve his English teacher twice, and was found guilty of violating the honor code on both occasions. Based on the evidence presented to me I ~~mistake~~ do not believe that Cadet Spadone is deserving to remain a cadet at the Academy. It is unfair to his classmates and other members of the corps that he would be deserving of remaining a cadet at USMA.

5

HEARING MEMBER WORKSHEET

MACC-CPME-H                                          Date: 3/8/10

MEMORANDUM FOR Honor Board Member, Case of Cadet _____Spadone_____

SUBJECT: Hearing Member Worksheet

1.   I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.   During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted.  To make the first decision I will consider due process and the facts of the case.  To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.   Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes____ No _X___

Explain the basis for your response.

Based on the testimony of the respondent's character witnesses, it has been made apparent that the ethical failure of the respondent was a departure from his character due to distress. I believe the number of character witnesses that were willing to come in and speak highly of the respondent shows that, up until this point, his character was in line with the honorable thing.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes _X__ No____

Explain the basis for your response.

The respondent showed remorse for his actions and made it clear that because of the distress he was under, he was unable to make sound decisions. I believe he shows the potential to learn from his mistakes. All of his character witnesses stated without hesitation that they would be willing to serve with him or would be confident in his ability as an Army Officer.

1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

**3. Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, unusual external personal circumstances such as a death in the family or a similar family crisis may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress does not include the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes _X_ No ____

Explain the basis for your response.

The respondent invested a lot of his time into setting up a semester abroad with Cambridge University. As the process was described, the respondent had to approach many people about making this possible over the better part of a year or so, and despite many speed bumps, he continued to work towards his goal. After much time and effort was spent, he was crushed to discover that he was denied the opportunity with no apparent good reason.

**4. Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes _X_ No ____

Explain the basis for your response.

Every character witness spoke highly of the respondent's character up until the incident. Based on the evidence, it appears to be out of character from his normal conduct. Every character witness felt that the respondent would most likely be able to learn from his mistakes and become a better officer for it. Again, every character witness was willing to serve with him 2 in the future.

6.3

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation.* The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent <u>may grant discretion</u> and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES <u>V</u>  NO ____

**If you answered <u>YES</u> to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend? In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

a. Allow to graduate On Time with Current Class.

b. Delay graduation by six months as a December Graduate.

c. Delay graduation by a one year as a Full Year Turn Back.

**If you answered <u>NO</u> to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes____  No____

Explain the basis for your response.

00048**6-4**

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

    **a.** Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

    **b.** Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

    **c.** Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

    ~~**d.** Removal from positions~~ of responsibility to include but not limited to ~~the Chain of~~ Command (down to and including ~~team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.~~

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

                                        **Yes** $\lambda$ **No** \_\_\_\_

**If you answer <u>Yes</u> to Question #6,** please **<u>cross out</u>** those administrative sanctions you **<u>do not want</u>** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

*I feel that with the lessons learned from the incident, the respondent would be able to pass on the lessons learned to others and hopefully impact them in such a manner so that they do not make the same mistakes be made.*

4

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

7. **Other Factors.**  Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

5

HEARING MEMBER WORKSHEET

MACC-CPME-H

Date: _8 Mar 10_____

MEMORANDUM FOR Honor Board Member, Case of Cadet _Alan   Spadone_____

SUBJECT: Hearing Member Worksheet

1.   I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.   During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted. To make the first decision I will consider due process and the facts of the case.  To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.   Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes ✓ No____

Explain the basis for your response.

I think that in a time of stress CDT Spadone loses sight of his moral compass and his values. Given that CDT Spadone violated the Cadet Honor Code on two essays, I feel that this is a fundamental flaw that will surface again if CDT Spadone is faced with a similar situation.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes____ No ✓

Explain the basis for your response.

CDT Spadone has been proactive in seeking help from CPD concerning his stress levels.

I also feel that the second violation on the next essay shows that CDT Spadone did not learn from his mistake.

1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

**3. Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, <u>unusual external personal circumstances such as a death in the family or a similar family crisis</u> may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress <u>does not include</u> the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes ✓ No ____
↳ only for violation 1

Explain the basis for your response.

CPT Spadone's Semester Abroad program which he had worked hard for for months was denied shortly before the first violation.

However the second violation shows that CPT Spadone did not learn from his mistakes and I do not feel he was under duress at that time

**4. Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes ✓ No ____

Explain the basis for your response.

I feel that Cadet Spadone could have the potential to serve as an officer if he learns to Deal with stress and Disappointment. As it stands now I would not trust him to make the right choice under stress.

2

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent may grant discretion and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES____   NO ✓

**If you answered YES to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend?
In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

   **a.** Allow to graduate On Time with Current Class.

   **b.** Delay graduation by six months as a December Graduate.

   **c.** Delay graduation by a one year as a Full Year Turn Back.

**If you answered NO to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes ✓   No____

Explain the basis for your response.

I feel that CDT Spadone's violation shows a fundamental flaw that surfaces under stress and disagreement. I think that given time in the Army CDT Spadone can learn to deal with this stress. And if he can overcome this flaw then he should be given the opportunity to re-apply to USMA

000489 7-4

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

~~a. Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.~~

**b.** Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

**c.** Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

~~d. Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.~~

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

Yes ✓ No____

**If you answer Yes to Question #6,** please **cross out** those administrative sanctions you **do not want** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

I feel that it CDT Spadone is retained, that remaining in Chain of Command positions will allow him to learn and develop.

000490   7-5

7. **Other Factors.** Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

I feel that the Second Violation shows that CDT Spadone did not learn from his first mistake and represents a fundamental Character flaw. Given his actions and his testimony I am not Convinced that CDT Spadone Acknowledges that what he did was wrong and I feel that he will just blame this mistake on duress and not truly learn from this.

5

## HEARING MEMBER WORKSHEET

MACC-CPME-H                                          Date: 8 March 2010

MEMORANDUM FOR Honor Board Member, Case of Cadet Alan Spadeux

SUBJECT: Hearing Member Worksheet

1.   I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.   During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted. To make the first decision I will consider due process and the facts of the case.  To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.   Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

8-1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes_____ (No___)

Explain the basis for your response.

CDT Spedene seems to have a record of virtual cadet flawlessness until recent events when his scholarship was denied and he experienced a personal crisis.
an extreme
While it is not excusable or ideal for judgment concerning ethical matters to suffer during such a time of personal duress, I do not believe such actions are indicative of his character.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

(Yes___) No_____

Explain the basis for your response.

I think this back-to-back case of plagiarism is serving as an ugly aftershock of his disappointment over not getting to go to Cambridge & a painful wakeup call for someone who has never experienced this kind of stress.

1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

**3.** **Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, unusual external personal circumstances such as a death in the family or a similar family crisis may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress does not include the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case? (Yes) No____

Explain the basis for your response.

*It seems like he did absolutely everything within his power to go to Cambridge and experienced a wildly uncommon level of stress & disappointment associated with it.*

**4.** **Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army? (Yes)____ No____

Explain the basis for your response.

*Again, this seems to be an aberration that is not indicative of what CDT Spadone has to offer to the Army.*

2

8.3

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent <u>may grant discretion</u> and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES ____ NO ____

**If you answered <u>YES</u> to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend?
In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

a.  Allow to graduate On Time with Current Class.

b.  Delay graduation by six months as a December Graduate.

c.  Delay graduation by a one year as a Full Year Turn Back.

**If you answered <u>NO</u> to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes____   No____

Explain the basis for your response.

3

8.4

000495

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

a. Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

b. Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

c. Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

d. Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

Yes __✓__   No _____

**If you answer Yes to Question #6, please cross out those administrative sanctions you do not want applied to the respondent during his/her time in the Honor Mentorship Program.**

Explain the basis for your response.

options a, c, & d hurt the individuals w/ no impact on ~~corse b respts budy the academy~~ USMA's appearance

option b would impact USMA's appearance & He should still be allowed opportunities like being a Company commander or traveling on an AIAD. he is not going to grow from this or learn if he is forced to not participate in anything West Point has to offer.

8.5

000496

7. **Other Factors.**  Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

Dr Laura Vetter's statement After appearance describing her knowledge of CDT Spadone with her background here is invaluable in assessing CDT Spadone's character.

CDT Spadone's personal history of excellence & the understandable mess he became when he experienced failure for the first time so dramatically.

5

## HEARING MEMBER WORKSHEET

MACC-CPME-H                                Date: 6 MAR 10

MEMORANDUM FOR Honor Board Member, Case of Cadet _Spadore_

SUBJECT: Hearing Member Worksheet

1.  I use the information from these worksheets when deciding the disposition of a found cadet's case. I want you to know that I will personally read these worksheets in their entirety. From my perspective, you represent the voice of the Corps of Cadets for this case.

2.  During the review of this case, I will make two decisions: 1) whether to approve or set aside the findings of the board; and 2) what the further disposition of this case should be—more specifically, whether discretion should be granted. To make the first decision I will consider due process and the facts of the case.  To make the second decision I will consider additional factors, including the time the respondent has served under the Cadet Honor Code; the manner in which the violation was reported; the respondent's demonstrated resolve to live honorably in the future; the likelihood that the honor violation reflects the true character of the respondent; the presence of duress; and, if applicable, the impact administrative sanctions may have on the respondent's Company, Corps Squad Team, Cadet Club/Activity, and ultimately the Corps of Cadets.

3.  Your views will influence the disposition of this case. Please think carefully about your answers so that I may have the best possible information as I make these decisions.

F.L. HAGENBECK
Lieutenant General, US Army
Superintendent

9-1

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

1. **Character.** Do you believe this ethical failure is a true reflection of the respondent's character (Yes) or does it represent a departure from his/her demonstrated character (No)?

Yes____ No_X_

Explain the basis for your response.

CDT Spadore was given outstanding remarks by both of his Tactical team and Ms. Vetter. It is very obvious they held him in very high regard and from their remarks this is an absolute departure from his character.

2. **Resolve.** Do you believe that the respondent has resolved to live honorably in the future and will dedicate himself/herself to remediating this ethical failure?

Yes _X_ No____

Explain the basis for your response.

CDT Spadore demonstrate great remorse throughout these proceedings and I believe he has learned his lesson. All of his character witnesses also spoke to this.

1

9-2

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

**3.** **Duress.** Stress is a common feature of cadet life and a deliberate element of cadet development. As cadets and officers, we are expected to make ethical decisions in spite of these pressures. However, underlined external personal circumstances such as a death in the family or a similar family crisis may result in a level of duress that affects a cadet's ethical decision-making ability. **Duress** **does not include** **the fear of failing a graded requirement, a relationship break-up, or receiving disciplinary action as a consequence of misconduct.**

Do you believe that the respondent experienced any unusual personal circumstances that may have temporarily interfered with or affected his/her judgement in this case?

Yes **X** No_____

Explain the basis for your response.

CDT Spadone was denied entry into an incredibly important and competitive scholarship that he was accepted for by Cambridge. He worked incredibly hard to receive this scholarship and when he was denied entry by West Point it crushed him.

**4.** **Potential for Service as an Officer.** You were not presented with the respondent's full file, however, based upon the finding of the board, the evidence presented to the board, and any statements made by character witnesses please answer the question below.

Does the respondent have the potential to serve as an officer in the U.S. Army?

Yes **X** No_____

Explain the basis for your response.

All people asked in regards to this case said that they would be more than happy with CDT Spadone as a PL in their command. There was not one negative word said about CDT Spadone.

2

9.3

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

5. **Recommended Sanctions.** The maximum sanction for a cadet who violates the Cadet Honor Code is *Separation*. The Superintendent may separate a cadet who commits an honor violation with or without a formal invitation to reapply to West Point at some point in the future. In cases where the Superintendent deems appropriate, he may elect to invite the cadet to reapply pending a successful period of enlistment and successful completion of the Army (Academy) Mentorship Program in the U.S. Army. In lieu of Separation, the Superintendent <u>may grant discretion</u> and suspend a cadet's separation pending successful completion of the Honor Mentorship Program.

Do you believe the Superintendent should grant discretion in this case, allowing the respondent to remain a cadet at West Point (either graduating with class, as a December graduate, or a full year turn back) and rehabilitate by participating in a 6-month Honor Mentorship Program?

YES _X_ NO ____

**If you answered YES to Question #5** (the Superintendent should grant discretion and allow the respondent to stay at West Point), which of the following sanctions do you recommend?
In all cases, the Superintendent will suspend the separation at least until successful completion of the Honor Mentorship Program. **(Circle one).**

   a. Allow to graduate On Time with Current Class.

   b. Delay graduation by six months as a December Graduate.

   c. Delay graduation by a one year as a Full Year Turn Back.

**If you answered NO to Question #5** (the Superintendent should Separate the respondent from West Point), should the respondent be invited to participate in the Army (Academy) Mentorship Program with an opportunity to reapply to the U.S. Military Academy, pending a successful period of enlistment in the U.S. Army?

Yes____ No____

Explain the basis for your response.

I believe CDT Spadone simply deserves more time under the honor code in order to properly inculcate its values. I do not believe either him or the Army will be served by separation.

3

9-4

000501

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

6. **Administrative Sanctions.** In accordance with USCC PAM 15-1, many administrative sanctions are binding immediately following the completion of an HIH or CAB, and continue through successful completion of the 6-month Honor Mentorship Program. Some of these sanctions include:

~~a. Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.~~

b. Exclusion from participation in public relations activities such as CPRC, media interviews or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

~~c. Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.~~

~~d. Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.~~

Based on the respondent's record, should he/she be granted an exception to policy to represent the Academy in a specific capacity?

Yes X No____

**If you answer Yes to Question #6,** please **cross out** those administrative sanctions you **do not want** applied to the respondent during his/her time in the Honor Mentorship Program.

Explain the basis for your response.

I believe that barring CDT Spadore from participating in external events would be the only appropriate sanction available in this list.

4

9.5

000502

Appendix 2, Hearing Member Worksheet to Cadet Honor Committee Procedures

7. **Other Factors.** Explain any other factors involved in this investigation that you believe will help the Superintendent determine the proper disposition of this case.

Despite the fact that CDT Spadone was found on two violations, I do not believe that this is representative of his character. I believe he was under intense pressure and stress and made the wrong decision. This is a deviation from the character that was described by his tactical team and Ms. Vetter especially.

000503

9-6



APPELLATE EXHIBITS

000504

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 27 October 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his Advanced Composition (EN302) Essay #3, and submitting it as his own without proper documentation, and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his Advanced Composition (EN302) Essay #4, and submitting it as his own without proper documentation, and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 4 December 2009, violate the Cadet Honor Code by lying, by stating to Doctor Terri Sabatos, Associate Professor, Department of English, that he did not accurately write down the authors or page numbers in his notebook, or words to that effect, knowing said statement was false at the time he presented it, or not then believing it to be true, and doing so with the intent to deceive or mislead another person.

**APPELLATE EXHIBIT I**

## `INVESTIGATIVE TEAM (IT) NOTIFICATION FORM

MACC-CPME-H                                    Date: 11 November 2009

MEMORANDUM THRU Tactical Officer, Company C-1

FOR Honor Investigative Team, Company C-1

1° Honor Representative Cadet Joshua Miles
2° Honor Representative Cadet Jeremiah Zingapan

SUBJECT:  Appointment of Honor Investigation of Cadet Spadone, Company B-1, Class of 2011

1.  You are hereby appointed by order of the Commandant as the Investigative Team (IT) for the honor investigation of Cadet Spadone.  See the allegation(s) listed on the attached page.  Use the *USCC Pamphlet 15-1, Honor Committee Procedures, Chapter 1* as a reference.

2.  I believe that you play an integral role in the honor system, and as such I want to emphasize the importance of a timely and efficient investigation.  You are authorized to miss drill and intramurals in order to actively work on this investigation for the next four duty days.

3.  The case is due to your Regimental Honor Representative NLT Taps on 18 November 2009.

Kenneth Howell
CDT CPT, USCC
Regimental Honor Representative
Cadet Honor Committee

APPELLATE EXHIBIT II-1

000506

## Cadet Under Investigation (CUI) Notification

MACC-CPME-H

Date: 11 November 2009

MEMORANDUM THRU Tactical Officer, Company B-1

FOR Cadet Alan M. Spadone Company B-1, Class 2011

SUBJECT:  Cadet Under Investigation (CUI) Notification of an Honor Investigation

1.  You are hereby appointed by order of the Commandant to meet with Cadets  to interview as a CUI in an honor investigation.  This duty takes precedence over drill and intramurals.  If you are part of a Corps Squad or Club Squad team, **you are required** to make arrangements within the next 24 hours to meet with the investigators.

2.  I want to emphasize the importance of meeting with the cadet investigators for a timely and efficient investigation.

KENNETH HOWELL
CDT CPT, USCC
Regimental Honor Representative

APPELLATE EXHIBIT II-2

000507

## INVESTIGATIVE TEAM (IT) NOTIFICATION FORM

MACC-CPME-H                                          Date: 7 January 2009.

MEMORANDUM THRU Tactical Officer, Company B-1

FOR Honor Investigative Team, Company B-1

1° Honor Representative Cadet John Gibbons
2° Honor Representative Cadet Jeremiah Zingapan

SUBJECT: Appointment of Honor Investigation of Cadet Alan M. Spadone, Company B-1, Class of 2011

1. You are hereby appointed by order of the Commandant as the Investigative Team (IT) for the honor investigation of Cadet Spadone. See the allegation(s) listed on the attached page. Use the Cadet Honor Committee Procedures Handbook as a reference.

2. I believe you play in integral role in the honor system, and as such I want to emphasize the importance of a timely and efficient investigation. You are authorized to miss drill and intramurals in order to actively work on this investigation for the next four duty days.

3. This case is due to your Regimental Honor Representative NLT Taps on 14 January 2009.

Kenneth A. Howell
CDT Captain, USCC
1st Regimental Honor Representative
Cadet Honor Committee

**APPELLATE EXHIBIT II-3**

## CADET UNDER INVESTIGATION (CUI) NOTIFICATION

MACC-CPME-H                                          Date: 7 January 2009

MEMORANDUM THRU Tactical Officer, Company B-1

FOR Cadet Alan M. Spadone, Company B-1, Class of 2011

SUBJECT: Cadet Under Investigation (CUI) Notification of an Honor Investigation

1. You are hereby appointed by order of the Commandant to meet with Cadets Gibbons and Zingapan to interview as a CUI in an honor investigation. This duty takes precedence over drill and intramurals. If you are part of a Corps Squad or Club Squad team, **you are required** to make arrangements within the next 24 hours to meet with the investigators.

2. I want to emphasize the importance of meeting with the cadet investigators for a timely and efficient investigation.

Kenneth A. Howell
CDT Captain, USCC
1st Regimental Honor Representative
Cadet Honor Committee

APPELLATE EXHIBIT II-4

# RIGHTS WARNING PROCEDURE/WAIVER CERTIFICATE
For use of this form, see AR 190-30; the proponent agency is ODCSOPS

## DATA REQUIRED BY THE PRIVACY ACT

**AUTHORITY:** Title 10, United States Code, Section 3012(g)
**PRINCIPAL PURPOSE:** To provide commanders and law enforcement officials with means by which information may be accurately identified.
**ROUTINE USES:** Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval.
**DISCLOSURE:** Disclosure of your Social Security Number is voluntary.

| 1. LOCATION Sherman Barracks, Room 510 | 2. DATE 18 Nov 09 | 3. TIME 1030 | 4. FILE NO. |
|---|---|---|---|

| 5. NAME *(Last, First, MI)* Spadone, Alan, M | 8. ORGANIZATION OR ADDRESS USCC B-1 |
|---|---|

| 6. SSN N/A | 7. GRADE/STATUS CDT / 2011 | |
|---|---|---|

## PART I - RIGHTS WAIVER/NON-WAIVER CERTIFICATE

### Section A. Rights

The investigator whose name appears below told me that he/she is with the United States Army ___CPT Harris___
and wanted to question me about the following offense(s) of which I am
suspected/accused: ___Honor violation; cheating on an EN302 essay___

Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:

1. I do not have to answer any question or say anything.
2. Anything I say or do can be used as evidence against me in a criminal trial.
3. *(For personnel subject othe UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

- or -

   *(For civilians not subject to the UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. I understand that this lawyer can be one that I arrange for at my own expense, or if I cannot afford a lawyer and want one, a lawyer will be appointed for me before any questioning begins.
4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.

5. COMMENTS *(Continue on reverse side)*

### Section B. Waiver

I understand my rights as stated above. I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

| WITNESSES *(If available)* | 3. SIGNATURE OF INTERVIEWEE |
|---|---|
| 1a. NAME *(Type or Print)* JEREMIAH ZINGAPAN | *Alan Spdn* |
| b. ORGANIZATION OR ADDRESS AND PHONE USCC, C-1 | 4. SIGNATURE OF INVESTIGATOR |
| 2a. NAME *(Type or Print)* | 5. TYPED NAME OF INVESTIGATOR Martin Harris |
| b. ORGANIZATION OR ADDRESS AND PHONE | 6. ORGANIZATION OF INVESTIGATOR USCC, C-1 |

### Section C. Non-waiver

1. I do not want to give up my rights
   ☐ I want a lawyer    ☐ I do not want to be questioned or say anything

2. SIGNATURE OF INTERVIEWEE

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT *(DA FORM 2823)* SUBSEQUENTLY EXECUTED BY THE SUSPECT/ACCUSED

**DA FORM 3881, NOV 89**    EDITION OF NOV 84 IS OBSOLETE    USAPA 2.01



APPELLATE EXHIBIT III-1
000510

**PART II - RIGHTS WARNING PROCEDURE**

## THE WARNING

1. WARNING - Inform the suspect/accused of:
   a. Your official position.
   b. Nature of offense(s).
   c. The fact that he/she is a suspect/accused.
2. RIGHTS - Advise the suspect/accused of his/her rights as follows:
   "Before I ask you any questions, you must understand your rights."
   a. "You do not have to answer my questions or say anything."
   b. "Anything you say or do can be used as evidence against you in a criminal trial."
   c. (For personnel subject to the UCMJ) "You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer

can be a civilian you arrange for at no expense to the Government or a military lawyer detailed for you at no expense to you, or both."

- or -

(For civilians not subject to the UCMJ) You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer can be one you arrange for at your own expense, or if you cannot afford a lawyer and want one, a lawyer will be appointed for you before any questioning begins."

   d. "If you are now willing to discuss the offense(s) under investigation, with or without a lawyer present, you have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if you sign a waiver certificate."

Make certain the suspect/accused fully understands his/her rights.

## THE WAIVER

"Do you understand your rights?"
(If the suspect/accused says "no," determine what is not understood, and if necessary repeat the appropriate rights advisement. If the suspect/accused says "yes," ask the following question.)

"Have you ever requested a lawyer after being read your rights?"
(If the suspect/accused says "yes," find out when and where. If the request was recent (i.e., fewer than 30 days ago), obtain legal advice whether to continue the interrogation. If the suspect/accused says "no," or if the prior request was not recent, ask him/her the following question.)

"Do you want a lawyer at this time?"
(If the suspect/accused says "yes," stop the questioning until he/she has a lawyer. If the suspect/accused says "no," ask him/her the following question.)

"At this time, are you willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer and without having a lawyer present with you?" (If the suspect/accused says "no," stop the interview and have him/her read and sign the non-waiver section of the waiver certificate on the other side of this form. If the suspect/accused says "yes," have him/her read and sign the waiver section of the waiver certificate on the other side of this form.)

## SPECIAL INSTRUCTIONS

WHEN SUSPECT/ACCUSED REFUSES TO SIGN WAIVER CERTIFICATE: If the suspect/accused orally waives his/her.rights but refuses to sign the waiver certificate, you may proceed with the questioning. Make notations on the waiver certificate to the effect that he/she has stated that he/she understands his/her rights, does not want a lawyer, wants to discuss the offense(s) under investigation, and refuses to sign the waiver certificate.

IF WAIVER CERTIFICATE CANNOT BE COMPLETED IMMEDIATELY: In all cases the waiver certificate must be completed as soon as possible. Every effort should be made to complete the waiver certificate before any questioning begins. If the waiver certificate cannot be completed at once, as in the case of street interrogation, completion may be temporarily postponed. Notes should be kept on the circumstances.

PRIOR INCRIMINATING STATEMENTS:
   1. If the suspect/accused has made spontaneous incriminating statements before being properly advised of his/her rights he/she should be told that such statements do not obligate him/her to answer further questions.

2. If the suspect/accused was questioned as such either without being advised of his/her rights or some question exists as to the propriety of the first statement, the accused must be so advised. The office of the serving Staff Judge Advocate should be contacted for assistance in drafting the proper rights advisal.

NOTE:   If 1 or 2 applies, the fact that the suspect/accused was advised accordingly should be noted in the comment section on the waiver certificate and initialed by the suspect/accused.

WHEN SUSPECT/ACCUSED DISPLAYS INDECISION ON EXERCISING HIS OR HER RIGHTS DURING THE INTERROGATION PROCESS: If during the interrogation, the suspect displays indecision about requesting counsel (for example, "Maybe I should get a lawyer."), further questioning must cease immediately. At that point, you may question the suspect/accused only concerning whether he or she desires to waive counsel. The questioning may not be utilized to discourage a suspect/accused from exercising his/her rights. (For example, do not make such comments as "If you didn't do anything wrong, you shouldn't need an attorney.")

