## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ) | | |
| **ALAN MATTHEW SPADONE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 11-1601 (RWR)** |
| **v.** | ) | |
| | ) | |
| **JOHN M. McHUGH,** | ) | |
| | ) | |
| **Defendants** | ) | |
| _____ | ) | |

### DEFENDANT'S STATEMENT OF FACTS

Pursuant to LCvR 7(h)(2) and in support of Defendant's Motion for Summary Judgment, Defendant respectfully submits this statement of facts.

1. Plaintiff, Alan M. Spadone, took his oath of enlistment as a cadet on July 2, 2007. (AR 47-48)

2. At the same time as Plaintiff's oath, he entered into an agreement to serve.  (AR 47-48) Plaintiff agreed to the following:

      a.      To complete the course of instruction at the United States Military Academy.  (AR 47)

      b.      To serve a total of eight (8) years from graduation from the United States Military Academy.  Any part of that service not completed on active duty must be served in a Reserve Component (not on active duty), unless he was discharged from the Reserve Component by a proper military authority. (AR 47)

      c.      That if Plaintiff failed to complete the course of instruction of the United States Military Academy, breached his service agreement, as defined, the Statement of Policies,

or declined to accept an appointment as a commissioned officer, he would serve on active duty. (AR 47)

        d.      That if Plaintiff voluntarily fails, or because of misconduct fails, to complete the period of active duty specified he would reimburse the United States in an amount that bears the same ratio to the total cost of advanced education provided to him as the unserved portion of active duty bears to the total period of active duty he agrees to serve.  (AR 47)

        e.      Plaintiff agreed that a cadet, like him, who enters the United States Military Academy directly from civilian status assumes a military service obligation of eight (8) years. (AR 48)

        f.      Plaintiff acknowledged that a cadet who enters USMA directly from a civilian status and resigns or is separated from the USMA prior to the commencement of the Second Class academic year will be discharged from the U.S. Army. (AR 48)

        g.      Plaintiff agreed that a cadet who has commenced his or her Second Class academic year and who resigns or is separated prior to completing the course of instruction will normally be transferred to a Reserve Component in an enlisted status and, if deemed to have breached his or her service agreement, may be ordered to active duty for not less than two years but no more than four years.  The Secretary of the Army or his/her designee retains final authority to order the individual to active duty. (AR 48)

        h.      Per this agreement the Second Class academic year is deemed to have commenced at noon on the first day of regularly scheduled academic classes following the summer training period. (AR 48)

I.      A breach of this agreement includes separation resulting from resignation, from any of the bases for separation listed in AR 210-26, Table 7-1.  This includes separations as a result of violations fo the cadet honor code.  (AR 48; Army Regulation 216-26, Table 7-1)

3.      Plaintiff began his Second Class, third, academic year. (Compl. ¶¶ 26-27) Plaintiff made the conscious choice not to resign prior to this date.  (Compl. ¶ 26)

4.      Prior to beginning his Second Class academic year, Plaintiff applied and was accepted to Pembroke College at the University of Cambridge.  (Compl. ¶ 16) Plaintiff requested authorization from West Point to attend Pembroke College under the Academy's study abroad program.  (Compl. ¶ 18)

5.      On September 2, 2009, the Dean denied Plaintiff's request to attend Pembroke College under the study abroad program.  (Compl. ¶ 27)  Plaintiff sought reconsideration of that decision after raising money to pay for his attendance.  (Compl. ¶ 30) On October 2, 2009, the Dean denied Plaintiff's request.  (Compl. ¶ 32)

6.      In the Fall 2009 academic semester, Plaintiff was enrolled in EN 302, Advanced Composition, a class required for graduation from West Point. (United States Military Academy Academic Program, Curriculum and Course Descriptions, available at http://www.dean.usma.edu/sebpublic/curriccat/static/index.htm)  EN302 is designed to "refine[] basic writing skills, develops sophisticated techniques of written expression, and establish[] a critical editorial sense with respect to the cadet's own composition and the writing of others." (Id.)

7.      Plaintiff plagiarized two academic assignments by submitting essays that were not his own work.  (Compl. ¶ 33; AR 568-69)

3

8.      On October 27, 2009, Plaintiff submitted Essay #3, a graded requirement for completion of EN302.  (AR 575; 583-89) Plaintiff stated, "MY DOCUMENTATION IDENTIFIES ALL SOURCES USED AND ASSISTANCE RECEIVED IN COMPLETING THIS ASSIGNMENT." (AR 583)

9.      Plaintiff's professor, Dr. Terri Sabatos, noticed a sophisticated writing style and vocabulary that was not indicative of undergraduate writing.  (AR 575)  Dr. Sabatos typed in phases from the paper into an internet search engine and discovered that virtually all of the paper was a word for word, paragraph by paragraph match with an online journal article not cited by Plaintiff.  (AR 575)

10.      The cadet honor code states, "[a] cadet will not lie, cheat, steal or tolerate those who do."  (Compl. ¶ 34; United States Corps of Cadets Pamphlet [hereinafter USCC Pam] 15-1, The Cadet Honor Code, System, and Committee Procedures ¶ 101) "Cadets violate the Cadet Honor Code by cheating if they wrongfully act out of self-interest, or if they do work or obtain results with the intent to gain for themselves or to give others an unfair advantage, or with the intent to deceive or mislead. . . . Cheating includes such acts as intentional plagiarism (presenting someone else's ideas, words, data, or work as one's own), intentional misrepresentation (failing to document the assistance of another in the preparation of an assignment with the intent to deceive, mislead, gain, or give an unfair advantage), citing sources that were not actually consulted, and using unauthorized references (crib sheets, notes, texts) during an examination."  (USCC Pam 15-1 ¶ 107.b.)