COMMENTS (Continued)

USAPA V2.01

APPELLATE EXHIBIT III-2

000511

# RIGHT WARNING PROCEDURE/WAIVER CERTIFICATE

For use of this form, see AR 190-30; the proponent agency is ODCSOPS

## DATA REQUIRED BY THE PRIVACY ACT

**AUTHORITY:** Title 10, United States Code, Section 3012(g)

**PRINCIPAL PURPOSE:** To provide commanders and law enforcement officials with means by which information may be accurately identified.

**ROUTINE USES:** Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval.

**DISCLOSURE:** Disclosure of your Social Security Number is voluntary.

| 1. LOCATION Lee Barracks, Room 5 | 2. DATE 18NOV09 | 3. TIME 2143 | 4. FILE NO. |
|---|---|---|---|

| 5. NAME (Last, First, MI) Spadone, Alan, M | 8. ORGANIZATION OR ADDRESS USCC, B-1 |
|---|---|

| 6. SSN N/A | 7. GRADE/STATUS CDT/2011 | |
|---|---|---|

## PART I - RIGHTS WAIVER/NON-WAIVER CERTIFICATE

### Section A. Rights

The investigator whose name appears below told me that he/she is with the United States Army CDT Zingapan _____ and wanted to question me about the following offense(s) of which I am suspected/accused: Honor Violation; Cheating on EN302 _____

Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:

1. I do not have to answer any question or say anything.

2. Anything I say or do can be used as evidence against me in a criminal trial.

3. *(For personnel subject othe UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

- or -

*(For civilians not subject to the UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. I understand that this lawyer can be one that I arrange for at my own expense, or if I cannot afford a lawyer and want one, a lawyer will be appointed for me before any questioning begins.

4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.

5. COMMENTS *(Continue on reverse side)*

### Section B. Waiver

I understand my rights as stated above. I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

| WITNESSES *(If available)* | 3. SIGNATURE OF INTERVIEWEE *Alan Spadone* |
|---|---|
| 1a. NAME *(Type or Print)* Martin Harris | |
| b. ORGANIZATION OR ADDRESS AND PHONE USCC, C-1 | 4. SIGNATURE OF INVESTIGATOR |
| 2a. NAME *(Type or Print)* | 5. TYPED NAME OF INVESTIGATOR JEREMIAH ZINGAPAN |
| b. ORGANIZATION OR ADDRESS AND PHONE | 6. ORGANIZATION OF INVESTIGATOR USCC, C-1 |

### Section C. Non-waiver

1. I do not want to give up my rights
   ☐ I want a lawyer          ☐ I do not want to be questioned or say anything

SIGNATURE OF INTERVIEWEE

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT *(DA FORM 2823)* SUBSEQUENTLY EXECUTED BY THE SUSPECT/ACCUSED

| **DA FORM 3881, NOV 89** | EDITION OF NOV 84 IS OBSOLETE | USAPA 2.01 |
|---|---|---|

APPELLATE EXHIBIT III.3

**PART II - RIGHTS WARNING PROCEDURE**

## THE WARNING

1. WARNING - Inform the suspect/accused of:
   a. Your official position.
   b. Nature of offense(s).
   c. The fact that he/she is a suspect/accused.
2. RIGHTS - Advise the suspect/accused of his/her rights as follows:
   "Before I ask you any questions, you must understand your rights."
   a. "You do not have to answer my questions or say anything."
   b. "Anything you say or do can be used as evidence against you in a criminal trial."
   c. (For personnel subject to the UCMJ) "You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer

can be a civilian you arrange for at no expense to the Government or a military lawyer detailed for you at no expense to you, or both."

- or -

*(For civilians not subject to the UCMJ)* You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer can be one you arrange for at your own expense, or if you cannot afford a lawyer and want one, a lawyer will be appointed for you before any questioning begins."

   d. "If you are now willing to discuss the offense(s) under investigation, with or without a lawyer present, you have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if you sign a waiver certificate."

Make certain the suspect/accused fully understands his/her rights.

## THE WAIVER

"Do you understand your rights?"
(If the suspect/accused says "no," determine what is not understood, and if necessary repeat the appropriate rights advisement. If the suspect/accused says "yes," ask the following question.)

"Have you ever requested a lawyer after being read your rights?"
(If the suspect/accused says "yes," find out when and where. If the request was recent *(i.e., fewer than 30 days ago)*, obtain legal advice whether to continue the interrogation. If the suspect/accused says "no," or if the prior request was not recent, ask him/her the following question.)

"Do you want a lawyer at this time?"
(If the suspect/accused says "yes," stop the questioning until he/she has a lawyer. If the suspect/accused says "no," ask him/her the following question.)

"At this time, are you willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer and without having a lawyer present with you?" *(If the suspect/accused says "no," stop the interview and have him/her read and sign the non-waiver section of the waiver certificate on the other side of this form. If the suspect/accused says "yes," have him/her read and sign the waiver section of the waiver certificate on the other side of this form.)*

## SPECIAL INSTRUCTIONS

WHEN SUSPECT/ACCUSED REFUSES TO SIGN WAIVER CERTIFICATE: If the suspect/accused orally waives his/her rights but refuses to sign the waiver certificate, you may proceed with the questioning. Make notations on the waiver certificate to the effect that he/she has stated that he/she understands his/her rights, does not want a lawyer, wants to discuss the offense(s) under investigation, and refuses to sign the waiver certificate.

IF WAIVER CERTIFICATE CANNOT BE COMPLETED IMMEDIATELY: In all cases the waiver certificate must be completed as soon as possible. Every effort should be made to complete the waiver certificate before any questioning begins. If the waiver certificate cannot be completed at once, as in the case of street interrogation, completion may be temporarily postponed. Notes should be kept on the circumstances.

PRIOR INCRIMINATING STATEMENTS:
1. If the suspect/accused has made spontaneous incriminating statements before being properly advised of his/her rights he/she should be told that such statements do not obligate him/her to answer further questions.

2. If the suspect/accused was questioned as such either without being advised of his/her rights or some question exists as to the propriety of the first statement, the accused must be so advised. The office of the serving Staff Judge Advocate should be contacted for assistance in drafting the proper rights advisal.

NOTE: If 1 or 2 applies, the fact that the suspect/accused was advised accordingly should be noted in the comment section on the waiver certificate and initialed by the suspect/accused.

WHEN SUSPECT/ACCUSED DISPLAYS INDECISION ON EXERCISING HIS OR HER RIGHTS DURING THE INTERROGATION PROCESS: If during the interrogation, the suspect displays indecision about requesting counsel (for example, "Maybe I should get a lawyer."), further questioning must cease immediately. At that point, you may question the suspect/accused only concerning whether he or she desires to waive counsel. The questioning may not be utilized to discourage a suspect/accused from exercising his/her rights. (For example, do not make such comments as "If you didn't do anything wrong, you shouldn't need an attorney.")

COMMENTS *(Continued)*

USAPA V2.01

APPELLATE EXHIBIT III-4

000513

# RIGHTS WARNING PROCEDURE/WAIVER CERTIFICATE
For use of this form, see AR 190-30; the proponent agency is ODCSOPS

## DATA REQUIRED BY THE PRIVACY ACT

**AUTHORITY:** Title 10, United States Code, Section 3012(g)
**PRINCIPAL PURPOSE:** To provide commanders and law enforcement officials with means by which information may be accurately identified.
**ROUTINE USES:** Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval.
**DISCLOSURE:** Disclosure of your Social Security Number is voluntary.

| 1. LOCATION USCC, C-1 Study Room | 2. DATE 01/08/10 | 3. TIME 18:42 | 4. FILE NO. |
|---|---|---|---|

| 5. NAME (Last, First, MI) Spadone, Alan, M | 8. ORGANIZATION OR ADDRESS USCC E+ STO B-1 |
|---|---|
| 6. SSN | |
| 7. GRADE/STATUS CDT | |

## PART I - RIGHTS WAIVER/NON-WAIVER CERTIFICATE

### Section A. Rights

The investigator whose name appears below told me that he/she is with the United States Army **Honor Committee** _____ and wanted to question me about the following offense(s) of which I am suspected/accused: **Cheating on EN302 Essay #A**

Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:

1. I do not have to answer any question or say anything.
2. Anything I say or do can be used as evidence against me in a criminal trial.
3. *(For personnel subject othe UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

- or -

*(For civilians not subject to the UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. I understand that this lawyer can be one that I arrange for at my own expense, or if I cannot afford a lawyer and want one, a lawyer will be appointed for me before any questioning begins.

4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.

5. COMMENTS *(Continue on reverse side)*

### Section B. Waiver

I understand my rights as stated above. I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

| WITNESSES *(If available)* | 3. SIGNATURE OF INTERVIEWEE |
|---|---|
| 1a. NAME *(Type or Print)* JEREMIAH ZIRGAPAN | |
| b. ORGANIZATION OR ADDRESS AND PHONE USCC, C-1 | 4. SIGNATURE OF INVESTIGATOR |
| 2a. NAME *(Type or Print)* | 5. TYPED NAME OF INVESTIGATOR John T. Gibbons |
| b. ORGANIZATION OR ADDRESS AND PHONE | 6. ORGANIZATION OF INVESTIGATOR USCC, C-1 |

### Section C. Non-waiver

1. I do not want to give up my rights
   ☐ I want a lawyer                  ☐ I do not want to be questioned or say anything

SIGNATURE OF INTERVIEWEE

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT *(DA FORM 2823)* SUBSEQUENTLY EXECUTED BY THE SUSPECT/ACCUSED

**DA FORM 3881, NOV 89**     EDITION OF NOV 84 IS OBSOLETE     USAPA 2.01

APPELLATE EXHIBIT III-5

000514

## PART II - RIGHTS WARNING PROCEDURE

### THE WARNING

1. WARNING - Inform the suspect/accused of:
   a. Your official position.
   b. Nature of offense(s).
   c. The fact that he/she is a suspect/accused.
2. RIGHTS - Advise the suspect/accused of his/her rights as follows:
   "Before I ask you any questions, you must understand your rights."
   a. "You do not have to answer my questions or say anything."
   b. "Anything you say or do can be used as evidence against you in a criminal trial."
   c. (For personnel subject to the UCMJ) "You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer

can be a civilian you arrange for at no expense to the Government or a military lawyer detailed for you at no expense to you, or both."

- or -

(For civilians not subject to the UCMJ) You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer can be one you arrange for at your own expense, or if you cannot afford a lawyer and want one, a lawyer will be appointed for you before any questioning begins."

   d. "If you are now willing to discuss the offense(s) under investigation, with or without a lawyer present, you have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if you sign a waiver certificate."

Make certain the suspect/accused fully understands his/her rights.

### THE WAIVER

"Do you understand your rights?"
(If the suspect/accused says "no," determine what is not understood, and if necessary repeat the appropriate rights advisement. If the suspect/accused says "yes," ask the following question.)

"Have you ever requested a lawyer after being read your rights?"
(If the suspect/accused says "yes," find out when and where. If the request was recent (i.e., fewer than 30 days ago), obtain legal advice whether to continue the interrogation. If the suspect/accused says "no," or if the prior request was not recent, ask him/her the following question.)

"Do you want a lawyer at this time?"
(If the suspect/accused says "yes," stop the questioning until he/she has a lawyer. If the suspect/accused says "no," ask him/her the following question.)

"At this time, are you willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer and without having a lawyer present with you?" (If the suspect/accused says "no," stop the interview and have him/her read and sign the non-waiver section of the waiver certificate on the other side of this form. If the suspect/accused says "yes," have him/her read and sign the waiver section of the waiver certificate on the other side of this form.)

### SPECIAL INSTRUCTIONS

WHEN SUSPECT/ACCUSED REFUSES TO SIGN WAIVER CERTIFICATE: If the suspect/accused orally waives his/her rights but refuses to sign the waiver certificate, you may proceed with the questioning. Make notations on the waiver certificate to the effect that he/she has stated that he/she understands his/her rights, does not want a lawyer, wants to discuss the offense(s) under investigation, and refuses to sign the waiver certificate.

IF WAIVER CERTIFICATE CANNOT BE COMPLETED IMMEDIATELY: In all cases the waiver certificate must be completed as soon as possible. Every effort should be made to complete the waiver certificate before any questioning begins. If the waiver certificate cannot be completed at once, as in the case of street interrogation, completion may be temporarily postponed. Notes should be kept on the circumstances.

PRIOR INCRIMINATING STATEMENTS:
   1. If the suspect/accused has made spontaneous incriminating statements before being properly advised of his/her rights he/she should be told that such statements do not obligate him/her to answer further questions.

2. If the suspect/accused was questioned as such either without being advised of his/her rights or some question exists as to the propriety of the first statement, the accused must be so advised. The office of the serving Staff Judge Advocate should be contacted for assistance in drafting the proper rights advisal.

NOTE:   If 1 or 2 applies, the fact that the suspect/accused was advised accordingly should be noted in the comment section on the waiver certificate and initialed by the suspect/accused.

WHEN SUSPECT/ACCUSED DISPLAYS INDECISION ON EXERCISING HIS OR HER RIGHTS DURING THE INTERROGATION PROCESS: If during the interrogation, the suspect displays indecision about requesting counsel (for example, "Maybe I should get a lawyer."), further questioning must cease immediately. At that point, you may question the suspect/accused only concerning whether he or she desires to waive counsel. The questioning may not be utilized to discourage a suspect/accused from exercising his/her rights. (For example, do not make such comments as "If you didn't do anything wrong, you shouldn't need an attorney.")

### COMMENTS (Continued)

REVERSE OF DA FORM 3881

USAPA V2.01

APPELLATE EXHIBIT III-6

000515

## RIGHTS WARNING PROCEDURE/WAIVER CERTIFICATE
For use of this form, see AR 190-30; the proponent agency is ODCSOPS

### DATA REQUIRED BY THE PRIVACY ACT

**AUTHORITY:** Title 10, United States Code, Section 3012(g)
**PRINCIPAL PURPOSE:** To provide commanders and law enforcement officials with means by which information may be accurately identified.
**ROUTINE USES:** Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval.
**DISCLOSURE:** Disclosure of your Social Security Number is voluntary.

| 1. LOCATION Sherman 519 | 2. DATE 20100112 | 3. TIME 2030 | 4. FILE NO. |
|---|---|---|---|

| 5. NAME *(Last, First, MI)* Spadone, Alan M. | 8. ORGANIZATION OR ADDRESS USCC Company B-1 |
|---|---|

| 6. SSN N/A | 7. GRADE/STATUS CDT/Active |
|---|---|

### PART I - RIGHTS WAIVER/NON-WAIVER CERTIFICATE

**Section A. Rights**

The investigator whose name appears below told me that he/she is with the United States Army Honor Committee _____
_____ and wanted to question me about the following offense(s) of which I am
suspected/accused: cheating on EP302 Essay #4 _____

Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:

1. I do not have to answer any question or say anything.
2. Anything I say or do can be used as evidence against me in a criminal trial.
3. *(For personnel subject othe UCMJ* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

- or -

*(For civilians not subject to the UCMJ)* I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. I understand that this lawyer can be one that I arrange for at my own expense, or if I cannot afford a lawyer and want one, a lawyer will be appointed for me before any questioning begins.

4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.

5. COMMENTS *(Continue on reverse side)*

**Section B. Waiver**

I understand my rights as stated above. I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

| WITNESSES *(If available)* | 3. SIGNATURE OF INTERVIEWEE |
|---|---|
| 1a. NAME *(Type or Print)* John T. Gibbons | |
| b. ORGANIZATION OR ADDRESS AND PHONE USCC, C-1 | 4. SIGNATURE OF INVESTIGATOR |
| 2a. NAME *(Type or Print)* | 5. TYPED NAME OF INVESTIGATOR JEREMIAH ZINGAPAN |
| b. ORGANIZATION OR ADDRESS AND PHONE | 6. ORGANIZATION OF INVESTIGATOR USCC, C-1 |

**Section C. Non-waiver**

1. I do not want to give up my rights
   ☐ I want a lawyer          ☐ I do not want to be questioned or say anything

SIGNATURE OF INTERVIEWEE

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT *(DA FORM 2823)* SUBSEQUENTLY EXECUTED BY THE SUSPECT/ACCUSED

**DA FORM 3881, NOV 89**      EDITION OF NOV 84 IS OBSOLETE      USAPA 2.01

APPELLATE EXHIBIT III-7

000516

## PART II - RIGHTS WARNING PROCEDURE

### THE WARNING

1.  WARNING - Inform the suspect/accused of:
    a.  Your official position.
    b.  Nature of offense(s).
    c.  The fact that he/she is a suspect/accused.
2.  RIGHTS - Advise the suspect/accused of his/her rights as follows:
    "Before I ask you any questions, you must understand your rights."
    a.  "You do not have to answer my questions or say anything."
    b.  "Anything you say or do can be used as evidence against you in a criminal trial."
    c.  (For personnel subject to the UCMJ) "You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer

can be a civilian you arrange for at no expense to the Government or a military lawyer detailed for you at no expense to you, or both."

- or -

(For civilians not subject to the UCMJ) You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer can be one you arrange for at your own expense, or if you cannot afford a lawyer and want one, a lawyer will be appointed for you before any questioning begins."

d.  "If you are now willing to discuss the offense(s) under investigation, with or without a lawyer present, you have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if you sign a waiver certificate."

Make certain the suspect/accused fully understands his/her rights.

### THE WAIVER

"Do you understand your rights?"

(If the suspect/accused says "no," determine what is not understood, and if necessary repeat the appropriate rights advisement. If the suspect/accused says "yes," ask the following question.)

"Have you ever requested a lawyer after being read your rights?"

(If the suspect/accused says "yes," find out when and where. If the request was recent (i.e., fewer than 30 days ago), obtain legal advice whether to continue the interrogation. If the suspect/accused says "no," or if the prior request was not recent, ask him/her the following question.)

"Do you want a lawyer at this time?"

(If the suspect/accused says "yes," stop the questioning until he/she has a lawyer. If the suspect/accused says "no," ask him/her the following question.)

"At this time, are you willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer and without having a lawyer present with you?"  (If the suspect/accused says "no," stop the interview and have him/her read and sign the non-waiver section of the waiver certificate on the other side of this form. If the suspect/accused says "yes," have him/her read and sign the waiver section of the waiver certificate on the other side of this form.)

### SPECIAL INSTRUCTIONS

WHEN SUSPECT/ACCUSED REFUSES TO SIGN WAIVER CERTIFICATE: If the suspect/accused orally waives his/her rights but refuses to sign the waiver certificate, you may proceed with the questioning. Make notations on the waiver certificate to the effect that he/she has stated that he/she understands his/her rights, does not want a lawyer, wants to discuss the offense(s) under investigation, and refuses to sign the waiver certificate.

IF WAIVER CERTIFICATE CANNOT BE COMPLETED IMMEDIATELY: In all cases the waiver certificate must be completed as soon as possible. Every effort should be made to complete the waiver certificate before any questioning begins. If the waiver certificate cannot be completed at once, as in the case of street interrogation, completion may be temporarily postponed. Notes should be kept on the circumstances.

PRIOR INCRIMINATING STATEMENTS:

1.  If the suspect/accused has made spontaneous incriminating statements before being properly advised of his/her rights he/she should be told that such statements do not obligate him/her to answer further questions.

2.  If the suspect/accused was questioned as such either without being advised of his/her rights or some question exists as to the propriety of the first statement, the accused must be so advised. The office of the serving Staff Judge Advocate should be contacted for assistance in drafting the proper rights advisal.

NOTE:    If 1 or 2 applies, the fact that the suspect/accused was advised accordingly should be noted in the comment section on the waiver certificate and initialed by the suspect/accused.

WHEN SUSPECT/ACCUSED DISPLAYS INDECISION ON EXERCISING HIS OR HER RIGHTS DURING THE INTERROGATION PROCESS: If during the interrogation, the suspect displays indecision about requesting counsel (for example, "Maybe I should get a lawyer."), further questioning must cease immediately. At that point, you may question the suspect/accused only concerning whether he or she desires to waive counsel. The questioning may not be utilized to discourage a suspect/accused from exercising his/her rights. (For example, do not make such comments as "If you didn't do anything wrong, you shouldn't need an attorney.")

COMMENTS  (Continued)

REVERSE OF DA FORM 3881

USAPA V2.01

APPELLATE EXHIBIT III-8

000517

# INVESTIGATIVE TEAM REPORT
## CADET HONOR COMMITTEE

| CASE IDENTIFICATION | |
|---|---|
| **Cadet Under Investigation: Alan M. Spadone** | **Co/Class:B1/2011** |
| SSN:   N/A | |
| IT Members: | |
| First Class – Joshua Miles | Co/Class: C1/2011 |
| Second Class – Jeremiah Zingapan | Co/Class: C1/2011 |
| At Large Cadet – Martin Harris | Co/Class: C1/2011 |

| ALLEGATION(S) |
|---|
| CDT Spadone is alleged to have cheated on an EN302 essay by plagiarizing his essay from an online source without documenting any assistance. |

| TIMELINE/BACKGROUND |
|---|
| *Provide the background of the case and a brief timeline of the events that occurred.* |

1. On 23 October 2009 Cadet Spadone goes to EN302 class for a peer review session. This class was proctored by MAJ Joshua Carlisle. CDT Spadone's paper was peer reviewed by CDT Erik Tonfeldt. This paper is nearly identical in every way in his final submission.
2. On 27 October 2009 Cadet Spadone turns in his final submission of his EN302 to his instructor Dr. Terri Sabatos.
3. Upon Dr. Sabotos' review of the paper, she noticed a sophisticated writing style and vocabulary not typically used by undergraduates. This tipped her off that the essay may not be CDT Spadone's work, and she typed, "rather, every image has the fresh quality and provisional status of a first impression," into a web search engine. This was almost identical to the review of the film *Lost in Translation* by Homay King that appeared in the journal *Film Quarterly*.
4. On 06 November 2009 Dr. Sabatos conducted an approach for clarification with CDT Spadone. MAJ Anthony George (English Department Honor Officer) and CDT Adam Bishop (Cadet Departmental Honor Liason) attended as well. During the approach, when asked as to the similarities between CDT Spadone's paper and King's review, he responded, "What can I say ma'am it was a bad week." He also remarked that the essay appeared to be his. When question if he had anything else to add, he said no, and was released.
5. The case was then referred to the Cadet Honor Committee.

APPELLATE EXHIBIT **IV-1**

# INVESTIGATIVE TEAM REPORT
## CADET HONOR COMMITTEE

| WITNESS COLLABORATION / INVESTIGATIVE TEAM NOTES |
|---|
| *First, please describe any evidence of collaboration between any witnesses in the case. Secondly, use this space to provide any notes of interest from the investigation.* |
| There does not appear to be any witness collaboration. As a special note from the investigation, it seems that CDT Spadone lost faith in the USMA system after not receiving his semester abroad slot. It seems hard to connect this with his rational in his actions. |

| ANALYSIS |
|---|
| *Analyze the evidence of the case using the elements of the allegation(s) below.* |

| Lying | Cheating | Stealing | Tolerating |
|---|---|---|---|
| 1. A statement was made. 2. The statement was false. 3. CUI knew statement was false when they made it. 4. CUI had intent to deceive or mislead. | 1. The cadet did a certain act. 2. The CUI did the act with the intent to gain or give an unfair advantage or with the intent to deceive another person. | 1. Cadet took certain property from another. 2. The property belonged to another. 3. Property had value. 4. Did so with the intent to deprive or defraud owner of the property. | 1. Cadet became aware of an unresolved incident with implications of an Honor Code violation. 2. The cadet failed to report the incident to the proper authority within a reasonable amount of time. |

1. It appears that CDT Spadone did cheat on his EN302 paper by plagiarizing from the review of *Lost in Translation* on or before 23 October 2009.
2. The CUI did this action with the intent to deceive his professor, the Academy, and with the intent to gain an unfair advantage over his classmates.

| RECOMMENDATION |
|---|
| *Provide a recommendation on whether the case should go to an HIH, CAB, or not.* |
| After interviewing CDT Spadone we recommend that this case should go to a CAB. |

| SIGNATURES | |
|---|---|
| Signature: | *[signature]* |
| Date: | Nov-18-09 |

## INVESTIGATIVE TEAM REPORT
## CADET HONOR COMMITTEE

| CASE IDENTIFICATION | |
|---|---|
| **Cadet Under Investigation:** | **Co/Class:** |
| **Alan Spadone** | **B-1** |
| **SSN:   N/A** | |
| **IT Members:** | |
| First Class –<br>John Gibbons | Co/Class:<br>C-1 |
| Second Class –<br>Jeremiah Zingapan | Co/Class:<br>C-1 |
| At Large Cadet – | Co/Class: |

| ALLEGATION(S) |
|---|

CDT Spadone is suspected of violating the honor code through cheating on his EN302 Essay #4, entitled "The Contruction [sic] of an Image."

| TIMELINE/BACKGROUND |
|---|

*Provide the background of the case and a brief timeline of the events that occurred.*

On or about 19 NOV 2009, CDT Spadone submitted an EN302 essay entitled "The Contruction [sic] of an Image." In this essay, CDT Spadone cited using the work of Edwin Palmer Hoyt and Anne Tucker. After review by Dr. Terri Sabatos, she noticed that the work attributed to these authors did not match the page numbers, which CDT Spadone noted. In addition, the ideas listed on those page numbers of the sources did not match the information presented in CDT Spadone's paper.