11.      In cases where someone is not sure whether an honor violation has occurred, "but you believe that some questions may elicit clarification on the situation and there may be a

reasonable explanation for the situation, you [cadet or faculty and staff] should conduct an approach for clarification."  (USCC Pam 15-1 ¶ 202) "The intention of an approach for clarification is to determine if there is a reasonable explanation for the situation."  (USCC Pam 15-1 ¶ 202) There is no requirement to provide a rights warning during an approach for clarification.  (USCC Pam 15-1 ¶ 202)

12.     After Dr. Sabatos's approach for clarification did not clear up her suspicions she determined, after speaking with other faculty members, that an honor investigation was warranted.  (AR 575)  On November 9, 2009, the Colonel James Kerin forwarded a file for investigation of a honor violation by Plaintiff.  (AR 548)

13.     Upon referral, the honor committee appoints an investigative team.  (USCC Pam 15-1 ¶ 304; AR 506)  The investigative team for Plaintiff's first honor code violation was appointed on November 11, 2009.  (AR 506) The investigative team is required to provide a rights warning to a suspected cadet.  (USCC Pam 15-1 ¶ 304.d.)  Plaintiff was read his rights on November 18, 2009.  (AR 510-13) In turn, Plaintiff made two voluntary statements.  (AR 571-74) Plaintiff admitted to violating the honor code and cheating.  (AR 573)  The investigative team forward their conclusion that Plaintiff violated the honor code to the Regimental Honor Representative.  (USCC Pam 15-1 ¶ 304-05; AR 518-19)

14.     On November 19, 2009, the Regimental Honor Representative recommended an Honor Investigative Hearing.  (USCC Pam 15-1 ¶ 305; AR 522-24)

15.     On November 19, 2009, Plaintiff submitted Essay #4, a graded requirement for completion of EN302.  (AR 403; 408-15) Plaintiff stated, "MY DOCUMENTATION

IDENTIFIES ALL SOURCES USED AND ASSISTANCE RECEIVED IN COMPLETING

THIS ASSIGNMENT." (AR 408)

16.    Plaintiff's professor, Dr. Terri Sabatos, noticed references that did not make sense

in Plaintiff's Essay #4 based on the context.  (AR 408)  Dr. Sabatos referenced the sources

Plaintiff cited and the sources did not match the information presented in his paper.  (AR 403)

Dr. Sabatos conducted an approach for clarification.  (AR 403)  After Dr. Sabatos's approach for

clarification did not clear up here suspicions she determined, after speaking with other faculty

members, that an honor investigation was warranted.  (AR 404)

17.    On November 30, 2009, the Vice Chairmen for Investigations of the Cadet Honor

Committee recommended an Honor Investigative Hearing.  (USCC Pam 15-1 ¶ 306; AR 528)

18.    On November 30, 2009, a Pre-Referral Hearing panel recommended an Honor

Investigative Hearing.  (USCC Pam 15-1 ¶ 307; AR 528)

19.    On December 9, 2009, Colonel James Kerin forwarded a file for investigation of a

honor violation by Plaintiff.  (AR 553)

20.    Upon referral, the honor committee appointed an investigative team.  (USCC Pam

15-1 ¶ 304; AR 508-09)  The investigative team for Plaintiff's second honor code violation was

appointed on January 7, 2010.  (AR 508-09)  The investigative team is required to provide a

rights warning to a suspected cadet.  (USCC Pam 15-1 ¶ 304.d.)  Plaintiff was read his rights on

January 8 and 12, 2010.  (AR 514-17)  In turn, Plaintiff made two voluntary statements.  (AR

399-402) This time Plaintiff denied violating the honor code and cheating.  (AR 399-402)  The

investigative team forward their conclusion that Plaintiff violated the honor code to the

regimental honor representative.  (USCC Pam 15-1 ¶ 304-05; AR 520-21)

21.    On January 18, 2010, the Regimental Honor Representative recommended an Honor Investigative Hearing.  (USCC Pam 15-1 ¶ 305; AR 525-27)

22.    On February 2, 2010, the Vice Chairmen for Investigations of the Cadet Honor Committee recommended an Honor Investigative Hearing.  (USCC Pam 15-1 ¶ 306; AR 529)

23.    On February 10, 2010, a Pre-Referral Hearing panel recommended an Honor Investigative Hearing for the offenses of cheating and lying.  (USCC Pam 15-1 ¶ 307; AR 532-34)

24.    On February 16, 2010, the Chief, Military Justice conducted a legal review concurring with the recommendation of the Pre-Referral Hearing Panels.  (USCC Pam 15-1 ¶ 309; AR 535)