Dr. Sabatos grew suspicious and on 30 NOV 2009, she set up a meeting with CDT Spadone to discuss his paper. The meeting took place on 4 DEC 2009 and included CDT Spadone, Dr. Sabatos, MAJ Anthony George, the English Department Honor Officer, and CDT Daniel Gray, the CDT Departmental Honor Liaison. At this time, Dr. Sabatos conducted an approach for clarification in that she asked CDT Spadone why the information he cited was not found on the pages described in his citation. CDT Spadone responded that he wrote notes in a notebook as to what sources he used, but may have mistakenly transferred them onto his work-cited page. When asked by Dr. Sabatos if CDT Spadone had the notebook with him at that time, CDT Spadone replied negatively. CDT Gray then asked CDT Spadone if the page numbers were correct, but the authors were incorrect and CDT Spadone replied that he could not recall and would have to check his notebook.

0520

## INVESTIGATIVE TEAM REPORT
## CADET HONOR COMMITTEE

### WITNESS COLLABORATION / INVESTIGATIVE TEAM NOTES

*First, please describe any evidence of collaboration between any witnesses in the case. Secondly, use this space to provide any notes of interest from the investigation.*

No collaboration.

CDT Spadone has said that if he had the actual books to review the page numbers in question, he may be able to point out where the information he used was located. However, the books are unavailable to be checked out, as they are in Dr. Sabatos's possession.

### ANALYSIS

*Analyze the evidence of the case using the elements of the allegation(s) below.*

| Lying | Cheating | Stealing | Tolerating |
|---|---|---|---|
| 1. A statement was made. 2. The statement was false. 3. CUI knew statement was false when they made it. 4. CUI had intent to deceive or mislead. | 1. The cadet did a certain act. 2. The CUI did the act with the intent to gain or give an unfair advantage or with the intent to deceive another person. | 1. Cadet took certain property from another. 2. The property belonged to another. 3. Property had value. 4. Did so with the intent to deprive or defraud owner of the property. | 1. Cadet became aware of an unresolved incident with implications of an Honor Code violation. 2. The cadet failed to report the incident to the proper authority within a reasonable amount of time. |

There is reason to believe that CDT Spadone has violated the honor code by cheating because he repeatedly used incorrect page numbers in his citations for his EN302 paper. A single instance of an incorrect page number can be attributed to carelessness, but repeat instances, as highlighted by Dr. Sabatos on CDT Spadone's paper, can be construed as an act of plagiarism. By choosing random page numbers as citation pages, CDT Spadone has been given an unfair advantage because he did not put in the level of research others were required to do.

CDT Spadone's failure to produce the notebook he mentioned with the accurate page numbers also discredits his story of knowing where exactly the information he cited was located in his texts.

### RECOMMENDATION

*Provide a recommendation on whether the case should go to an HIH, CAB, or not.*

We believe this case should be forwarded to an HIH.

### SIGNATURES

| Signature: | JEREMIAH ZINGRAN   John T. Gibbons |
|---|---|
| Date: | 12 JAN 10 |

DEPARTMENT OF THE ARMY
Cadet Honor Committee
United States Corps of Cadets
West Point, New York 10996

MACC-CPME-H                                           19 November 2009

MEMORANDUM for the Vice Chair for Investigations

SUBJECT: RHR Recommandation for Cadet Alan M. Spadone, Company B-1, Class of
2011.

1. **Recommendation**. After careful review and investigation of the case in point, I
recommend that the Commandant **does** convene an Honor Investigative Hearing to
resolve this matter.

2. **Allegations**.

**Cheating**
Cadet Alan M. Spadone, Company B-1, Class of 2011, did, on or about 27 October 2009 violate
the cadet honor code by cheating by plagiarizing an Essay during EN302 Advanced Composition.

3. **Facts of the Case.**

    a.  23 October 2009-CDT Spadone goes to EN302 for a peer editing session. CDT
Spadone's paper was peer reviewed by CDT Erik Tonfeldt and was identical to
the paper that he would submit in his final submission.

    b.  27 October 2009-CDT Spadone turns in his final submission to his EN302
instructor.

    c.  During the grading process Dr. Sabotos noticed a sophistacted writing style and
vocabulary not typically used by undergraduates. This tipped her off that the
essay may not be CDT Spadone's work. Typing in a line from CDT Spadone's
essay into a web search engine revealed that his essay was identical to the review
of the film Lost in Translation by Homay King that appeared in the journal Film
Quarterly.



APPELLATE EXHIBIT **V-1**

MACC-CPME-H
SUBJECT: RHR Recommendation for Cadet Alan Spadone, Company B-1, Class of 2011

4. **Analysis of the Evidence.**

### 2. Cheating

a. <u>The cadet did a certain act.</u>  CDT Spadone submitted a plagiarized essay.

b. <u>The CUI did the act with the intent to gain or give an unfair advantage or with the intent to deceive another person.</u>  CDT Spadone wished to deceive his instructor into believing that the work was his own because he did not site the source that he used.

5. **Witnesses.**

a. CDT Alan Spadone B-1, 2011 (CUI)

b. DR Terri Sabatos, Department of English

c. CDT Adam Bishop, F-2, 2011

d. MAJ Anthony George, Department of English

6. **List of Evidence.**

a. EN302: Advanced Composition-Essay #3 Prompt.

b. CDT Alan M. Spadone, Sworn Statement, 18 November 2009.

c. CDT Adam Bishop, Sworn Statement, 9 November 2009.

d. MAJ Anthony George, Sworn Statement, 16 November 2009.

e. DR Terri Sabatos, Sworn Statement, 16 November 2009.

f. Film Quarterly review of Lost in Translation.

g. Essay submission of CDT Spadone.

h. CDT Spadone's rough draft.

i. EN302 Course Syllabus.

j. EN302 Section I10 Absences Report.

2

APPELLATE EXHIBIT **V-2**

000523

MACC-CPME-H
SUBJECT: RHR Recommendation for Cadet Alan Spadone, Company B-1, Class of 2011

### 7. **Regimental Honor Representative's Remarks**

All of the evidence shows that CDT Spadone plagiarized his EN302 essay. In his sworn
statement he essentially admits this fact and that he did so with the intent to deceive. This
case should go to a Cadet Advisory Board.

8.   **POC**.  Point of contact for this memorandum is the undersigned and can be reached at
extension

KENNETH HOWELL
CDT CPT, USCC
1st Regimental Honor Representative

3

APPELLATE EXHIBIT **V·3**

000524

DEPARTMENT OF THE ARMY
Cadet Honor Committee
United States Corps of Cadets
West Point, New York 10996

MACC-CPME-H                                                    18 January 2009

MEMORANDUM FOR THE COMMANDANT OF CADETS

SUBJECT: RHR Recommendation for Cadet Alan Spadone, Company B-1, Class of 2011

1. **Recommendation.** After careful review and investigation, I recommend that this case be **forwarded to an Honor Investigative Hearing**.

2. **Allegations.**

**Cadet Alan Spadone, B-1, Class of 2011, United States Military Academy did, at or near West Point, New York, on or about 19 November 2009, with the intent to deceive or mislead Dr. Terri Sabatos, violate the Cadet Honor Code by cheating, by providing inaccurate page numbers on multiple sources in his EN302 paper entitled "The Contruction [sic] of an Image."**

3. **Facts of the Case.**

   a. On or about 19 NOV 2009, CDT Alan Spadone submitted an EN302 essay entitled "The Contruction [sic] of an Image."

   b. CDT Spadone used information from Edwin Palmer Hoyt and Anne Tucker and provided citations including page numbers.

   c. On or about 30 NOV 2009, Dr. Terri Sabatos reviewed CDT Spadone's paper and noticed inconsistent sentences within the overall scheme of the paragraph the aforementioned sentence was placed.

   d. Noticing that said sentences had accompanying citations, Dr. Sabatos reviewed the page numbers associated with those citations to gain a better understanding of what CDT Spadone may have been trying to convey in his essay .

   e. At this time, Dr. Sabatos noticed that the information provided in CDT Spadone's citations were not found on the page number listed or within a reasonable range of said page number.

   f. On 30 NOV 2009, Dr. Sabatos arranged for a meeting with CDT Spadone to discuss his paper and to serve as an approach for clarification.

   g. The approach for clarification occurred on 4 DEC 2009 with CDT Spadone, Dr. Sabatos, MAJ Anthony George, the English Department Honor Officer, and CDT Daniel Gray, the Cadet Departmental Honor Liaison in attendance.

   h. During the approach for clarification, CDT Spadone stated that he may have inadvertently transferred his page citation notes from his notebook onto his paper.

   i. When asked by Dr. Sabatos if CDT Spadone had the notebook in his possession at the time, he replied negatively.



APPELLATE EXHIBIT **Y-4**

000525

MACC-CPME-H
SUBJECT: RHR Recommendation for Cadet Alan Spadone, Company B-1, Class of 2011

j. When asked by CDT Gray if CDT Spadone's page numbers were correct, but his authors were inaccurate, CDT Spadone replied he would have to check his notebook.

k. With no further questions, CDT Spadone was released and on the recommendation of MAJ George and CDT Gray, the event was forwarded to the Cadet Honor Committee for investigation.

## 4. Analysis of the Evidence.

CHEATING

a. CDT Spadone did a certain act. Cadet Spadone included inaccurate page numbers for his citations on his EN302 essay. A single occurrence of such an act could be attributed to carelessness, but because there were repeat instances, there is reason to believe that such an act was intentional.

b. It is undeterminable whether or not Cadet Spadone had intentions to gain an unfair advantage. CDT Spadone included inaccurate page numbers in his essay, but pointed out that he made citations, and that he had no intention of deceiving. However, with the inclusion of page numbers which did not contain the information presented in the essay's text, there is still reason to believe he may have given himself an unfair advantage due to not having to conduct as thorough research as his peers.

## 5. RHR Recommendation

This case is a classic "he said/she said" instance, for there are only two parties involved in the case, the CUI, CDT Spadone, and the accuser, Dr. Sabatos. Though CDT Spadone did state that he had no intention of deceiving, and that the citations were just inaccurate, the fact remains that the page numbers were very much off from the information he presented in his essay. For this reason, I believe this case should be judged by his peers in an Honor Investigative Hearing.

## 6. Witnesses.
a. Dr. Terri Sabatos, instructor, Department of English (Accuser)
b. Cadet Alan Spadone, B-1, 2011(CUI)

APPELLATE EXHIBIT **V - 5**

000526

MACC-CPME-H
SUBJECT: RHR Recommendation for Cadet Alan Spadone, Company B-1, Class of 2011

7. **List of Evidence**.

    a.  Sworn Statement, Dr. Terri Sabatos (14 DEC 2009)

    b.  Sworn Statement, Dr. Terri Sabatos (08 JAN 2010)

    c.  Rights Warning Form, CDT Alan Spadone, Company B-1, Class of 2011 (12 JAN 2010)

    d.  Sworn Statement, CDT Alan Spadone, Company B-1, Class of 2011 (12 JAN 2010)

    e.  Rights Warning Form, CDT Alan Spadone, Company B-1, Class of 2011 (08 JAN 2010)

    f.  Sworn Statement, CDT Alan Spadone, Company B-1, Class of 2011 (08 JAN 2010)

    g.  EN302 Essay #4 Prompt

    h.  "The Contruction of an Image" by CDT Alan Spadone

    i.  Photocopy of Hirohito: The Emperor and the Man by Edwin P. Hoyt

    j.  Photocopy of The History of Japanese Photography by Anne Wilkes Tucker et al.

    k.  EN302 Course Syllabus

    l.  EN302 Section I10 Attendance Record

    m.  COR on CDT Spadone written by Dr. Sabatos

    n.  Possible Honor Violation Memorandum by Dr. Sabatos

    o.  Official Honor Review of CDT Spadone's possible honor violation by LTC Theodore H. Reich.

    p.  Review of Procedures in Possible Honor Case Memorandum by COL James R. Kerin Jr.

    q.  Memorandum forwarding case to Honor Committee by COL James R. Kerin.

8. **POC**.  Point of contact for this memorandum is the undersigned at ▮▮▮▮▮▮▮▮

Kenneth Howell
CDT CPT, USCC
1st Regimental Honor Representative
Cadet Honor Committee

APPELLATE EXHIBIT **V-6**

000527

DEPARTMENT OF THE ARMY
Cadet Honor Committee
United States Corps of Cadets
West Point, New York 10996

MACC-CPME-H                                                          30 November 2009

MEMORANDUM FOR THE COMMANDANT OF CADETS

SUBJECT: VCI Recommendation for Cadet Alan Spandone, Company B-1, Class of 2011

1. **Recommendation**.    After careful review and investigation, I recommend that the Commandant convene an Honor Investigative Hearing to resolve this matter.

2. **Allegations**.

   Cadet Alan Spandone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 27 October 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his EN302: Advanced Composition Essay #3 and submitting it as his own without proper documentation and doing so with the intent to gain an unfair advantage or to deceive or mislead another person

3. **Facts of the Case.** See Regimental Honor Representative's statement.

4. **Analysis of the Evidence.** See Regimental Honor Representative's statement.

5. **Witnesses.** See Regimental Honor Representative's statement.

6. **List of Evidence.** See Regimental Honor Representative's statement.

7. **Redactions.** The alpha numeric references found in the evidence in the served packet are referenced in the Vice Chair of Investigations recommendation. They will be deleted from the board packet.

8. **POC.** Point of contact for this memorandum is the undersigned at ▮▮▮▮▮▮▮

*Elyse Vail*

ELYSE VAIL
CDT CPT, HHC
Vice Chairmen for Investigations
Cadet Honor Committee

APPELLATE EXHIBIT **VI - I**

DEPARTMENT OF THE ARMY
Cadet Honor Committee
United States Corps of Cadets
West Point, New York 10996

MACC-CPME-H                                                    2 February 2009

MEMORANDUM FOR THE COMMANDANT OF CADETS

SUBJECT: VCI Recommendation for Cadet Alan Spandone, Company B-1, Class of 2011

1. **Recommendation.**   After careful review and investigation, I recommend that the Commandant convene an Honor Investigative Hearing to resolve this matter.

2. **Allegations.**

   Cadet Alan Spandone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his  EN302: Advanced Composition Essay #4 entitled "Contruction [sic] of an Image" and submitting it as his own without  proper documentation and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.

3. **Facts of the Case.**  See Regimental Honor Representative's statement.

4. **Analysis of the Evidence.**  See Regimental Honor Representative's statement.

5. **Witnesses.**  See Regimental Honor Representative's statement.

6. **List of Evidence.**  See Regimental Honor Representative's statement.

7. **Redactions.**  The alpha numeric references found in the evidence in the served packet are referenced in the Vice Chair of Investigations recommendation.  They will be deleted from the board packet.

8. **POC.**  Point of contact for this memorandum is the undersigned at

ELYSE VAIL
CDT CPT, HHC
Vice Chairmen for Investigations
Cadet Honor Committee

APPELLATE EXHIBIT **VI-2**

DEPARTMENT OF THE ARMY
Cadet Honor Committee
United States Corps of Cadets
West Point, New York 10996

MACC-CPME-H

30 November 2009

MEMORANDUM FOR THE COMMANDANT OF CADETS

SUBJECT: Pre-Referral Hearing Panel Reasoning for Cadet Alan Spandone, Company B-1,
Class of 2011.

1. **Recommendation**. After careful review of the materials presented by the Vice Chair for
Investigations, this panel has recommended this allegation be forwarded to the Commandant of
Cadets for referral.

2. **Allegations.**

Cadet Alan Spandone, Company B-1, Class of 2011, did, at or near West Point, New
York, on or about 27 October 2009, violate the Cade Honor Code by cheating, by
plagiarizing all or part of his EN302: Advanced Composition Essay #3 and submitting it
as his own without proper documentation, and doing so with the intent to gain an unfair
advantage or to deceive or mislead another person.

3. **Reasoning.** Cadet Spandone admits in his statement provided to the Investigative Team that he
did not properly document his essay. He suggests that he did so with the intent to gain an unfair
advantage.

4. **POC.** Point of contact for this memorandum is the undersigned a

ADAM ROYAL
Vice Chair for Education
Cadet Honor Committee
Executive Staff Representative to the PRHP

I certify that this panel was conducted in accordance with USCC PAM 15-1

BENJAMIN JIMENEZ
Honor Executive Officer
Cadet Honor Committee

APPELLATE EXHIBIT **VII - 1**

000530

**PRE-REFERRAL HEARING PANEL**
**CASE OF CADET ALA.. SPANDONE**
**COMPANY B-1, CLASS OF 2011**

)
)
)

**DECISION WORKSHEET**

1. The following allegation(s) were considered by this panel:

Cadet Alan Spandone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 27 October 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his EN302: Advanced Composition Essay #3 and submitting it as his own without proper documentation and doing so with the intent to gain an unfair advantage or to deceive or mislead another person

2. We, the members of this Pre-Referral Hearing Panel, after careful consideration of the evidence presented by the Vice Chair for Investigations, have decided by at least a two-thirds majority:

[✓]     that there is substantial evidence to support the allegation(s) circled above, and this case is therefore forwarded to the Commandant of Cadets for referral.

[ ]     that there is not substantial evidence to support any allegation(s) listed above, and this case is therefore dropped from consideration by the Cadet Honor Committee.

[ ]     that the aspects of this case listed below require further investigation before an intelligent and informed decision can be reached, and this case is therefore returned to the Vice Chair for Investigations for further investigation of the following areas:

_____

_____

_____
Honor Executive Staff Member (sign)

CDT CPT Adam R Royal
(print)

_____
Corps Chain of Command Member (sign)

CDT LT Alex J Reiter
(print)

_____
Company Honor Representative (sign)

CDT SGT Alessandra C Brown
(print)

3. I affirm that this hearing was conducted in accordance with the procedures outlined in USCC PAM 15-1, *Honor Committee Procedures*; that this panel fairly and completely reviewed all evidence presented by me; and that the decision of this panel is therefore legitimate and binding.

_____
Executive officer (sign)

CDT CPT Benjamin A Jimenez
(print)

30 NOV 09
(date)

APPELLATE EXHIBIT VII -2

000531

DEPARTMENT OF THE ARMY
Cadet Honor Committee
United States Corps of Cadets
West Point, New York 10996

MACC-CPME-H                                                 10 February 2010

MEMORANDUM FOR THE COMMANDANT OF CADETS

SUBJECT: Pre-Referral Hearing Panel Reasoning for Cadet Alan Spadone, Company B-1, Class of 2011.

1. **Recommendation**. After careful review of the materials presented by the Vice Chair for Investigations, this panel has recommended these allegations be forwarded to the Commandant of Cadets for referral.

2. **Allegations.**

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his EN302: Advanced Composition Essay #4 entitled "Construction [sic] of an Image" and submitting it as his own without proper documentation and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 4 December 2009, violate the Cadet Honor Code by lying, by claiming to his instructor, Ms. Sabatos, that he did not accurately write down the authors or page numbers in his notebook, with the intent to deceive his instructor into thinking that he had done proper research for his documentation.

3. **Reasoning.**

For the first allegation, CDT Spadone had six different cases of improper documentation, and some of these sources did not even match with what he presented in his paper. He attempts to gain an unfair advantage by using his improper documentation as an excuse for his cheating. Not one citation was correct and one did not have anything to do with the topic of his paper.
For the second allegation, when CDT Spadone's teacher, Ms. Sabatos, approached him for clarification on 4 December 2009, he was asked by her why the page numbers were off with his sources. His response was that he was careless when taking notes from many texts he used and did not write down the authors or page numbers accurately in his notebook. Upon review of his notebook, there are no page numbers and there is barely anything written in his notebook, so the members of the panel believe that he lied to his teacher with the intent to deceive her into thinking that he had improperly documented.

4. **POC**. Point of contact for this memorandum is the undersigned at ▮▮▮▮▮▮

Patrick Ryan
Vice Chairman for Mentorship
Cadet Honor Committee
Executive Staff Representative to the PRHP

I certify that this panel was conducted in accordance with USCC PAM 15-1

APPELLATE EXHIBIT **VII-3**

000532

SAHM CHO
Honor Executive Officer
Cadet Honor Committee

APPELLATE EXHIBIT VII.4

000533

**PRE-REFERRAL HEARING PANEL** )
**CASE OF CADET ALAN SPANDONE** ) **DECISION WORKSHEET**
**COMPANY B-1, CLASS OF 2011** )

1. The following allegation(s) were considered by this panel:

Cadet Alan Spandone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his EN302: Advanced Composition Essay #4 entitled "Contruction [sic] of an Image" and submitting it as his own without proper documentation and doing so with the intent to gain an unfair advantage or to deceive or mislead another person

2. We, the members of this Pre-Referral Hearing Panel, after careful consideration of the evidence presented by the Vice Chair for Investigations, have decided by at least a two-thirds majority:

[X] that there is substantial evidence to support the allegation(s) circled above, and this case is therefore forwarded to the Commandant of Cadets for referral.

[ ] that there is not substantial evidence to support any allegation(s) listed above, and this case is therefore dropped from consideration by the Cadet Honor Committee.

[ ] that the aspects of this case listed below require further investigation before an intelligent and informed decision can be reached, and this case is therefore returned to the Vice Chair for Investigations for further investigation of the following areas:

Cadet Alan Spandone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 4 December 2009, violate the Cadet Honor Code by lying, by claiming to his instructor, Mr. Solantos, that he did not write down the authors or page numbers in his notebook.

_____
**Honor Executive Staff Member (sign)**

Patrick Ryan
**(print)**

_____
**Company Honor Representative (sign)**

Brittany Jensen
**(print)**

_____
**Corps Chain of Command Member (sign)**

Chris Choi
**(print)**

3. I affirm that this hearing was conducted in accordance with the procedures outlined in USCC PAM 15-1, *Honor Committee Procedures*; that this panel fairly and completely reviewed all evidence presented by me; and that the decision of this panel is therefore legitimate and binding.

_____       9 FEB 10
**Executive officer (sign)**       **(date)**

Sahm D. Cho
**(print)**

APPELLATE EXHIBIT **VII.5**



**DEPARTMENT OF THE ARMY**
OFFICE OF THE STAFF JUDGE ADVOCATE
UNITED STATES MILITARY ACADEMY
WEST POINT, NEW YORK  10996

REPLY TO
ATTENTION OF:

MAJA-MJ                                                                                    16 February 2010

MEMORANDUM FOR Commandant, United States Military Academy, West Point, New York 10996

SUBJECT:  SJA Prereferral Advice on Disposition of Honor Investigative allegations in the matter of Cadet Alan Spadone, Class of 2011, Company B, 1st Regiment, United States Corps of Cadets, United States Military Academy, West Point, New York 10996

1.  I have reviewed the attached allegations and allied papers in the honor investigation of Cadet Alan Spadone and render this advice in accordance with the provisions of paragraph 309, USCC PAM 15-1, Honor Committee Procedures.

2.  After reviewing the attached allegations and allied papers, I have reached the following conclusions concerning legal sufficiency:

    a.  The allegations allege offenses under the Cadet Honor Code.

    b.  The allegations are warranted by the evidence provided by the allied documents.

3.  The Regimental Honor Representative, Deputy Vice-Chair for Investigations, Pre-Referral Hearing Panel and the Special Assistant for Honor recommend that this investigation be referred to an Honor Investigative Hearing.  I concur with the aforementioned recommendations.


DANIEL MAZZONE
CPT, JA
Chief, Military Justice


**APPELLATE EXHIBIT VIII**

000535



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
Simon Center for the Professional Military Ethic
West Point, New York 10996



MACC-PME-H

MEMORANDUM THRU

Director, Simon Center for the Professional Ethic, United States Corps of Cadets, West Point, New York 10996

Office of the Staff Judge Advocate, United States Military Academy, West Point, New York 10996

FOR Commandant of Cadets, United States Corps of Cadets, West Point, New York 10996

SUBJECT:  Referral for an Honor Investigative Hearing for the Case of Cadet Alan Spadone, Company B-1, Class of 2011

1.  This file contains sufficient evidence to support referral to an Honor Investigative Hearing.

2.  If you refer this case, I recommend the following allegation:

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 27 October 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his Advanced Composition (EN302) Essay #3, and submitting it as his own without proper documentation, and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his Advanced Composition (EN302) Essay #4, and submitting it as his own without proper documentation, and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 4 December 2009, violate the Cadet Honor Code by lying, by stating to Doctor Terri Sabatos, Associate Professor, Department of English, that he did not accurately write down the authors or page numbers in his notebook, or words to that effect, knowing said statement was false at the time he presented it, or not then believing it to be true, and doing so with the intent to deceive or mislead another person.