25.    On February 16, 2010, the Special Assistant to the Commandant for Honor recommended that the Command refer Plaintiff's case to a Honor Investigative Hearing.  (USCC Pam 15-1 ¶ 308; AR 536-37)  The Commandant concurred and referred three allegations of violations of the Cadet Honor Code to an Honor Investigative Hearing.  (USCC Pam 15-1 ¶ 310; AR 477-79) Specifically, Plaintiff was alleged to have done the following:

a.    Cadet Alan Spadone, Company B-1, Class of 2011, did, at or near West Point, New York, on or about 27 October 2009, violate the Cadet Honor Code by cheating, by plagiarizing all or part of his Essay #3, and submitting it as his own, with incomplete documentation, and doing so with the intent to gain an unfair advantage or with the intent to deceive another person. (AR 536)

b.    Cadet Alan Spadone, Company B-1, Class of 2012, did, at or near West Point, New York, on or about 19 November 2009, violate the Cadet Honor Code by cheating, by

7

plagiarizing all or part of his Essay #4, and submitting it as his own, with incomplete

documentation, and doing so with the intent to gain an unfair advantage or with the intent to

deceive another person. (AR 536)

c.      Cadet Alan Spadone, Company B-1, Class of 2012, did, at or near West Point,

New York, on or about 03 Nov 2010, violate the Cadet Honor Code by lying by stating to Doctor

Terri Sabatos, Associate Professor, Department of English, that he did not accurately write down

the authors or page numbers in his notebook, or words to that effect, knowing said statement was

false at the time he made it and making it with the intent to deceive or mislead another person.

(AR 536)

26.      On February 17, 2010, Plaintiff was notified of his rights and responsibilities

related to the referred Honor Investigative Hearing  (USCC Pam 15-1 ¶ 402; AR 536-37)

27.      On February 22, 2010, Plaintiff submitted an offer to plead guilty to one

allegation if the Commandant would drop two of the allegations.  (AR 556)  On February 23,

2010, the Commandant denied Plaintiff's request.  (AR 556-57)  Processing this request resulted

in an excusable delay.

28.      On February 24, 2010, Plaintiff submitted an additional request for delay.  He

requested that his Honor Investigative Hearing be held on March 8, 2010.  (AR 558)  On

February 25, 2010, the Commandant approved this request.  (AR 559)

29.      On March 2, 2010, the Commandant appointed members of the Corps of Cadets

to serve on the Honor Investigative Hearing.  (AR 564-65)

30.      On March 3, 2010, Plaintiff filed a motion to exclude certain statements and

objecting to his hearing as a violating of his right to a speedy trial.  (AR 560-61)

31.     March 5 and 8, 2010, the Hearing Advisor ("HA"), a Judge Advocate, held a Preliminary Hearing.  (USCC Pam 15-1 ¶ 404; AR 55-229)  At that time the HA covered the following issues:

        a.     First, the HA informed Plaintiff of his rights including the right to consult with an attorney, his right to remain silent, the right to appear personally and be present during all open sessions, the right to present evidence and have witnesses testify, the right to examine witnesses, the right to object to evidence, the right to challenge members of the Honor Investigative Hearing and the Cadet Advisory Board, the right to bring to the HA's attention any matter that the Plaintiff believed made the hearings unfair, and the right to have a Cadet Advisor assist him during the hearing.  (AR 61-65)  Plaintiff acknowledged he understood these rights and had no questions.  (AR 65)  Plaintiff stated he had consulted with counsel and he was satisfied with his counsel's advice.  (AR 61)  As part of these rights the HA stated, "if you believe at any time during any of the Honor proceedings something is unfair, you have the right to bring the matter to my immediate attention.  A failure to immediately speak up about an issue of fairness may result in your giving up, or waiving, your right to raise the issue at a later time.  I cannot overemphasize this point.  If you have any questions about procedures or think that something is unfair, please tell me immediately.  I will do everything I can to ensure the fairness of this proceeding."  (AR 63)  Further, the HA informed Plaintiff he had a right to present an opening statement and closing argument.  (AR 66)

        b.     The HA took the testimony of Dr. Sabatos and the Regimental Honor Representative dealing with Plaintiff's objection to the evidence because it violated his right to remain silent.  (AR 70-106)

   c.  Plaintiff stated he received the rights and responsibilities notification and he did not have any questions about his rights.  (AR 109)

   d.  The HA then discussed Plaintiff's objection to the evidence.  (AR 119-128).  Plaintiff stated "[w]e are not objecting to any evidence from — [HA]:  Concerning Allegation No. 1; [Plaintiff]:  Correct."  (AR 120)

   e.  Plaintiff stated he had requested at least two delays in this case and the HA noted he raised a speedy trial issue.  (AR 129-30)

   f.  The HA excluded some evidence.  (AR 133-34)  He admitted the statements over Plaintiff's objection because they were approaches for clarification and therefore rights warnings were not required.  (AR 196-98)  Furthermore, statements in violation of a person's right to remain silent are not excluded since this is an administrative proceeding. USCC Pam 15-1, para. 406(g)(4)(e) states, "The exclusionary aspects of Article 31, by its terms, does not apply to administrative proceedings such as an HIH or CAB.  The HA will ensure that the HIH will not accept a Respondent's statement obtained by unlawful coercion, or inducement likely to affect its truthfulness, or in situations were the admission of the subject evidence would be contrary to fairness and fundamental due process.  However, the fact that a Respondent was not advised of his/her Article 31 rights does not, of itself, prevent acceptance of the confession or its admission as evidence."  (USCC Pam 15-1 ¶ 406(g)(4)(e))

   g.  The HA next allowed Plaintiff to present documentary evidence.  Plaintiff provided evidence and it was accepted.  (AR 134-38)

   h.  The HA next explained the elements of the allegations of cheating and lying pending against Plaintiff.  (AR 138-39)