3.  I recommend that at least the following board witness(es) be called to testify:

a.  Doctor Terri Sabatos, Associate Professor, Department of English

b.  Major Anthony George, Instructor, Department of English

**APPELLATE EXHIBIT IX -1**

MACC-PME
SUBJECT:  Referral for an Honor Investigative Hearing for the Case of Cadet Alan Spadone, Company B-1, Class of 2011

   c.  Cadet Adam Bishop, Company F-2, Class of 2011

   d.  Cadet Matthew Krause, Company Commander B-1, Class of 2010 **(Character Witness)**

   e.  Major Michael Denehy, Tactical Officer, Company B-1 **(Character Witness)**

4.  If you decide to refer the above allegation(s) and direct that the above cadet appear as a respondent before a board, I recommend that you sign, date, and initial the following appropriate action.

5.  Upon referral of the case, the Office of the Special Assistant for Honor and the Office of the Staff Judge Advocate will coordinate a board date and the appointment of a Hearing Advisor.


16 Feb 10
_____
Date

MICHAEL B. BAKA
MAJ, IN
Special Assistant to the Commandant
  for Honor Matters


ACTION BY THE COMMANDANT:

_____ Refer Case with Above Allegation(s)

_____    Return to VCI _____

_____    Other _____


16 Feb 10
_____
Date

WILLIAM E. RAPP
Brigadier General, US Army
Commandant of Cadets


APPELLATE EXHIBIT **IX-2**

000537

**UNITED STATES MILITARY ACADEMY**
**UNITED STATES CORPS OF CADETS**
**West Point, New York 10996**

MACC-CPME-H

MEMORANDUM FOR Cadet Alan Spadone, Company B-1, Class of 2011, United States Corps of Cadets, United States Military Academy, West Point, New York 10996

SUBJECT: Notification of Respondent's Rights and Responsibilities

1. The Commandant of Cadets has directed that an investigation be conducted to determine whether you have violated the Cadet Honor Code as set forth in the Special Assistant for Honor's Memorandum. A Hearing Advisor (HA) will be appointed to address any issues you raise and to ensure that proper procedures are followed. You will be informed of the date and location of your hearing as soon as it is scheduled. For planning purposes, you should anticipate the hearing will convene on the **fifth duty day following the receipt of this notice**. Uniform for the hearing will be appropriate seasonal privilege uniform.

2. You must contact the Legal Assistance Office (LAO) of the Office of the Staff Judge Advocate NLT **the next duty day from receipt of this notice** to arrange an appointment to discuss your rights and responsibilities and to receive advice concerning your case. Their telephone number is (845) 938-4541 and they are located in Bldg. 606, 4th floor. **This meeting is mandatory and cannot be waived.**

3. You have the choice to either contest the allegation(s) or to admit to the allegation(s). You have an absolute right to contest the allegation(s) and no adverse action will be taken against you for doing so. If you are a first class or a second class cadet and you are found to have committed the allegation(s) or admit to the allegation(s) and are subsequently separated from the Academy, you may be required to repay the cost of your educational expenses in accordance with 10 U.S.C. 2005, or you may be ordered to Active Duty to fulfill your service obligation in accordance with AR 612-205, paragraph 7 and table 3.

4. **Rights.** You have the following rights whether you contest the allegation(s) or admit to the allegation(s) unless indicated otherwise.

   a. The right to remain silent—this right is waived to some extent if you choose to admit to the allegation(s). This waiver is only in regard to the allegation(s) admitted. No adverse action or inference will be taken if you choose to remain silent.

   b. The right to consult with legal assistance before all proceedings. You may retain a civilian attorney at your own expense and/or consult with the West Point Legal Assistance Office, Staff Judge Advocate, at no cost to you. Civilian or military counsel may not represent you at any hearing. However, you may consult with your attorney during breaks and recesses.

   c. The right to call witnesses and present evidence on your behalf. Character witnesses will not be allowed to testify on your behalf during the fact finding phase of the hearing unless they are testifying as to a particular character trait that is being called into question by the



APPELLATE EXHIBIT **X-1**

**000538**

MACC-CPME-H
SUBJECT: Notification of Respondent's Rights and Responsibilities for Cadet Alan Spadone,
Company B-1, Class of 2011

allegation(s). If you are found, they may testify as to your general character during the
recommendations portion of the hearing.

d. The right to object to evidence being used in the hearing.

e. The right to appear personally and to be present during open sessions. You may elect to
waive the right to be present at an open session of the hearing. Before being allowed to do so,
the Hearing Advisor will ensure that you fully understand your rights. Your absence does not
relieve the HIH of the duty to make a thorough, complete, and impartial inquiry of the matter
referred for investigation. If absent, you may not be able to question witnesses and object to the
introduction of evidence.

f. The right to question all witnesses who testify at the hearing. To some extent, the right to
question adverse factual witnesses is waived if you admit to the allegation(s) since adverse
factual witnesses will not be called to testify. You do retain the right, however, to question any
witnesses who do testify.

g. The right to challenge any board member of the HIH or CAB "for cause" where you
believe that the admittance of this member to the HIH or CAB will result in a bias against you or
if you believe they lack the qualifications to sit as a member of the board.

h. The right to obtain copies of all investigative reports, recommendations, statements,
hearing member worksheets and all other official documents relating to the investigation, hearing
and subsequent review process.

i. The right to have a Cadet Advisor present at the hearing. You may not receive assistance
from the Cadet Advisor during your testimony. However, you may ask the Hearing Advisor for
a recess during your testimony to discuss any matters with the Cadet Advisor.

j. The right to bring matters to the attention of the BP during any of the Honor proceedings if
you perceive something as unfair. A failure to immediately bring a matter to the attention of the
HA about an issue of fairness may result in the waiving of your right to raise the issue at a later
time.

k. The right to challenge the HA or BP "for cause," if you believe that the HA or BP will not
be impartial or that the HA lacks the qualifications to ensure you get a fair hearing.

l. The right to make an opening statement and a closing argument before the board even if
you choose to remain silent and not testify. Your statements, however, are not evidence and will
not be considered as such. If you wish the board to have the benefit of what you have to say as
evidence they can consider when making a decision, you must testify under oath and be subject
to cross-examination.

5. **Responsibilities**. You have the following responsibilities whether you contest the
allegation(s) or admit to the allegation(s) unless indicated otherwise.

a. **You must forward this completed notification of rights and responsibilities to the HA
no later than 24 hours before the start of your preliminary hearing.**

2


APPELLATE EXHIBIT X-2

MACC-CPME-H
SUBJECT: Notification of Respondent's Rights and Responsibilities for Cadet Alan Spadone,
Company B-1, Class of 2011

b. Upon being served by the Secretary of the Honor Committee you must meet with an attorney from LAO who can assist you. It is your responsibility to fully understand your rights and responsibilities and the LAO is available to help you if you do not.

c. You must submit all documents and names of witnesses you want to testify on your behalf to the HA in writing no later than 24 hours prior to the start of the preliminary hearing. You are responsible to ensure your requested witnesses are present on the day of the hearing. The Honor Committee will <u>assist</u> you in this regard if necessary.    **INITIAL**

d. You must submit all requests for the redaction of evidence, exclusion of witnesses, or other requests to the HA in writing no later than 24 hours prior to the start of the preliminary hearing.

e. You must submit notice of intent to admit to a violation to the HA no later than 24 hours prior to the start of the preliminary hearing **if you choose to admit to the allegation(s).** (See paragraph 306 of the Honor SOP for admit procedures during a CAB.)

f. You must be prepared to participate during all stages of the Honor process or must request additional time in advance of the preliminary hearing so that you can be prepared.

g. If you are a member of a minority group and if you want a minority group member to be included on the board that will decide your case, you must submit    **INITIAL** a written request to the Secretary of the Honor Committee not later than 24 hours after this notification requesting that a minority group member be included. However, non-availability of a member of a minority group will not prevent the Commandant from convening the board. In the event of non-availability, the reason will be stated in the record of proceedings. In the case of a female respondent, the board will, upon your written request and if reasonably available, include a female as a voting member.

6. **Admit Procedures**. You may choose to admit to the allegation(s). Admitting does not relieve you of the responsibilities listed above. You still must meet with a LAO attorney who can assist you in this process.

a. If you decide to admit to the allegation(s), you give up the following rights.

(1) You give up your right to remain silent concerning the allegation(s) in that you must testify before the HA at the <u>Providence Inquiry</u> as well as testify at the CAB, upon request of the President of the CAB, concerning your violation(s). You do not waive your right, however, to remain silent concerning other matters in accordance with Article 31 of the UCMJ.

(2) You give up your right to a full hearing of the facts by the Honor Investigative Hearing, which would have to find that the evidence established that it was more likely than not that you violated the Honor Code, before a violation could be found.

(3) You give up your right to cross examine any factual witnesses against you, that is, the right to hear witnesses testify and question them concerning their testimony, except for those character witnesses testifying during the Cadet Advisory Board.

b. If you admit to the violation(s), the CAB will consider the following when making their recommendations. Your admission and testimony (you may be called to testify concerning the

3    APPELLATE EXHIBIT **X-3**

000540

MACC-CPME-H
SUBJECT: Notification of Respondent's Rights and Responsibilities for Cadet Alan Spadone,
Company B-1, Class of 2011

violation); the testimony of your TAC and Cadet Company Commander; the complete board
packet, and any other relevant evidence <u>you choose to submit</u>, either in written form or by
testimony of witnesses, your testimony during the Providence Hearing and your testimony before
the CAB.

7. **I declare that: I have thoroughly read this notice and I understand my rights and
responsibilities. I have / have not (circle one) met with an attorney from the Legal
Assistance Office. Initial your intent below:**

_____ I will not admit to the violation(s)

_____ I will admit to the violation(s)

_____ (Signature of Respondent)

_Alen Spadone_ (Printed Name of Respondent)

8. **Your HIH will convene on or about the following date:** _24 FEB 2010_

9. I acknowledge receipt of the foregoing notice of an HIH.

_____ (Signature of the Respondent)

Served on the _17_ day of _FEB_ 20 _10_

Encl

JOSEPH CALLEJAS
Cadet Captain
Secretary, Honor Committee

4

APPELLATE EXHIBIT **X.4**

000541

Cheating

Cadets violate the Honor Code by cheating if they wrongfully act out of self-interest, or if they do work or obtain results with the intent to gain for themselves or to give others an unfair advantage, or with the intent to deceive or mislead. Actions that assist another cadet to do these things also constitute cheating. Cheating includes such acts as intentional plagiarism (presenting someone else's ideas, words, data, or work as one's own), intentional misrepresentation (failing to document the assistance of another in the preparation of an assignment with the intent to deceive, mislead, gain, or give an unfair advantage), citing sources that were not actually consulted, and using unauthorized references (crib sheets, notes, texts) during an examination.

Elements of Cheating.

    (a) That on or about a certain date, the cadet did a certain act.

    (b) That the cadet did so with the intent to gain or give an unfair advantage or with the intent to deceive another person.

Source: USCC Pam 632-1, Cadet Honor Committee Procedures, dated 1 February 2007

APPELLATE EXHIBIT **XI**

<u>Cheating</u>.  Cadets violate the Honor Code by cheating if they wrongfully act out of self-interest, or if they do work or obtain results with the intent to gain for themselves or to give others an unfair advantage, or with the intent to deceive or mislead.  Actions that assist another cadet to do these things also constitute cheating.  Cheating includes such acts as intentional plagiarism (presenting someone else's ideas, words, data, or work as one's own), intentional misrepresentation (failing to document the assistance of another in the preparation of an assignment with the intent to deceive, mislead, gain, or give an unfair advantage), citing sources that were not actually consulted, and using unauthorized references (crib sheets, notes, texts) during an examination.

<u>Elements of Cheating</u>.

(a)  That on or about a certain date, the cadet did a certain act.

(b)  That the cadet did so with the intent to gain or give an unfair advantage or with the intent to deceive another person.

Source:  USCC Pam 15-1, The Cadet Honor Code, System, and Committee Procedures, dated 11 November 2009



APPELLATE EXHIBIT **XII**

Lying. Cadets violate the Honor Code by lying if they deliberately deceive another person by stating an untruth, or *by any direct form of communication,* to include the telling of a partial truth or the vague or ambiguous use of information or language, with the intent to deceive or mislead.

Elements of Lying.

(a)  That on or about a certain date(s) the cadet made a certain statement or communication.

(b)  That such statement or communication was false or the cadet believed the statement or communication to be false.

(c)  That the cadet knew such statement or communication was false at the time he/she made it, or did not believe the statement or communication to be true at the time it was made.

(d)  That the cadet made it with the intent to deceive another person.


Source:  USCC Pam 15-1, The Cadet Honor Code, System, and Committee Procedures, dated 11 November 2009

APPELLATE EXHIBIT **XIII**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

**REPLY TO
ATTENTION OF**

MADN-ENL

6 November 2009

MEMORANDUM FOR LTC Jeffrey S. Wilson, Department of English, United States Military Academy, West Point, New York 10996

SUBJECT: Review of Procedures in Possible Honor Case

1. Please review the enclosed memorandum (with enclosures) prepared by Dr. Sabatos.

2. Decide whether the actions taken with respect to the suspected misconduct involving CDT Spadone have proceeded according to the departmental SOP ("Mission and Policies" document) and other relevant guidelines. Comment on any variations.

3. Identify any relevant information that may be missing and recommend revisions to the instructor's memorandum if appropriate.

4. Make a recommendation as to whether the information available warrants consideration by the Cadet Honor Committee.

5. Please respond NLT 1630 hours on 9 November with a memorandum to me that will accompany the case if we forward it for further action.

Encl
Memorandum on CDT Spadone

JAMES R. KERIN, JR.
COL, USA
Professor and Head
Department of English

**APPELLATE EXHIBIT XIV**

ENCL 2



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MADN-ENL                                                        6 November 2009

MEMORANDUM FOR RECORD

SUBJECT: CDT Alan M. Spadone, Class of 2011—Potential Honor Violation

1. This memorandum is submitted in compliance with paragraph 5c in Annex F of the Department of English SOP, titled "Procedures in Cases of Suspected Plagiarism."

2. On 27 October 2009, Cadet Alan M. Spadone C07058570, Company B1, Class of 2011, a student in my EN302 Advanced Composition class section (I10), turned in his EN302 Essay 3, which is 10% (100 pts) of his course grade. I took this section of EN302 over from Dr. Karen Peirce on October 21 (Lesson 23). Cadet Spadone's paper invites suspicion that he has represented an undocumented source as his own work to gain an unfair advantage.

3. This assignment required cadets to compose a 3-4 page essay in response to a prompt concerning conventional views of Japan in written and visual texts (encl. 1). On November 1, reading Cadet Spadone's essay on the film *Lost in Translation*, I immediately noticed the sophisticated writing style and vocabulary, including the use of the word "signifier," a word related to more advanced linguistic theory (encl. 2). The mature writing style continued without faltering and I became further troubled when Cadet Spadone mentioned the scholar Edward Said (page 2). I knew from my discussions with Dr. Karen Peirce, the instructor I had replaced, that Said's theories and writings had not been discussed in her portion of the course, and I had not used this text either. Although Cadet Spadone cited Said's text *Orientalism* in his paper, he cited Said's book, not the edited version of the introduction to the book which is included on the EN302 website. Concerned that this paper had been informed by another source, I typed the phrase "rather, every image has the fresh quality and provisional status of a first impression" from Cadet Spadone's paper (page 1) into a web search engine. The first hit was a review of the film *Lost in Translation*, by Homay King, that appeared in the journal *Film Quarterly* (encl. 3). I compared the first paragraph of Cadet Spadone's paper to the first paragraph of the Homay King review and they were almost identical. I went on to compare both paper and article side by side and found that virtually all of Cadet Spadone's paper was a paragraph by paragraph match with the review of the film from the journal. Although he cites many of the same sources as Homay King, Cadet Spadone does not cite Homay King.

4. On 6 November, I conducted an approach for clarification with Cadet Spadone; MAJ Anthony George the English Department's Honor officer, and Cadet Adam Bishop, the Cadet Departmental Honor Liaison were present. I showed Cadet Spadone his paper and the article I had found on the internet and asked him to read the first paragraphs of both and clarify how they could be so similar. Cadet Spadone replied "What can I say Ma'am, it was a bad week." He did not continue speaking but continued to flip through the essay. I waited for a few moments and said "Could you please clarify what that means; what are your trying to tell me about your paper?" He made no further comment except to remark that the paper I showed him "looked like his paper" but he did not say anything further. I did not continue to question him. MAJ George told him that this was not an accusation, but a chance to clarify the similarities between his paper and the journal article and asked him if he had anything further to say. Cadet Spadone said no and we released him. I



APPELLATE EXHIBIT **XV-1**

ENCL 3

000546

MADN-ENL
SUBJECT: CDT Alan M. Spadone, Class of 2011

conferred with Cadet Bishop and MAJ George and we determined that the situation warranted an investigation.

5. I also conferred with Cadet Spadone's former instructor Dr. Karen Peirce and she was very clear that she covered the requirements to write papers in accordance with the Dean's Documentation of Written Work at Lesson 4, as stated in her syllabus (encl. 4). According to the attendance log, Cadet Spadone was present at this class (encl. 5).

6. Cadet Spadone's entire essay, except for an occasional word change, and the concluding sentence of paragraph one, is copied from the film review by Homay King. Cadet Spadone did not document his use of this source although his acknowledgement statement indicates that he documented all sources used. Please note that also attached to his final paper is a draft that was peer reviewed by Cadet Tonsfeldt in class on 23 October as Cadet Spadone cites in his notes page. The handwriting on the draft is Cadet Tonsfeldt's. The peer review was proctored that lesson by MAJ Joshua Carlisle, a fellow EN302 instructor. It was the policy of Dr Karen Peirce that all drafts should be included when turning in final papers and I elected to continue that policy.

7. I recommend that this case be forwarded to the Cadet Honor Committee for further investigation. Cadet Spadone did not have any unexpected explanation for the similarity between his paper and the review by Homay King and his actions may have been deliberate, intended to "deceive or gain an unfair advantage" (Documentation of Written Work, Section VI.2.c).

8. The POC for this memorandum is the undersigned at

*TR Sabatos*

TERRI SABATOS
ASSOCIATE PROFESSOR
Department of English

Encl.1: Essay 3 prompt
Encl. 2: Cadet Spadone's paper and draft
Encl. 3: Homay King review
Encl. 4: Dr. Peirce syllabus
Encl. 5: Attendance log



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

**REPLY TO
ATTENTION OF**

MADN-ENL                                                                9 November 2009

MEMORANDUM FOR CADET HONOR COMMITTEE, ATTN: Department of English Liaison

SUBJECT: Possible Honor Violation, CDT Alan M. Spadone, Company B-1

1. Enclosed is an evidence file concerning a possible honor violation by CDT Alan M. Spadone, Class of 2011, resulting from participation in EN302, Advanced Composition.

2. My review of the memorandum from Dr. Sabatos led me to direct her to include in it an accounting for the unusual presence of a draft version of the essay; as she has noted, she included it because it was an expected part of the graded assignment's final submission. It is worth noting that no instructor read that draft prior to its submission along with the final copy; the draft was exclusively part of a peer-review dynamic leading to the final product.

3. As noted in the procedural review conducted by LTC Wilson, the information presented by Dr. Sabatos clearly indicates that further review by the Cadet Honor Committee is appropriate.

4. Members of the Department of English are available to assist as appropriate.

JAMES R. KERIN, JR.
Colonel, US Army
Professor and Head
Department of English

Encl
1. Case Evaluation Memorandum—LTC Wilson
2. COL Kerin's Memorandum to LTC Wilson
3. Dr. Sabatos's MFR with enclosures

**APPELLATE EXHIBIT XVI**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MADN-ENL                                                    9 November 2009

MEMORANDUM FOR COL James R. Kern, Professor and Head, Department of English,
United States Military Academy, West Point, New York 10996

SUBJECT: CDT Alan M. Spadone, B1, Class of 2011—Potential Honor Violation

1. This memorandum is submitted in compliance with paragraph 7 in Annex F of the
Department of English SOP titled "Procedure in Cases of Suspected Plagiarism."

2. I have reviewed the actions of Dr. Terri R. Sabatos and other Department personnel in the
case of suspected plagiarism by CDT Spadone and find that they have properly followed the
Department of English SOP and the Dean's Program Operating Memorandum 02-4.

3. I have independently evaluated the evidence Dr. Sabatos presented with her Instructor's
Memorandum. In my judgment, Dr. Sabatos has included all relevant information and explained
the sequence of events leading to her suspicions about CDT Spadone's work in sufficient detail.

4. I find that there is sufficient reason to forward this file to the Cadet Honor Committee for
further investigation.

5. The POC for this memorandum is the undersigned at

JEFFREY S. WILSON
LTC, LG, USA
Assistant Professor
Department of English

APPELLATE EXHIBIT **XVII**

000549

DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MADN-ENL                                                        7 December 2009

MEMORANDUM FOR RECORD

SUBJECT: CDT Alan M. Spadone, B1, Class of 2011—Potential Honor Violation

1.  This memorandum is submitted in compliance with paragraph 5c in Annex F of the Department of
English SOP, titled "Procedures in Cases of Suspected Plagiarism."

2.  On 19 November 2009, CDT Spadone, a student in my EN302 Advanced Composition class
(Section I10), turned in his Essay 4, which is 20% (200 pts) of his course grade. I took over this section
of EN302 from Dr. Karen Peirce on October 21 (Lesson 23). CDT Spadone's paper contains 6 different
instances of parenthetically cited information which does not appear to originate from the page numbers
of the sources identified in the citations, a clear case of insufficient documentation and plagiarism.
CDT Spadone's subsequent explanation of the circumstances behind his failure to document properly
did not resolve my questions, leaving me concerned that dishonorable documentation may have
occurred.

3.  Essay 4 required students to compose a 3-4 page essay complicating the conventional views of Japan
that they had introduced in Essay 3 (encl 1). On November 30, I began reading CDT Spadone's essay
"Contructions (sic) of an Image" about photographs of Emperor Hirohito made before and after WWII
(encl 2). I noticed immediately that the essay did not address the prompt by revising the theme of his
Essay 3, and did not discuss any of the course texts. As I read the essay I also noticed that while CDT
Spadone used particular academic phrases such as "masculine display and commemoration," (p. 1) and
"embodiment of a type of masculine identity," (p. 2) these ideas were not clearly supported or well
explained in the paper. He also made an oblique reference to images of Hirohito constructed by the
Allies after the war that "displayed [the emperor] as human, and the loaded images of Mt. Fuji, along
with any representations of samurai values were completely left out of the new representation (Hoyt
162)" (p. 2). Because he had not referenced either Mt Fuji or samurai values earlier in his essay, it
seemed as if these ideas were part of a much larger discussion from one of his sources. My initial
thought was that CDT Spadone needed more instruction on how to appropriately incorporate other
scholar's viewpoints into his own discussion. Since this sentence had a parenthetical citation, I decided
to look it up to see if I could better understand the original discussion in the source as well as how CDT
Spadone was trying to incorporate it. When I arrived at the page in the source, the text and ideas therein
did not even remotely match what was presented in CDT Spadone's paper; moreover, none of the other
5 citations did either (encls 3 and 4). For example, page 110 of *The History of Japanese Photography*
by Anne Wilkes Tucker, does not discuss photographs taken of Emperor Hirohito and Douglas
Macarthur as claimed in CDT Spadone's essay. This page in Tucker discusses the photographic
industry and photographic journals in early 20th century Japan. In fact, according to the index of the
Tucker text, there is only one brief mention of this photograph in the entire book on page 323 (encl 4).

4.  On 30 November I sent CDT Spadone an email requesting a meeting and explaining that I had
questions concerning his essay 4. I did not detail what those questions were. On 4 December I
conducted an approach for clarification with CDT Spadone; MAJ Anthony George, the English
Department's Honor officer, and CDT Daniel Gray, the CDT Departmental Honor Liaison, were also
present. I showed CDT Spadone his paper and the books from the USMA library that were listed on his
works cited page. Before I could finish, he said that as soon as he received my email, he knew what the
problem was and went to the library to find the books cited in his paper, but that they were not there and
that he could explain what happened. I explained that it was clear from the ideas in the paper that


APPELLATE EXHIBIT **XVIII.1**

000550

SUBJECT: CDT Alan M. Spadone, Class of 2011
MADN-ENL

academic sources were used in preparing the paper. However, because the ideas were not well connected or well explained, it was not clear to me what he was trying to do with them. When I looked up the sources listed in the works cited page to clarify the ideas in the paper, and turned to the specific authors and page numbers cited in the body of the paper, not one of the citations was correct. It was not a matter of being "off" by a page or two; one of the sources he claimed to have used had nothing to do with the topic of his paper. CDT Spadone's response was that he was careless when taking notes from the many texts he used and did not write down the authors or page numbers accurately in his notebook. He said he had the notebook, but neglected to bring it with him, despite claiming he knew, from my initial email, why I wanted to meet with him. MAJ George asked if I was satisfied as to what constituted CDT Spadone's work from the ideas of the sources he used and I said no. Because he used no quotes, nor attributive tags in the body of the essay, and the citations were all completely incorrect, I had no way of knowing what were CDT Spadone's interpretations and what were the ideas from his sources. CDT Gray asked if the page numbers were accurate, but the authors name were just incorrect, and CDT Spadone said he did not know, he would have to check his notebook. CDT Gray asked if he remembered the names of the other books he used and CDT Spadone said he did not remember the names of any of the other books he used. As he had no other explanations and there were no further questions, we released him. After CDT Spadone left, I consulted with MAJ George and CDT Gray and we determined that CDT Spadone's explanations were not adequate to explain the inaccuracies and this case warranted an investigation.