I.      The HA provided a list of witnesses to be called.  Plaintiff did not object (AR 139-40)

j.      The HA provided a copy of books relevant to the cheating charge and allowed Plaintiff to take possession of the books in order to prepare his defense.  (AR 145-47)

k.      Plaintiff was asked if he had any witnesses on his behalf.  He acknowledged he did.  (AR 153-55)

l.      Plaintiff was again advised of his rights and asked if he wished to still plead guilty to one of the allegations.  (AR 155-61)  Plaintiff acknowledged his understanding and stated he wanted to admit to one of the allegations.  (AR 158)  Plaintiff understood that pleading guilty meant, as to that allegation, he was giving up his right to remain silent, his right to a full hearing, and the right to cross-examine witnesses.  (AR160)  Given this Plaintiff still chose to plead guilty to one allegation of cheating.  (AR 160)

m.      Plaintiff pled guilty to one allegation of cheating on Essay #3.  (AR 167-182) Plaintiff stated he copied the paper from an online journal and represented that it was his work.  (AR 167-82) He stated that his cheating "hurt the institution[, West Point]."  (AR 175)

32.      On March 8, 2010, following the preliminary hearing, Plaintiff's Honor Investigative Hearing began.  (AR 230)  The purpose of the HIH is to hear the facts of the case and after hearing the evidence to vote on whether or not a violation of the Cadet Honor Code occurred.  (USCC Pam 15-1 ¶ 405)

a.      Plaintiff indicated he had sufficient time to prepare for the HIH.  (AR 231)

b.      One board member was excused for cause.  (AR 232)

c.      Plaintiff gave an opening statement.  (AR 244-46)

d.      Plaintiff cross-examined the witnesses.  (AR 263-83; 285-86; 306–07; 309-11)

e.      Plaintiff was advised of his right to remain silent at the HIH and chose to testify.  (AR 312-13)  Plaintiff testified on his own behalf.  (AR 314-328)

f.      Plaintiff was given an opportunity to read the instructions to the board members.  (AR 330)  Plaintiff was satisfied with the instructions.  (AR 333)

g.      Plaintiff gave closing arguments.  (AR 336-38)

h.      After deliberating the members determined that the allegations of cheating were supported by a preponderance of the evidence but the allegation of lying was not.  (AR 352-53)  Thus, on March 8, 2010, Plaintiff was "found" to have committed an additional instance of cheating but was "not found" to have committed the offense of lying by the Honor Investigative Board.  (AR 513-14)

33.  After Plaintiff was "found" to have committed an additional honor code violation the HIH members sat as an HIH and Cadet Advisory Board ("CAB").  A CAB is a "modified version of an HIH designed for cadets who admit allegations(s) referred against them. . . . The sole purpose of the CAB is to provide a recommendation to the Superintendent on the final disposition of a case."  (USCC Pam 15-1 ¶ 407)

a.      At the HIH/CAB portion of the proceedings Plaintiff presented the testimony of several character witnesses.  (AR 356-93)

b.      In addition to the evidence and witnesses Plaintiff presented, Plaintiff addressed the HIH/CAB prior to their final recommendation.  The Plaintiff stated, in part, "I honestly didn't agree with what you found in the second case, but I don't think that really

12

matters right now.  I'll speak in regard to the first case.  I obviously made a mistake, a huge

mistake, as I've said."  (AR 394-95)

34.     On March 8, 2010, the HIH/CAB provided recommendations to the

Superintendent for his consideration.  (USCC Pam 15-1 ¶ 505.a.; AR 45-46)  Specifically, the

members recommended the following:  "The Cadet Advisory Board recommends that Cadet

Spadone be retained as a cadet at the United States Military Academy, with 7 out of 9 board

members recommending that he be granted discretion and given the opportunity to stay here at

the academy. The Cadet Advisory Board recommends with l out of 9 that CDT Spadone graduate

on time with his class, l out of 9 recommend a one year turn back and 5 out of 9 recommend

December Grad. 2 out of 9 board members recommend that CDT Spadone be separated with the

option of participating in the Army Mentorship Program." (AR 45)

35.     On April 7, 2010, the Chief, Military Justice conducted a legal review of the

proceedings.  (AR 42-44)  The legal review concluded that "[t]he proceedings were conducted in

accordance with law and regulation and complied with legal requirements. . . .[t]here was no

error that had a materially adverse effect on a substantial right of the Respondent [Plaintiff]."