5. I also conferred with CDT Spadone's former instructor Dr. Karen Peirce and she was very clear that she covered the requirements to write papers in accordance with the Dean's Documentation of Written Work at Lesson 4, as stated in her syllabus (encl 5). According to the attendance log, CDT Spadone was present at this class (encl 6).

6. CDT Spadone's paper does not use appropriate attributive tags nor is it cited accurately or correctly so it is impossible to determine which ideas are his, and which are those of other scholars. This clearly is a case of plagiarism that is at the least compounded by improper documentation.

7. I recommend that this case be forwarded to the CDT Honor Committee for further investigation. CDT Spadone did not have any unexpected explanation for why he did not attribute ideas appropriately in his paper or why the citations in his paper were completely inaccurate and his actions may have been deliberate, intended to "deceive or gain an unfair advantage" (Documentation of Written Work, Section VI.2.c).

8. The POC for this memorandum is the undersigned at

TERRI SABATOS
ASSOCIATE PROFESSOR
Department of English

Encls

**Sabatos, T. DR ENG**

om:                 Sabatos, T. DR ENG
**Sent:**            Monday, December 07, 2009 5:14 PM
**To:**              Sabatos, T. DR ENG
**Subject:**         Cadet Observation Report Confirmation

Here is the information from a Cadet Observation Report you completed on 07 Dec 09:

Cadet: SPADONE ALAN M (B1 '11)
Date of Event:       30 Nov 09
Event Description:   EN302 Essay #4
Cadet Behavior:      Insufficient and incorrect documentation for sources used in EN302 Essay
4.
Your Comments:       Cadet Spadone failed to document his sources accurately for his Essay #4
in EN302 Advanced Composition. An approach for clarification was conducted on 4 December.
The cadet and the cadet's Tac Team ( MAJ DENEHY , SFC SNUGGS ) are also being notified by e-
mail.

Do not reply to this e-mail. If you wish to send comments to a specific party, use the
"forward" feature in Outlook.

ı APPELLATE EXHIBIT XIX

000552



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

**REPLY TO
ATTENTION OF**

MADN-ENL                                                                  9 December 2009

MEMORANDUM FOR LTC Theodore H. Reich, Department of English and Philosophy, United States Military Academy, West Point, New York 10996

SUBJECT: Review of Procedures in Possible Honor Case

1. Please review the enclosed memorandum (with enclosures) prepared by Dr. Sabatos.

2. Decide whether the actions taken with respect to the suspected misconduct involving CDT Spadone have proceeded according to the departmental SOP ("Mission and Policies" document) and other relevant guidelines.  Comment on any variations.

3. Identify any relevant information that may be missing and recommend revisions to the instructor's memorandum if appropriate.

4. Make a recommendation as to whether the information available warrants consideration by the Cadet Honor Committee.

5. Please respond NLT 1700 hours on 10 December with a memorandum to me that will accompany the case if we forward it for further action.

Encl                                           JAMES R. KERIN, JR.
Memorandum on CDT Spadone            COL, USA
                                               Professor and Head
                                               Department of English
                                                 and Philosophy

APPELLATE EXHIBIT **XX**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

**REPLY TO
ATTENTION OF**

MADN-ENL

11 Dec 2009

MEMORANDUM FOR COL James R. Kerin, Jr., Professor and Head, Department of English and Philosophy, United States Military Academy, West Point, New York 10996

SUBJECT: CDT Alan M. Spadone, B1, Class of 2011—Review of Procedures in Suspected Dishonorable Conduct

1. This memorandum constitutes my official review of the Honor Review file prepared by Professor Terry Sabatos in response to an essay submitted by CDT Spadone for EN 302 this semester.

2. Professor Sabatos, the English and Philosophy Department Honor Liaison Officer, and other Department personnel properly followed the guidelines for cases of this type in DPOM 02-4, the Department of English and Philosophy SOP, and other relevant sources. The Department has met all guidelines for submission outlined in these references.

3. In my review of this case, I determined that the evidence establishing the relevant facts of this case concerning CDT Spadone's improper documentation is adequate and effectively presented. I also recommended some minor edits to Professor Sabatos' memorandum to improve its overall clarity in communicating her reasons for suspecting that CDT Spadone's insufficient documentation and resultant plagiarism also strongly suggested the presence of dishonorable intentions.

4. Recommend that the Cadet Honor Committee consider this case for suspected dishonorable documentation and possible violation of the Cadet Honor Code.

5. The POC for this memorandum is the undersigned at ▮▮▮▮▮▮▮▮

THEODORE H. REICH
LTC, USA
Assistant Professor
Department of English and Philosophy



APPELLATE EXHIBIT XXL

**000554**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MADN-ENL

11 December 2009

MEMORANDUM FOR CADET HONOR COMMITTEE, ATTN: Department of English and Philosophy Liaison

SUBJECT: Possible Honor Violation, CDT Alan M. Spadone, Company B-1

1. Enclosed is an evidence file concerning a possible honor violation by CDT Alan M. Spadone, Class of 2011, resulting from participation in EN302, Advanced Composition.

2. As noted in the procedural review conducted by LTC Reich, the information presented by Dr. Sabatos clearly indicates that further review by the Cadet Honor Committee is appropriate.

3. Members of the Department of English and Philosophy are available to assist as appropriate.

JAMES R. KERIN, JR.
Colonel, US Army
Professor and Head
Department of English
and Philosophy

Encl
1. Case Evaluation Memorandum—LTC Reich
2. COL Kerin's Memorandum to LTC Reich
3. Dr. Sabatos's MFR with enclosures

APPELLATE EXHIBIT **XXII**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MAJA-LA                                                    22 February 2010

                                                          Non concur / MBB
MEMORANDUM THRU                                            23 Feb 10

USCC Legal Advisor, United States Military Academy, West Point, NY 10996
Special Assistant to the Commandant for Honor Matters, USCC, West Point, New York 10996

                              [initials] 23 Feb 10
FOR Commandant of Cadets, United States Corps of Cadets, West Point, New York

SUBJECT: Motion to Reduce Charges and Plea Agreement in the Honor Investigative Hearing
(HIH) for the Case of CDT Alan Spadone, Company B-1/2011

1. CDT Spadone is facing three allegations in the above-captioned matter.

2. On behalf of CDT Spadone and with his concurrence, the undersigned respectfully requests
that you reduce and amend the number of charges referred for an HIH.

3. CDT Spadone offers to plead guilty to the first allegation in a Cadet Advisory Board (CAB) if
the second and third allegations are dropped.

4. CDT Spadone does not believe he is guilty of the second allegation and the third allegation is
legally objectionable.

5. In the interest of justice and judicial efficiency we ask that you grant the relief requested
herein.

6. The Point of Contact for this action is the undersigned at the Office of the Staff Judge
Advocate at             Please do not hesitate to call me if I can be of assistance.

                              MICHAEL T. BARRETT, ESQ.
                              Chief of Legal Assistance



APPELLATE EXHIBIT **XXIII**

## ACTION BY THE COMMANDANT

In the Honor Investigative matter of Cadet Alan Spadone, Company B-1, Class of 2011, I have reviewed the motion submitted by her counsel requesting dismissal of Allegations 2 and 3 in exchange for his offer to admit to Allegation 1.  I take the following action:

_____ Approved.  Allegations 2 and 3 will be dismissed after Cadet Spadone is found to be provident to Allegation 1 at his preliminary hearing.

_____ Denied.

_____ Other _____

23 Feb 10
_____
Date

WILLIAM E. RAPP
Brigadier General, U.S. Army
Commandant of Cadets

APPELLATE EXHIBIT XX IV

000557



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MAJA-LA                                                      24 February 2010

MEMORANDUM THRU

Chief, Military Justice, Office of the Staff Judge Advocate, United States Military Academy,
    West Point, New York 10996
Special Assistant to the Commandant for Honor, United States Military Academy, West Point,
    New York 10996

FOR Commandant of Cadets, United State Military Academy, West Point, NY 10996

SUBJECT:  Honor Investigative Hearing (HIH), CDT Alan M. Spadone, Company B-1, Class of
2011

1. The undersigned, in the capacity as consulting counsel to Cadet Alan M. Spadone, and with
his concurrence, respectfully requests a delay in his Honor Investigative Hearing until 8 March
2010.

2. The reason for this request is that Cadet Joshua Young, Company B-1, who is serving as
Cadet Spadone's Hearing Advisor, has been unavailable since 21 February 2010. This
unavailability is attributed to the demise of his father. Therefore, he has not been available to
assist Cadet Spadone in preparing an adequate defense. Cadet Young's anticipated returned to
USMA is 27 February 2010. This would only give Cadet Spadone and Cadet Young a little over
a day to work together prior to the hearing which is currently scheduled for 1 March 2010.

3. Furthermore, this is a highly complex case that consists of three individual matters that took
place at diverse times over a 38 day period. The case also consists of both a Cadet Advisory
Board and an Honor Investigative Hearing. The case packet contains some 23 Board Exhibits
and 22 Appellate Exhibits. The Cadet Respondent has also requested other evidence that has yet
to be provided. Therefore, this matter necessitates additional time for the Cadet Respondent to
adequately prepare.

4. Thank you for your consideration.

MICHAEL T. BARRETT, ESQ.
Chief of Legal Assistance

CF: Hearing Advisor



APPELLATE EXHIBIT **XXV**

## ACTION BY THE COMMANDANT

In the Honor Investigative matter of Cadet Alan Spadone, Company B-1, Class of 2011, I have reviewed the motion submitted by his counsel requesting a delay until 8 March 2010. I take the following action:

_____ Approved.

_____ Denied.

_____ Other _____

25 Feb 10

Date

WILLIAM E. RAPP
Brigadier General, U.S. Army
Commandant of Cadets

APPELLATE EXHIBIT **XXVI**

DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
West Point, New York 10996

REPLY TO
ATTENTION OF

MAJA-LA                                                            3 March 2010

MEMORANDUM FOR HEARING ADVISOR; Honor Investigative Hearing for the Case of
Cadet Alan Spadone, Company B-1, Class of 2010

SUBJECT: Motion to Exclude Objectionable Evidence

1. The undersigned attorney, in the capacity as Advisory Counsel to CDT Alan Spadone requests
all parts of Board Exhibits 7, 9, 10, 22 & 23 be excluded from the Honor Investigative Hearing in
this matter.

2. The first allegation in this matter is that Cadet Spadone violated the Honor Code on or about
27 October 2009, by cheating, by plagiarizing all or part of his Advanced Composition (EN302)
Essay#4. Cadet Spadone has admitted to this violation and has acted in good faith while trying
to resolve this matter as judiciously as possible therefore, he will not object to Board Exhibits, 1,
2, 5, 6 & 11 despite a flagrant violation of the Cadet Respondent's Article 31 protections by
Major Anthony George, Dr. Terri Sabatos and Cadet Adam J. Bishop. This violation is even
identified by Cadet Bishop, a member of the Honor Committee where he states in his sworn
statement, "I had the Rights Notification form with me, but we decided to let an IT team read it
since he had made no incriminating statements and did not want to make a statement." **Please
see Board Exhibit 11.**

3. Board Exhibits 7, 9 & 10 recount what was clearly an interrogation of a subordinate by a Field
Grade Officer, a Civilian Professor and the a member of the Honor Committee. In fact the
Investigative Team Report, prepared by the IT who presumably interviewed Dr. Sabatos, states in
its findings, "Dr. Sabatos grew suspicious and on 30 Nov 2009, she set up a meeting with CDT
Spadone to discuss his paper." **Please see Appellate Exhibit IV -3.** These parties clearly
suspected Cadet Spadone of misconduct when they questioned him and did not inform his of his
right to remain silent consistent with Article 31 of the Uniform Code of Military Justice (UCMJ).

4. At the time of the incident, some three months ago, the USCC 15-1 in effect, as of 11
November 2009 did recognize the right to remain silent during the approach for clarification and
this approach clearly violated both Art 31 of the UCMJ and USCC 15-1. Article 31 applies in
this instance due to the fact that the statements made may incriminate the Cadet/Respondent
under Article 133 of the Uniform Code of Military Justice, Conduct Unbecoming an Officer and
Gentleman. Article 133 expressly states that it applies to Cadets and specifically lists cheating as
an example of an offense. The questioning was not an approach for clarification but an
interrogation that took place as part of an investigation of the Cadet/Respondent.

5. Article 31 cannot be limited by simply labeling a violation of the UCMJ as non-criminal.
Article 31 should apply whenever someone is under investigation even if the investigation is for
administrative matters. The US Court of Appeals for the Armed Forces has gone so far as to



APPELLATE EXHIBIT **XXVII -1**

000560

extend the protection to those questioned by an Inspector General (IG). US v. Cohen, 63 M.J. 45 (2006). In this instance one of the questioners was a Major who had previously interrogated this Cadet in the other matter at hand and he clearly suspected the Cadet of wrongdoing. The duty of Soldiers to adhere to the UCMJ may not be abrogated by their simple adherence to a local pamphlet (USCC PAM 15-1), which does not even have the authority of a General Order. An institution such as this charged with training future officers who are to follow the laws of the land irrespective of whether they agree with the underlying reasoning for these laws, should appreciate the duty to not circumvent the law.

6. USCC PAM 15-1 empowers the Hearing Advisor to ensure that all board exhibits are admissible.

7. Board Exhibits 22 & 23 EN 302 Absence Tracking Sheets should also be excluded for the reasons that they irrelevant to the matter at hand, may evidence some uncharged misconduct by the Cadet Respondent, they would serve to confuse the Board and that their prejudice far outweighs their probative value. Furthermore, there has been no offer of proof made by the Honor Committee as to the relevance of these documents and the Honor Committee has had ample opportunity to demonstrate any relevance

8. It should also be pointed out that there exist some procedural irregularities in this matter.

    a. The first is the total disregard for Article 31 illustrated above in Paragraph #2.

    b. The second example is where the Investigative Team Report states, *"CDT Spadone has said that if he had the actual books to review the page numbers in question, he may be able to point out where the information he used was located. However, the books are unavailable to be checked out, as they are in Dr. Sabatos's (sic) possession."* (Emphasis added) The fact that possible exculpatory evidence exists in the possession of the Government and has not been provided to the Cadet Respondent shocks the conscience. Not only does it evidence further due process violations of the Cadet Respondent but it demonstrates an appalling lack of thoroughness or concern by the Honor Investigative Team in violation of their charge under USCC Pam 15-1 and their appointment by the Commandant. **Please see Appellate Exhibit IV-4.**

    c. The third is where, in the Investigative Team Report states, in its analysis, *"CDT Spadone's failure to produce the notebook he mentioned with the accurate page numbers also discredits his story of knowing where exactly the information he cited was located in his texts."* (Emphasis added) **Please see Appellate Exhibit IV-4.** This is odd due to the fact that the PRHP Memorandum in this matter, dated 10 February 2010, states, *"Upon review of his notebook, there are no page numbers and there is barely anything written in his notebook, so the members of the panel believe that he lied..."* (Emphasis added) **Please see Appellate Exhibit VII-3.** These two statements are inconsistent and could be demonstrative of the fact that all evidence was not reviewed by the IT Team in this matter.

    d. The fourth example is the flagrant speedy trial violation in this matter. The first allegation was brought to the attention of the Honor Committee on or about 6 November 2009, some 117 days ago. The second and third allegations were brought to the attention of the Honor Committee on or about 30 November 2009, some 93 days ago. USCC Pam 15-1 paragraph 201 directs that such matters shall be resolved within 40 days. These investigations far exceed the

APPELLATE EXHIBIT XXVII-2 

limitations set by USCC Pam 15-1. The purpose for speedy trial is well recognized by this Republic and it affords protections to those accused in various ways such as in protecting the ripeness of evidence both testimonial and physical. This case demonstrates a pattern of disregarding many of the basic tenents of Due Process for which this Academy was created to protect.

9. Wherefore, the undersigned respectfully requests that, the aforementioned objectionable statements excluded from the HIH Board Packet in this matter or in the alternative and any other relief consistent with the facts herein.


MICHAEL T. BARRETT, ESQ.
Chief, Legal Assistance


cc.:
Chief of Military Justice
Cadet Spadone

## PRIVACY ACT STATEMENT

AUTHORITY: Title 10, United States Code, Section 3012.

PRINCIPAL PURPOSE: The purpose for soliciting this information is to provide the Superintendent, United States Military Academy, a basis for a determination regarding your alleged Cadet Honor Code violation and if so, what punishment, if any, is appropriate.

ROUTINE USES: Any information you provide is disclosable to members of the Department of Defense who have a need for the information in the performance of their duties.

DISCLOSURE: Providing the information is voluntary. There will be no adverse effect on you for not furnishing the information other than that certain information might not otherwise be available to the commander for his or her decision in the matter.

I, the undersigned, understand the significance and meaning of the above statement and its effect on me.

_____
Signature

**ALAN SPADONE**
(Printed Name)

**Company B-1, Class of 2011**
(Company and Class)

S Mar 2010
(Date)

Drafted 19 January 2005

APPELLATE EXHIBIT XXVIII

**HEADQUARTERS UNITED STATES MILITARY ACADEMY**
OFFICE OF THE COMMANDANT OF CADETS
WEST POINT, NEW YORK 10996

MACC-CPME-H                                                          2 March 2010

MEMORANDUM FOR: SEE DISTRIBUTION

SUBJECT:  Appointment of an Honor Investigative Hearing for Cadet Alan M. Spadone, Company B-1, Class of 2011.

1.  General.

    a. Name of Board:  Honor Investigation Hearing.

    b. Purpose:  To investigate and reach findings concerning the case for Cadet Alan M. Spadone Company B-1, Class of 2011.

    c. Authority:  *Honor System and SOP* dated February 2007. Hearing Advisor detailed by concurrence of commanders concerned.

    d. Period:  Indefinite.

    e. Effective Date:  2 MAR 2010

2.  The following board is appointed to call of the President thereof and will consist of members as follows in positions indicated.

    a. Primary Board Members:

        1)  GRAVES DONALD W, Company H-4, Class of 2010 USCC (Primary Honor Representative)
        2)  TAYLOR KATHERINE L, Company E-4, Class of 2010 USCC (Primary Honor Representative)
        3)  MULLIGAN THOMAS A, Company C-4, Class of 2011 USCC (Primary Honor Representative)
        4)  QUIMBY CHRISTINA , Company B-2, Class of 2011 USCC (Primary Honor Representative)
        5)  WRIGHT BRANDON L, Company B-2, Class of 2010 USCC (Primary Member)
        6)  LI YOU , Company F-2, Class of 2011 USCC (Primary Member)
        7)  OROZCO MARC A, Company C-4, Class of 2011 USCC (Primary Member)
        8)  LEE LOGAN D, Company H-3, Class of 2012 USCC (Primary Member)
        9)  HOLLAND COLE W, Company G-2, Class of 2013 USCC (Primary Member)



APPELLATE EXHIBIT -XXIX-1

000564

MACC-CPME-H
SUBJECT: Appointment of an Honor Investigative Hearing for Cadet Alan M. Spadone, Company B-1, Class of 2011.

b. Alternate Board Members:

    1) BORDEN STEFAN F, Company B-3, Class of 2010 USCC (Alternate Honor Representative)
    2) MCSHEA THOMAS M, Company G-4, Class of 2010 USCC (Alternate Honor Representative)
    3) LAPLANTE NICHOLAS A, Company B-4, Class of 2011 USCC (Alternate Honor Representative)
    4) RAMIA NATHAN B, Company F-4, Class of 2011 USCC (Alternate Honor Representative)
    5) SWANSON EZRA E, Company E-4, Class of 2010 USCC (Alternate Member)
    6) HAUCK CARISSA J, Company F-3, Class of 2011 USCC (Alternate Member)
    7) SCHUMAKER ANDREW P, Company G-2, Class of 2011 USCC (Alternate Member)
    8) CLEGG DEANNA L, Company E-3, Class of 2012 USCC (Alternate Member)
    9) VERDE JUSTIN M, Company D-4, Class of 2013 USCC (Alternate Member)

c. Reserve Board Members:

    1) PAPPAS ALEXANDER S, Company H-3, Class of 2010 USCC (Reserve Honor Representative)
    2) WURZBACH KATHARINE D, Company F-3, Class of 2010 USCC (Reserve Honor Representative)
    3) ANTHONY TERRELL U, Company D-4, Class of 2011 USCC (Reserve Honor Representative)
    4) PERIOLA MATTHEW E, Company A-4, Class of 2011 USCC (Reserve Honor Representative)
    5) BERNAU ERIC J, Company H-2, Class of 2010 USCC (Reserve Member)
    6) HUNDELT MATTHEW R, Company C-3, Class of 2011 USCC (Reserve Member)
    7) JOHNSON THOMAS J, Company G-4, Class of 2011 USCC (Reserve Member)
    8) CLUFF ISAAC C, Company H-2, Class of 2012 USCC (Reserve Member)
    9) MYERS SOFIA E, Company D-3, Class of 2013 USCC (Reserve Member)

3. Special Instructions: To be furnished separately to the Board President. Alternate members will be selected by class in order to replace members of the same class. Uniform: Appropriate seasonal uniform. The board is scheduled to convene on Monday, 8 March, at 0830 hours in Cadet Courtroom (Nininger Hall, 4th Floor)..

WILLIAM E. RAPP
Brigadier General, US Army
Commandant of Cadets

DISTRIBUTION :
All personnel concerned (1)

2   APPELLATE EXHIBIT   **XXIX-2**

DEPARTMENT OF THE ARMY
Cadet Honor Committee
United States Corps of Cadets
West Point, New York 10996

MACC-CPME-H

8 March 2010

MEMORANDUM FOR THE HONOR INVESTIGATIVE HEARING

SUBJECT: Investigative Representative Statement

1. **Allegations.**

**Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his Advanced Composition (EN302) Essay #4, and submitting it as his own without proper documentation, and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.**

**Cadet Alan Spadone, Company B-1, Class of 2011, did , at or near West Point, New York, on or about 4 December 2009, violate the Cadet Honor Code by lying, by stating to Doctor Terri Sabatos, Associate Professor, Department of English, that he did not accurately write down the authors or page numbers in his notebook, or words to that effect, knowing said statement was false at the time he presented it, or not then believing it to be true, and doing so with the intent to deceive or mislead another person.**

2. **Facts of the Case.**

   a. On or about 19 NOV 2009, CDT Alan Spadone submitted an EN302 essay entitled "The Contruction [sic] of an Image."

   b. CDT Spadone used information from Edwin Palmer Hoyt and Anne Tucker and provided citations including page numbers.

   c. On or about 30 NOV 2009, Dr. Terri Sabatos reviewed CDT Spadone's paper and noticed inconsistent sentences within the overall scheme of the paragraph the aforementioned sentence was placed.

   d. Noticing that said sentences had accompanying citations, Dr. Sabatos reviewed the page numbers associated with those citations to gain a better understanding of what CDT Spadone may have been trying to convey in his essay .

   e. At this time, Dr. Sabatos noticed that the information provided in CDT Spadone's citations were not found on the page number listed.

   f. On 30 NOV 2009, Dr. Sabatos arranged for a meeting with CDT Spadone to discuss his paper and to serve as an approach for clarification.

   g. The approach for clarification occurred on 4 DEC 2009 with CDT Spadone, Dr. Sabatos, MAJ Anthony George, the English Department Honor Officer, and CDT Daniel Gray, the Cadet Departmental Honor Liaison in attendance.

   h. During the approach for clarification, CDT Spadone stated that he may have inadvertently transferred his page citation notes from his notebook onto his paper.



APPELLATE EXHIBIT XXX - 1

MACC-CPME-H
SUBJECT: RHR Recommendation for Cadet Alan Spadone, Company B-1, Class of 2011

    i. When asked by Dr. Sabatos if CDT Spadone had the notebook on his person at the time, he replied negatively.

    j. With no further questions, CDT Spadone was released and on the recommendation of MAJ George and CDT Gray, the event was forwarded to the Cadet Honor Committee for investigation.

On or about, MAR

    k. 30 January Cadet Spadone gave notebook to Investigative Team.

Kenneth Howell
CDT CPT, USCC
1st Regimental Honor Representative
Cadet Honor Committee

HONOR INVESTIGATIVE HEARING        )
CASE OF CADET ALAN SPADONE          )        **FINDINGS WORKSHEET**
COMPANY B-1, CLASS OF 2011          )

1. If you do not find that the preponderance of evidence supports the allegations of the honor violations, the following should be announced by the President of the Board:

**"CADET SPADONE,** the finding of the Honor Board is that the allegations are not supported by a preponderance of the evidence."