(AR 43)

36.     The Special Assistant to the Commandant for Honor Matters provided a

recommendation for the Superintendent.  (AR 37-41)  He recommended that "the Superintendent

separate Cadet Spadone, suspend the separation, *make him a Full Year Turnback to the Class of

2012,* suspend him from the Academy until August 2010, enroll him in the Honor Mentorship

Program, and *allow him to serve as a member of the chain of command during 2nd semester of

his repeated Cow Year*." (USCC Pam 15-1 ¶ 505.d.; AR 41 (emphasis in original))

13

37.     The Commandant held an interview with Plaintiff and made a recommendation to

the Superintendent.  (USCC Pam 15-1 ¶ 505. f.)  Specifically, he stated,

> 3. With the cadet chain of command, honor staff, and Tactical
> Officer, I went through the incidents thoroughly with Cadet
> Spaddone [sic] and feel that he still does not fully understand the
> difference between incorrect documentation and cheating. While
> he has accepted responsibility for the first incident of cheating, he
> continues to worry me as to whether or not he is resolved to make
> major changes in his behavior. Case in point- he was still wearing
> his rank instead of "US" up to the hour before coming to my office.
>
> 4. Cadet Spaddone [sic] is doing extremely well at West Point in
> all pillars and his Tactical Officer speaks highly of his potential.
> While I am not convinced that Cadet Spaddone [sic] will fully
> internalize his faults and make the changes we demand, I am
> recommending that we take the chance on him and make him a 12-
> month turnback to the Class of 2012 and put him into the Honor
> Mentorship Program. Because MAJ Dennehy (his Tactical Officer)
> knows him so well, I recommend that he be scrambled only after
> completing the HMP so that he can be personally supervised
> through that program and that Ms. Vetter not be allowed to be his
> mentor. (AR 34)

38.     The recommendations and the legal review were provided to Plaintiff.  (AR 36)

He was advised if he desired to provide comment on the review he must do so by 1600 hours, 22

April 2010.  (USCC Pam 15-1 ¶ 505.g.; AR 36)

39.     Plaintiff did not submit anything for the Superintendent's consideration.  (AR 33)

40.     The Staff Judge Advocate provided a recommendation to the Superintendent.

(USCC Pam 15-1 ¶ 505.h.; AR 33)

41.     On May 3, 2010, after considering all the evidence and the recommendations the

Superintendent made a decision.  (AR 32)  The Superintendent approved the findings of the HIH.

(AR 32)  He also concluded,

In accordance with the authority granted to me by the Secretary of the Army, I have determined that Cadet Spadone should be separated from the United States Military Academy. This decision, however, is suspended until Cadet Spadone's graduation in 2012, contingent upon his future exemplary conduct. Cadet Spadone will be turned back to the Class of 2012, but he will be allowed to finish the academic term 10-2. Additionally, Cadet Spadone will be assigned a mentor from the USMA staff or faculty and will complete several requirements under the USMA Honor Mentorship Program as deemed necessary and appropriate by his mentor and tactical officer. He will also be scrambled outside the 1st Regiment, and will not represent the Academy until he has completed the Honor Mentorship Program. The terms of the suspension will be considered to have been violated if Cadet Spadone:

. . . .

(2) Fails to complete any requirement under the USMA Honor Mentorship Program (AR 32)

42.     The Superintendent has the authority to suspend punishment "under such terms and conditions as deemed appropriate."  (Army Regulation 210-26 ¶ 6-4)

43.     West Point regulations provide goals for the processing of Honor cases.  (USCC Pam 15-1 ¶¶ 204-507) The regulation includes a discussion on processing guidelines.  (USCC Pam 15-1 ¶ 507)

        a.     Those guidelines state, "The Secretary of the Army recommended to the Superintendent that the United States Military Academy process all cadet honor investigations within 60 duty days.  However, the Academy goal is to process honor cases in 40 duty days commencing with the inception date through the Superintendent's decision."  (USCC Pam 15-1 ¶ 507.a.)

        b.     Processing days include "any day, on which regular academic classroom periods are scheduled for the Corps of Cadets, and when the cadet under investigation is present for duty at West Point."  (USCC Pam 15-1 ¶ 507.a.)  Given this definition, the following are

15

specifically excluded, "[a]ll Saturdays and Sundays, [a]ll Federal Holidays, []Term End Examination Periods, Corps Leave periods, []Compressed Class Day . . ., []Reorganization Weeks, [a]ny other day when the Corps is not present for duty at West Point, such as Project's Day/Reading Day, . . . Fridays prior to Ring Weekend, 500th Night Weekend, Yearling Winter Weekend, 100th Night Weekend, and Plebe Parent Weekend."  (USCC Pam 15-1 ¶ 507.c.)

c.      After the HIH/CAB is held, "only duty days for USMA military and civilian personnel are counted as processing days, unless the cadet is unavailable and his/her presence is required for case processing."  (USCC Pam 15-1 ¶ 507.e.)

d.      Based on this regulation, considering the days excluded and the days Plaintiff requested delay, there were sixty-two (62) processing days starting from the inception of the investigation regarding Essay #4.  Processing time related to Essay #3 is not relevant given that Plaintiff pled guilty to that allegation. (See ECF No. 13, Def. Exh. B, Encl. 1, to Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, for a list of the days that are excludable after comparing them to the regulation)[1]

43.      The Honor Mentorship Program's purpose is to "enable the [found] cadet to identify and remediate shortcomings in personal integrity and ethical decision-making skills that resulted in a violation of the Cadet Honor Code."  (USCC Pam 15-1 ¶ 601.a.)  The program itself is a "reflective practicum similar to an internship in which a cadet applies acquired knowledge to a work environment under the expert supervision of a mentor."  (USCC Pam 15-1 ¶ 601.b.)