2. If you find that the preponderance of evidence supports the allegations of the honor violations, the following should be announced by the President of the Board:

**"CADET SPADONE,** the finding of the Honor Board, at least six of the nine voting Members concurring, is that the following allegation(s) is/are supported by the preponderance of evidence, and that:

Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his Advanced Composition (EN302) Essay #4, and submitting it as his own without proper documentation, and doing so with the intent to gain an unfair advantage or to deceive or mislead another person.

~~Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 4 December 2009, violate the Cadet Honor Code by lying, by stating to Doctor Terri Sabatos, Associate Professor, Department of English, that he did not accurately write down the authors or page numbers in his notebook, or words to that effect, knowing said statement was false at the time he presented it, or not then believing it to be true, and doing so with the intent to deceive or mislead another person.~~

3. If you find that only one of the allegations is supported by a preponderance of the evidence, it should be announced as outlined in Paragraph 2, above; and as to the allegation(s) not supported by a preponderance of the evidence, the following should be announced:

"The board further finds that the other allegation(s) is/are not supported by a preponderance of the evidence."

**(Each allegation not supported by a preponderance of the evidence should be crossed out.)**



APPELLATE EXHIBIT **XXXI - 1**

HONOR INVESTIGATIVE HEARING    )
CASE OF CADET ALAN SPADONE    )    **FINDINGS WORKSHEET**
COMPANY B-1, CLASS OF 2011    )

4.  If the Board desires to make any appropriate advisory recommendations, they should be announced by the President of the Board after the findings.

PRESIDENT   Donald Graves   8 MAR 10     Member Christopher Cox   8 Mar 10

Member   Nicholas LaPlnto   8 MAR 10     Member   You Li   08 MAR 10

Member   Logan Lee   8 MAR 10     Member   Andrew Schumaker   8 Mar 10

Member   Katherine Caplin   8 March 10     Member   Cole W. Holland   8 MAR 10

Member   Brandon Wight   08 MAR 18

*Please print your <u>NAME and DATE</u> below your signature.
*Cross out the finding that is not applicable.

APPELLATE EXHIBIT **XXXI-2**

000569

RELATED EXHIBITS

000570

# SWORN STATEMENT

For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

## PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| **PRINCIPA** | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| **ROUTINE USES:** | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| **DISCLOSURE:** | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *IYYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Sherman Barracks, Room 510 | 20091118 | 1630 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Spadone, Alan, Matthew | N/A | CDT/2011 |

| 8. ORGANIZATION OR ADDRESS |
|---|
| USCC-B1 |

9.

I, Alan Spadone _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

When you were confronted by Dr. Sabatos and MAJ George, did you have any idea about what it might be about before you spoke with them?
I had a slight idea, yes. *AmS*

When you were about to sign your cover sheet, did you pause and reflect on your documentation before you acted?
I can't remember specifically. *AmS*

Is the document in enclosure 2 your paper?
Yes *AmS*

Are all of your citations accurate and true?
No, they're not. *AmS*

Did you change your paper after the peer review?
Yes-- minimal revision *AmS*

What factors of duress were you experiencing prior to submitting the paper?
I was obsessed with the goal of going abroad that when it was taken away from me, I lost sight of what was truly impoprtant. There are usual cadet pressures, but there was no excuse for my actions. *AmS*

Was time a factor at all in your actions?
Time is always a factor. *AmS*

How did seeking a semster abroad slot affect your performance?
I lost track of what was important here at the academy and should not have let that happen. All of the factors came together during the week when the paper was do *AmS*

Were you consious of the fact that plagiarizing would lead to an honor investigation? *AmS*
No, I don't think I was even thinking logically enough to evaluate those secondary and tertiary effects.

Who else have you talked to about this? → *Under advice of TAC and Company Honor Reps*
My parents, Mr. Barrett (chief legal assistant), CDT Josh Young (roommate) *AmS* *TAC, Company Honor Reps*

Have you read the Homay King article on lost in translation?
Yes, I read it in a journal. *AmS*

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT *AmS* | PAGE 1 OF 2 PAGES |
|---|---|---|

*ADDITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.*

**DA FORM 2823, DEC 1998**     DA FORM 2823, JUL 72, IS OBSOLETE     USAPA V 1.00

STATEMENT OF _Alan Spadone_   TAKEN AT _1922_   DATED _2009/11/17_

9. STATEMENT *(Continued)*

Ams

Ams                    Ams

Ams

**AFFIDAVIT**

I, _Alan Spadone_ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE     I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

WITNESSES: 

JEREMIAH ZINGAPAN

ORGANIZATION OR ADDRESS
USCC C-1

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _17_ day of _November_ , _2009_ at _1922_

_(Signature of Person Administering Oath)_

Martin Harris
_(Typed Name of Person Administering Oath)_

USCC Honor Committee
_(Authority To Administer Oaths)_

INITIALS OF PERSON MAKING STATEMENT   _AMS_

PAGE _2_ OF _2_ PAGES

*PAGE 3, DA FORM 2823, DEC 1998*

RELATED DOCUMENT 1-2
USAPA V 1,00
000572

# SWORN STATEMENT
For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

### PRIVACY ACT STATEMENT

| AUTHORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| RINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *IYYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Lee 522 | 2009/11/18 | 2143 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Spadone, Alan, Matthew | | 2011 |

| 8. ORGANIZATION OR ADDRESS |
|---|
| United States Military Academy |

9.

I, _Alan Spadone_____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I have always strived to represent myself, the United States Military Academy, and the Honor Code in the best possible light. I have always tried to live my life, never having to say "What if." Unfortunately my actions on October 27th violated this most strongly held belief. On October 27th I turned in a paper that was not my own, it was plagiarized.

I know nothing I can say that will justify my actions; I only offer information to illustrate some of the factors that were causing duress in my life. Ever since my first year at the Academy I have worked to obtain a semester abroad. I felt as though this experience would have greatly increased my development as I would be able to relate and operate in an ever-changing world. I am currently studying Farsi and currently there are no semester abroad options to Farsi speaking countries. With this knowledge I sought to obtain a nontraditional semester abroad. I was supported by numerous faculty members and administration figures. Over the summer I learned that I was one of ten international students to be selected by the University of Cambridge for a semester abroad slot. Over the summer I worked to coordinate this opportunity and all signs were that the program would go through. During the second week of school I was informed that the program was going to be denied, but the decesion would be reconsidered if outside funding was made available. Over the next four weeks I fought to obtain all of the necessary outside funding to cover the cost of the program. At this point I was told that it was not a funding issue, but rather an issue of this program not conforming to the semester abroad program goals. After this I tried to see if there was any other option. I percieved that at every turn, were before there was support, there was now denial.  *at AMS*

When this opportunity evaporated from my fingers I lost track of what was truly important. I was so focused on chasing my own "White Whale" that I lost track of values that are infinitely more important. I violated myself, the Honor Code, the United States Military Academy and my fellow cadets. I know nothing I say will take away from the seriousness of my actions and I accept the full consequence of my actions.

I know that this incident will be a catalyst in my life, teaching me what is truly important. I only hope that you give me the chance to give something back to the Country and the Academy that has given me so much.

*Nothing else Follows*

*AMS*

*AMS*

*AMS*

*AMS*

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT *AMS* | PAGE 1 OF _____ PAGES |
|---|---|---|

*ADDITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.*

**DA FORM 2823, DEC 1998**　　　　DA FORM 2823, JUL 72, IS OBSOLETE　　　　USAPA V 1.00


RELATED DOCUMENT 2-1
000573

STATEMENT OF _Alan Spadone_   TAKEN AT _____   DATED _____

9. STATEMENT *(Continued)*

A M S

A M S

A M S

A M S

**AFFIDAVIT**

I, _Alan Spadone_ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE ____ I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

WITNESSES: JEREMIAH ZINGAPAN

USCC ,C-1
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _18_ day of _November_
at _____

_(Signature of Person Administering Oath)_

Martin Harris
_(Typed Name of Person Administering Oath)_

USCC Honor Committee
_(Authority To Administer Oaths)_

ORGANIZATION OR ADDRESS

INITIALS OF PERSON MAKING STATEMENT   A M S

PAGE [ ] OF [ ] PAGES

*PAGE 3, DA FORM 2823, DEC 1998*

USAPA V 1.00

## SWORN STATEMENT

For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

### PRIVACY ACT STATEMENT

| | |
|---|---|
| \UTHORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| ʲRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Lincoln Hall | 20091116 | 1600 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| SABATOS, TERRI  RENEE | | Associate Professor |

| 8. ORGANIZATION OR ADDRESS |
|---|
| Department of English and Philosophy |

9.

I, __Terri Renee Sabatos_____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On 27 October 2009, Cadet Alan M. Spadone [ ] Company B1, Class of 2011, a student in my EN302 Advanced Composition class section (I10), turned in his EN302 Essay 3, which is 10% (100 pts) of his course grade. I took this section of EN302 over from Dr. Karen Peirce on October 21 (Lesson 23). Cadet Spadone's paper invites suspicion that he has represented an undocumented source as his own work to gain an unfair advantage.

This assignment required cadets to compose a 3-4 page essay in response to a prompt concerning conventional views of Japan in written and visual texts. On November 1, reading Cadet Spadone's essay on the film Lost in Translation, I immediately noticed the sophisticated writing style and vocabulary, including the use of the word "signifier," a word related to more advanced linguistic theory. The mature writing style continued without faltering and I became further troubled when Cadet Spadone mentioned the scholar Edward Said . I knew from my discussions with Dr. Karen Peirce, the instructor I had replaced, that Said's theories and writings had not been discussed in her portion of the course, and I had not used this text either.  Although Cadet Spadone cited Said's text Orientalism in his paper, he cited Said's book, not the edited version of the introduction to the book which is included on the EN302 website. Concerned that this paper had been informed by another source, I typed the phrase "rather, every image has the fresh quality and provisional status of a first impression" from Cadet Spadone's paper into a web search engine. The first hit was a review ›f the film Lost in Translation, by Homay King, that appeared in the journal Film Quarterly. I compared the first paragraph of Cadet Spadone's paper to the first paragraph of the Homay King review and they were almost identical. I went on to compare both paper and article side by side and found that virtually all of Cadet Spadone's paper was a paragraph by paragraph match with the review of the film from the journal. Although he cites many of the same sources as Homay King, Cadet Spadone does not cite Homay King.

On 6 November, I conducted an approach for clarification with Cadet Spadone; MAJ Anthony George the English Department's Honor officer, and Cadet Adam Bishop, the Cadet Departmental Honor Liaison were present. I showed Cadet Spadone his paper and the article I had found on the internet and asked him to read the first paragraphs of both and clarify how they could be so similar. Cadet Spadone replied "What can I say Ma'am, it was a bad week." He did not continue speaking but continued to flip through the essay. I waited for a few moments and said "Could you please clarify what that means; what are your trying to tell me about your paper?"  He made no further comment except to remark that the paper I showed him "looked like his paper" but he did not say anything further. I did not continue to question him. MAJ George told him that this was not an accusation, but a chance to clarify the similarities between his paper and the journal article and asked him if he had anything further to say.  Cadet Spadone said no and we released him.   I conferred with Cadet Bishop and MAJ George and we determined that the situation warranted an investigation.

I also conferred with Cadet Spadone's former instructor Dr. Karen Peirce and she was very clear that she covered the requirements to write papers in accordance with the Dean's Documentation of Written Work at Lesson 4, as stated in her syllabus.  According to the attendance log, Cadet Spadone was present at this class.

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF  2        PAGES |
|---|---|---|

*ʲDDITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE  INDICATED.*

**DA FORM 2823, DEC 1998**          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V 1.00

**USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED. PLEASE PROCEED TO FINAL PAGE OF THIS FORM.**

STATEMENT OF Terri Renee Sabatos          TAKEN AT 407 Lincoln Hall          DATED 20091116

9. STATEMENT *(Continued)*

   Cadet Spadone's entire essay, except for an occasional word change, and the concluding sentence of paragraph one, is copied from the film review by Homay King. Cadet Spadone did not document his use of this source although his acknowledgement statement indicates that he documented all sources used. Please note that also attached to his final paper is a draft that was peer reviewed by Cadet Tonsfeldt in class on 23 October as Cadet Spadone cites in his notes page. The handwriting on the draft is Cadet Tonsfeldt's. The peer review was proctored that lesson by MAJ Joshua Carlisle, a fellow EN302 instructor. It was the policy of Dr Karen Peirce that all drafts should be included when turning in final papers and I elected to continue that policy.

   I recommend that this case be forwarded to the Cadet Honor Committee for further investigation. Cadet Spadone did not have any unexpected explanation for the similarity between his paper and the review by Homay King and his actions may have been deliberate, intended to "deceive or gain an unfair advantage" (Documentation of Written Work, Section VI.2.c).



*Nothing Else Follows*

INITIALS OF PERSON MAKING STATEMENT

PAGE _____ OF _____ PAGES

RELATED DOCUMENT 00352

USAPA V1.00

STATEMENT OF _____ TAKEN AT 412 Lincoln Hall _____ DATED 20091021

9. STATEMENT (Continued)

*JRS*
*JRS* *JRS*
*JRS*

**AFFIDAVIT**

◼▬◼ Dr Terri Sabatos _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _____ I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*JR Sabatos*
(Signature of Person Making Statement)

WITNESSES: _____

Martin Harris

USCC, C-1
ORGANIZATION OR ADDRESS

_____

_____
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 16 day of November , 2009 at 407 Lincoln Hall

*J. Zingapan*
(Signature of Person Administering Oath)

JEREMIAH ZINGAPAN
(Typed Name of Person Administering Oath)
USCC Honor committee
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT
*JRS*

| | PAGE | | OF | | PAGES |
|---|---|---|---|---|---|

PAGE 3, DA FORM 2823, DEC 1998

RELATED DOCUMENT 3-7

USAPA V 1.00

000577

# SWORN STATEMENT
For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

### PRIVACY ACT STATEMENT

| AUTHORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| PRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Lincoln Hall 407 | 2009/11/16 | 1615 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Sabatos, Terri, Renee | | Assistant Professor |

| 8. ORGANIZATION OR ADDRESS |
|---|
| Department of English and Philosophy |

9.

I, _____ Terri Renee Sabatos _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

Who have you talked to about this case?

MAJ George, English Departmental Liason.
MAJ Ray Dillman, EN302 Course Director XO
LTC Justin Gage, EN302 Course XO
DR. Karen Peirce, original instructor
CDT Adam Bishop, Cadet English Honor Liason *JRS*

Who else should we talk to about this case?
No one else but the cadet [Spadone] himself. *JRS*

Do you have anything else to add?
No. *JRS*

*Nothing Else Follows   JRS*

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT *JRS* | PAGE 1 OF _____ PAGES |
|---|---|---|

*ADDITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.

**DA FORM 2823, DEC 1998**          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V 1.00

RELATED DOCUMENT 4-1
000578

STATEMENT OF _____   TAKEN AT _____   DATED _____

9. STATEMENT *(Continued)*

JRS

JRS   JRS

JRS

**AFFIDAVIT**

I, TERRI RENEE SABATOS _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT
WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE ____ I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE
BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE
CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT
THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*JRSabatos*

*(Signature of Person Making Statement)*

WITNESSES:

Martin Harris _____

USCC/C-1 _____
ORGANIZATION OR ADDRESS

_____

_____
ORGANIZATION OR ADDRESS

JRS

INITIALS OF PERSON MAKING STATEMENT

Subscribed and sworn to before me, a person authorized by law to
administer oaths, this 16 day of November, 2009
at Lincoln Hall 407

*(Signature of Person Administering Oath)*

JEREMIAH ZINGAPAN

*(Typed Name of Person Administering Oath)*

USCC Honor Committee

*(Authority To Administer Oaths)*

| PAGE | OF | PAGES |
|------|----|----|
|      |    |    |

*PAGE 3, DA FORM 2823, DEC 1998*

USAPA V 1.00

RELATED DOCUMENT 4.2

000579

## SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is PMG.

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN).

**PRINCIPAL PURPOSE:** To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents.

**ROUTINE USES:** Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions.

**DISCLOSURE:** Disclosure of your SSN and other information is voluntary.

| 1. LOCATION West Point, NY | 2. DATE (YYYYMMDD) 20091109 | 3. TIME 1800 | 4. FILE NUMBER |
|---|---|---|---|

| 5. LAST NAME, FIRST NAME, MIDDLE NAME Bishop, Adam, James | 6. SSN | 7. GRADE/STATUS |
|---|---|---|

8. ORGANIZATION OR ADDRESS  USCC

9.

I, _Adam J. Bishop_ , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I received an email from MAJ George requesting my presence as the English dept liaison for Honor at an Approach for clarification to take place in Lincoln Hall at 0900 on 6 Nov. 2009. When I showed up, MAJ George asked me how to conduct the approach the best way and I told him to be very open ended in his questions and not to make any accusations. All I knew about the case was that it involved possible plaigerism. We met up with Dr. Sabatos, the teacher, and we again went over how to ask questions and not be accusatory. At this point, Dr. S called in CDT Alan Spadone ('11) to MAJ George's office. Dr. Sabatos started by saying that this was an approach for clarification. CDT Spadone responded, "Ok." Dr. S. then showed Spadone his most recent paper with highlighted boxes around different sections and numbers next to them, then next to it, she laid an article with highlighted sections that were numbered. She then asked if he could explain

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT AJB | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

**DA FORM 2823, NOV 2006**     DA FORM 2823, DEC 1998, IS OBSOLETE     APD V1.00

RELATED DOCUMENT 5-1
00580

USE THIS PAGE IF NEEDED.  IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.

STATEMENT OF _Adam Bishop_ TAKEN AT _1800_ DATED _09 Nov 09_

9.  STATEMENT  *(Continued)*

the similarities between his paper and the article that was not cited. He responded with "What can I say, ma'am. It was a busy week." He didn't say anything else but continued flipping through his essay. Dr. Sabatos waited about a minute and asked what are you trying to say about your paper? CDT Spadone didn't respond. MAJ George then said that this wasn't an accusation, but merely an opportunity for him to clarify the similarities between his paper and this article. CDT Spadone continued looking at his paper in silence. MAJ George then asked if he had anything else to say and CDT Spadone responded "No". MAJ George asked Dr. Sabatos and I if we were satisfied and we said yes. They released CDT Spadone at this time. After he left, Dr. Sabatos and MAJ George discussed the approach with me. I told them it went very well because no accusatory remarks were made. I had the Rights Notification form with me, but we decided to let an IT team read it since he had made no incriminating statements and did not want to make a statement.

INITIALS OF PERSON MAKING STATEMENT _AB_

PAGE _2_ OF _3_ PAGES

RELATED DOCUMENT **5-2**

000581

STATEMENT OF _Adam Bishop_____ TAKEN AT _1800_____ DATED _09 Nov 2009__

9. STATEMENT  *(Continued)*

We all agreed that there was enough solid evidence to support an allegation of cheating and that CDT Spadone had not provided any sort of explanation for why his paper had identical paragraphs to the article. MAJ George and Dr. Sabatos discussed what the dept policy is for forwarding honor cases and they agreed to write statements for the Investigating Team when they come.

*Nothing Follows*

**AFFIDAVIT**

I, _Adam Bishop_____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE_____. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_____
*(Signature of Person Making Statement)*

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _10_ day of _November_, _2009_ at _West Point, NY_

_____

_____
ORGANIZATION OR ADDRESS

_____
*(Signature of Person Administering Oath)*

_Eric J Solomon_
*(Typed Name of Person Administering Oath)*

_____
ORGANIZATION OR ADDRESS

_USCC Honor Committee_
*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

PAGE     OF     PAGES

DA FORM 2823, NOV 2006

APD V1.00

**RELATED DOCUMENT 5-3**

000582

UNITED STATES MILITARY ACADEMY

PACIFIC-WIDE OCEAN OF FANTASIES

EN302: ADVANCED COMPOSITION

SECTION I14

PROF. SABATOS

BY

CADET ALAN SPADONE '11, CO B1

WEST POINT, NEW YORK

27 OCTOBER 2009

*AmS* MY DOCUMENTATION IDENTIFIES ALL SOURCES USED AND ASSISTANCE
RECEIVED IN COMPLETING THIS ASSIGNMENT.

_____ NO SOURCES WERE USED OR ASSISTANCE RECEIVED IN COMPLETING THIS
ASSIGNMENT.

SIGNATURE *Alan Spadone*

RELATED DOCUMENT 6-1

000583

Spadone 1

*best word?*

Sofia Coppola's *Lost in Translation* is littered with familiar signifiers for an

unfamiliar Japan: streets ablaze with neon pictographs, bowing concierges bustling after

*nice images* ☺

guests in a high-tech hotel, pop-star hipsters with multicolored hair sporting synthetic

fashions. Marketed as a comedy, the film prompts snickers of amusement from its

Western audience. But its humor did not translate well with Japanese audiences: the

film's Japanese distributor, Tohokushinsha Co., opted for a delayed opening at a single

Tokyo movie theater, with a website trailer as its sole advertisement. Local critics were

not laughing either: Yoshio Tsuchiya called the film "stereotypical and discriminatory";

the writer Kotaro Sawaki noted that the Japanese characters "are consistently portrayed as

*interesting word*

foolish" (Tsuchiya). Indeed, the film's Orientalism is marked enough to have prompted

the Los Angeles-based non-profit organization Asian Media Watch to launch a campaign

against its four Academy Award nominations. Despite such protests, the film garnered

the award for best original screenplay, and the majority of American critics have

continued to rave about its nuanced representation of cultural alienation (Musetto). Many

*nice.*

of these critics overlook the fact that the film really only captures the conventional, and at

times ethnocentric, American reaction to being in Japan.

With *Lost in Translation*, Coppola wavers between insight into the comedy of

cultural difference and clichéd cultural stereotyping. On occasion, the balance tips in her

favor. *Lost in Translation* does not claim to represent Tokyo authentically, objectively, or

thoroughly; rather, every image has the fresh quality and provisional status of a first

impression. But nor does the film sufficiently clarify that its real subject is not Tokyo

itself, but Western perceptions of Tokyo-in particular, the fantasies that two lonely

Americans project onto the city and its residents. When Japan appears superficial,

**RELATED DOCUMENT 6·2**

000584

inappropriately erotic, or unintelligible, we are never completely sure whether this vision belongs to Coppola, to her characters, or simply to a Hollywood cinematic imaginary that has been offering up such images of the East since the early 1900's (Marchetti 40). We remain unsure whose pair of murky glasses we are wearing, lost without reference points in a Pacific-wide ocean of fantasies.

It was the late Edward Said who wrote the book on Orientalism. While his study concerns Western Europe's relation to the Arab world, rather than the United States' relation to East Asia, Said's text is still an illuminating one in this context. "Everyone who writes about the Orient," Said cautions, "must locate himself vis-à-vis the Orient" (20). This location, Said continues, is not spatial, but rather discursive, subjective, and perceptual. It includes "the kind of narrative voice" the author adopts, "the type of structure" the text assumes, and "the kinds of images, themes, and motifs" that circulate within it, all of which, according to Said, ultimately conspire to "contain" the Orient: to "represent or speak on its behalf"(20).

In a way, we could say that a film like *Lost in Translation* breaks from the tradition of Orientalism that Said is describing because its author never clearly locates herself in relation to the city and people she films. We feel like aloof tourists at one turn and intimate locals at the next. Coppola's camera adopts an ambiguous attitude, combining dazzled humility with bemused condescension. At no point, it is true, do we securely occupy the confident position of the superior Western gaze upon the non-Western. But the film ends up containing the Orient and "speaking on its behalf"(Said 20) in another way: by representing it as a space where an American may get lost, but without being significantly changed or unmoored by the experience. As Scarlett

RELATED DOCUMENT 6-3

000585

Johansson's character puts it, she "doesn't feel anything" when she encounters her cultural others (Coppola).

Our guides on the journey are Bob Harris (Bill Murray), a fading, B-level Hollywood actor who travels to Tokyo to shoot a Suntory whiskey advertisement, and Charlotte (Scarlett Johansson), a recent Yale graduate, already bored in her marriage, who has accompanied her music-producer husband on a trip to film a video. Both characters have lost their bearings, the compasses of their desire momentarily set adrift by the very images through which they had previously defined themselves. Charlotte and Bob meet by chance in the New York Bar of the Park Hyatt Hotel, where lounge singers croon tepid versions of American pop songs as tourists sip their American cocktails. Charlotte recognizes Bob from his movies. Along with the setting, this dose of the familiar provides an antidote to their homesickness and insomnia that will spark an eroticized yet sublimated friendship.