---

[1] The inception date for purposes of counting is January 7, 2010, the appointment of an Honor investigative team for Plaintiff's second honor code violation.  The completion date for purposes of counting is May 3, 2010, the date of the Superintendent's action.  Regardless, there is no prejudice that results to Plaintiff regarding counting here because he was allowed to complete the remainder of the Spring 2010 academic semester and his separation was suspended.  (AR 32)

a.      The HMP program "is six months from the time of receiving mentorship appointment orders.  Successful remediation is an objective [sic] evaluation and is not based solely on completion of requirements.  If a cadet is clearly not remediating, the program may be terminated early at the request of the mentor."[2]  (USCC Pam 15-1 ¶ 603.g.)

b.      The HMP program progresses in four steps: 1) admission; 2) reflection; 3) rehabilitation; and 4) restoration.

c.      "Step one of any rehabilitative program is to identify and understand the problem.  This step is critical for future success in moral-ethical growth and development.  The Cadet must address the character flaws that led to a violation of the Cadet Honor Code."  (USCC Pam 15-1 ¶ 602.a.)

d.      "Successful completion of this [Honor Mentorship] program is mandatory for all cadets found in violation of the Cadet Honor Code and given discretion by the Superintendent.  Failure to successfully complete the Honor Mentorship Program results in the Superintendent vacating the suspension and separating the cadet immediately."  (USCC Pam 15-1 ¶ 603.a.)  The regulation establishes no processing guidelines for vacating a suspended separation or removal from the HMP program.  (USCC Pam 15-1, Chapter 6)

e.      A mentored cadet is required to develop their own "character development plan."  (USCC Pam 15-1 ¶ 605.a.)  Also, a mentored cadet must receive counseling from his mentor.  (USCC Pam 15-1 ¶ 605.b.)

-------

[2] The regulation misuses the term "objective."  In context, the regulation unequivocally calls for a subjective assessment of a cadet's progress in the HMP as well as the objective component to successfully complete certain requirements contained in para. 605.

      f.      Another requirement for HMP completion is the completion of a journal.

(USCC Pam 15-1 ¶ 605.c.)  The journal requirements are:

**c. Journals.** The purpose of the journal is to reinforce the reflective and rehabilitative processes. The journal allows the mentored cadet to document actions and reflect upon the associated thought processes behind those actions. The journal will also provide a good opportunity to discover personal habits that relate to moral decision-making. The journal is not a diary, but directed reflection on topics/issues by the mentor.

(1) Format. There is no set format or length for journal entries; however, a page typed is the recommended length. They will be legible and maintained in the portfolio.

(2) Frequency. The mentored cadet will make journal entries at least twice a week.  They will pre-plan their entry days on the planning calendar, continue journal entries over the holidays, and while away from West Point. If a mentored cadet falls behind, he/she may journal three times per week but no more than three per week is authorized. In addition, a mentored cadet is not authorized to finish the program early by submitting extra journal entries to reach 48 entries.

(3) Content. The mentored cadet should write down brief descriptions of events that stimulated or challenged the sense of morality. The mentored cadet should record what confronted him/her, what action(s) taken, *and what the cadet was thinking at the time.* The issues do not need to be tremendously significant. A small argument with a roommate can provide many opportunities for reflection upon one's values and leadership dimensions. As time progresses, the mentored cadet should record efforts to alter his/her behavior to break "bad" habits. This will serve to heighten awareness during normal experiences and increase the likelihood that the cadet will try to modify behavior in the future. The goal is to REFLECT upon events that involve the mentored cadet's moral bearings. This should not just be a description of the mentored cadet's daily events.

(4) Review. The mentored cadet should review the journal, and provide a copy for the mentor, before seeing the mentor. During the review, the mentored cadet should examine the thought processes and search for behavioral aspects and beliefs that should change. The cadet and mentor should also look for repeated

behaviors, habits that are both positive and negative. This advance
preparation will enhance the effectiveness of each counseling
session. (USCC Pam 15-1 ¶ 605.c.)

44.   Plaintiff "showed neither the ability to identify any shortcomings he had that led

to his [Honor Code] violation[s] nor the desire to remediate any of his integrity and/or decision-

making skills to complete the HMP."  (AR 11)

      a.   Plaintiff did not timely schedule an inbrief.  (AR 11)  The inbrief initiates

the HMP and is a requirement.  (USCC Pam 15-1 ¶ 603.c.)  This caused a delay in beginning the

program.  (AR 11)  In other words, Plaintiff's failure prevented the mentor from beginning the

program and working with Plaintiff over the summer.

      b.   Due to the delay, Plaintiff's mentor offered Plaintiff the opportunity to

participate with him over the summer and received no response.  (AR 11)

      c.   It took Plaintiff three weeks into the fall semester prior before he

contacted his mentor to begin the program.  (AR 11)

      d.   Plaintiff did not complete his character development plan.  (AR 11)

      e.   Plaintiff did not turn in a journal entry until October 6, 2010.