When Bob shows up for his photo shoot, he is confronted with the images that Japanese culture has projected onto him as a representative of Hollywood masculinity. The photographer commands him to assume various iconic poses-a James Bond wink, a Dean Martin swagger-as he reluctantly tips his glass for the camera. The scene is acted and shot for humor at the expense of the Japanese perception of what a desirable American male looks like: how he sits and gestures, what kind of suit he wears, what kind of whiskey he drinks. The more Bob gives the photographer what he wants, the more he is emasculated, both because he is following the orders of a man who cannot correctly pronounce "Rat Pack," and because the images he recreates seem antiquated and



**RELATED DOCUMENT 6-4**

fey by contemporary American standards. But this emasculation does not stick to Bob. It is returned to sender: attributed to Japanese naïveté rather than to its American source.

Many scenes in *Lost in Translation* would seem to present opportunities for the mirror to be held up in the other direction. But because point of view is limited to Bob and Charlotte, we see more of their incomprehension than that of their hosts. The camera emphasizes Bob's bewildered reaction to the bowing greeters at the hotel, his face an amalgam of jet lag and sarcasm. When a call girl arrives at his hotel room, the camera seems to share his vaguely repulsed indifference. The film prompts us to read this incident, as well as his quick exit from an after-hours strip club, as a comment on Japanese sexuality and gender roles rather than on American prudishness. The film focalizes these images through Bob: it is the greeter, not he, who looks ridiculous; it is the dancer who is overly salacious, not he who projects this image onto her. Other scenes in the film-Bob's appearance on a Japanese television show, for instance-share in this attitude.

There are a few scenes where we get an inkling that the incomprehension is mutual, a flicker of understanding that the West might also be an exotic enigma for the East. In a scene at a hospital waiting room, for instance, a stranger asks Bob in Japanese how many years he has been in Japan. Failing to understand, Bob can only mimic a few syllables; his interlocutor bursts into laughter. The tables are turned: West now imitates East.

Yet on the whole, *Lost in Translation* makes but minimal efforts to rewrite the myths of Asia that Hollywood film has been recycling for nearly a century: the Orient as primitive, feminized, and eroticized; Asian citizens as alternately silly or perilous,

RELATED DOCUMENT 6.5

000587

enigmatic and cloaked in artifice. Such myths can be traced to historical factors such as the Opium Wars, nineteenth-century immigration patterns from China, the traumas of World War II, the Korean War, and the Vietnam War. But they also fulfill a psychical need, a projection whereby Hollywood's Tokyos and Chinatowns become a kind of cinematic dumping ground for anything that defies Western comprehension.

RELATED DOCUMENT 6.6

Spadone 6

## Works Cited

*Lost in Translation.* Dir. Sofia Coppola. Focus Features, 2003. DVD.

Marchetti, Gina. *Romance and the "Yellow Peril": Race, Sex, and Discursie Strategies.*
    Berkeley: University of California, 1993.

Musetto, V.A. ""Lost" in Translation." *New York Post* [New York] 21 May 2009.

Said, Edward W. *Orientalism.* New York: Vintage, 1979.

Tsuchiya, Yoshio. Trans. Fumie Nakamura. Film Review in *Yomiuri Shimbun* 19 Apr.
    2009.

RELATED DOCUMENT **6·7**

Spadone 7

Notes

    1.    CDT Eric Tonsfeldt, C4, '11, assistance given to author, verbal discussion, West Point, New York,  23 October 2009.  Cadet Tonsfeldt reviewed my essay in class and commented on my focus and depth of the essay.  His comments are attached.

RELATED DOCUMENT 6.8

000590

*consider connotation of word*

Sofia Coppola's *Lost in Translation* (2003) is littered with familiar signifiers for an unfamiliar Japan: streets ablaze with neon pictographs, bowing concierges bustling after guests in a high-tech hotel, pop-star hipsters with multicolored hair sporting *culture?* synthetic fashions. Marketed as a comedy, the film prompts snickers of amusement from its Western audience. But its humor did not translate well with Japanese audiences: the film's Japanese distributor, Tohokushinsha Co., opted for a delayed opening at a single Tokyo movie theater, with a website trailer as its sole advertisement. Local critics were not laughing either: Yoshio Tsuchiya called the film "stereotypical and discriminatory"; the writer Kotaro Sawaki noted that the Japanese characters "are consistently portrayed as foolish." NEED CITATION 1 Indeed, the film's Orientalism is marked enough to have prompted the Los Angeles-based non-profit organization Asian Media Watch to launch a campaign against its four Academy Award nominations. Despite such protests, the film garnered the award for best original screenplay, and the majority of American critics have continued to rave about its nuanced representation of cultural alienation.

With *Lost in Translation*, Coppola wavers between insight into the comedy of cultural difference and clichéd cultural stereotyping On occasion, the balance tips in her favor. *Lost in Translation* does not claim to represent Tokyo authentically, objectively, or thoroughly; rather, every image has the fresh quality and provisional status of a first impression. But nor does the film sufficiently clarify that its real subject is not Tokyo itself, but Western perceptions of Tokyo-in particular, the fantasies that two lonely Americans project onto the city and its residents. When Japan appears superficial, inappropriately erotic, or unintelligible, we are never completely sure whether this vision belongs to Coppola, to her characters, or simply to a Hollywood cinematic imaginary that

*include thesis*
*that foreigns view of foreign*
*about to link*
*to stuff*
*to prompt*

*her movie*

*Comical Difference vs stereotyping*

*Solidify this stuff into a topic sentence that links to "Conventi view*

*Very Good*

*Break up*

has been offering up such images of the East at least since Cecil B. DeMille's 1915 *The Cheat*, as described by scholar Gina Marchetti. NEED CITATION 2 We remain unsure whose pair of murky glasses we are wearing, lost without reference points in a Pacific-wide ocean of fantasies.

*bring in the title somehow + make it a topic sentence that links paragraph with thesis*

It was the late Edward Said who wrote the book on Orientalism. While his study concerns Western Europe's relation to the Arab world, rather than the United States' relation to East Asia, Said's text is still an illuminating one in this context. "Everyone who writes about the Orient," Said cautions, "must locate himself vis-à-vis the Orient." This location, Said continues, is not spatial, but rather discursive, subjective, and perceptual. It includes "the kind of narrative voice" the author adopts, "the type of structure" the text assumes, and "the kinds of images, themes, and motifs" that circulate within it, all of which, according to Said, ultimately conspire to "contain" the Orient: to "represent or speak on its behalf." NEED CITATION 3 In a way, we could say that a film like *Lost in Translation* breaks from the tradition of Orientalism that Said is describing because its author never clearly locates herself in relation to the city and people she films. We feel like aloof tourists at one turn and intimate locals at the next. Coppola's camera adopts an ambiguous attitude, combining dazzled humility with bemused condescension. At no point, it is true, do we securely occupy the confident position of the superior Western gaze upon the non-Western. But the film ends up containing the Orient and "speaking on its behalf" in another way: by representing it as a space where an American may get lost, but without being significantly changed or unmoored by the experience. As Scarlett Johansson's character puts it, she "doesn't feel anything" when she encounters her cultural others.

*Orientalist Theory*

*Again, awesome. But break up*

*Tie to Orientalism*

*awkward*

Our guides on the journey are Bob Harris (Bill Murray), a fading, B-level Hollywood actor who travels to Tokyo to shoot a Suntory whiskey advertisement, and Charlotte (Johansson), a recent Yale graduate, already bored in her marriage, who has accompanied her music-producer husband on a trip to film a video. Both characters have lost their bearings, the compasses of their desire momentarily set adrift by the very images through which they had previously defined themselves. Charlotte and Bob meet by chance in the New York Bar of the Park Hyatt Hotel, where lounge singers croon tepid versions of American pop songs as tourists sip their American cocktails. Charlotte recognizes Bob from his movies. Along with the setting, this dose of the familiar provides an antidote to their homesickness and insomnia that will spark an eroticized yet sublimated friendship.

When Bob shows up for his photo shoot, he is confronted with the images that Japanese culture has projected onto him as a representative of Hollywood masculinity. The photographer commands him to assume various iconic poses-a James Bond wink, a Dean Martin swagger-as he reluctantly tips his glass for the camera. The scene is acted and shot for humor at the expense of the Japanese perception of what a desirable American male looks like: how he sits and gestures, what kind of suit he wears, what kind of whiskey he drinks. The more Bob gives the photographer what he wants, the more he is emasculated, both because he is following the orders of a man who cannot correctly pronounce "Rat Pack," and because the images he recreates seem antiquated and fey by contemporary American standards. But this emasculation does not stick to Bob. It is returned to sender: attributed to Japanese naïveté rather than to its American source.

**RELATED DOCUMENT 7.3**

000593

*Again thesis, in fic in*

Many scenes in *Lost in Translation* would seem to present opportunities for the mirror to be held up in the other direction. But because point of view is limited to Bob and Charlotte, we see more of their incomprehension than that of their hosts. The camera emphasizes Bob's bewildered reaction to the bowing greeters at the hotel, his face an amalgam of jet lag and sarcasm. When a call girl arrives at his hotel room, the camera seems to share his vaguely repulsed indifference. The film prompts us to read this incident, as well as his quick exit from an after-hours strip club, as a comment on Japanese sexuality and gender roles rather than on American prudishness. The film focalizes these images through Bob: it is the greeter, not he, who looks ridiculous; it is the dancer who is overly salacious, not he who projects this image onto her. Other scenes in the film-Bob's appearance on a Japanese television show, for instance-share in this attitude.

*More representation of Japanese*

There are a few scenes where we get an inkling that the incomprehension is mutual, a flicker of understanding that the West might also be an exotic enigma for the East. In a scene at a hospital waiting room, for instance, a stranger asks Bob in Japanese how many years he has been in Japan. Failing to understand, Bob can only mimic a few syllables; his interlocutor bursts into laughter. The tables are turned: West now imitates East. But on the whole, *Lost in Translation* makes but minimal efforts to rewrite the myths of Asia that Hollywood film has been recycling for nearly a century: the Orient as primitive, feminized, and eroticized; Asian citizens as alternately silly or perilous, enigmatic and cloaked in artifice. Such myths can be traced to historical factors such as the Opium Wars, nineteenth-century immigration patterns from China, the traumas of World War II, the Korean War, and the Vietnam War. But they also fulfill a psychical

*Turn of perception*

**RELATED DOCUMENT 7.4**

need, a projection whereby Hollywood's Tokyos and Chinatowns become a kind of

cinematic dumping ground for anything that defies Western comprehension.

You need a conclusion that ties in main points, and funnels down to your overall thesis

RELATED DOCUMENT 7.5

000595

# Lost in Translation

Director/writer: Sofia Coppola. Producers: Ross Katz, Coppola. Cinematographer: Lance Acord. Focus Features/Universal.

Sofia Coppola's *Lost in Translation* (2003) is littered with familiar signifiers for an unfamiliar Japan: streets ablaze with neon pictographs, bowing concierges bustling after guests in a high-tech hotel, pop-star hipsters with multicolored hair sporting synthetic fashions. Marketed as a comedy, the film prompts snickers of amusement from its Western audience. But its humor did not translate well with Japanese audiences: the film's Japanese distributor, Tohokushinsha Co., opted for a delayed opening at a single Tokyo movie theater, with a website trailer as its sole advertisement. Local critics were not laughing either: Yoshio Tsuchiya called the film "stereotypical and discriminatory"; the writer Kotaro Sawaki noted that the Japanese characters "are consistently portrayed as foolish."[1] Indeed, the film's Orientalism is marked enough to have prompted the Los Angles-based non-profit organization Asian Media Watch to launch a campaign against its four Academy Award nominations. Despite such protests, the film garnered the award for best original screenplay, and the majority of American critics have continued to rave about its nuanced representation of cultural alienation.



Bill Murray and Scarlett Johansson—two lonely Americans in *Lost in Translation*

With *Lost in Translation,* Coppola wavers between insight into the comedy of cultural difference and clichéd cultural stereotyping. On occasion, the balance tips in her favor. *Lost in Translation* does not claim to represent Tokyo authentically, objectively, or thoroughly; rather, every image has the fresh quality and provisional status of a first impression. But nor does the film sufficiently clarify that its real subject is not Tokyo itself, but Western perceptions of Tokyo—in particular, the fantasies that two lonely Americans project onto the city and its residents. When Japan appears superficial, inappropriately erotic, or unintelligible, we are never completely sure whether this vision belongs to Coppola, to her characters, or simply to a Hollywood cinematic imaginary that has been offering up such images of the East at least since Cecil B. DeMille's 1915 *The Cheat,* as described by scholar Gina Marchetti.[2] We remain unsure whose pair of murky glasses we are wearing, lost without reference points in a Pacific-wide ocean of fantasies.

45

*Film Quarterly,* Vol. 59, Issue 1, pages 45-48. ISSN 0015-1386, electronic ISSN 1533-8630. © 2005 by The Regents of the University of California. All rights reserved. Please direct all requests for permission to photocopy or reproduce article content through the University of California Press's Rights and Permissions website, at www.ucpress.edu/journals/rights.htm.

RELATED DOCUMENT 8-1

000596

It was of course the late Edward Said who wrote the book on Orientalism. While his study concerns Western Europe's relation to the Arab world, rather than the United States' relation to East Asia, Said's text is still an illuminating one in this context. "Everyone who writes about the Orient," Said cautions, "must locate himself vis-à-vis the Orient." This location, Said continues, is not spatial, but rather discursive, subjective, and perceptual. It includes "the kind of narrative voice" the author adopts, "the type of structure" the text assumes, and "the kinds of images, themes, and motifs" that circulate within it, all of which, according to Said, ultimately conspire to "contain" the Orient: to "represent or speak on its behalf."[3] In a way, we could say that a film like *Lost in Translation* breaks from the tradition of Orientalism that Said is describing because its author never clearly locates herself in relation to the city and people she films. We feel like aloof tourists at one turn and intimate locals at the next. Coppola's camera adopts an ambiguous attitude, combining dazzled humility with bemused condescension. At no point, is it true, do we securely occupy the confident position of the superior Western gaze upon the non-Western. But the film ends up containing the Orient and "speaking on its behalf" in another way: by representing it as a space where an American may get lost, but without being significantly changed or unmoored by the experience. As Scarlett Johansson's character puts it, she "doesn't feel anything" when she encounters her cultural others.

Our guides on the journey are Bob Harris (Bill Murray), a fading, B-level Hollywood actor who travels to Tokyo to shoot a Suntory whiskey advertisement, and Charlotte (Johansson), a recent Yale graduate, already bored in her marriage, who has accompanied her music-producer husband on a trip to film a video. Both characters have lost their bearings, the compasses of their desire momentarily set adrift by the very images through which they had previously defined themselves. Charlotte and Bob meet by chance in the New York Bar of the Park Hyatt Hotel, where lounge singers croon tepid versions of American pop songs as tourists sip their American cocktails. Charlotte recognizes Bob from his movies. Along with the setting, this dose of the familiar provides an antidote to their homesickness and insomnia that will spark an eroticized yet sublimated friendship.

When Bob shows up for his photo shoot, he is confronted with the images that Japanese culture has projected onto him as a representative of Hollywood masculinity. The photographer commands him to assume various iconic poses—a James Bond wink, a Dean Martin swagger—as he reluctantly tips his glass for the camera. The scene is acted and shot for humor at the expense of the Japanese perception of what a desirable American male looks like: how he sits and gestures, what kind of suit he wears, what kind of whiskey he drinks. The more Bob gives the photographer what he wants, the more he is emasculated, both because he is following the orders of a man who cannot correctly pronounce "Rat Pack," and because the images he recreates seem antiquated and fey by contemporary American standards. But this emasculation does not stick to Bob. It is returned to sender: attributed to Japanese naïveté rather than to its American source.

Many scenes in *Lost in Translation* would seem to present opportunities for the mirror to be held up in the other direction. But because point of view is limited to Bob and Charlotte, we see more of their incomprehension than that of their hosts. The camera emphasizes Bob's bewildered reaction to the bowing greeters at the hotel, his face an amalgam of jet lag and sarcasm. When a call girl arrives at his hotel room, the camera seems to share his vaguely repulsed indifference. The film prompts us to read this incident, as well as his quick exit from an after-hours strip club, as a comment on Japanese sexuality and gender roles rather than on American prudishness. The film focalizes these images through Bob: it is the greeter, not he, who looks ridiculous; it is the dancer who is overly salacious, not he who projects this image onto her. Other scenes in the film—Bob's appearance on a Japanese television show, for instance—share in this attitude.

There are a few scenes where we get an inkling that the incomprehension is mutual, a flicker of understanding that the West might also be an exotic enigma for the East. In a scene at a hospital waiting room, for instance, a stranger asks Bob in Japanese how many years he has been in Japan. Failing to understand, Bob can only mimic a few syllables; his interlocutor bursts into laughter. The tables are turned: West now imitates East. But on the whole, *Lost in Translation* makes but minimal efforts to rewrite the myths of Asia that Hollywood film has been recycling for nearly a century: the Orient as primitive, feminized, and eroticized; Asian citizens as alternately silly or perilous, enigmatic and cloaked in artifice. Such myths can be traced to historical factors such as the Opium Wars, nineteenth-century immigration patterns from China, the traumas of World War II, the Korean War, and the Vietnam War. But they also fulfill a psychical need, a projection whereby Hollywood's Tokyos and Chinatowns become a kind of cinematic dumping ground for anything that defies Western comprehension.[4]

46



Set adrift on the streets of Tokyo ...

How, then, does one make a film about one people's projections onto another, one culture's fantasies about another, without reproducing those very projections? How does one represent what is lost in translation from both sides? The task may ultimately be impossible: to strip away those projections entirely would require a vision unencumbered—and unenhanced—by the human psyche. But Coppola's earlier film, *The Virgin Suicides,* handles an analogous transaction more deftly. In *The Virgin Suicides,* a group of adolescent boys fantasize about the five beautiful sisters who live across the street as, one by one, these sisters take their own lives. Wanting to communicate, but not knowing how to crack through the walls of the girls' enchanted castle, the boys can only watch and send coded messages by phonograph. The sisters remain a mystery; their actions are never fully explained. But if they are reduced to Ophelia-like ciphers of tragic girlhood, it is because this film is not really about them: it is about the boys' fascination with them. *The Virgin Suicides* is about the boys' struggle to sift through the thickly layered images of 1970s idealized femininity—Brady Bunch sisters, Barbie dolls, Karen Carpenter, echoes of the von Trapp family—and find the human beings underneath. This story is equally important to tell, because, as the film makes clear, the girls' own subjectivities are not distinct from but shaped by these very images.

*Lost in Translation* might have benefited from a similar treatment—from a clarification that its Japan is but an amalgam of signs and images. It might also have benefited from the influence of earlier films that address the theme of Western perceptions of the East. Chris Marker's *Sans soleil* (1983), Leslie Thornton's

*Adynata* (1983), and Wim Wenders' *Tokyo-Ga* (1985) and *Notebook on Cities and Clothes* (1989) come to mind. Of particular relevance is *Tokyo-Ga,* which documents the filmmaker's trip to Japan in the spring of 1983. Initially, Wenders goes to research Yasujiro Ozu, but he soon becomes entranced by the landscape as a whole: he films Pachinko parlors, indoor golf ranges, and a factory where artificial plastic foods are produced. Part essay, part travelogue, *Tokyo-Ga* is narrated from multiple "locations," in Said's sense. Wenders speaks to us in voiceover as pilgrim, film historian, and poet-philosopher. At one turn he applies the researcher's detached gaze to Japanese athletics; at another he reveals the depths of his love for Yuuharu Atsuta's cinematography. But at each point, Wenders specifies the context of his perceptions and marks his relationship to them. Like Roland Barthes' *Empire of Signs,* a book of meditative fragments inspired by a similar trip, *Tokyo-Ga* makes clear that it "in no way attempts to represent reality itself." Rather, it could be said, in Barthes' words, to "descend into the untranslatable . . . without attempting to muffle its shock."[5]

An example of this occurs when Wenders shows two sets of images of the Shinjuko neighborhood in Tokyo, filmed first with his own lens, and then a second time with the 50-millimeter lens preferred by Ozu. "Another image presented itself," he tells us, "one that no longer belonged to me." Soon after, Wenders happens upon a group of Japanese teenagers in 1950s styles of dress, earnestly lindy-hopping as the music of Elvis Presley sounds from a boom box in a public park. At no time, however, does Wenders' camera smirk at them. Rather, it seems to marvel at the inextricable mixture of

47

**RELATED DOCUMENT 8·3**

East and West, and at the emergence of the past into the present in such an unexpected and vital form. Unlike the photographers and karaoke singers in *Lost in Translation*, these dancers are not foreign copycats mimicking and pirating a superior American ideal. Rather, their rockabilly masks are donned with all the self-consciousness of Kabuki actors. They do not transcribe 1950s America; they translate it.

*Lost in Translation*, on the other hand, emphasizes what is mimicked without understanding, what escapes translation. Sensations of incomprehension, of loss of control, of forgetting even the time of day, tend to dominate. These sensations, the film makes clear, can be highly pleasurable, and even transformative when one is open to them. Coppola's images of Tokyo streets viewed through the windows of taxis reveal a carnival of sirenlike signs, ablaze and saturating the skyline. During an extended nightlife sequence, Bob and Charlotte rent a karaoke room in a high-rise building; its façade appears as if sectioned into hundreds of television screens. This image calls attention to its representational status, its status as sign rather than reality. Cityscapes that appear to defy the laws of Western perspective, curving off-ramps that seem to defy gravity—these are rendered all the more exhilarating because Bob and Charlotte cannot read them, and thus may appreciate them for their visual properties. Such images revel in the feeling of lostness without attempting to muffle its shock with cheap humor.

One scene in *Lost in Translation* appears to quote another of Wenders' films, *Paris, Texas*. This is a kindred film in that it represents a European perception of a foreign place, the American West. In one scene, the eight-year-old Hunter sits in the window of a Houston, Texas, hotel listening to a tape recording that his father has left for him: a goodbye letter. Hunter's body outlined against the views of an alien city, the disembodied voice of his father both bridging and highlighting the sense of disconnection—these qualities are also apparent in an image of Coppola's, in which Charlotte sits in her Tokyo hotel-room window talking on the telephone to a relative back home. The reference is subtle enough that the quotation cannot be vouchsafed; I cannot really tell whether I am projecting it onto Coppola's film. But perhaps this is what *Lost in Translation* can teach us: that an authentic essence can never be fully distinguished from the barrage of signifiers that are slathered onto it. The trick, then, is to chart that risky territory with care, and with openness to new ways of seeing.

## NOTES

1. Yoshio Tsuchiya, trans. Fumie Nakamura, film review in *Yomiuri Shimbun* (April 19, 2004); Kotaro Sawaki, film review in *Asahi Shimbun*, quoted in V. A. Musetto, "'Lost' in Transition," *New York Post* (May 21, 2004).

2. See Gina Marchetti, *Romance and the "Yellow Peril": Race, Sex, and Discursive Strategies in Hollywood Fiction* (Berkeley, CA: University of California Press, 1993).

3. Edward W. Said, *Orientalism* (New York: Vintage, 1979), 20.

4. For more detailed studies of the psychical mechanisms that underlie this type of racialized subjectivity, see Anne Cheng's *The Melancholy of Race: Psychoanalysis, Assimilation, and Hidden Grief* (New York: Oxford University Press, 2001) and David Eng's *Racial Castration: Managing Masculinity in Asian America* (Durham, N.C.: Duke University Press, 2001).

5. Roland Barthes, *Empire of Signs*, trans. Richard Howard (New York: Hill and Wang, 1982), 3.

**HOMAY KING** is Assistant Professor of Film Studies in the Department of History of Art at Bryn Mawr College. Her essays have appeared in *Camera Obscura*, *Discourse*, and *Qui Parle*.

**ABSTRACT** *Lost in Translation* was big in the States, but less so in Japan, where its racism deterred critics. While clearly trafficking in stereotypes, the film does depart from Hollywood's tradition of Orientalism by indicating that its Tokyo is actually a fantasy version projected by Americans abroad. Still, the film lacks the complexity of its European predecessors.

RELATED DOCUMENT 8·4

000599

# EN302: Advanced Composition
## Essay 3: Japan and the "They Say" Argument
### (100 points)

In persuasive writing, as in conversation, one has to know what "they" say. The mysterious but authoritative "they" are often the pronouncements of conventional wisdom. "They" say that texting while driving is dangerous. "They" say that the Yankees will win the pennant this year. "They" say that Cows at USMA are cynical—and then based on our direct or indirect experiences with Cows we can either agree, disagree, or make another, related point about the nature of Cows to continue the conversation. Before we can stake out an alternative position of our own, however, we must understand the conventional views of many participants. Those views might come in various colors, from the common sensical to the maliciously stereotypical. This assignment asks you to explore what "they" might say about Japan based on interpreting something you've read or viewed. It asks you to imagine an interpreter who has a common perspective on Japanese culture, one that may be different than your own in ways large or small. How would you define the conventional view? What would "they" say about the Japanese based on a given artifact of communication? Why would "they" say that after reading or viewing it? How is what "they" would say conventional?

> Select a text, film, or image that you have read or viewed for the course and write an essay explaining how it presents a conventional view of the Japanese.

Due: at the **beginning** of Lesson 25 on 26/27 October 2009.