45.   Plaintiff wrote nine (9) short journal entries.  Journal entries are required twice

per week to complete the program.  (USCC Pam 15-1 ¶ 605.c.(2))  If a cadet falls behind, he can

make up entries but no more than three per week are authorized.  (USCC Pam 15-1 ¶ 605.c.(2))

46.   Plaintiff stated, in part, the following in his journal entries:

Prior to this point I was told that an officer's word is his bond.
Frankly, I felt like I was just lied to twice by the Dean.  Over time
this has lead to a deficit of trust between myself and West Point.
Without trust there is no accountability and without accountability
there is no leadership.  Now I know that an Officer's bond is

something that is in writing and is signed, initialed and dated. (AR 28)

Nearly every day here we are reminded of Duty, Honor, Country and the importance of being a leader of character.  I was just lied to by a One Star General. This apparent blatant hypocrisy has tainted my view of West Point so badly that any mention of Duty, Honor, Country makes me nauseous.  Honestly, I can say that's the real issue right there. I do not trust West Point right now and I honestly don't know if I want to be a part of an organization like that.  (AR 28)

My whole image of West Point was destroyed and frankly anytime I heard the words duty, honor, country or anything reflecting to the honor code I wanted to vomit.  I just had a One Star General lie to me about being able to go on this program and now it seemed like I was stuck at West Point, in the Army for the next ten years of my life, and I was just being told to move on. (AR 29)

It is within this context that I committed and [sic] honor violation. On around October 27 I tuned in an English paper that was not my own. I admit that was the wrong thing to do.  At that time and still to this day I feel as though the contract between West Point and myself was broken.  It was broken when I committed the next ten years of my life based upon a lie.  (AR 29)

So after that I came back to West Point, and frankly right now if someone were to ask me "Do you want to be at West Point right now?" I would probably respond no.  I had an honor violation, yes, but at this point I still cannot get over the fact that I signed ten years of my life away based on a lie.  Probably one of the most distressing aspects about West Point is that the Academy will never admit a mistake.  It is like dealing with the Papacy.  This is the one thing preventing me from moving on.  This trust deficit is a two way street and I will do all the work alone.  I'm an incredibly talented individual and I know I'd make a great officer, but at this point, I don't even know if I want to do that.  I will walk around with my scarlet US brass and be your Hester Prynne but the ball is in your court USCC. (AR 30-31)

47.    After reading Plaintiff's journal entries Plaintiff's mentor concluded, "Alan is an

intellectually bright person, but I do not feel he will ever adhere to either the code or the spirit of

the code here at West Point.  My opinion is based upon being a former cadet honor representative, five years as an Assistant Professor here at the Academy and over twenty-five years of service in the Army."  (AR 11)

48.     On October 22, 2010, the Special Assistant to the Commandant for Honor Matters reported his assessment and recommendation regarding Plaintiff's participation in the HMP. (AR 23)

a.     He stated, "Upon returning to the Academy for the Fall Academic Semester, he was directed to begin active work on the Honor Mentorship (HMP) requirements. For the seven weeks CDT Spadone is to have been actively working (2SEP10 to 22OCT 10) in HMP, he has neglected to submit any journals that meet the intent of reflection outlined in HMP, [n]or has he began work on any other HMP requirement.  Furthermore, CPT Spadone's mentor, LTC John Billie, believes that he has unresolved issues that will prevent him from being able to participate in the program.  Additionally, CPT Spadone's TAC [Tactical Officer] reported that he was cleared by a professional at behavioral health, who stated that CPT Spadone cannot contribute [sic] his actions to any mental condition."  (AR 23)

b.     Based on this, MAJ Dougherty recommended "to process a packet recommending the vacation of CDT Spadone's Suspended Separation Status due to his failure to complete HMP requirements."  (AR 23)

49.     On October 28, 2010, Plaintiff's Tactical Officer, the first military commissioned officer in his chain of command, counseled Plaintiff on the reasons he was considered as an HMP failure.  (AR 21)

a.     Plaintiff's Tactical Officer told him:

Your activity in the Honor Mentorship Program up to this point leads me to consider you an HMP failure. Both your honor mentor and myself believe that your participation in the program is a failing effort due to your inability to move beyond issues from your past as well as your refusal to live up to expectations of you as a member of the program.  Reason 1: You were told to begin the HMP process last semester well before you left USMA for the summer and you did not. Reason 2: You refused to don the US brass insignia which you were ordered to do as part of your HMP.[3] Reason 3: Upon return to USMA this semester, you again failed to begin the program for over a month until [I] directed you to do so by me.  Reason 4: Upon reading your first several essays, you seem intent on ensuring others receive blame for what you feel are their flaws prior to moving past what you have done, For example, your essays are made up of bearly [sic] 5,000 words of which less than 50 addressed your honor case. The remainder simply addressed the actons [sic] of others, none of which justifies you having cheated twice. You also compared being denied the ability to go overseas for one semester to being a victim of rape which brings your perspective on the matter into question. These actions leave both your HMP mentor, LTC Billie of your choosing, and myself convinced beyond any doubt that you are unwilling to progress in the HMP.  (AR 21)

      b.      Plaintiff agreed and offered no additional comment.  (AR 22)