**Essay Format:**
- **A title page** formatted in accordance with *Dean's Documentation of Written Work*, section X (pages 21-23) and appendix 1;
- **Essay pages** typed in 12-point Times New Roman font; double-spaced; 1" margin top, bottom, left, and right, with a ½ inch left gutter; last name and page number in the top right header;
- **A Notes page**, if required, describing collaboration or assistance as detailed in section VII of *DDWW;*
- **A Works Cited page** in MLA style for all sources, collaboration, or assistance (See *Little, Brown Handbook* chapters 47 and 48).

**Documentation:** Use Modern Language Association (MLA) in-text parenthetical references. Consult *Little, Brown Handbook,* Chapter 47, "Using MLA Documentation and Format," for examples. To cite assistance, use superscript notes and a Notes page inserted before your Works Cited page. Acknowledge all homework assignments according to Appendix 6 of *DDWW.*

**USMA Writing Standards:** We evaluate writing in four interdependent dimensions. Competent writing observes all four of these dimensions: substance, organization, style, correctness and conventions. These standards are more fully explained in the course syllabus.

**Turn-in procedure:** HARD COPY IN CLASS on LESSON 25, OCTOBER 26 (Monday) /27 (Tuesday)

## RELATED DOCUMENT 9

# SWORN STATEMENT
For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

## PRIVACY ACT STATEMENT

| AUTHORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| PRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *IYYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| 412 Lincoln Hall | 20091116 | 1640 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| George, Anthony | | Major |

| 8. ORGANIZATION OR ADDRESS |
|---|
| Department of English and Philosophy |

9.

I, Anthony George _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

1. On 6 November I sat in an approach for clarification with Dr. Terri Sabatos, Cadet Alan Spadone, and Cadet Adam Bishop. Dr. Sabatos was conducting the approach because of a paper that Cadet Spadone had turned in that appeared to be taken from an internet source and was not documented. Before the approach actually happened, Dr. Sabatos, CDTBishop, and myself, talked and clarified that the purpose of the approach was not to accuse CDT Spadone of anything and that we were only going to determine if there was some explanation that he might have, that Dr Sabatos may not have thought of, that could clarify the situation. During the actual approach, Dr. Sabatos showed CDT Spadone the paper he'd turned in and an article off of the internet that was very similar to much of the content in CDT Spadone's paper. Dr Sabatos asked CDT Spadone if he could explain the similarity. CDT Spadone did not have a ready explanation; he looked at the two documents for a few moments then said something similar to "what can I say, it was a bad week". Dr. Sabatos gave him more time to look at the papers and to give an explanation, but when it seemed apparent that there was no clarifying explanation forthcoming, I ended the approach. Since the purpose of the approach was not going to be achieved, we stopped it and the packet for an Honor Investigation was begun.

who else should we talk to about this case?
LTC Wilson, because he can serve as the impartial reviewer. AG

who have you talked to about this case?
Only CDT Bishop and Dr. Sabatos. AG

Do you have anything else to add?
No. AG

NOTHING FOLLOWS

AG   AG
AG      AG

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT AG | PAGE 1 OF 2 PAGES |
|---|---|---|

*ADDITIONAL PAGES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.*

**DA FORM 2823, DEC 1998**          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V 1.00

STATEMENT OF MAJ Anthony George   TAKEN AT 412 Lincoln Hall   DATED 20091116

9. STATEMENT *(Continued)*

ACG

ACG

ACG

ACG

**AFFIDAVIT**

■□■  MAJ Anthony George _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE ____ I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES:

_____

_____

ORGANIZATION OR ADDRESS

_____

_____

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 16 day of November , 2009 at 412 Lincoln Hall

*(Signature of Person Administering Oath)*

JEREMIAH ZINGAPAN

*(Typed Name of Person Administering Oath)*

USCC Honor Committee

*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

ACG

PAGE 2 OF 2 PAGES

USAPA V 1,00

RELATED DOCUMENT 10.2

000602

# SWORN STATEMENT

For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

## PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN).* |
| **PRINCIPA** | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| **ROUTINE USES:** | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| **DISCLOSURE:** | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE *IYYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Lincoln Hall 405 | 2010/01/08 | 1650 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Sabatos, Terri, Renee | | Assistant Professor |

| 8. ORGANIZATION OR ADDRESS |
|---|
| Department of English and Philosophy |

9.

I, __Terri Renee Sabatos_____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

Who have you talked to about this case?

MAJ George, English Departmental Liason.
MAJ Ray Dillman, EN302 Course Director XO
LTC Justin Gage, EN302 Course XO
LTC Ted Rich, EN302 Reviewing Officer
DR. Karen Peirce, original instructor
CDT ~~Adam Bishop~~, Cadet English Honor Liason
*Daniel Gray   TRS*
Who else should we talk to about this case?
CDT Spadone.
Librarians to see if CDT Spadone has actually checked out the books. *TRS*

Do you have anything else to add?
Perhaps you could talk to the librarians to see if CDT Spadone actually checked out the books in question. *TRS*

*Nothing Follows*

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF __2__ PAGES |
|---|---|---|

ADDITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST
BE INDICATED.

**DA FORM 2823, DEC 1998**    DA FORM 2823, JUL 72, IS OBSOLETE    USAPA V 1.00

RELATED DOCUMENT 00008

STATEMENT OF _Sabatos, Terri, Renee_   TAKEN AT _1650_   DATED _3AN 08 2010_

STATEMENT _(Continued)_

TRS
TRS
TRS
TRS

**AFFIDAVIT**

■□ _Terri R. Sabatos_ _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _____ I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

WITNESSES:

_John T. Gibbons_
_John T. Gibbons_

~~USCC~~ J.T.G

ORGANIZATION OR ADDRESS

_USCC , C-1_

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _08_ day of _January_ , _2010_ at _Lincoln Hall AOS_

_(Signature of Person Administering Oath)_

JEREMIAH ZINDAPAN

_(Typed Name of Person Administering Oath)_

USCC Honor Committee

_(Authority To Administer Oaths)_

INITIALS OF PERSON MAKING STATEMENT _TRS_   | PAGE _2_ OF _2_ PAGES

Section Administration | Course List

## Absences for EN302 I10 - 2010 1

Show Remarks | Export to Excel

| Name | Type | Date | Lesson | Reason | |
|------|------|------|--------|--------|---|
| SPADONE, ALAN M | Absent | 24 Aug 2009 | 3 | Honor Board | Edit |
| SPADONE, ALAN M | Absent | 02 Oct 2009 | 17 | Academic Trip | Edit |
| SPADONE, ALAN M | Departed | 08 Oct 2009 | 19 | Other | Edit |

RELATED DOCUMENT 12

| | | | | | |
|---|---|---|---|---|---|
| SPADONE, ALAN M | Absent | 24 Aug 2009 | 3 | Honor Board | Edit |
| SPADONE, ALAN M | Absent | 02 Oct 2009 | 17 | Academic Trip | Edit |
| SPADONE, ALAN M | Departed | 08 Oct 2009 | 19 | Other | Edit |

RELATED DOCUMENT 13

000606

## SWORN STATEMENT

For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

### PRIVACY ACT STATEMENT

| | |
|---|---|
| . . THORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN).* |
| PRINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION<br>Lincoln Hall | 2. DATE *IYYYYMMDD)*<br>20091214 | 3. TIME<br>1000 | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME<br>SABATOS, TERRI RENEE | 6. SSN | | 7. GRADE/STATUS<br>Associate Professor |
| 8. ORGANIZATION OR ADDRESS<br>Department of English and Philosophy | | | |

9.

I, Terri Renee Sabatos _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On 19 November 2009, CDT Spadone, a student in my EN302 Advanced Composition class (Section 110), turned in his Essay 4, which is 20% (200 pts) of his course grade. I took over this section of EN302 from Dr. Karen Peirce on October 21 (Lesson 23). CDT Spadone's paper contains 6 different instances of parenthetically cited information which does not appear to originate from the page numbers of the sources identified in the citations, a clear case of insufficient documentation and plagiarism. CDT Spadone's subsequent explanation of the circumstances behind his failure to document properly did not resolve my questions, leaving me concerned that dishonorable behavior may have occurred.

Essay 4 required students to compose a 3-4 page essay complicating the conventional views of Japan that they had introduced in Essay 3. On November 30, I began reading CDT Spadone's essay "Contructions (sic) of an Image" about photographs of Emperor Hirohito made before and after WWII. I noticed immediately that the essay did not address the prompt by revising the theme of his Essay 3, and did not discuss any of the course texts. As I read the essay I also noticed that while CDT Spadone used particular academic phrases such as "masculine display and commemoration," (p. 1) and "embodiment of a type of masculine identity," (p. 2) these ideas were not clearly supported or well explained in the paper. He also made an oblique reference to images of Hirohito constructed by the ˜es after the war that "displayed [the emperor] as human, and the loaded images of Mt. Fuji, along with any representations of ˜ ˜murai values were completely left out of the new representation (Hoyt 162)" (p. 2). Because he had not referenced either Mt Fuji or samurai values earlier in his essay, it seemed as if these ideas were part of a much larger discussion from one of his sources. My initial thought was that CDT Spadone needed more instruction on how to appropriately incorporate other scholar's viewpoints into his own discussion. Since this sentence had a parenthetical citation, I decided to look it up to see if I could better understand the original discussion in the source as well as how CDT Spadone was trying to incorporate it. When I arrived at the page in the source, the text and ideas therein did not even remotely match what was presented in CDT Spadone's paper; moreover, none of the other 5 citations did either. For example, page 110 of The History of Japanese Photography by Anne Wilkes Tucker, does not discuss photographs taken of Emperor Hirohito and Douglas Macarthur as claimed in CDT Spadone's essay. This page in Tucker discusses the photographic industry and photographic journals in early 20th century Japan. In fact, according to the index of the Tucker text, there is only one brief mention of this photograph in the entire book on page 323.

On 30 November I sent CDT Spadone an email requesting a meeting and explaining that I had questions concerning his essay 4. I did not detail what those questions were. On 4 December I conducted an approach for clarification with CDT Spadone; MAJ Anthony George, the English Department's Honor officer, and CDT Daniel Gray, the CDT Departmental Honor Liaison, were also present. I showed CDT Spadone his paper and the books from the USMA library that were listed on his works cited page. Before I could finish, he said that as soon as he received my email, he knew what the problem was and went went to the library to find the books cited in his paper, but that they were not there and that he could explain what happened. I explained that it was clear from the ideas in the paper that academic sources were used in preparing the paper. However, because the ideas were not well connected or well explained, it was not clear to me what he was trying to do with them. When I looked up the sources listed in the works cited page to clarify the ideas in the paper, and turned to the specific authors and page numbers cited in the body of the paper, not one of the citations was correct. It was not a matter of being "off" by a page or two; one of the sources he claimed to have used had nothing to do with the topic of his paper. CDT Spadone's response was that he was careless when taking notes from the many texts he used and did not write down the authors or page numbers accurately in his notebook.

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF  3    PAGES |
|---|---|---|

*ITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF          TAKEN AT          DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.*

| DA FORM 2823, DEC 1998 | DA FORM 2823, JUL 72, IS OBSOLETE | USAPA V 1.00 |
|---|---|---|

| USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED. PLEASE PROCEED TO FINAL PAGE OF THIS FORM. |
|---|

| STATEMENT OF Terri Renee Sabatos | TAKEN AT 407 Lincoln Hall | DATED 20091214 |
|---|---|---|

9. STATEMENT *(Continued)*

He said he had the notebook, but neglected to bring it with him, despite claiming he knew, from my initial email, why I wanted to meet with him. MAJ George asked if I was satisfied as to what constituted CDT Spadone's work from the ideas of the sources he used and I said no. Because he used no quotes, nor attributive tags in the body of the essay, and the citations were all completely incorrect, I had no way of knowing what were CDT Spadone's interpretations and what were the ideas from his sources. CDT Gray asked if the page numbers were accurate, but the authors name were just incorrect, and CDT Spadone said he did not know, he would have to check his notebook. CDT Gray asked if he remembered the names of the other books he used and CDT Spadone said he did not remember the names of any of the other books he used. As he had no other explanations and there were no further questions, we released him. After CDT Spadone left, I consulted with MAJ George and CDT Gray and we determined that CDT Spadone's explanations were not adequate to explain the inaccuracies and this case warranted an investigation.

I also conferred with CDT Spadone's former instructor Dr. Karen Peirce and she was very clear that she covered the requirements to write papers in accordance with the Dean's Documentation of Written Work at Lesson 4, as stated in her syllabus. According to the attendance log, CDT Spadone was present at this class.

CDT Spadone's paper does not use appropriate attributive tags nor is cited accurately or correctly so it is impossible to determine which ideas are his, and which are those of other scholars. This clearly is a case of plagiarism that is at the least compounded by improper documentation.

I recommend that this case be forwarded to the CDT Honor Committee for further investigation. CDT Spadone did not have any unexpected explanation for why he did not attribute ideas appropriately in his paper or why the citations in his paper were completely inaccurate and his actions may have been deliberate, intended to "deceive or gain an unfair advantage" (Documentation of Written Work, Section VI.2.c).



*— Nothing Follows —*

| INITIALS OF PERSON MAKING STATEMENT | PAGE 2 OF 3 PAGES |
|---|---|

RELATED DOCUMENT 1862

STATEMENT OF  Terri Renee Sabatos          TAKEN AT  407 Lincoln Hall        DATED  20091214

STATEMENT *(Continued)*

**AFFIDAVIT**

I, Dr Terri Sabatos , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE **2**. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES: _____

_____

ORGANIZATION OR ADDRESS _____

_____

_____

ORGANIZATION OR ADDRESS _____

Subscribed and sworn to before me, a person authorized by law to administer oaths, this  14  day of  December , 2009 at 407 Lincoln Hall

*(Signature of Person Administering Oath)*

MAJ Anthony L. George

*(Typed Name of Person Administering Oath)*

*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

PAGE  3  OF  3  PAGES

USAPA V 1,00

RELATED DOCUMENT 143
000609

# SWORN STATEMENT

For use of this form, see AR 1 90-45; the proponent agency is ODCSOPS

## PRIVACY ACT STATEMENT

| | |
|---|---|
| THORITY: | Title I 0 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| ⌐RINCIPA | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION Lincoln Hall | 2. DATE *IYYYYMMDD)* ~~20100211~~ 20100212 | 3. TIME 1200 | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME Georg, Anthony, Lee | | 6. SSN | 7. GRADE/STATUS MAJ |

8. ORGANIZATION OR ADDRESS
Department of English and Philosophy

9.

I, Anthony Lee George _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I was present for two approaches for clarification conducted by Dr. Sabotos with Cadet Spadone. The first was on 6 November in my office; the second was on 4 December in the Smoot Library. Cadet Adam Bishop was present for the first approach and Cadet Daniel Gray was present for the second. They are the Honor Representatives/Liaisons for the English and Philosophy Department.

At the first approach, Dr. Sabatos showed Cadet Spadone a paper he had turned in and an online article that Cadet Spadone had not cited as a resource in his paper. Dr. Sabatos asked Cadet Spadone to clarify for her how the two items could be as similar as they were. Cadet Spadone looked at the two items for a long time and did not offer any explanation. When it seemed reasonably sure that he was not going to have any information to offer that would clarify this situation in a satisfactory way, I told him that we were not accusing him of anything, but were giving him an opportunity to clarify for Dr. Sabatos how this could have happened. I asked him if he had any information to offer that would clarify the situation; he said that he did not, and so we released him. Once Cadet Spadone was gone, Dr. Sabatos, myself, and Cadet Bishop agreed that the situation warranted an investigation by the Honor Committee.

At the second approach, the situation seemed less straightforward. Dr. Sabatos said that she had been unable to determine what, in this second paper, were interpretations that belonged to CDT Spadone and what were interpretations that CDT Spadone had taken from secondary sources. In order to help determine this, Dr. Sabatos had referred to the works in CDT Spadone's Works Cited. But, when checking them, she found that CDT Spadone's citations were completely inaccurate. So, CDT Spadone's documentation was not ⌐y faulty in that one could not determine what was his and what wasn't, but his documentation was also wrong in that where he did document, he cited books that had nothing to do with the material he wrote. CDT Spadone said that he knew why he had been called to an approach this time; he said that after Dr. Sabatos had emailed him, telling him that she wanted to see him, he had gone to the library to check out the books he'd cited and found that they'd been checked out already. Although he stated that he knew that this approach was for, he said that he did not bring any materials with him to clarify the situation. Specifically, he said that he had sloppily taken notes about what books he had referenced (which he used while writing his paper) and when Dr. Sabatos asked him what books he might have been referencing, given that the one's he cites in his paper are not accurate, CDT Spadone said that he'd have to look at that notebook. I noticed that he had gone to the trouble of going to the library to check books out, in preparation for this approach for clarification, but he did not bring his notebook to the approach- which might have helped clarify the situation. Once it seemed clear that CDT Spadone's explanation wasn't helping to clarify anything or to resolve suspicions about his documentation, we released him. CDT Gray, Dr. Sabatos, and I agreed that this situation warranted an investigation by the honor committee.

Question: Who else have you talked to concerning this case?
Answer: Noone. *ALG*
Question: Who else should we talk to concerning this case?
Answer: I don't know. Noone that I can think of, who isn't mentioned above. *ALG*
Qustion: Do you have anything else to add?
Answer: No. *ALG*

←——— *NOTHING FOLLOWS* ———

*ALG*    *ALG*    *ALG*
*ALG*

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT *ALG* | PAGE 1 OF 2 PAGES |
|---|---|---|

*ITIONAL PACES MUST CONTAIN THE HEADING 'STATEMENT OF _____ ( TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PACE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PACE NUMBER MUST BE INDICATED.*

| DA FORM 2823, DEC 1998 | DA FORM 2823, JUL 72, IS OBSOLETE | USAPA V 1.00 |
|---|---|---|

RELATED DOCUMENT 15-1
000610

| STATEMENT OF Anthony Lee George | TAKEN AT 412 Lincoln Hall | DATED 20100212 |
|---|---|---|

STATEMENT *(Continued)*

ALG

ALG

ALG

ALG

**AFFIDAVIT**

I, Anthony Lee George , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 2 . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OP. REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

*(Signature of Person Making Statement)*

WITNESSES:

Sam T. Gibson

John T. Sullivan

ORGANIZATION OR ADDRESS

USCC, C-1

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 12 day of February , 2010 at 412 Lincoln Hall

*(Signature of Person Administering Oath)*

JEREMIAH ZINGAPAN
MAJ Anthony L. George ALG

*(Typed Name of Person Administering Oath)*

USCC Honor Committee

*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

ALG

| | PAGE 2 OF 2 PAGES |
|---|---|

USAPA V 1.00

RELATED DOCUMENT 15-2

000611





DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
Simon Center for the Professional Military Ethic
West Point, New York 10996

MACC-CPME-H

MEMORANDUM FOR Special Assistant to the Commandant for Honor Matters, United States Corps of Cadets, United States Military Academy, West Point, New York 10996

SUBJECT: Privacy Act Statement for Cadet Alan Spadone, Company B-1, Class of 2011, United States Corps of Cadets, United States Military Academy, West Point, New York 10996

1. Under the provisions of 5 USC 552a, The Privacy Act of 1974, and AR 340-21, The Army Privacy Program, prohibit the release of personal information maintained in a System of Records to agencies or individuals outside the federal government (or government employees requesting the information in a non-official status) without the subject individual's consent. I understand that I am under no obligation to authorize the release of such information for any reason; and should I withhold such authorization, the information will not be released to third parties and no consequences of any kind will result.

2. Select from the options below to designate how you wish your personal information to be released.

☐ I do or    ☐ Initial

☑ I do not    ☒ Initial

authorize the SAH to discuss, orally or in writing, the dynamics of my case and the result(s) of my board with the following individual(s) only:

Person(s)                     Relationship

_____        _____

_____        _____

3. This authorization is in effect from this date until a new authorization is submitted. I understand that I may withdraw this authorization in writing at any time.

_8 Mar 2010_
Date

_Alan Spadone_
Signature

**RELATED DOCUMENT 16**

**000612**



DEPARTMENT OF THE ARMY
**UNITED STATES MILITARY ACADEMY**
Simon Center for the Professional Military Ethic
West Point, New York 10996



MACC-CPME-H

MEMORANDUM FOR RECORD

SUBJECT: Election Statement for Cadet Alan Spadone, Company B-1, Class of 2011, United States Corps of Cadets, United States Military Academy, West Point, New York 10996

1. On this date, the undersigned briefed the above cadet on the procedures for cadets found to have violated the Cadet Honor Code.

2. The cadet has elected to:

   a. Remain at West Point during the review process.  Check and initial your choice.

     [✓] Stay in their company or     [AmS] initial

     [ ] Be moved to another company.     [ ] initial

   b. Resign from the United States Military Academy.  Check and initial your choice.

     [✓] No I do not desire to resign at this time or   [AmS] initial

     [ ] Yes I desire to resign at this time.     [ ] initial

3. The undersigned will contact USCC S1 Adjutant with the elected information.

2 Encl
1. USCC Pam 15-1, (Honor Committee
   Procedures) Chapter 4 (Post Hearing
   Procedures and the Review Process)
2. USCC Reg 351-2, Chapter 1 (Excerpts)

MICHAEL B. BAKA
MAJ, IN
Special Assistant to the
   Commandant for Honor Matters

I have acknowledged being briefed on the procedures for cadets found to have violated the Cadet Honor Code and receipt of parts of the above-mentioned USCC Pamphlet and Regulation.

_8 Mar 2010_
    Date

_Alan Spadone_
    Signature

**RELATED DOCUMENT 17**

**000613**

**503. STATUS OF FOUND CADETS.** Immediately following an HIH or CAB, the SAH will also serve the cadet with a letter from the Commandant, identifying administrative sanctions separate from the final disposition of the case. The cadet will sign the letter acknowledging receipt. Copies will be forwarded to the Dean of the Academic Board, BTO, RTO, Company Tactical Officer, USCC Regulations and Discipline Officer (R&D), Vice Chair for Mentorship, and in the case of corps squad and club squad athlete, to the Director of Intercollegiate Athletics and the Head of the Department of Physical Education, respectively.

a. These administrative sanctions are binding, begin immediately after an HIH or CAB, and continue through successful completion of the Honor Mentorship Program. Any request made by the found cadet or the Chain of Command to deviate from these sanctions will be requested in writing on an official memorandum thru the found cadet's Mentor, TAC, RTO, and BTO for the Commandant's final approval. A copy of the Commandant's approved exception to policy memorandum must be furnished to the SAH for inclusion in the cadet's honor file. These administrative sanctions are effective immediately and include the following:

(1) Reduction in rank to Private First Class, if an Upperclass cadet. Fourth-Class Cadets may not be promoted until completion of the Honor Mentorship Program. Only Fourth-Class Cadets who have completed their entire Plebe year (i.e., made it through Graduation Week and became a Yearling), are authorized to wear PFC rank if they are directed by the Superintendent to repeat their Plebe year.

(2) Loss of pass privileges, off-post privileges (OPP's), and walking privileges (see Chapter 5, USCC SOP). Authorized "leave" periods, to include Thanksgiving, Winter, Spring, Term End Examination (TEE) Week, and Summer Leave, are not affected. If a cadet's sponsor lives off post, the cadet must inform their Company Tactical Officer when they are departing post to visit their sponsor's home. Company Tactical Officers will use their discretion if they feel a cadet is abusing their privilege to visit an off-post sponsor's home.

b. Additional administrative sanctions regarding representation of the found cadet are voted on by each Board Member of the HIH or CAB using the Superintendent's Hearing Member Worksheet (see Appendix 2-2-5). If two-thirds of the Board Members vote in favor of the found cadet representing USMA in a specific capacity, then the found cadet is authorized to continue representing USMA in this specific capacity until the Superintendent's final decision. On the other hand, if less than two-thirds of the Board members are in favor, then the found cadet is not authorized to represent USMA in this specific capacity unless the Superintendent overturns the Board's recommendation. The applicable administrative sanctions regarding representation of USMA are effective immediately and include the following:

(1) Exclusion from representing the Academy through participation in corps squad and/or club squad activities, including participating in games/competitions, traveling with the team or club, and officially representing the Academy as a member of the team or club. Cadets are, however, allowed to continue practicing with the team and attend club meetings at the Academy.

(2) Exclusion from participation in public relations activities such as CPRC, media interviews, or as an invited guest to external events. Participation in community service projects as a part of the Honor Mentorship Program are approved exceptions.

(3) Exclusion from otherwise representing USMA at official functions, conferences, AIAD's, or trip sections both at and away from the Academy.

(4) Removal from positions of responsibility to include but not limited to the Chain of Command (down to and including team leader), Corps or Club Squad Team Captains, and Club CIC or Staff.

---

I have acknowledged being briefed on the procedures for cadets found to have violated the Cadet Honor Code and receipt of parts of the above-mentioned USCC Pamphlet 15-1 (dated 11 November 2009).

_____                          _____
Date                                                               Signature