49.      On November 19, 2010, the Staff Judge Advocate conducted a legal review and recommended revoking the suspension of Plaintiff's separation.  (AR 20)

50.      On November 30, 2010, the Superintendent determined that Plaintiff violated the terms of his suspended separation and revoked his suspension.  (AR 16-18)  He also suspended Plaintiff from the academy at that time.  (AR 18)

51.      On December 10, 2010, Plaintiff's attorney submitted matters for the Superintendent to consider.  (AR 12-15)  These matters asked the Superintendent to reconsider

---

[3] The U.S. Brass insignia represents a reduction in Cadet rank during Plaintiff's enrollment in the HMP.

his decision.  The sole basis for Plaintiff's objection was that "[t]he separation of Cadet Spadone

for a purported violation of the HMP is arbitrary and capricious, an abuse of discretion, and not

in accordance with the law."  (AR 12)

52.     On December 20, 2010 through January 15, 2011, the chain of command

provided their recommendations for the Superintendent regarding his Plaintiff's request for

reconsideration. (AR 9)  Plaintiff's tactical officer concluded,

> My interactions with Cadet Spadone over the last year and half
> lead me to distrust him and his judgment I feel that that [sic] Cadet
> Spadone would be a potentially hazardous liability to his future
> chain of command. He has displayed a continuing downward spiral
> of personality issues which include suicidal acts and intentions, a
> lack of a functioning grasp of reality, and an inability to move
> beyond what most observers consider to be inconsequential events.
> I distrust him to the extent that I would not allow him to be armed
> given the reasons expressed above.
> . . . .
> CDT Spadone has displayed a pattern of misconduct since being
> enrolled into the Honor Mentorship Program (HMP). Namely, he
> failed to comply with orders by refusing to begin the HMP until
> several months after being enrolled, failing to wear the rank
> assigned to him while in the HMP, and failing to submit HMP
> requirements until several months overdue. Also, on 20 DEC 10,
> during a phone conversation with CDT Spadone, I gave him orders
> not to return to West Point which he disobeyed. (AR 9)

53.     On February 21, 2011, the Staff Judge Advocate conducted a legal review.  (AR

7-8)  He noted, "Subsequent to your signing these 30 November 2010 memoranda, matters were

received from Cadet Spadone's psychiatrist, from his Honor Mentor, and from his attorney

(TABS C, D, and E, respectively)"  (AR 8)  To date, only so much of your 30 November 2010

memoranda as concluded that Cadet Spadone has violated the terms of his suspended separation,

as immediately suspended Cadet Spadone from USMA, and as ordered that Cadet Spadone's pay

and allowances be stopped upon his departure from West Point, has been enforced. This limited

enforcement is due to the receipt of the additional matters mentioned . . . above." (AR 8)  The

Staff Judge Advocate recommended, "that you [the Superintendent] vacate the suspension of

Cadet Spadone's separation, and discharge him from the Army with an Honorable Discharge

certificate under the provisions of AR 612-205, Table 3, Rule 9, and the Delegation of

Separation and Discharge Authority for USMA memorandum, dated 5 March 2007, and its

enclosures." (AR 8)

     54.     On March 7, 2011, the Superintendent reconsidered his initial decision. (AR 4-6)

After considering all the evidence, including the matters submitted on Plaintiff's behalf the

Superintendent concluded, "I reaffirm that Cadet Spadone has violated the terms of his

suspended separation by his failure to complete the requirements of the USMA Honor

Mentorship Program." (AR 5)  Further, he stated, "A copy of the entire case file, including the

summarized record of the honor proceedings and a copy of the USMA Honor Mentorship

Program requirements, will be forwarded to Headquarters, Department of the Army, with a

recommendation that Cadet Spadone be separated from USMA, transferred to the United States

Army Reserve in the grade of E-3 for two years, and ordered to active duty for two years, in

accordance with AR 612-205, Table 3, Rule 6." (AR 6)

     55.     The Assistant Secretary of the Army (Manpower and Reserve Affairs) approved

the Superintendent's recommendation on August 23, 2011. (AR 3)

     56.     The Army issued orders on September 2, 2011 requiring Plaintiff to report for

Advanced Individual Training on October 10, 2011. (AR 2)  Those orders were amended and he

is now required to report on April 23, 2012. (AR 1)

Respectfully submitted,

RONALD D. MACHEN, JR., D.C. Bar # 447889
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

By: _____/s_____
DANIEL J. EVERETT
Special Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
daniel.everett@usdoj.gov
(202) 353-9895 / fax (202) 616-5200

Of Counsel:
Major Jacob Wolf
Litigation Attorney
U.S. Army Litigation Division
9275 Gunston Road
Fort Belvoir, Virginia 22060-5546
(703) 693-1014